**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

|  |  |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>        **Plaintiffs,**<br>**v.**<br><br>**X.AI and MZX TECH LLC**<br><br>        **Defendants.** | **No. 3:26-cv-00074-MPM-JMV** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED PER L.R. 7(b)(6)(A)**

**TABLE OF CONTENTS**

INTRODUCTION......................................................................................1

I.    BACKGROUND ...............................................................................2

      A.    The Clean Air Act requires operators to prevent harmful air pollution..........2

      B.    Defendants constructed the Colossus Gas Plant without any permits and
            operated it without necessary pollution controls. ..........................................4

      C.    The Colossus Gas Plant poses dangers to public health and welfare. ............6

II.   STANDARD OF REVIEW ..............................................................8

III.  ARGUMENT....................................................................................9

      A.    Plaintiffs have standing to bring this lawsuit...............................................9

      B.    The Court has statutory jurisdiction over this Clean Air Act citizen suit.....12

      C.    A Preliminary Injunction is warranted to protect Plaintiffs from the
            unpermitted and uncontrolled pollution of the Colossus Gas Plant..............13

            1.   Plaintiffs are likely to succeed in establishing
                 Defendants are violating the law...............................................13

                 a.   Claim 1: Defendants lack the necessary preconstruction
                      permit to build and operate the Colossus Gas Plant. .......................13

                 b.   Claim 2: Defendants lack the permits to build and operate
                      the Colossus Gas Plant as a major stationary source. .......................15

            2.   Defendants' excuses for shirking air pollution permit, control,
                 and monitoring requirements do not withstand scrutiny........................17

                 a.   The turbines of the Colossus Gas Plant are not
                      "mobile sources."......................................................................17

                 b.   Whether the turbines are "temporary" is irrelevant. ...................19

            3.   Plaintiffs face a substantial threat of irreparable harm. .........................21

            4.   The balance of harms tips decisively in Plaintiffs' favor. .....................23

            5.   An injunction is in the public interest....................................................25

      D.    Waiver of bond is appropriate here............................................................25

IV.   CONCLUSION ...............................................................................26

In Southaven, Mississippi—a community already burdened by air pollution—Defendants built their Colossus Gas Plant to power xAI's nearby data center. Following the "move fast and break things" business model, the companies built their network of massive gas-fired turbines without any air pollution permits or the necessary pollution controls. Defendants certainly built their Plant fast, but in doing so they betrayed the community—and broke the law.

New sources of air pollution pose new risks to the health and welfare of those communities most likely to bear the brunt of environmental and climate decisions, frontline and fenceline neighborhoods. That's why the Clean Air Act requires operators to get permits that set pollution limits *before* they build their facility, and then to operate it in accordance with those permit limits. Without controls, the Colossus Gas Plant's turbines can emit *ten times* the amount of nitrogen oxides pollution they should under the Act, contributing to increasing risks of heart disease, lung disease, and premature death in the surrounding neighborhoods where Black and other frontline communities live, including members of Plaintiffs NAACP and NAACP MS.

The Clean Air Act's permitting system is not "red tape" that operators can cut to save time and money; it is a safety belt that protects the lives and livelihoods of surrounding communities. But, disregarding neighbors' health and the Act's plain requirements, Defendants continue to expand the Gas Plant's capacity without air permits, pollution controls, emissions monitoring, or community involvement, trading public health for speed in their race to market.

Only an injunction prohibiting operations can protect the community and prevent illegal harms as the Clean Air Act demands. The law requires permits and controls; Defendants don't have them. The Gas Plant causes imminent and irreparable harm each day it operates, disrupting the lives of community members and exposing them to illegal pollution. This Court should

1

enjoin the Colossus Gas Plant's operation until Defendants obtain the permits and implement the pollution controls that federal and state laws require.

## I. BACKGROUND

### A. The Clean Air Act requires operators to prevent harmful air pollution.

More than 50 years ago, Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare" of communities like those living near the Colossus Gas Plant. 42 U.S.C. § 7401(b)(1). In it, Congress directed EPA to establish air quality standards,[1] which State permitting authorities would work to attain and maintain as they managed regional development. Setting the paradigm for cooperative federalism, the Clean Air Act then allowed States to develop their own regulations—"State Implementation Plans"—to implement the Act's protections. 42 U.S.C. § 7407(a). State Implementation Plans must be at least as stringent as the federal template, and once approved by EPA, they become federally enforceable under the Clean Air Act. 42 U.S.C. §§ 7413, 7604. EPA has approved the Mississippi State Implementation Plan (SIP). 40 C.F.R. § 52.1270(c)–Table 1.

Congress in its statute and Mississippi in its SIP recognized that all *new* stationary sources of air pollution pose *new* and additional risks to the health and welfare of downwind communities. As such, before constructing a new source of air pollution, owners and operators must apply for permits that establish pollution limits, and then they must install and operate the necessary pollution controls to ensure the source keeps its pollution below those limits. There are two distinct permitting requirements at issue here:

---

[1] Called the National Ambient Air Quality Standards (or NAAQS). 42 U.S.C. § 7409(b)(1).

**1. New Source Construction Permits**. All new stationary sources of criteria pollutants—including nitrogen oxides ($NO_x$) and fine particulate matter ($PM_{2.5}$)—must apply for and obtain permits prior to construction and operation unless specific, enumerated exemptions apply. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013). "Stationary source" is defined as "any building, structure, facility, or installation which emits or may emit regulated air pollutant(s)." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013). Permits to construct include emissions limitations based on Clean Air Act requirements. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (10) (2013). Any later issuance of a permit from the Mississippi Permit Board "does not release the permittee from liability for constructing or operating air emissions equipment" without first obtaining a permit to construct. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (7) (2013).

**2. New Source Review Permits for Major Sources of Criteria Pollutants**. The Clean Air Act's New Source Review program requires new "major" sources of criteria air pollutants to obtain permits and comply with stringent emission limits that reduce pollution in order to "protect public health and welfare from any actual or potential adverse effect" from that air pollution. 42 U.S.C. § 7470(1). These strict limits are referred to as "best available control technology" or "BACT," and are defined as "an emission limitation" that restricts pollutant discharges "on a continuous basis." *Id.* §§ 7475(a)(4), 7479(3), 7602(k). Set case-by-case, BACT must achieve the maximum pollution reduction possible considering "energy, environmental and economic impacts and other costs." *Id.* § 7479(3). The BACT requirement reflects Congress' design to "prevent" the "deterioration" of air quality, 42 U.S.C. §§ 7470–7492, so BACT limits must be set by permits *before* the new source is constructed, *id.* § 7475(a)(1), and the source must comply with the limitation during its operations thereafter. *Id.* § 7475(a)(4). No such permit can be issued for a new major source unless the owner or operator of the facility demonstrates

3

through air modeling that the facility will not cause or contribute to air pollution in excess of regional air quality standards, *id.* §7475(a)(3). Operators must establish air quality monitoring to track the facility's air pollution impacts. *Id*. § 7475(a)(7); *see also* 40 C.F.R. §§ 51.166(k), (m).

**B. Defendants constructed the Colossus Gas Plant without any permits and operate it without necessary pollution controls.**

In July of 2025, MZX Tech, a subsidiary of xAI, acquired property at 2875 Stanton Road South in Southaven, DeSoto County, Mississippi.[2] On July 25, the Vice President of Operations for xAI informed the Mississippi Department of Environmental Quality (MDEQ) of Defendants' "plans to build energy resources at our property in DeSoto County," beginning with unpermitted, "temporary" gas-fired turbines.[3] The turbines would provide fast power to xAI's Colossus 2 data center, xAI's second data center in Shelby County, Tennessee, a mile away.

Four days later, on July 29, MDEQ claimed in a two-paragraph letter that xAI's turbines were "exempt" from permitting requirements because they were "[1] 'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer) and [2] 'temporary' as it is intended for each to remain on-site (2875 Stanton Road South; Southaven, MS) for less than twelve (12) months."[4] In the meantime, MZX Tech stated that it would apply for air permits for a different set of turbines intended for future use at the site.[5]

---

[2]  *See* Public Records Collection, Ex. A. (Al-Zhyri Decl.) attaching Ex. A-3 (Deed).

[3]  Ex. A-4 (July 25, 2025 xAI Update).

[4]  Ex. A-5 (MDEQ's Determination Letter).

[5]  On August 22, 2025, MZX submitted a permit application proposing a different turbine fleet (and pollution controls) for the site, then revised its application on January 14, 2026. MDEQ issued MZX a permit on March 11, 2026. *See* Ex. A-18 (Amended PSD Air Permit Application) and Ex. A-25 (PSD Air Permit), respectively.

4

By August 1, 2025, Defendants had begun constructing gas-fired combustion turbines each the size of a single-family home at the Southaven property.[6] By the end of August, 18 gas-fired turbines had been built on site. By November, all 18 were powering xAI's data center.[7] And by December, Defendants had installed 9 more turbines, bringing the Plant's total to 27.[8]

Early community opposition to xAI's developments in the Memphis Area had publicly highlighted that residents and surrounding NAACP community members were concerned with the company's apparent circumvention of the law and disregard for public health. *See, e.g.*, Ex. G (Tipton Decl.) at ¶¶ 9, 10. Defendants met the same local opposition to their installation of gas-burning turbines without first inviting public participation in Southaven. On February 13, 2026, Plaintiffs issued a Notice of Intent to Sue, detailing Defendants' failures to follow Clean Air Act requirements, and underscoring the burdens those violations foist on frontline communities and neighbors that may be particularly vulnerable to risks posed by increased air pollution—like NAACP and NAACP MS's members living in the surrounding area.[9]

Aerial photographs from March 3 confirmed that 27 turbines were still on site at Defendants' Colossus Gas Plant in Southaven.[10] These 27 turbines have a combined generating capacity of at least 495 MW—enough to power 400,000 homes.[11]

On March 11, MZX Tech obtained a Prevention of Significant Deterioration (PSD) permit to build and operate a *different* fleet of gas turbines—complete with (at least some)

---

[6] Ex-A-11 (Nov. 25, 2025 Trinity Update).

[7] Ex. A-10 (Nov. 5, 2025 Trinity Update) at 2.

[8] Ex. A-13 (Dec. 11, 2025 Trinity Update).

[9] *See* Ex. A-21 (Notice of Intent).

[10] Ex. A-23 (March 3, 2026 Satellite Photo).

[11] Ex. A-13 (Dec. 11, 2025 Trinity Update); Eng. Analysis, Ex. H (Laufenberg Decl.) ¶ 7.

5

mandatory pollution controls.[12]

By April 14, 2026, over two months after Defendants received the NOI, aerial photographs revealed the construction of six additional turbines, all added after March 3.[13]

All of the configurations of turbines onsite—from 18 to 27 to 33—required Clean Air Act permits prior to construction, best available control technology to limit pollution during operations, and emissions monitoring for pollution tracking and transparency. Defendants have not obtained a single air permit for these turbines or otherwise complied with the Clean Air Act requirements at any point from installation to now.

### C. The Colossus Gas Plant poses dangers to public health and welfare.

The combustion turbines at Defendants' facility emit pollutants known to negatively impact human health, including nitrogen oxides ($NO_x$), fine particulate matter ($PM_{2.5}$), and carbon monoxide (CO). These pollutants have been regulated as dangerous for generations, and Black and frontline communities and vulnerable populations—like Plaintiffs' members in the area—face greater risks and bear a greater health burden from such pollution.[14]

Nitrogen dioxide ($NO_2$), a significant component of $NO_x$, can irritate airways and lead to short-term respiratory symptoms and susceptibility to allergens, as well as long-term conditions like cardiovascular disease, respiratory disease, or even premature mortality.[15] $NO_x$ also reacts with other chemicals in the air to form both $PM_{2.5}$ and ozone, and it is a primary cause of smog. Among other harmful health effects, ozone irritates people's lungs and causes asthma attacks.[16]

---

[12]  *See* Ex. A-25 (PSD Air Permit).

[13]  *See* Ex. A-29 (April 14, 2026 Satellite Photo); Ex. H (Laufenberg Decl.) ¶ 25.

[14]  *See* Public Health Review, Ex. I (Suh. Decl.) ¶¶ 61–68.

[15]  *See id.* ¶ 34-44.

[16]  *See, e.g., Health Effects of Ozone Pollution*, ENV'T PROT. AGENCY, published on EPA.gov [https://perma.cc/4P3V-Q7BE] (last updated May 23, 2025).[17]  *See* Ex. I (Suh Decl.)

Like $NO_2$, $PM_{2.5}$ exposure increases the risks of lung disease, heart disease, and even premature death in downwind communities.[17] Importantly—and as courts have recognized, "there is no safe level below which $PM_{2.5}$ is not harmful." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 773 (E.D. Mo. 2019), *aff'd in part, rev'd in part on different grounds and remanded*, 9 F.4th 989 (8th Cir. 2021). Indeed, "*any* incremental increase in $PM_{2.5}$ exposure produces an incremental increased risk of mortality and other health effects in the population exposed to" that pollution. *Id.* at 774 (emphasis added).

Carbon monoxide—still another pollutant emitted by the Gas Plant—adversely affects human health by reducing the amount of oxygen transported in the bloodstream to critical organs, like the heart and brain.[18]

When it consisted of 27 turbines, the Colossus Gas Plant had the potential to emit 1,732.71 tons of $NO_x$ per year, 588.26 tons of CO, and 181.62 tons of $PM_{2.5}$, among other pollutants.[19] Even then, it ranked as far-and-away the largest industrial source of $NO_x$ in the 11-county Memphis Metropolitan Statistical Area.[20] Now with 33 turbines, the Gas Plant has the potential to emit a staggering 2,507.96 tons of $NO_x$ per year, 837.08 tons of CO, and 236.36 tons

---

¶¶ 21–32; *Health and Env't Effects of Particulate Matter (PM)*, ENV'T PROT. AGENCY, [https://perma.cc/S5EY-5DXN] (last updated May 23, 2025).

[17] *See* Ex. I (Suh Decl.) ¶¶ 21–32; *Health and Env't Effects of Particulate Matter (PM)*, ENV'T PROT. AGENCY, [https://perma.cc/S5EY-5DXN] (last updated May 23, 2025).

[18] *See Basic Information about Carbon Monoxide (CO) Outdoor Air Pollution*, ENV'T PRO. AGENCY , [https://perma.cc/37NM-W34U] (last updated June 17, 2025).

[19] Ex. H (Laufenberg Decl.) ¶¶ 11, 23.

[20] For comparison, the next largest industrial $NO_x$ source emitted 743 tons in the most recent reporting year. *Cf.* 2020 National Emissions Inventory (NEI) Data, ENV'T PROT. AGENCY (2020), [https://perma.cc/N6MM-NN6X]; Ex. H (Laufenberg Decl.) ¶ 23.

of PM$_{2.5}$.[21] Of the 33 turbines on site, only the 14 smallest are equipped with appropriate controls to reduce emission of smog-forming pollutants; the larger models are not.[22]

Emissions from the Colossus Gas Plant contribute to already high levels of air pollution in DeSoto County and neighboring Shelby County, Tennessee, both of which received an "F" from the American Lung Association for ozone pollution in 2026.[23] And as ozone formation increases during the upcoming summer months, Defendants' operations of the unpermitted Plant pose an urgent threat to the city's air quality.

## II.  STANDARD OF REVIEW

To obtain a preliminary injunction, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also City of El Cenzio, Tex. v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (setting forth elements). When an injunction is sought pursuant to a federal statute, a court's exercise of its equitable discretion is "conditioned by the necessities of the public interest which Congress has sought to protect." *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir. 1981). In enacting the Clean Air Act, Congress determined that "the public interest required that substantial measures be taken to combat the deleterious effects of air pollution." *City of Painesville,* 644 F.2d at 1193.

---

[21]  Ex. H (Laufenberg Decl.) ¶¶ 11, 31.

[22]  *Id.* ¶¶ 15–16, 20.

[23]  *See* "State of the Air: 2026 Report," AM. LUNG ASS'N (2026) [https://perma.cc/5R2W-VEAX] at 108 (Grade for Desoto County, Miss.) at 146 (Grade for Shelby County, Tenn.).

### III.    ARGUMENT

Defendants' violations of the Clean Air Act warrant a preliminary injunction to protect the public health and welfare—to give NAACP and NAACP MS members in Southaven and other downwind communities in the Memphis area the benefit of the statutory protections Congress enshrined in the Clean Air Act half a century ago. Plaintiffs have standing to bring this lawsuit, this Court has jurisdiction over this case under the statute, and this Court should enter an injunction prohibiting the operation of the Colossus Gas Plant.

### A.    Plaintiffs have standing to bring this lawsuit.

An organization has associational standing to file suit where (1) at least one member would otherwise have standing, (2) the interests at stake in the litigation are germane to the organizations' purposes, and (3) neither the claims asserted nor the relief requested requires an individual member's participation in the suit. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000). An organization's member has standing where they face (1) an actual or imminent injury in fact that (2) can be traced to the defendant's conduct and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, at least one member of each NAACP and the NAACP MS suffers an injury traceable to the unlawful construction and operation of the turbines, injuries that would be redressed by favorable relief. *Cf. Lujan* 504 U.S. at 560-61.

The existing Colossus Gas Plant poses actual and imminent harms to Plaintiffs' members in the surrounding area, some of whom live less than a mile from the Gas Plant's unpermitted smokestacks. Plaintiffs' members Stephanie Norvell, Robert Tipton, Khadijah Sheard, Tracy Thornton, and Tiffany and Adrian Millsap live, work, garden, attend church, volunteer—

*breathe*—in neighborhoods adjacent to Defendants' Gas Plant.[24] The Gas Plant's operations have upended their lives with new fears, lost sleep, and changed routines. And MZX Tech's own air quality studies underscore the threats these turbines pose to downwind communities. MZX's future facility in Southaven—that fleet of turbines Defendants *did* bother to permit—will emit almost 425 tons of $NO_x$ pollution per year.[25] But even at that level—less than *a quarter* of the $NO_x$ potential posed by the fleet that is operating right now—MZX Tech projected facility pollution would exceed the "significant impact levels" used in permitting assessments as far as 20 kilometers away from the stacks.[26]



Under that threatening "red blob" of dangerous air quality impacts MZX projected for its future facility with a *fraction* of the pollution lie the homes and churches of Plaintiffs' members, including those of the standing witnesses in this case. So, members of Plaintiffs' organizations "[sit] squarely in the discharge zone of [the] polluting facility" currently operating at the same address. *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000); *see also Texans United,* 207 F.3d at 793 (finding traceability where unlawful emissions

---

[24]  *See* associated declarations, attached at Exhibits B–G.

[25]  Ex. A-15 (Trinity Modeling Report) at 28.

[26]  *Id.* at 69.

reach plaintiff members' residences); *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1245 (10th Cir. 2021) (holding a person injured by air pollution has standing under the Clean Air Act "to seek a remedy from a defendant that emits the injurious pollutant in the geographic vicinity of where the person is injured" and collecting cases).

Of course, the pollution emitted by the existing Colossus Gas Plant need not exceed the "significant impact levels" used in certain permitting steps to cause actual and imminent harms. At any level, increased exposure to air pollution like the pollution emitted by the Gas Plant increases risks of negative health effects, especially for children, older adults, and people with pre-existing cardiovascular and respiratory disease. *See* Ex. I (Suh Decl.) ¶¶ 16-20; 61–68. Even short-term increases in exposure are associated with increased rates of hospital admissions for heart failure, stroke, arrhythmia, and respiratory disease, and even premature death. *Id.* ¶¶ 24, 43, 55-56. Moreover, Plaintiffs' members' reasonable fear of exposure to that pollution limits their ability to enjoy their homes and communities the way they otherwise would—a "measurable intrusion" into their daily lives. *W. Va. Rivers Coal., Inc. v. Chemours Co.*, 793 F. Supp. 3d 790, 806 (S.D. W. Va. 2025); *see also, S. Tex. Env't. Just. Network v. Tex. Comm'n on Env't. Quality*, 165 F.4th 356, 366 (5th Cir. 2026) (injury in fact where individuals "allege that breathing polluted air will harm their health" and interfere with aesthetic enjoyment of places they visit).[27]

These harms would be redressed by a decision of the Court enjoining illegal operations of the Gas Plant and requiring compliance with the Clean Air Act's permitting and control requirements going forward. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528

---

[27] *See, e.g.*, Ex. E (Sheard Decl.) ¶¶ 15–17, 22–24; Ex. B (A. Millsap Decl.) ¶¶ 17, 18; Ex. G (Tipton Decl.) ¶¶ 12, 15, 16; Ex. F (T. Thornton Decl.) ¶¶ 14, 15, 17.

U.S. 167, 184–86 (2000) (recognizing injunctive relief as a form of redress for a citizen's injury from excess pollution).[28]

Finally, the members' interests are germane to the NAACP's and NAACP MS's missions, which include advocating for clean air, healthful communities, and environmental justice in Mississippi.[29] Neither the claims asserted nor the relief requested require participation by individual members. *Laidlaw,* 528 U.S. at 181. Therefore, Plaintiffs have standing.

**B.      The Court has statutory jurisdiction over this Clean Air Act citizen suit.**

The Clean Air Act's citizen suit provision authorizes citizens to sue for violations of "an emission standard or limitation" under the Act. 42 U.S.C. § 7604(a)(1). Plaintiffs must provide Defendants, and others, with at least 60 days of notice before they bring certain types of claims. *Id.* § 7604(a)(1), (b)(1)(A). Here, Plaintiffs provided notice on February 13, 2026, and filed suit 60 days later, on April 14, 2026. Thus, this Court has jurisdiction.

MDEQ's brief 2025 letter to xAI agreeing the Colossus Gas Plant was exempt from permitting does not bar this suit. Citizen suits may still proceed after state agencies determine permits are not required, *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1011–12 (9th Cir. 2002), or while agencies pursue parallel investigations. *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 469 (S.D. Tex. 2011). Just as state applicability determinations do not bar federal enforcement under the Clean Air Act, *United States v. S. Ind. Gas & Elec. Co.*, No. IP99-1692-CMF, 2002 WL 1760699, at *4 (S.D. Ind. July 26, 2002), they do not shield operators from citizen enforcement. If they did, it would frustrate the very purpose of the citizen suit provision. *Ass'n to Protect Hammersley*, 299 F.3d at 1011–12.

---

[28]   *Cf.*, *e.g.*, Ex. B (A. Millsap Decl.) ¶ 24; Ex. D (Norvell Decl.) ¶ 23.

[29]   Ex. G (Tipton Decl.) ¶¶ 3, 17; Ex. E (Sheard Decl.) ¶¶ 4, 13; Ex. C (T. Millsap Decl.) ¶ 5; Ex. F (Thornton Decl.) ¶ 11.

**C.      A Preliminary Injunction is warranted to protect Plaintiffs from the unpermitted and uncontrolled pollution of the Colossus Gas Plant.**

Defendants unlawfully operate an unpermitted power plant, one of the largest sources of air pollution for miles. The law and equities weigh in favor of preliminary injunctive relief to prevent further harm to the surrounding community as the Clean Air Act requires.

**1.  Plaintiffs are likely to succeed in establishing Defendants are violating the law.**

The Clean Air Act requires operators to obtain permits and control new sources of air pollution. Defendants didn't—and they continue to expand their unpermitted facility even now.

a.      **Claim 1:** Defendants lack the necessary preconstruction permit to build and operate the Colossus Gas Plant.

With but a few exceptions not relevant here, Mississippi's regulations require: [1] owners or operators of [2] "any new stationary source" [3] of criteria pollutants to [4] obtain a permit "before beginning construction." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013). This requirement applies *regardless* of whether the facility is a "major" or "minor" source of pollutants. *Id.* Moreover, even after a stationary source has obtained a construction permit, an owner or operator "cannot begin operation" until they certify construction was completed in accordance with the permit. 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (1), (3) (2013). Plaintiffs likely will succeed in establishing all four elements.

MZX Tech owns the property on which the Colossus Gas Plant was built—its name is on the deed.[30] And MZX Tech represented to the MDEQ that it was responsible for the installation and operation of the turbines in question on the site.[31] Meanwhile, xAI officers have coordinated

---

[30]  *See* Ex. A-3 (Deed).

[31]  *See, e.g.*, Ex. A-18 (Amended PSD Air Permit Application) at 4, 10.

with MDEQ and present themselves as responsible for the permitting and operation of the Gas Plant.[32] Defendants own and operate the Colossus Gas Plant.

The Colossus Gas Plant is also a "stationary source." Under the SIP, a "stationary source" is "any building, structure, facility, or installation which emits or may emit regulated air pollutant(s)." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013). The turbines at the Gas Plant are unquestionably structures that—according to their own manufacturer spec sheets—emit air pollution while operating. And the emissions stacks Defendants built to vent the pollution stand as stories-tall admissions of that fact. *See* Compl., Dkt. No. 1, at 29 fig. 5.

Next, the Colossus Gas Plant emits air pollution. The Mississippi SIP defines "[r]egulated air pollutant[s]" as, among other things, any pollutant regulated as part of the New Source Review program. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (21). The Clean Air Act defines New Source Review pollutants as any pollutant subject to the NAAQS. 40 C.F.R. § 52.21(b)(50). The Act establishes NAAQS for $NO_x$, $PM_{2.5}$, and ozone, among others. 40 C.F.R. §§ 50 et seq. The Colossus Gas Plant plainly emits regulated air pollution. Ex. H (Laufenberg Decl.) ¶¶ 11, 23, 31. Many of the specification sheets for these turbines describe their emission of $NO_x$. *See id*. at Att. 2, 3. At xAI's sister facility in Shelby County, Tennessee, the company has an operating permit for a fleet of 15 Solar SMT-130 gas turbines—the very same type as some of those installed in Southaven—which regulates their emission of $PM_{2.5}$, $NO_x$, $SO_2$, and CO.[33]

---

[32]    *See* Ex. A-5 (MDEQ's Determination Letter) (discussion of air pollution permitting directed to the "Vice President of Operations" at xAI); Ex. A-7 (Original PSD Air Permit Application) at 9, 15 (listing Dan Rowland at xAI as the Responsible Official for the facility and the Duly Authorized Representative for air permit matters); *cf United States v. EES Coke Battery*, No. 22-11191 2026 WL 498640 at *7 (E.D. Mich. Feb 17, 2026) (parent company is directly liable where it exhibits control over a facility's "environmental decision-making").

[33]    *See* Ex. A-2 (Shelby County's Colossus 1 Permit).

Finally, MZX Tech began construction of the Colossus Gas Plant without a permit. It also began operations without submitting a certification of construction as the regulations require. *Accord* 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (1), (4) (2013). To this day, Defendants have neither a construction permit nor enforceable emissions limitations constraining the Gas Plant's pollution.

"[A] showing of a substantial likelihood of success on the merits[] does not require that the movant prove his case. . . . Even some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators., USA v. City of Dallas*, 760 F. Supp. 2d 693, 696 (N.D. Tex. 2010) (citing, inter alia, *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co*., 621 F.2d 683, 686 (5th Cir. 1980) ("[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.")). Here, the law requires a permit, and Defendants don't have one. It's as simple as that.

      b.      **Claim 2:** <u>Defendants lack the permit to build and operate the Colossus Gas Plant as a major stationary source.</u>

In addition to failing to obtain the Mississippi-required preconstruction permit for *all* air pollution sources, Defendants failed to obtain the specific New Source Review permit required for its "major" source of air pollution. Pursuant to the Clean Air Act: [1] owners and operators of [2] any "major emitting facility" must [3] obtain a Prevention of Significant Deterioration permit (which would set BACT) [4] prior to construction. 42 U.S.C. § 7475(a); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) (adopting PSD regulations into Mississippi SIP). As established above, MZX Tech and xAI are the owners and operators of the Colossus Gas Plant, a stationary source which they constructed—and now operate—without *any* Clean Air Act permits. Elements 1, 3, and 4 are met here again. All that remains is whether the facility is a "major emitting facility" under the Act. There is no question that it is.

15

The Clean Air Act defines a "major" source as one that "emits, or has the potential to emit" more than 250 tons per year of a regulated criteria pollutant, including $NO_x$, CO, $PM_{2.5}$, or ozone. 40 C.F.R. § 51.166(b)(1)(i)(B). Here, the 33-turbine Colossus Gas Plant has the potential to emit over 2,500 tpy of $NO_x$, and 837 tpy of CO—several multiples of the 250 tpy threshold. *See* Ex. H (Laufenberg Decl.) ¶ 31. Because the plant is a major source of $NO_x$, it also is automatically a major source for ozone under the relevant regulations. 40 C.F.R. § 52.21(b)(ii) ("[a] major source that is major for . . . $NO_x$ shall be considered major for ozone"). As a major emitting facility, the Gas Plant was required to implement "best available control technology" to prevent its harmful emissions prior to its construction. *See* 42 U.S.C. § 7475(a)(4).

The BACT requirement is clear. EPA published its guidance on another company's BACT analysis for similar gas turbines *more than 25 years ago*.[34] More recently, Shelby County issued a permit that "require[s] BACT" for a network of 15 gas turbines at a related xAI site in Tennessee.[35] The Colossus Gas Plant at issue here consists of at least 27 operating gas turbines— many the same make and model as at the Tennessee site. There should be no doubt that the Gas Plant is a major emitting facility for which Defendants also need a major source PSD permit.

These are not mere paperwork violations. PSD permits impose stringent emissions limitations which are set (as the name implies) according to the *best available control technology*. By way of example, selective catalytic reduction systems (known in the industry as SCRs), are generally considered to set best available control technology limits for $NO_x$ pollution

---

[34] *See* Letter from Genevieve Damico, ENV'T PROT. AGENCY, ENV'T PROT. AGENCY, to Donald E. Sutton, Ill, ENV'T PROT. AGENCY (July 5, 2000) [https://perma.cc/W2ET-7LZ4] (Presented on EPA's website as "Assistance in Determining BACT for Simple-Cycle Natural Gas Turbine Peaker Project").

[35] Ex. A-2 (Shelby County's Colossus 1 Permit).

from gas turbines. In fact, SCRs are exactly what the permit requires for xAI's sister facility in Shelby County, Tennessee.[36] And as EPA reported in 2019, "commercial coal-, oil-, and natural gas–fired SCR systems are often designed to meet control targets of over 90 percent."[37] That means, by skirting the Clean Air Act permitting requirements, turbines at Defendants' Colossus Gas Plant may be emitting ten times as much $NO_x$ as they should.

### 2. *Defendants' excuses for shirking air pollution permit, control, and monitoring requirements do not withstand scrutiny.*

Defendants have suggested their Colossus Gas Plant is "exempt" from permit and control requirements because the turbines are "mobile" sources and the installation is "temporary." The first purported exemption is inapplicable; the second does not exist. In any event, it is Defendants' burden to establish the benefit of any exemption. *See*, *e.g.*, *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001); *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948).

#### a. The turbines of the Colossus Gas Plant are not "mobile sources."

The manufacturer specifications for Solar's SMT-130 turbines note that, once installed, the unit is 14 feet tall, almost 100 feet long, and weighs more than 200,000 pounds. *See* Exs. H-2 & H-3 (collecting manufacturer specification sheets for Colossus Gas Plant turbines). Defendants' Colossus Gas Plant is a network of 33 turbines (and growing)—all at least the size of the SMT-130s (the M35 turbine weighs in at more than 400,000 pounds). The turbines have all been installed on concrete pads. Ex. H (Laufenberg Decl.) ¶¶ 33-34 (noting that concrete pads are used to support more permanent structures). Nevertheless, xAI's correspondence with MDEQ in July 2025 suggests the Gas Plant is somehow exempt from air pollution permitting

---

[36] *See* Ex. A-2 (Shelby County's Colossus 1 Permit).

[37] ENV'T PROT. AGENCY, Chapter 2 Selective Catalytic Reduction, 2-1 (John L. Sorrels et al. eds, 2019) [https://perma.cc/L7A3-KKV2].

requirements because the turbines are "mobile" sources of air pollution.[38] This argument stretches the text of the Clean Air Act's mobile source provisions beyond the breaking point.

To be sure, the SIP provides an exemption for "mobile" sources, a term that is not defined by the State. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (3) (2013). But EPA regulations do define "mobile source"; it means "a motor vehicle, nonroad engine or nonroad vehicle." 40 C.F.R. § 51.50. As the Colossus Gas Plant's turbines are neither "self-propelled" nor "vehicle[s]" that carry or move anything, they are not "motor vehicles" or "nonroad vehicles." *Cf.* 42 U.S.C. §§ 7550(2) (defining "motor vehicle"); 7550(11) (defining "nonroad vehicle"). The last option— "nonroad engine"—is defined as "an internal combustion engine" that, among other things, "is not affected by sections 111 or 202 of the Clean Air Act. *Id.*; *see also* 42 U.S.C. § 7550(10). However, the turbines here *are* subject to a New Source Performance Standard ("NSPS") under Section 111 of the Act because they are gas turbines with a heat-input capacity greater than 10 MMBtu/hr. *See* Ex. H (Laufenberg Decl.) ¶¶ 6, 29; 40 C.F.R. Part 60, Subpart KKKK. As such, they are excluded from being considered "nonroad engines."[39]

Notably, the NSPS for gas turbines describes them as "stationary" because they are "not self-propelled or intended to be propelled while performing its function," even while it recognizes that that such sources "may, however, be mounted on a vehicle for portability." 91 Fed. Reg. 1910, 1914 (Jan. 15, 2026). Ultimately, there is a world of difference between the hand-held or cart-carried generators that might be used for powering construction tools—the

---

[38]  Ex. A-4 (July 25, 2025 xAI Update); Ex. A-5 (MDEQ's Determination Letter)

[39]  *See also* 40 C.F.R. § 1068.30 (excluding from "nonroad engine" those subject to NSPS); NSPS Review for Stationary Combustion Turbines and Stationary Gas Turbines (Jan. 9, 2026), 91 Fed. Reg. 1910, 1926-27 ("Historically . . . EPA has not regulated combustion turbines, even those that may be portable, as nonroad engines, but rather as stationary sources.").

natural reading of mobile "nonroad engines" *id.*—and the building-sized gas turbines Defendants installed here, each of which can power a neighborhood, and together can power a city. The Clean Air Act's provisions and EPA's regulations recognize that difference. Defendants' attempt to shoehorn their Colossus Gas Plant into the Clean Air Act's regulation of mobile sources is unavailing. Congress does not "hide elephants in mouseholes," and though the Act left the garage door open to mobile sources, it does not mean MZX can drive its power plant inside. *Accord Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

b.     <u>Whether the turbines are "temporary" is irrelevant.</u>

The turbines at the Colossus Gas Plant are attached to natural gas supply lines, water injection lines, and connected—through transformers and electrical lines—to the Colossus 2 data center. *See* Ex. H (Laufenberg Decl.) ¶¶ 33, 35. They are permanent installations for purposes of the Clean Air Act and should be permitted as such.

Even so, MDEQ agreed with xAI's letter proposal that the Colossus Gas Plant could be considered "exempt" from permitting requirements because the turbines were "temporary."[40] But neither xAI in its letter nor MDEQ in its response cite anything for the principle. *Id.*

Defendants' dreamed-up exemption for "temporary" major sources does not exist in the text of the Clean Air Act. Nor does the Act allow room to read in such a loophole. It is black-letter law that "[t]he Clean Air Act imposes strict liability on owners and operators that violate its provisions." *United States v. EES Coke Battery, LLC*, No. 22-11191, 2026 WL 498640, at *7 (E.D. Mich. Feb. 17, 2026) (citing *United States v. Anthony Dell'Aquilla Enters. & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998)). The purported "exemption" is based on nothing more than Defendants' expressed *intent* that the turbines of the Colossus Gas Plant would be "temporary."

---

[40]   Ex. A-4 (July 25, 2025 xAI Update); Ex. A-5 (MDEQ's Determination Letter).

19

Allowing such "exemptions" based on the unenforceable statements of developers would replace the Act's rigorous preconstruction permitting program with a pinky swear.

What is more, Mississippi's SIP explicitly contemplates "facilit[ies] which will be located only temporarily at a site." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (5) (2013). Far from exempting such facilities from permit requirements, the regulations note that the State's Permit Board may "issue a statewide permit or a permit for operation in multiple areas" to ensure the source controls its pollution *wherever* it is parked. *Id*.

Defendants may also try to argue that no New Source Review permit was required because it had not begun actual construction. Not so. Under the Clean Air Act, and as incorporated in the Mississippi SIP, no "new major stationary source . . . shall begin actual construction without a [PSD] permit." 40 C.F.R. § 52.21(a)(2)(iii); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2. The phrase "begin actual construction" means "initiation of physical on-site construction activities on an emissions unit which are of a permanent nature." 40 C.F.R. § 52.21(b)(11)). These activities "include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures." *Id.*

Here, Defendants have installed 33 gas turbines. They have added exhaust stacks to some turbines. They have laid concrete slabs, erected three structures (likely switch houses used to route electrical current) and installed seventeen transformers. Ex. H (Laufenberg Decl.) ¶ 33. Further, Defendants have run electric lines, gas supply lines, and water injection lines to each turbine. *Id*. Decommissioning this infrastructure would take significant time—and indicates the materials, equipment, and structures are not "temporary." *Id.* ¶ 35. These are "physical on-site construction activities" on emissions units that are "of a permanent nature." Even if Defendants eventually swap out the first set of gas turbines for a (permitted) set later, they cannot evade the

20

Clean Air Act's public health protections in the meantime. A company with a rotating fleet of gas turbines cannot be allowed perpetual exemptions on an installment plan. The size of Colossus Gas Plant and the threat it poses to public health demand control measures pursuant to the Act's New Source Review permitting program.

### 3. *Plaintiffs face a substantial threat of irreparable harm.*

Plaintiffs have suffered irreparable harm to their health and wellbeing due to pollution from the Colossus Gas Plant—and they are certain to suffer further irreparable harms in the absence of an injunction. *Accord Winter*, 555 U.S. at 22. A harm is irreparable "where there is no adequate remedy at law[.]" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "[B]reathing and smelling polluted air" constitutes an "injury-in-fact," *Texans United*, 207 F.3d at 792, that cannot be adequately addressed by legal remedies. *See Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (finding irreparable injury where a Clean Air Act violation would result in "more relaxed emission standards"). And "[e]nvironmental injury," including damage to natural resources, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987). In short, "irreparable harm . . . is obvious" where "emissions of harmful pollutants damage human health and the environment." *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (finding irreparable harm based on health impacts of pollution from unpermitted diesel generators); *see also Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 358–59 (D.D.C. 2012) (finding irreparable harm posed by potential pollution of power plant expansion).

Members of NAACP MS, who are also members of NAACP, live, work, and recreate near the Colossus Gas Plant and they are injured by the unlawful pollution resulting from

Defendants' failure to adhere to the Clean Air Act.[41] These members include Stephaine Norvell and Tracey Thornton, who live less than one mile away from the Plant.[42] Ms. Norvell is very worried that exposure to air pollution from the turbines while doing the things she enjoys—tending to her garden, grilling and hosting company on her deck, going for walks in the neighborhood—will negatively impact her health as well as the health of her husband, both of whom have survived cancer and have heart conditions. *See* Ex. D (Norvell Decl.) ¶¶ 9–10, 13. After working long shifts, Mr. Thornton prefers to spend his time at home in the garden or relaxing in his favorite spot—his renovated garage with the door open to the fresh breeze. *See* Ex. F (Thornton Decl.) ¶¶ 6–8. But he is worried the Plant's pollution will impact his sinus health and the health of his neighbors, and now keeps his door closed. *See id.* ¶¶ 14–15, 18.

Other neighbors and members of NAACP and NAACP MS who live near the Colossus Gas Plant share these concerns. Robert Tipton, President of the DeSoto County Chapter of the NAACP Mississippi State Conference, lives about five miles from the Gas Plant and likes to spend most of his time outside, but now he worries the Gas Plant's pollution will exacerbate his sarcoidosis and threatens the health of his family, friends, and fellow NAACP branch members. *See* Ex. G (Tipton Decl.) ¶¶ 6, 11, 15–16, 18. Khadijah Sheard is a registered nurse who lived less than a mile from the facility until she moved to get away from it. *See* Ex. E (Sheard Decl.) ¶¶ 6, 22. Still, her concern about increased risk of respiratory disease because of the Plant's pollution interferes with her ability to enjoy her time visiting nearby parks, volunteering with NAACP MS, and attending her local Southaven church. *See id.* ¶¶ 3, 16–18. And Adrian and

---

[41] *Accord Diesel Power Gear*, 21 F.4th at 1245 (collecting cases recognizing injuries are traceable to plaintiffs in areas near regulated pollution).

[42] *See* Ex. D (Norvell Decl.) ¶ 7; Ex. F (Thornton Decl.) ¶ 3.

Tiffany Millsap live around 5.5 miles of the turbines. *See* Ex. B (A. Millsap Decl.) ¶ 3; Ex. C (T. Millsap Decl.) ¶ 3. Since learning about the turbines, they have limited their time outside to avoid exposure, which Mrs. Millsap worries will increase her already severe allergies, and could aggravate allergy and asthma symptoms of family members when they visit. Ex. C (T. Millsap Decl.) ¶¶ 13–16; *cf. Franklin Cnty. Power*, 546 F.3d at 936 (finding "a decrease in recreational and aesthetic enjoyment" due to pollution could not be remedied by economic award).

These members' concerns are consistent with the proven health effects of short and prolonged exposure to $NO_x$, ozone, and $PM_{2.5}$—pollutants which the Gas Plant's turbines emit. *See* Ex. I (Suh Decl.) ¶¶ 24, 43, 55-56; *accord Laidlaw*, 528 U.S. at 183–84 (crediting members' reasonable concerns). Pollution increases from the Gas Plant—particularly on top of the already high levels of ozone and $NO_x$ pollution the greater Memphis area—will likely impact the health of these members and public health generally, particularly for residents facing prolonged exposures. *See* Ex. I (Suh Decl.) ¶¶ 16-20; 61-68. These members will continue to suffer irreparable harm to their health and to their enjoyment of their communities absent an injunction.

### 4. *The balance of harms tips decisively in Plaintiffs' favor.*

The balance of equities here favors protecting the health and recreational wellbeing of NAACP and NAACP MS's members—and preventing illegal air pollution throughout the region. Plaintiffs' members and the broader public breathe Defendants' unlawful pollution and live daily with the increased health risks that pollution poses. They are reasonably concerned about their health and the health of their families, and have reduced how often they do activities they enjoy, such as inviting family members to their home and entertaining outdoors, because of the pollution.[43] Where this injury is not only likely but already occurring, the balance of harms

---

[43] *See, e.g.*, Ex. C (T. Millsap) ¶¶ 14–16; Ex. G (Tipton Decl.) ¶¶ 12, 15–16, 18.

23

"favor[s] the issuance of an injunction to protect" human health and the environment. *Amoco Prod. Co.*, 480 U.S. at 545.

Moreover, where Congress has proscribed conduct, it has balanced the equities already. *Accord Burlington N. R.R. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) ("Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." (citation omitted)). Though courts need not issue an injunction in all cases, neither can they "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001).

Defendants may complain an injunction would be costly to their business. But "[t]he costs of pollution controls are a cost of doing business." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 815 (E.D. Mo. 2019), *aff'd in part, rev'd in part on different grounds and remanded*, 9 F.4th 989 (8th Cir. 2021). They began construction and operation of the now-33-turbine Colossus Gas Plant without a permit almost immediately after purchasing the property. *See supra* Section 1.B. They did so despite public opposition to and express concerns with the practice of using unpermitted gas turbines to power another xAI data center in nearby Tennessee.[44] Moreover, MZX *did* apply to permit an entirely different gas plant to be constructed on this very site. Though the permit is insufficient,[45] *that* gas plant—which promises pollution controls and emissions limitations—is the only facility that MDEQ has reviewed and considered, and it is the only one MZX is allowed to construct and operate. There is no Clean Air Act loophole that allows a company to operate one facility while it goes through the required

---

[44] *See* Ex. G (Tipton Decl.) ¶¶ 9–10 (describing community organizing against xAI's earlier development efforts in the Memphis area).

[45] Ex. A-28 (NAACP and Young, Gifted and Green's Permit Appeal).

24

permitting process for *another* facility because it can't be bothered to wait. The time and money required to review a facility's design, establish pollution limits, and install the necessary controls before operation—the time and money necessary to protect the health and welfare of downwind communities—are indelible costs of doing business. *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1194 (6th Cir. 1981) (Congress prioritized the Act even where judicial relief "would be expensive").

### 5. *An injunction is in the public interest.*

The public interest strongly favors an injunction. "Enforcement of the environmental laws is in the public interest." *Commonwealth Oil Refin. Co., Inc. v. United States Env't Prot. Agency*, 805 F.2d 1175, 1190 (5th Cir. 1986). Courts recognize preliminary injunctions requiring Clean Air Act compliance are in the public interest. *United States v. Gear Box Z Inc.,* 526 F. Supp. 3d 522, 529 (D. Ariz. 2021) ("Congress enacted the CAA to combat air pollution, which itself is a declaration of public policy."); *see also Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, No. 2:17-cv-00032-RJS-DBP, 2020 WL 4282148, at *27 (D. Utah Mar. 6, 2020) *aff'd in part and remanded on other grounds by* 21 F.4th 1229 (10th Cir. 2021).

Here, reducing unacceptable risks of breathing illegal pollution serves the Clean Air Act's purpose of "protect[ing] and enhance[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Allowing the facility to operate during litigation would reward private companies that build their own personal power plants next to homes, schools, and churches without obtaining permits and implementing controls in hopes they can just "pay a penalty" later.

### D. Waiver of bond is appropriate here.

This Court should enjoin the operation of the unpermitted Colossus Gas Plant without requiring a bond. Federal Rule of Civil Procedure 65(c) allows courts to require security in

25

instances of a preliminary injunction, but issuance and amount of such security is within the discretion of the court. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curiam)). Indeed, a court "may elect to require no security at all." *Id.* Courts elect not to require security for plaintiffs "engaged in public interest litigation." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (affirming a decision not to require a bond where the parties included a union and a welfare rights organization "seeking to protect citizens . . . from perceived adverse economic and social consequences"). This guarantees that public interest groups are not "barred from obtaining meaningful judicial review." *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13-cv-60-BO, 2014 WL 1922234, at *10 (E.D.N.C. May 13, 2014); *see also Louisiana Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv.*, No. cv25-378-JWD-RLB, 2025 WL 1787429, at *31 (M.D. La. June 27, 2025) (contrasting a case seeking equitable relief from a contractual dispute for money damages, where a bond would be more appropriate). Here, the Court should exercise its discretion and waive the bond or require only a nominal amount, consistent with courts' practices in other environmental cases. *See, e.g.*, *Wisconsin Heritages, Inc. v. Harris*, 476 F. Supp. 300, 302 (E.D. Wis. 1979) (collecting cases and waiving bond where plaintiffs were enforcing an environmental statute).

IV.     **CONCLUSION**

For the foregoing reasons, the NAACP and NAACP MS ask this Court to **GRANT** the motion for a preliminary injunction and enjoin xAI and MZX Tech from operating any of the unpermitted turbines at the Colossus Gas Plant until they obtain the necessary permits and implement the requisite pollution controls.

26

Dated: May 7, 2026                                    Respectfully submitted,

                                            _____ */s/ Carroll Rhodes* _____

                                            Carroll Rhodes (MS Bar No. 5314)
                                            MISSISSIPPI STATE CONFERENCE
                                               OF THE NAACP
                                            119 Downing St
                                            Hazlehurst, MS 39083
                                            crhode@bellsouth.net
                                            Phone: 601-894-4323

_____ */s/ Elias L. Quinn* _____                    _____ */s/ Benjamin Grillot* _____

Mary Rock (IL Bar No. 6332240)                     Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)*                                   *(Pro Hac Vice)* – Lead Counsel
Elias L. Quinn (CO Bar No. 42159)                  SOUTHERN ENVIRONMENTAL LAW CENTER
*(Pro Hac Vice)* – Lead Counsel                    500 New Jersey Ave., Suite 600
EARTHJUSTICE                                        Washington, DC 20001
D.C. Regional Office                               bgrillot@selc.org
1250 I Street, 4th Floor                           Phone: 202-828-8382
Washington, DC 20005
mrock@earthjustice.org                             Patrick Anderson (GA Bar No. 226260)
equinn@earthjustice.org                            *(Pro Hac Vice)*
Phone: 202-667-4500                                SOUTHERN ENVIRONMENTAL LAW CENTER
                                                   Ten 10th Street NW, Suite 1050
Lauren Godshall (LA Bar No. 31465)                 Atlanta, GA 30309
*(Pro Hac Vice)*                                   panderson@selc.org
Rebecca Ramirez (TX Bar No. 24126749)              Phone: 404-521-9900
*(Pro Hac Vice)*
EARTHJUSTICE                                        Elizabeth Putfark (VA Bar No. 100358)
Gulf Regional Office                               *(Pro Hac Vice)*
845 Texas Ave., Suite 200                          SOUTHERN ENVIRONMENTAL LAW CENTER
Houston, TX 77002                                  120 Garrett Street, Suite 400
lgodshall@earthjustice.org                         Charlottesville, VA 22902
rramirez@earthjustice.org                          eputfark@selc.org
Phone: 773-828-0836                                Phone: 434-977-4090

*Counsel for Plaintiffs*

27