# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MISSISSIPPI STATE CONFERENCE OF THE NAACP,** | § § § § § | |
| *Plaintiffs*, | § | Case No. 3:26-cv-00074-DMB-JMV |
| v. | § § | |
| **X.AI CORP. and MZX TECH LLC,** | § § § | |
| *Defendants.* | § | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Daniel W. Van Horn (MS Bar No. 102105)
BUTLER SNOW LLP
6075 Poplar Ave., Suite 500
Memphis, TN 38187
(901) 680-7331
danny.vanhorn@butlersnow.com

Ryan Beckett (MS Bar No. 99524)
Keri E. Herrington (MS Bar No. 106815)
BUTLER SNOW LLP
1020 Highland Colony Pkwy., Suite 1400
Ridgeland, MS 39157
(601) 948-5711
(601) 948-5177
keri.herrington@butlersnow.com
ryan.beckett@butlersnow.com

Patrick D. Traylor*
Jeremy C. Marwell*
VINSON & ELKINS LLP
2200 Pennsylvania Ave. NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com

Michael B. Buschbacher*
Taylor M. Myers*
Walker Fortenberry*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
tmyers@boydengray.com
wfortenberry@boydengray.com

*Attorneys for X.AI Corp. and MZX Tech LLC*

*\*Pro Hac Vice*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    A.    The Clean Air Act's Regulatory Regime for Stationary Sources ............................ 3

    B.    MDEQ Authorizes Temporary Portable Turbines ................................................. 4

    C.    The NAACP's "Citizen Enforcement" Action ....................................................... 7

ARGUMENT ...................................................................................................... 7

I.    The NAACP Cannot Sue on Behalf of Its Members. ............................................. 7

II.    Plaintiffs' Permit Counts (1 and 2) Fail to State Claims for Relief Under Mississippi's SIP and the Clean Air Act ................................................................ 9

III.    The Clean Air Act's Citizen Suit Provision Violates Article II of the Constitution and the Private Non-Delegation Doctrine ........................................................... 13

    A.    The Power to Prosecute Federal Public Offenses Belongs to the President Alone ................................................................................................................. 13

    B.    The Clean Air Act's "Citizen Enforcement" Provision Unconstitutionally Delegates Federal Law Enforcement Power to Private Persons ........................... 15

CONCLUSION ................................................................................................... 19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ........................................................................................21

*Alaska Dep't of Env't Conserv. v. EPA*,
540 U.S. 461 (2004) .......................................................................................................11

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................................2, 21

*Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*,
652 F. Supp. 620 (D. Md. 1987) .....................................................................................21

*Collins v. Yellen*,
594 U.S. 220 (2021) ........................................................................................................21

*Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1868) ...........................................................21

*Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*,
813 F. Supp. 1132 (E.D. Pa. 1993) .................................................................................21

*DOT v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015) ..........................................................................................................21

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ........................................................................................2, 21

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................................................21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ......................................................................................................2, 21

*United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland,
L.L.C.*, 157 F.4th 758 (5th Cir. 2025) .............................................................................21

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................................................................................21

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ..........................................................................................................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..........................................................................................................8

*Mississippi v. EPA*,
744 F.3d 1334 (D.C. Cir. 2013)......................................................................4

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*,
200 F. Supp. 2d 551 (E.D.N.C. 2001)...........................................................21

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
__ F.4th __, 2026 WL 1689717 (5th Cir. June 11, 2026)..........................2, 21

*Ohio v. EPA*,
603 U.S. 279 (2024)........................................................................................3

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) .......................................................................21

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016).........................................................................21

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)......................................................................................21

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
355 F.3d 370 (5th Cir. 2004) ..........................................................................5

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*,
165 F.4th 356 (5th Cir. 2026) .......................................................................10

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020).............................................................................1, 2, 21

*Sierra Club v. Franklin Cnty. Power of Ill., LLC*,
546 F.3d 918 (7th Cir. 2008) ..........................................................................7

*Sierra Club v. La. Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) ...............................................................3, 10, 21

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)......................................................................................1, 8

*Student Pub. Int. Rsch. Grp. of N.J., Inc. v. Monsanto Co.*,
600 F. Supp. 1474 (D.N.J. 1985) .................................................................21

*Trump v. United States*,
603 U.S. 593 (2024).....................................................................................21

*United Food & Commercial Workers Union, Local 1564 of New Mexico v
Albertson's, Inc*,
207 F3d 1193 (10th Cir. 2000) .......................................................................8

iii

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 (S.D. Ohio 2001) ...................................................21

*United States v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) ...........................................................3, 21

*United States v. Hoechst Celanese Corp.*,
128 F.3d 216 (4th Cir. 1997) ...............................................................21

*United States v. S. Ind. Gas & Elec. Co.*,
245 F. Supp. 2d 994 (S.D. Ind. 2003) .....................................................21

*United States v. Texas*,
599 U.S. 670 (2023)...........................................................................21

*Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*,
191 F. Supp. 3d 1287 (D. Utah 2016).......................................................21

**Constitutional Provisions**

U.S. Const. art. I...............................................................................21

U.S. Const. art. II .............................................................................21

U.S. Const. art. II, § 1, cl. 1 .................................................................21

U.S. Const. art. II, § 3 ........................................................................21

U.S. Const. art. III............................................................................21

**Statutes**

29 U.S.C. § 216(b) ...............................................................................8

42 U.S.C. § 7407...................................................................................4

42 U.S.C. § 7407(a) ...........................................................................3, 10

42 U.S.C. § 7409(b)(1) ...........................................................................4

42 U.S.C. § 7410..................................................................................21

42 U.S.C. § 7413(a)(1)...........................................................................21

42 U.S.C. §§ 7470–7492............................................................................4

42 U.S.C. § 7475(a)(1)............................................................................4

42 U.S.C. § 7604(a) ......................................................................1, 2, 8, 21

iv

42 U.S.C. § 7604(a)(1) ..................................................................................................21

42 U.S.C. § 7604(a)(3) ..................................................................................................21

42 U.S.C. § 7604(f) .......................................................................................................21

42 U.S.C. § 7604(g) ........................................................................................................2

42 U.S.C. § 7604(g)(1) ..................................................................................................21

Miss. Code § 49-17-17(h) ...............................................................................................4

**Regulations**

43 Fed. Reg. 26,388 (June 19, 1978) .............................................................................5

85 Fed. Reg. 10,070 (Feb. 21, 2020) ...........................................................................10

89 Fed. Reg. 86,751 (Oct. 31, 2024) ............................................................................10

91 Fed. Reg. 1,910 (Jan. 15, 2026) ................................................................................6

11 Pt. 2 Ch. 1 Miss. Code R. 2.13(D)(3) .......................................................................5

11 Pt. 2 Ch. 1 Miss. Code R. 6.7(A)(15) ........................................................................5

11 Pt. 2 Ch. 2 Miss. Code R. 2.1(D)(2) ..........................................................................4

11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) ........................................................................9, 10

11 Pt. 2 Ch. 5 Miss. Code R. 5.2 ....................................................................................4

**Other Authorities**

*About Grok*, X HELP CTR.,
     https://web.archive.org/web/20260511163650/https://help.x.com/en/using-x/
     about-grok (last visited May 11, 2026) ....................................................................3

AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) .....................10

*Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968) .........................................................8

*Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024) .......................................................8

Fed. R. Civ. P. 10(c) .......................................................................................................5

THE FEDERALIST NO. 70 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ...............21

THE FEDERALIST NO. 33 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ...............21

*Green Book: Counties Designated "Nonattainment"*,
EPA, https://www3.epa.gov/airquality/greenbook/mapnpoll.html............................................4

Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521 (2005)..........................21

Saikrishna Prakash, *The Essential Meaning of Executive Power*,
2003 U. ILL. L. REV. 701 (2003) .........................................................................................21

1 WILLIAM BLACKSTONE, COMMENTARIES....................................................................................21

**INTRODUCTION**

At one level, this is a highly technical Clean Air Act case about whether portable, temporary natural gas turbines are subject to the same burdensome permitting requirements that apply to permanent, stationary generators. They are not. Under the governing Mississippi air-quality regulations, which EPA approved and which Plaintiffs now seek to enforce, the portable temporary turbines here are "mobile sources" excluded from the construction and operation permitting requirements for stationary sources. Defendants MZX Tech LLC ("MZX") and its parent, X.AI Corp. (collectively, "Defendants"), rightly relied on the Mississippi Department of Environmental Quality's ("MDEQ") determination to that effect. Plaintiffs' permitting claims (Counts 1 and 2) thus fail.

At a more fundamental level, however, this case is about something much simpler, and more important: who gets to enforce federal law? This case was not brought by EPA or by the State of Mississippi, but by two private groups suing on behalf of their members: The National Association for the Advancement of Colored People and the Mississippi State Conference of the NAACP ("NAACP" or "Plaintiffs").

There are two problems with this. The first is statutory. The Clean Air Act says that a private plaintiff may sue "on his own behalf." 42 U.S.C. § 7604(a). A group can thus sue to "vindicate only its own interests as an organization, and not"—as the NAACP attempts here—to advance "the interests of its individual members." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.6 (1998). Plaintiffs thus lack statutory standing right out of the gate.

The second problem is constitutional. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020). Federal law enforcement power thus belongs exclusively to the executive branch. Congress typically respects this restriction. Private citizens do not,

1

for example, get to enforce federal immigration law or the tax code or virtually any other area of federal public law.

The Clean Air Act is a rare exception. It authorizes "any person" to "enforce" the Act's myriad emissions and permitting requirements against "any" other person by obtaining sweeping injunctive relief and enormous civil monetary penalties (over $120,000 per day per violation) payable to the U.S. Treasury. 42 U.S.C. § 7604(a), (g). As courts have long recognized, "citizen suit" plaintiffs are thus "private attorneys general" who in all but name "seek relief not on their own behalf but on behalf of society as a whole." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (Sutton, J.) (cleaned up).

This is unconstitutional. As the Supreme Court has explained, private citizens cannot "conduct[ ] civil litigation … for vindicating public rights." *Buckley v. Valeo*, 424 U.S. 1, 140 (1976). This is especially true when, as here, the plaintiff claims the "power to seek daunting monetary penalties against private parties"—"a quintessentially executive power" that "belongs to the President alone." *Seila Law*, 591 U.S. at 213, 219; *accord Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, __ F.4th __, 2026 WL 1689717, at *7 (5th Cir. June 11, 2026) ("The power[s] … to sanction [and] sue" are "quintessentially executive functions."). The NAACP's attempt to nevertheless act as "a self-appointed mini-EPA," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 209 (2000) (Scalia, J., dissenting), independent of the Executive Branch, therefore violates Article II of the Constitution and the private non-delegation doctrine.

Because the NAACP has not, and cannot, state a claim upon which relief could be granted, this Court should dismiss with prejudice.

**BACKGROUND**

xAI is a leading frontier AI developer and the designer and owner of the large language model known as Grok. Compl. ¶ 6, Doc. 1. Grok provides data analysis and reasoning capabilities

2

to users globally to advance human comprehension and capabilities.[1] The development and deployment of frontier AI models like Grok are critical national priorities with enormous economic competitiveness and national security implications.

To meet these demands, Defendants developed advanced computing facilities in the greater Memphis area. *Id.* ¶¶ 192–94; 217–18. MZX also acquired an industrial property at 2875 Stanton Road South in Southaven, Mississippi ("the Stanton Road site") to build a new 1.2 gigawatt single-cycle gas combustion turbine plant that will power these computing facilities. *Id.* ¶¶ 127–28.

A.      **The Clean Air Act's Regulatory Regime for Stationary Sources**

The Clean Air Act operates on a statutory framework often called "cooperative federalism." *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 560 (5th Cir. 2024). EPA establishes national ambient air quality standards ("NAAQS"), but "the primary responsibility" for meeting those standards falls on state governments. *See* 42 U.S.C. § 7407(a). The central way the states exercise this responsibility is through state implementation plans ("SIPs") for "the 'implementation, maintenance, and enforcement' of [the NAAQS] in their jurisdictions." *Ohio v. EPA*, 603 U.S. 279, 283 (2024) (quoting 42 U.S.C. § 7410(a)(1)). Once approved by EPA, the state rules included in the SIP also take on "the force and effect of federal law." *Sierra Club*, 100 F.4th at 564. Accordingly, the "Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a State Implementation Plan that the EPA has approved," regardless of what EPA's other regulations may provide. *United States v. Cinergy Corp.*, 623 F.3d 455, 458 (7th Cir. 2010) (Posner, J.). MDEQ is the state regulatory body responsible for administering Mississippi's

---

[1] *About Grok*, X HELP CTR., https://web.archive.org/web/20260511163650/https://help.x.com/en/using-x/about-grok (last visited May 11, 2026).

3

SIP and for ensuring that the state continues to comply with the NAAQS. *See* Miss. Code § 49-17-17(h).

In July 2025, MZX applied to MDEQ for a permit for the future power plant at the Stanton Road site. The Stanton Road site is located in DeSoto County, which—like the rest of Mississippi—is designated as an "attainment" area under the Clean Air Act, meaning that the local air quality currently meets or exceeds the NAAQS. Compl. ¶ 72; *see* 42 U.S.C. § 7407.[2] This means that EPA has determined that the air quality in DeSoto County is clean enough to protect even the most vulnerable populations from air-pollution harms "allowing an adequate margin of safety." *See* 42 U.S.C. § 7409(b)(1); *Mississippi v. EPA*, 744 F.3d 1334, 1345 (D.C. Cir. 2013) (noting that EPA aims to protect "sensitive populations like asthmatics").

Because DeSoto County is in an attainment area, the primary regulatory concern is preventing the significant deterioration of existing air quality, rather than forcing further emission reductions, as is required in nonattainment areas. Compl. ¶ 71; 42 U.S.C. §§ 7470–7492. Mississippi's EPA-approved SIP thus incorporates federal Prevention of Significant Deterioration ("PSD") regulations, Compl. ¶ 74; 11 Pt. 2 Ch. 5 Miss. Code R. 5.2; and it provides that MDEQ will apply these regulations to new stationary sources, Compl. ¶¶ 75–76; 42 U.S.C. § 7475(a)(1); 11 Pt. 2 Ch. 2 Miss. Code R. 2.1(D)(2); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2.

**B.      MDEQ Authorizes Temporary Portable Turbines**

To power its advanced computing facilities in the interim, Defendants asked MDEQ whether MZX could use temporary portable gas-fired combustion turbines mounted on flatbed trailers for up to one year without a stationary-source permit. Compl., Ex. B-1 (July 25, 2025,

---

[2] Mississippi is one of only 16 states to be in full attainment with all NAAQS. *See Green Book: Counties Designated "Nonattainment"*, EPA, https://www3.epa.gov/airquality/greenbook/mapnpoll.html.

email from Brent Mayo, xAI, to Jaricus Whitlock & Chris Wells, MDEQ). MDEQ evaluated the technical specifications of the proposed equipment and its intended use. On July 29, 2025, MDEQ issued a formal regulatory determination under the Mississippi SIP concluding that, because the turbine units were affixed to portable trailers and would remain in place for less than twelve months, they constituted temporary, portable sources and were therefore "mobile sources." *Id.*, Ex. B-2.[3] This is consistent with Mississippi's EPA-approved PSD and Title V permitting programs. *See* 11 Pt. 2 Ch. 1 Miss. Code R. 2.13(D)(3) (categorically excluding mobile sources from requirement to obtain permit to construct and operate); *id.* R. 6.7(A)(15) (excluding mobile sources from Mississippi Title V operating permit program). And it makes good sense, not just as a matter of ordinary language, but also of purpose: temporary use of mobile generators for a year or less is not the kind of thing that is likely to create "significant deterioration" of the regional air quality, a point confirmed by EPA's longstanding rule exempting temporary stationary sources from regional air quality modeling. *See* 43 Fed. Reg. 26,388, 26,394 (June 19, 1978) ("Temporary sources are also exempt from full PSD review, since their ambient air impacts are short-lived.").

Relying upon MDEQ's determination, MZX began deploying the temporary portable turbines in August 2025. Compl. ¶¶ 136, 209. The fleet includes multiple types of portable turbines, including SMT-130 units, an M35 unit, and several generations of TM2500 units. *Id.* ¶ 142. Defendants also engaged consultants to maintain continuous communication with MDEQ. *Id.* ¶ 136. The consultants provided MDEQ with detailed updates regarding the deployment, capacity, and emission control status of each portable turbine. *Id.* ¶¶ 136–37.

---

[3] A court may consider exhibits attached to the Complaint in evaluating a Rule 12(b)(6) motion. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004); *see also* Fed. R. Civ. P. 10(c) (exhibits attached to a complaint are deemed to be part of the complaint "for all purposes"). Plaintiffs discuss the referenced correspondence in Paragraphs 132 and 133 of their Complaint and attached copies as Exhibit B-1 and Exhibit B-2.

MZX equipped all of these temporary units with state-of-the-art emission controls. By November 2025, Defendants' consultant confirmed to MDEQ that all SMT-130 units were operating with both selective catalytic reduction and oxidation catalysts. *Id.* ¶ 137(f); *see also id.*, Ex. C-4. Simultaneously, all TM2500 units were operating with demineralized water-injection systems. *Id.* ¶ 137(f); *see also id.*, Ex. C-4. These advanced control technologies minimize emissions of nitrogen oxides ("$NO_X$") and other pollutants. As Defendants reported to MDEQ, even though these are mobile sources, the controlled emission levels for these temporary units meet or exceed the stringent federal requirements for stationary combustion sources established under EPA's New Source Performance Standards. *Compare id.*, Ex. A at 54 n.27[4] (noting that the company represented emission rates for $NO_X$ of 25 parts per million ("ppm") or less), *with* 91 Fed. Reg. 1,910, 1,925 (Jan. 15, 2026) ("The EPA finds 25 ppm to be the appropriate standard of performance for $NO_X$ emissions from temporary [stationary] combustion turbines.").

As noted above, while the temporary portable turbines supplied necessary interim power, MZX simultaneously pursued the required permit for a permanent power generation facility at the Stanton Road site. Compl. ¶ 211. MDEQ processed this permit application according to the SIP's procedural requirements and issued a PSD permit for a permanent gas plant, which will feature forty-one turbines with a total generating capacity of 1.2 gigawatts, operating under a federally enforceable emissions limit of 423.39 tons per year of $NO_X$. *Id.* ¶ 213. MZX began construction of this plant in May 2026. As permanent power generation becomes available, the temporary portable turbines will be removed. MZX currently expects to complete construction by early next year.

---

[4] All page numbers in citations to the Complaint's exhibits refer to the PageID #.

C.      The NAACP's "Citizen Enforcement" Action

On April 14, 2026, the NAACP filed this "citizen enforcement" action, Compl. ¶ 122, against Defendants, alleging that its members are exposed to air pollutants emitted from temporary portable turbines, and that those emissions are worsening what they allege to be the already poor air quality in the Memphis metropolitan area, *see, e.g.*, *id.* ¶¶ 1–5. The NAACP brings three claims under the Clean Air Act: construction and operation of a stationary source without a permit, construction and operation without a PSD permit or the best available control technology ("BACT"), and construction and operation of a major source of hazardous air pollutants ("HAPs") without complying with federal regulatory requirements. *Id.* ¶¶ 221–55. Plaintiffs seek declaratory and injunctive relief that would order MZX to halt the operation of the temporary portable turbines, install BACT, and take other mitigation actions. *Id.* at 42 (Prayer for Relief). The NAACP also seeks enormous civil penalties—over $120,000 per day per alleged violation. *Id.* And in the interim, the NAACP has asked this Court to preliminarily enjoin the ongoing operation of all of the portable, temporary gas turbines at the site. *Id.* To the best of Defendants' knowledge, such relief ordering an immediate shutdown has never been granted in any case since the Clean Air Act was enacted in 1970. *Cf. Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (upholding district court injunction prohibiting *further* construction until developer obtained a PSD permit).

Plaintiffs did not plead any injury to their organizations directly, but sue solely based upon alleged "harm[s] [to] members of the NAACP." Compl. ¶ 13; *see also id.* ¶¶ 5, 22.

## ARGUMENT

## I.      The NAACP Cannot Sue on Behalf of Its Members.

The plain text of the Clean Air Act's citizen suit provision precludes the NAACP from bringing suit on behalf of its members. Statutory standing turns on "whether a legislatively

7

conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). That statutory question must be resolved by applying the "traditional tools of statutory interpretation." *Id.* at 127–28. The Clean Air Act's citizen suit provision provides that "any person may commence a civil action *on his own behalf*." 42 U.S.C. § 7604(a) (emphasis added). The plain meaning of "on his own behalf" indicates that a plaintiff may sue only for his "[b]enefit," not for the benefit of another, as an agent or representative of a third party. *Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968); *see also Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024) (noting that the phrase "*on behalf of* means 'in the name of, on the part of, as the agent or representative of.'"). The phrase "on his own behalf" in the Clean Air Act is thus best read to mean that an organization may sue "to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co.*, 523 U.S. at 104 n.6.

Courts strictly follow the plain text of other causes of action that prevent organizations from vindicating their members' rights. For example, the Fair Labor Standards Act authorizes suits "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). As the Tenth Circuit and several other courts have concluded, "[t]he wording of this provision suggests that standing to pursue an action for liability is statutorily limited to employees only," and therefore precludes suits by unions as representatives of their aggrieved employees. *United Food & Commercial Workers Union, Local 1564 of New Mexico v Albertson's, Inc*, 207 F3d 1193, 1200 (10th Cir. 2000). Similarly here, the natural reading of the phrase "on his own behalf" is that the NAACP may not sue as a representative of its members.

The NAACP does not allege that it is suffering injury to its own organizational interests sufficient to satisfy Article III. Rather, the NAACP is pursuing this "suit on behalf of its members,"

8

to redress their alleged injuries, relying solely upon a theory of associational standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In other words, the only harms that the NAACP seeks to remedy are alleged "harms to Plaintiffs' members"—third parties not before the Court. Mem. in Supp. of Pls.' Mot. for a Prelim. Inj. at 9–12, Doc. 26. The statutory text forbids that sort of on-behalf-of-others suit.

If "on his own behalf" means anything, it must mean that a plaintiff may not sue as a representative of someone else—but that is exactly what the NAACP attempts. Any other interpretation would render that phrase surplusage. Because the NAACP lacks a cause of action to pursue a claim on behalf of its members, it has not, and cannot, state a claim upon which relief could be granted.

## II. Plaintiffs' Permit Counts (1 and 2) Fail to State Claims for Relief Under Mississippi's SIP and the Clean Air Act.

Separately, as an independent ground for dismissal, Plaintiffs' first and second counts fail to state claims for relief and should be dismissed under Rule 12(b)(6). Plaintiffs' first and second counts are that Defendants failed to obtain a necessary pre-construction and PSD permit to construct and operate the portable turbines, in violation of Mississippi's federally approved SIP and the Clean Air Act. Compl. ¶¶ 227, 244. Mississippi's SIP, however, categorically excludes "mobile sources" from the obligation to obtain "a permit to construct and a permit to operate." 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D). Although the term "mobile source" is not defined in the SIP or in the Clean Air Act, the term, as ordinarily understood, covers the temporary portable turbines, and MDEQ, the permitting authority in charge of implementing and enforcing Mississippi's SIP, confirmed as much in its July 2025 letter to Defendants. Compl., Ex. B-2. Given this exemption, Plaintiffs' first and second claims must fail, even accepting Plaintiffs' factual allegations as true.

9

As explained above, the Clean Air Act is often described as an "experiment in cooperative federalism," with the states holding primary responsibility "for implementing [air quality] standards," through federally reviewed and approved SIPs. *Sierra Club*, 100 F.4th at 560 (cleaned up); *see* 42 U.S.C. § 7407(a). EPA most recently approved the relevant provisions of Mississippi's SIP in 2020 and 2024, thereby making those provisions federally enforceable pursuant to the Clean Air Act. *See* 85 Fed. Reg. 10,070 (Feb. 21, 2020) (approving 11 Pt. 2 Ch. 2 Miss. Code); 89 Fed. Reg. 86,751 (Oct. 31, 2024) (approving 11 Pt. 2 Ch. 5 Miss. Code). Accordingly, it is those SIP provisions that Plaintiffs seek to enforce. *See* Compl. ¶¶ 227, 244. Where a SIP's language is clear and unambiguous, courts must enforce the SIP as written. *See S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 369 (5th Cir. 2026) (looking to the "plain text" of a SIP provision). As explained below, the plain text shows that no actionable violation has occurred with respect to Plaintiffs' first and second claims.

Mississippi's SIP provides that "mobile sources" are "categorical[ly]" "excluded from the requirement for a permit to construct and a permit to operate." 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D). The term "mobile source" is not defined in the SIP, nor is the term defined in the Clean Air Act, so its ordinary meaning controls: "[c]apable of moving or being moved readily from place to place." AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1129 (4th ed. 2000). A mobile source is therefore an emission source that can move or be moved. Plaintiffs' factual allegations and exhibits demonstrate that MZX's portable turbines fall within this ordinary meaning of "mobile source." The Complaint identifies the portable turbines as "SMT-130s," "TM2500s," and one "M35," Compl. ¶ 142, and Plaintiffs point to technical and marketing documents for those same models of turbines that describe each model as "transported as … trailers," not "requir[ing]" a "concrete pad," "mobile," "transportab[le]," "easily relocatable," and "ready to go anywhere,

10

anytime"—among other similar descriptors, Compl., Ex. A at 73, 75–76, 79–81 (capitalization removed). In addition, Plaintiffs provide photographs of the turbines that depict them as parked trailers or being towed down the road by semi-truck cabs. Compl. ¶¶ 138 (Fig. 1), 156 (Fig. 5); Compl., Ex. A at 75, 77.

MZX's portable turbines are thus "mobile" in the ordinary sense of the word: each is intended and designed to be moved via a flatbed trailer and is marketed and deployed as a temporary power solution to be moved on- and off-site as needed.

MDEQ reached the same conclusion, issuing a formal determination letter to Defendants explaining that it "understands that the referenced turbines will be 'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer) and 'temporary' as it is intended for each to remain on-site … for less than twelve (12) months." *Id.*, Ex. B-2 at 89. MDEQ accordingly concluded that the "turbines are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D." *Id.*

This conclusion follows not merely from the plain language of the SIP, but also from MDEQ's unique expertise in administering the SIP's entire regulatory regime, as well as MDEQ's familiarity with the specific facts—which do not materially differ from those presented by Plaintiffs. MDEQ's interpretation and application of the SIP in drawing the line between mobile and stationary sources is hence entitled to careful consideration and particular weight. *Cf. Alaska Dep't of Env't Conserv. v. EPA*, 540 U.S. 461, 490–91 (2004) (even when the disagreement is with EPA, a "state agency's" application of SIP provisions should be sustained except where "not based on a reasoned analysis" (cleaned up)).

Indeed, courts have long held that the SIP controls even over conflicting general federal regulations and that private parties thus cannot be held liable under the Clean Air Act for conduct

11

that adheres to the plain text of the applicable, federally approved SIP. *See Cinergy*, 623 F.3d at 458–59 (a power plant operator cannot be held liable for violations of federal Clean Air Act regulations when the conduct at issue was, at the time it occurred, "authorized by a state implementation plan that the EPA had approved"); *Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*, 191 F. Supp. 3d 1287, 1293–96, 1301 (D. Utah 2016) (citing *Cinergy* and holding that where a mine owner complied with an "unambiguous" provision in a SIP, citizen-suit plaintiffs could not impose "liability"). That principle follows from the text and structure of the Clean Air Act, which vests states with responsibility for enacting and enforcing SIPs and does not contemplate imposing sanctions for conduct that complies with a state plan. *E.g.*, 42 U.S.C. §§ 7410, 7413(a)(1), 7604(a). Those principles apply with full force here: MZX's portable turbines are plainly "mobile sources" under the SIP and therefore are exempt from obligations to obtain a construction or operation permit. Any other outcome thus "would treat [EPA's] approval of [the mobile source exception] as [a] rejection of it." *Cinergy*, 623 F.3d at 459.

At the very least, Defendants were "not on notice" that the SIP's mobile source exception did not apply. *Id.* And dismissing counts 1 and 2 by giving effect to the clear language of the SIP avoids the serious constitutional questions that would be raised by attempting to sanction defendants' conduct undertaken in reasonable reliance on MDEQ's guidance. *See United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 225 (4th Cir. 1997); *United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1011 (S.D. Ind. 2003).

Then-Judge Kavanaugh illustrated this principle with the following example:

> Imagine that a police officer tells a pedestrian that the pedestrian can lawfully cross the street at a certain place. The pedestrian carefully and precisely follows the officer's direction. After the pedestrian arrives at the other side of the street, however, the officer hands the pedestrian a $1,000 jaywalking ticket. No one would seriously contend that the officer had acted fairly or in a manner consistent with basic due process in that situation.

12

*PHH Corp. v. CFPB*, 839 F.3d 1, 49 (D.C. Cir. 2016). The only difference here is that, instead of a police officer, it's a private party attempting a citizen's arrest, which only makes the problem worse.

**III.     The Clean Air Act's Citizen Suit Provision Violates Article II of the Constitution and the Private Non-Delegation Doctrine.**

**A.      The Power to Prosecute Federal Public Offenses Belongs to the President Alone.**

The Executive Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. This means that "[t]he entire 'executive Power' belongs to the President alone." *Seila Law*, 591 U.S. at 213. A key part of that executive power is the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Although the President may rely upon subordinate officers, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. This ensures that "the chain of dependence [is] preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting 1 ANNALS OF CONG. 518 (1789) (Joseph Gales ed., 1834) (statement of James Madison)). Statutes that vest federal executive power outside of the President's control are "acts of usurpation," and "deserve to be treated as such." THE FEDERALIST NO. 33, at 204 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

The "executive Power," as understood in 1789 and today, includes the core law enforcement authority to prosecute all federal public offenses, whether civil or criminal. Blackstone recognized that the king is the "proper person to prosecute for all public offences and breaches of the peace." 1 WILLIAM BLACKSTONE, COMMENTARIES *267–68. This principle continued after independence and ratification: "during the Washington administration, prominent officials across all

three branches recognized the president's role as chief law enforcement executive." Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. ILL. L. REV. 701, 800 (2003). Indeed, Washington personally "ordered his federal prosecutors to cease prosecutions, and to commence them." *Id.* at 802 (footnotes omitted). Thus, while Congress could allow district attorneys to "prosecute potential lawbreakers," the "president is the chief of these law enforcement executives." *Id.* at 737.

This is not to say that creation of any federal private right of action would violate Article II. Congress has long authorized rights of action allowing private parties to sue others for damages and equitable remedies based on violations of private rights. But what Congress cannot do is vest federal law enforcement power—including the authority to obtain federal penalties payable to the U.S. Treasury—outside the executive branch, at least unless such suits remain subject to presidential control and direction. *See* Saikrishna Prakash, *The Chief Prosecutor*, 73 GEO. WASH. L. REV. 521, 578 (2005) ("Consistent with the grant of executive power, the president must be able to terminate popular actions using either a pardon or a *nolle prosequi*."); *cf. Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457 (1868) (recognizing the "[s]ettled rule" that informer actions could proceed for the "benefit" of the federal government only under the ultimate control of the Attorney General).[5]

Consistent with this original understanding, the Supreme Court has recognized that "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how

---

[5] Even federal oversight may not be sufficient. Multiple justices have noted that there "are substantial arguments that the *qui tam* device is inconsistent with Article II and that private relators may not represent the interests of the United States in litigation" even though the United States retains significant oversight authority over private relator suits. *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (cleaned up) (Kavanaugh, J., joined by Barrett, J., concurring); *id.* at 449 (Thomas, J. dissenting); *see also United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 766 (5th Cir. 2025) (Ho., J., concurring).

14

aggressively to pursue legal actions against defendants who violate the law.'" *United States v. Texas*, 599 U.S. 670, 678–79 (2023). This discretion is not limited to proceedings labeled "criminal," but includes civil enforcement. *See In re Aiken County*, 725 F.3d 255, 263-64 & n.9 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). Moreover, the Take Care Clause makes the President's authority over enforcement actions "conclusive and preclusive," meaning that Congress is "disable[d]" from "acting upon the subject" at all. *Trump v. United States*, 603 U.S. 593, 607, 620 (2024) (cleaned up).

## B. The Clean Air Act's "Citizen Enforcement" Provision Unconstitutionally Delegates Federal Law Enforcement Power to Private Persons.

The Clean Air Act vests law-enforcement power in private persons without regard to these constitutional first principles. The Act authorizes "any person" to "commence a civil action on his own behalf" against "any" other "person … who is alleged to have violated … or to be in violation of" numerous Clean Air Act provisions, including emissions regulations and permitting requirements. 42 U.S.C. § 7604(a)(1), (a)(3), (f). This enforcement authority includes both the ability to seek expansive injunctive relief and "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court"—"a quintessentially executive power." *Seila Law*, 591 U.S. at 219; *see* 42 U.S.C. § 7604(g)(1). *Horsemen's*, 2026 WL 1689717, at *7 ("The power[s] … to sanction [and] sue" are "quintessentially executive functions."). Unlike relators in *qui tam* actions, moreover, citizen plaintiffs are assigned no portion of the penalty award; rather, the penalties must be deposited in a "special fund in the United States Treasury." 42 U.S.C. § 7604(g)(1). As this suggests, "citizen enforcement" plaintiffs—the NAACP's preferred term, Compl. ¶ 122—are not ordinary civil litigants but "private attorneys general" who "seek relief not

15

on their own behalf but on behalf of society as a whole," *Ellis*, 390 F.3d at 477 (cleaned up). This case is no exception. The NAACP asks this Court to compel Defendants to pay enormous monetary penalties to the U.S. Treasury and to cease operation of its portable temporary turbines until MDEQ gives MZX Clean Air Act permits—permits that MDEQ determined that MZX did not need to obtain. Compl. ¶ 255.

This is unconstitutional. For decades, members of the Supreme Court have noted that there are "[d]ifficult and fundamental questions" raised by citizen enforcement suits under "Article II of the Constitution." *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring); *see also id.* at 209 (Scalia, J., joined by Thomas, J., dissenting); *DOT v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). This makes sense. Nobody voted to elect the NAACP or appointed it to enforce federal law. Yet here it is, asserting the authority to unilaterally "conduct[ ] civil litigation … for vindicating public rights," *Buckley*, 424 U.S. at 140, that are "federally enforceable," Compl. ¶¶ 61, 65, 243.[6] As the Fifth Circuit recently held, delegations of law enforcement authority to private parties —including the authority to "sue[ ] violators for injunctions"—can pass constitutional muster only if the federal government retains complete oversight and control. *Horsemen's*, 2026 WL 1689717, at *10. Giving private parties the power to "levy fines[ ] and seek injunctions— all without the [Executive's] say-so," by contrast, "is forbidden by the constitution." *Id.* at *2.

Some district courts have upheld the constitutionality of Clean Air Act (and Clean Air Act-style) citizen suits. *See N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 200 F. Supp. 2d 551, 555–56 (E.D.N.C. 2001); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001); *Del. Valley Toxics Coal. v. Kurz-Hastings, Inc.*, 813 F. Supp. 1132,

---

[6] That Mississippi retains enforcement authority of its SIP is unproblematic because those regulations are creatures of state law. To be sure, EPA approval of a SIP *also* gives state rules "the force and effect of federal law," *Sierra Club*, 100 F.4th at 564, but this does not mean that those rules cease to be state law.

16

1138 (E.D. Pa. 1993); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 622–26 (D. Md. 1987); *Student Pub. Int. Rsch. Grp. of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478 (D.N.J. 1985). But those non-binding decisions all predate the current Court's reinvigoration of the unitary executive. Following *Seila Law* and *Trump v. United States*, and now *Horsemen's*, there is no longer any question: Clean Air Act "citizen enforcement" suits violate Article II because they give core executive law-enforcement power to private parties.

Nor do the decisions upholding "citizen enforcement" suits make sense even on their own terms. These cases dismiss the constitutional arguments out of hand because the law "enforcement powers are entrusted to private citizens, rather than to an entity that is controlled by Congress or the Judiciary," reasoning that this does not violate "the separation of *governmental* powers" because it does not give Congress executive law enforcement authority. *N.C. Shellfish Growers Ass'n*, 200 F. Supp. 2d at 556 (emphasis).[7] The Constitution, however, speaks of "vest[ing]" the different parts of governmental power in the three different branches of government. *See* U.S. Const. arts. I–III. "Surely, if the Vesting Clauses bar the three branches from exchanging powers among themselves, those Clauses bar unchecked reassignments of power to a non-federal entity." *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) (Sutton, J.). Whether or not Congress's vesting of executive law enforcement authority outside the President's control "aggrandize[s] the Legislative branch," *Chesapeake Bay Found.*, 652 F. Supp. at 626, is thus beside the point, *cf. Free Enter. Fund*, 561 U.S. at 518 (Breyer, J., dissenting) ("[A] feature that would

---

[7] *Accord Del. Valley Toxics Coal.*, 813 F. Supp. at 1138 ("Congress in enacting the [Emergency Planning and Community Right-to-Know Act] did not grant to a person or persons under its control executive power."); *Chesapeake Bay Found.*, 652 F. Supp. at 624 ("Private litigants … are hardly controlled by Congress," so giving them federal law enforcement authority cannot violate Article II.); *Student Pub. Int. Rsch. Grp. of N.J.*, 600 F. Supp. at 1478 ("Th[e] argument" that "Congress may only assign enforcement powers to the executive branch, exclusive of any other entity, governmental or non-governmental … is untenable.").

*aggrandize* the power of Congress—is not present here."). The principle against giving federal power to private persons—sometimes called the private nondelegation doctrine—prohibits "private entities" from, *inter alia*, bringing "enforcement actions … without the [Executive's] involvement." *Horsemen's*, 2026 WL 1689717, at \*8. At the very least, the private party's enforcement power must always "function subordinately to" the Executive, which must "retain[ ] the discretion to approve, disapprove, or modify" the private party's "enforcement actions." *Id.* at \*7, 15 (cleaned up); *cf. Oklahoma*, 163 F.4th at 307 ("Whether subordination always suffices to withstand a challenge raises complex separation-of-powers questions."). Indeed, if Congress could simply assign core law enforcement power to private parties, then all of the Supreme Court's recent unitary executive cases, from *Free Enterprise Fund*, to *Seila Law*, to *Collins v. Yellen*, 594 U.S. 220 (2021), would ring hollow. And there would be nothing unconstitutional in Congress giving "any person" the authority to enforce the entire U.S. Code.

The Framers rejected "the idea of plurality in the executive, under any modification whatever." THE FEDERALIST NO. 70, at 425 (Alexander Hamilton). And for good reason. The buck stops with the President because this provides democratic accountability for the execution of the most fundamental aspects of a functioning democracy: "the protection of the community against foreign attacks," "the steady administration of the laws," "the protection of property," and "the security of liberty." *Seila Law*, 591 U.S. at 223–24 (quoting THE FEDERALIST NO. 70, at 423). If a President does a poor job in carrying out these duties, the People know exactly whom to blame and can select someone else in the next election. Delegating to 300+ million private citizens the power to make their own law enforcement decisions independent of the President does not have "even a fig leaf of constitutional justification." *Ass'n of Am. R.Rs.*, 575 U.S. at 62 (Alito, J., concurring).

18

This case illustrates exactly these points. Allowing the NAACP to second-guess MDEQ's federally authorized permitting decisions is not the "steady administration of the laws"; it invites inconsistent and unpredictable enforcement. This is not to say that Plaintiffs' members have no voice on these matters, but only that their voices count as much as every other voter's.

## CONCLUSION

For these reasons, the NAACP's complaint should be dismissed with prejudice.

19

Dated: June 15, 2026

Patrick D. Traylor*
Jeremy C. Marwell*
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com

Michael B. Buschbacher*
Taylor M. Myers*
Walker Fortenberry*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com
tmyers@boydengray.com
wfortenberry@boydengray.com

Respectfully submitted,

*/s/ Daniel W. Van Horn*
Daniel W. Van Horn (MS Bar No. 102105)
BUTLER SNOW LLP
6075 Poplar Ave., Suite 500
Memphis, TN 38187
(901) 680-7331
danny.vanhorn@butlersnow.com

P. Ryan Beckett (MS Bar No. 99524)
Keri E. Herrington (MS Bar No. 106815)
BUTLER SNOW LLP
1020 Highland Colony Pkwy., Suite 1400
Ridgeland, MS 39157
(601) 948-5711
(601) 948-5177
ryan.beckett@butlersnow.com
keri.herrington@butlersnow.com

*Attorneys for X.AI Corp. and MZX Tech LLC*

*\*Pro Hac Vice*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2026, I filed the foregoing document with the Clerk of the U.S. District Court for the Northern District of Mississippi through the Court's CM/ECF system, which shall send notification of such filing to all parties of record in this case.

/s/ *Daniel W. Van Horn*
Daniel W. Van Horn