# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE,** | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | **Case No. 3:26-cv-00074-DMB-JMV** |
| **X.AI Corp. and MZX Tech LLC,** | § § § | |
| *Defendants.* | § § § § | |

## MEMORANDUM IN OPPOSITION
## TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION

Daniel W. Van Horn (MS Bar No. 102105)
BUTLER SNOW LLP
6075 Poplar Ave., Suite 500
Memphis, TN 38187
(901) 680-7331
danny.vanhorn@butlersnow.com

P. Ryan Beckett (MS Bar No. 99524)
Keri E. Herrington (MS Bar No. 106815)
BUTLER SNOW LLP
1020 Highland Colony Pkwy., Suite 1400
Ridgeland, MS 39157
(601) 948-5711
(601) 948-5177
keri.herrington@butlersnow.com
ryan.beckett@butlersnow.com

Patrick D. Traylor* (DC Bar No. 449350)
Jeremy C. Marwell* (DC Bar No. 1000299)
VINSON & ELKINS LLP
2200 Pennsylvania Ave. NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com

Michael B. Buschbacher*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Pro Hac Vice*

*Attorneys for X.AI Corp. and MZX Tech LLC*

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| INTRODUCTION AND SUMMARY OF ARGUMENT | | 1 |
| STATEMENT OF FACTS | | 5 |
| STANDARD OF REVIEW | | 7 |
| ARGUMENT | | 8 |

I. Plaintiffs have not shown that they will likely suffer irreparable harm. .......... 8

    A. Data show that ambient air quality has met EPA standards since the turbines began operating, and that is not projected to change under even the most conservative modeling standards. ........... 8

    B. Plaintiffs have not shown irreparable harm. ........... 9

        1. The declarations do not establish a substantial threat of irreparable harm. ........... 10

        2. The portable turbines' temporary status, and the ongoing transition to permanent power sources, cut further against finding irreparable harm. ........... 12

    C. The NAACP's delay in seeking injunctive relief undercuts their allegations of irreparable harm and precludes equitable relief. ........... 13

II. The NAACP has shown no likelihood of success on the merits. ........... 14

    A. The NAACP lacks statutory standing. ........... 15

    B. Citizen-suit liability cannot extend to conduct, like Defendants' here, undertaken in compliance with a federally approved state SIP. ........... 16

    C. Defendants did not "begin actual construction." ........... 20

    D. Fair notice principles bar liability, because Defendants reasonably relied on Mississippi's determination that no permit was required. ........... 22

    E. The CAA's citizen suit provision violates Article II of the U.S. Constitution. ........... 26

III. Catastrophic harms to Defendants and the public outweigh any injuries to Plaintiffs. ........... 29

    A. Any impacts to Plaintiffs' members from temporary, incremental emissions in an attainment area are dwarfed by the catastrophic harms an injunction would inflict on Defendants and hundreds of millions of AI users worldwide. ........... 29

    B. An injunction would disserve the public interest. ........... 32

IV. Any injunction must be conditioned on the NAACP posting bond. ........... 34

CONCLUSION ........... 34

## TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Alaska Dep't of Env't Conservation v. EPA*,
   540 U.S. 461 (2004) ................................................................................................... 18

*Anibowei v. Morgan*,
   70 F.4th 898 (5th Cir. 2023) ................................................................................ 7, 8

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ........................................................................................................ 28

*Canal Auth. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974) ..................................................................................... 29

*CFTC v. EOX Holdings, L.L.C.*,
   90 F.4th 439 (5th Cir. 2024) ................................................................................ 24, 25

*Commodity Futures Trading Comm'n v. Schor*,
   478 U.S. 833 (1986) .................................................................................................... 26

*Concepts in Prod., LLC v. Joiner*,
   No. 17-cv-118, 2018 WL 3419269 (N.D. Miss. July 13, 2018) ............................... 10

*Dep't of Transp. v. Ass'n. of Am. R.R.*,
   575 U.S. 43 (2015) ...................................................................................................... 28

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*,
   630 F.3d 431 (5th Cir. 2011) ..................................................................................... 21

*E.T. v. Paxton*,
   19 F.4th 760 (5th Cir. 2021) ................................................................................ 33, 34

*Ellis v. Gallatin Steel Co.*,
   390 F.3d 461 (6th Cir. 2004) ..................................................................................... 28

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
   867 F.3d 564 (5th Cir. 2017) ..................................................................................... 22

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) .................................................................................................... 22

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .................................................................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) .................................................................................................... 28

*Gates & Fox Co. v. OSHA*,
   790 F.2d 154 (D.C. Cir. 1986) .............................................................................. 22, 23

*Gen. Motors Corp. v. Harry Brown's, LLC*,
   563 F.3d 312 (8th Cir. 2009) ..................................................................................... 31

**Cases—Continued:** **Page(s)**

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) ............................................................. 34

*Haig v. Agee*,
453 U.S. 280 (1981) ........................................................................... 33

*Heckler v. Chaney*,
470 U.S. 821 (1985) ........................................................................... 27

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ..................................................... 10, 11, 12

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................... 16

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ........................................................... 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ........................................................................... 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................................... 18

*Maryland v. King*,
567 U.S. 1301 (2012) ......................................................................... 33

*McMillen v. Itawamba Cnty. Sch. Dist.*,
702 F. Supp. 2d 699 (N.D. Miss. 2010) ............................................. 33

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*,
200 F. Supp. 2d 551 (E.D. N.C. 2001) ............................................. 28

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
No. 23-10520, 2026 WL 1689717 (5th Cir. June 11, 2026) ................ 28

*Optimus Steel LLC v. U.S. Army Corps of Eng'rs*,
492 F. Supp. 3d 701 (E.D. Tex. 2020) ..................................... 31, 32, 33

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
839 F.3d 1 (D.C. Cir. 2016) ............................................................... 25

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
881 F.3d 75 (D.C. Cir. 2018) ............................................................. 25

*Phillips v. Charles Schreiner Bank*,
894 F.2d 127 (5th Cir. 1990) ............................................................. 34

*Residents of Gordon Plaza, Inc. v. Cantrell*,
25 F.4th 288 (5th Cir. 2022) ............................................................. 26

*Ronaldo Designer Jewelry, Inc. v. Cox*,
No. 17-cv-2, 2017 WL 3879095 (N.D. Miss. Sept. 5, 2017) ............... 13, 14

**Cases—Continued:** **Page(s)**

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*,
165 F.4th 356 (5th Cir. 2026) ................................................................................ 16

*Save RGV v. Space Expl. Techs. Corp.*,
No. 24-cv-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024) ..................................... 31, 33

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................................................ 27

*Sierra Club v. La. Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) .............................................................................. 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ...................................................................... 13, 33

*SO Apartments, L.L.C. v. City of San Antonio*,
109 F.4th 343 (5th Cir. 2024) .............................................................................. 29

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
No. 23-cv-58, 2023 WL 2759864 (D. Alaska Apr. 3, 2023) ............................................ 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................................... 15

*Trump v. United States*,
603 U.S. 593 (2024) .......................................................................................... 27

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) ....................................................................................... 28

*United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.*,
207 F.3d 1193 (10th Cir. 2000) ............................................................................. 16

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......................................................................................... 28

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 (S.D. Ohio 2001) ................................................................... 28

*United States v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) ...................................................................... 16, 18, 19

*United States v. Hoechst Celanese Corp.*,
128 F.3d 216 (4th Cir. 1997) ...................................................................... 23, 24, 25, 26

*United States v. Texas*,
599 U.S. 670 (2023) .......................................................................................... 27

*Upton v. SEC*,
75 F.3d 92 (2d Cir. 1996) .................................................................................... 25

*Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*,
191 F. Supp. 3d 1287 (D. Utah 2016) ..................................................................... 19

iv

**Cases—Continued:**         **Page(s)**

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
302 F. Supp. 2d 672 (S.D. Tex. 2004) ...................... 13

*W. Va. Rivers Coal., Inc. v. Chemours Co.*,
No. 25-1924, 2026 WL 1579491 (4th Cir. June 3, 2026) ...................... 11

*W. Watersheds Project v. Salazar*,
692 F.3d 921 (9th Cir. 2012) ...................... 31

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ...................... 29, 32

*Winter v. NRDC*,
555 U.S. 7 (2008) ...................... 10, 11, 12, 29, 32

*Wis. Res. Prot. Council v. Flambeau Mining Co.*,
727 F.3d 700 (7th Cir. 2013) ...................... 22

**Constitutional Provisions:**

U.S. Const. art. II, § 1, cl. 1 ...................... 27

U.S. Const. art. II, § 3 ...................... 27

**Statutes:**

29 U.S.C. § 216(b) ...................... 15

42 U.S.C. § 7409(b)(1) ...................... 8, 11

42 U.S.C. § 7410 ...................... 19

42 U.S.C. § 7411 ...................... 23

42 U.S.C. § 7411(a)(3) ...................... 23

42 U.S.C. § 7413(a)(1) ...................... 19

42 U.S.C. § 7475(a) ...................... 20

42 U.S.C. § 7550(10) ...................... 23

42 U.S.C. § 7602(e) ...................... 15

42 U.S.C. § 7602(z) ...................... 23

42 U.S.C. § 7604(a) ...................... 15, 19

42 U.S.C. § 7604(a)(1) ...................... 27

42 U.S.C. § 7604(a)(3) ...................... 27

42 U.S.C. § 7604(d) ...................... 34

42 U.S.C. § 7604(f) ...................... 27

**Statutes—Continued:**                                                     **Page(s)**

42 U.S.C. § 7607(b)(1) ........................................................................................ 19

42 U.S.C. § 7607(b)(2) ........................................................................................ 19

**Regulations:**

40 C.F.R. § 51.50 ................................................................................................. 19

40 C.F.R. § 52.21 ................................................................................................. 20

40 C.F.R. § 52.21(a)(2)(iii) .................................................................................. 20

40 C.F.R. § 52.21(b) ............................................................................................ 20

40 C.F.R. § 52.21(b)(11) ................................................................................. 20, 21

40 C.F.R. § 60.4420 ............................................................................................. 24

40 C.F.R. § 1036.5(d) .......................................................................................... 23

40 C.F.R. § 1068.30(1)(iii) .................................................................................. 23

40 C.F.R. § 1068.31(e)(1) .................................................................................... 24

40 C.F.R. § 1068.31(e)(2) .................................................................................... 24

43 Fed. Reg. 26,380 (June 19, 1978) .................................................................. 11

71 Fed. Reg. 14,658 (Mar. 23, 2006) .................................................................. 17

85 Fed. Reg. 10,070 (Feb. 21, 2020) ................................................................... 17

89 Fed. Reg. 101,306 (Dec. 13, 2024) ................................................................ 26

90 Fed. Reg. 8,741 (Jan. 31, 2025) ..................................................................... 32

91 Fed. Reg. 1,910 (Jan. 15, 2026) .................................................................. 9, 26

11 Pt. 2 Ch. 2 Miss. Code R. 2.1(B) (2013) ....................................................... 20

11 Pt. 2 Ch. 2 Miss. Code R. 2.1(D)(2) (2013) .............................................. 17, 20

11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(1) (2024) .................................................... 22

11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(4) (2024) .................................................... 22

11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013) ................................................. 17, 20

11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D)(3) (2013) ................................................. 23

**Rules:**

FED. R. CIV. P. 65(c)............................................................................................ 34

**Other Authorities:**                                                       **Page(s)**

AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) ................................... 17

BLACK'S LAW DICTIONARY (12th ed. 2024) ................................................................. 15, 21

BLACK'S LAW DICTIONARY (4th ed. 1968) ...................................................................... 15

Draft Memorandum from Anne L. Idsal, EPA Principal Deputy Assistant Adm'r, to Reg' Air Div. Dirs. (Mar. 25, 2020), https://tinyurl.com/2zhrud43 ......................................................... 20

EPA, *Mississippi Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants*, https://tinyurl.com/5a77pu4w .................................................................................. 8

Letter from Aaron Szabo, Assistant Adm'r, EPA Region 9, to Philip McNeely, Dir., Maricopa Cnty. Air Quality Dep't (Sept. 2, 2025), https://tinyurl.com/4knpnwck ................................. 22

MDEQ, *NSR/PSD Revision – Appendix G-6* (July 28, 2005) ...................................................... 17

Prakash, Saikrishna, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701 (2003) ...................................................................................................... 27

Press Release, U.S. Dep't of War, The War Department to Expand AI Arsenal on GenAI.mil With xAI (Dec. 22, 2025), https://tinyurl.com/3ek875j9 ......................................................... 32

WEBSTER'S NEW COLLEGIATE DICTIONARY (1980) ...................................................................... 21

WHITE HOUSE, FACT SHEET: PRESIDENT DONALD J. TRUMP ADVANCES ENERGY AFFORDABILITY WITH THE RATEPAYER PROTECTION PLEDGE (Mar. 4, 2026), https://tinyurl.com/42ced4xp .... 32

WHITE HOUSE, WINNING THE RACE: AMERICA'S AI ACTION PLAN (2025), https://tinyurl.com/6rrx2kbk ................................................................................................... 32

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In August 2025, after receiving written confirmation from the Mississippi Department of Environmental Quality ("MDEQ") that no air permit would be required, MZX Tech LLC began deploying temporary, portable gas-fired turbines at its Stanton Road property in Southaven, Mississippi, to provide power to nearby computing facilities. Over the next ten months, relying on MDEQ's guidance, Defendants MZX and xAI invested ████████████ in those facilities. Today, they constitute a computational resource unique in the United States and possibly the world. They power xAI's cutting-edge artificial intelligence model Grok, and other frontier AI models, including Anthropic's Claude and Google's Gemini. Hundreds of millions of people and businesses worldwide use these models, as does the federal government. Meanwhile, Defendants are already transitioning the computing facilities to a permanent power supply, that will replace temporary portable turbines at Stanton Road with permanent, permitted turbines subject to state-of-the-art emission controls. In fact, by the time this Court hears argument on the pending motions, numerous temporary turbines will already have been removed. ████████████████

███████████████████████

MZX's development plans, undertaken in close coordination with Mississippi regulators, reflect the critical role that access to power generation plays in the global AI race, as well as the enormous capital investments necessary to advance U.S. economic, technological, and national security interests in this area. An abrupt loss of power from Stanton Road would inflict catastrophic harms on Defendants and hundreds of millions of users worldwide: Grok would largely cease to function, and other cutting-edge AI services would be significantly disrupted, with cascading harms to users, companies, and America's national-security interests.

Despite all this, Plaintiffs now ask the Court to disrupt the status quo and immediately shut down the temporary turbines at Stanton Road. Plaintiffs claim that Defendants needed a "stationary

source" permit before using those portable turbines. Although they have known all pertinent facts since at least September 2025—more than eight months ago—only now do they demand an injunction. Without explaining the belated timing of their motion, they ground their late-breaking injunctive request on speculation that another few months of portable turbine operations may pose health or welfare risks for some of their members. And they do so notwithstanding the U.S. Environmental Protection Agency's ("EPA") determination that the area is in attainment with national ambient air quality standards—standards set to protect human health and welfare.

Plaintiffs' motion must be denied. The proposed injunction would be, so far as Defendants can determine, unprecedented in the history of the Clean Air Act ("CAA"). And it would harshly punish Defendants for making perhaps the largest private investment in Mississippi's history, in reasonable reliance on state regulators' determination that no permit was needed for temporary use of portable turbines. An injunction would cost xAI ▬▬▬▬▬▬▬▬▬, would render Grok essentially useless and disrupt other companies' access to computing resources that help power AI tools that millions—including the federal government—rely on, and handicap U.S. global competitiveness. What is more, the proposed injunction offers no tangible benefit to Plaintiffs or their members. The Southaven area is designated as in attainment with stringent federal and state air-quality standards that fully protect human health and welfare. Defendants developed, and are already implementing, a plan to remove all the temporary portable turbines from Stanton Road, and replace them with permanent power sources for which MDEQ already issued a permit. In short, granting Plaintiffs' belated injunction would yield them little (if any) benefit, while inflicting catastrophic harms on xAI and MZX, depriving hundreds of millions of users of the benefit of Grok and other AI tools, frustrating U.S. AI policy, and harming the public interest. Granting the

2

injunction would be profoundly harmful—and profoundly wrong, for Plaintiffs' arguments fail at every step.

*No irreparable harm.* Analyses of local air quality monitoring data show that the temporary turbines have not adversely impacted air quality. And computer modeling shows that the temporary turbines will not cause the area to exceed federal air quality standards that protect human health and welfare, with a margin of safety to protect even the most vulnerable populations. These data disprove Plaintiffs' speculative fears of health and welfare impacts. While Plaintiffs' expert declaration posits that any emissions (even, apparently, one molecule) increase the risk of harm, that "no safe level" theory cannot be reconciled with EPA's use of thresholds and standards to protect health and welfare. Nor have Plaintiffs shown that their members will *likely* suffer irreparable harm if the temporary turbines continue operating briefly before their removal.

Plaintiffs' unexplained eight-month delay in seeking injunctive relief undercuts their claims of urgency and irreparable harm. Plaintiffs' counsel have been aware of the material facts since no later than September 2025. Yet for months, Plaintiffs dragged their feet, while Defendants invested ███████████ in computing infrastructure and cutting-edge AI models that currently depend entirely on power from temporary turbines at Stanton Road, all in reasonable reliance on MDEQ's determination that no permit was required for the mobile sources. This Court has denied preliminary injunctions based on shorter periods of delay, and the same result is warranted here.

*No likely success on the merits.* Plaintiffs have shown no likelihood of success on the merits of their claims. First, under the CAA's citizen-suit provision, Plaintiffs lack statutory standing to assert claims on behalf of their members. Second, liability cannot extend to conduct, like Defendants' here, that complies with a federally approved state implementation plan. Third, the use of temporary, portable turbines did not trigger a permit obligation because MZX did not "begin

3

actual construction" of any permanent emission unit. Fourth, even assuming for the sake of argument that the Court sees some merit in Plaintiffs' claims, no liability could accrue because Defendants lacked fair notice that their conduct would violate the Clean Air Act or Mississippi's implementation plan—particularly where they sought, and proceeded in reasonable reliance on, MDEQ's determination that the temporary use of portable turbines does not require a permit. Finally, the CAA's citizen-suit provision itself violates Article II of the U.S. Constitution because it vests federal law enforcement authority outside of the executive branch.

*Harms to non-moving parties and the public interest.* Even if Plaintiffs could overcome those barriers, the balance of harms and public interest factors weigh decisively against granting relief. Shutting down the temporary turbines before permanent power is available would inflict immediate and catastrophic damage on xAI, rendering effectively useless the Grok AI tool currently used by ████████████████████████████████, and harming other companies (such as Anthropic, Google, and Cursor) that also use these unique computing resources. For its part, xAI would suffer financial losses on the order of approximately ██████████████████—a figure that, if anything, understates the harms, as it does not include potential damage to AI models, hardware, or software. An injunction would also frustrate U.S. policy favoring the development of AI technology. And it would harm Mississippi's sovereign prerogative to interpret and enforce its own laws, since Plaintiffs ask the Court to overrule MDEQ's determination that the portable, temporary turbines are exempt from stationary-source permitting. All these harms weigh heavily against granting a preliminary injunction, particularly as the region remains in attainment with highly protective federal standards and real-world data shows that the temporary turbines have not significantly affected regional air quality.

The Court should deny the motion. If the Court were to consider granting any injunctive relief, it must set a bond sufficient to protect Defendants from the ▉▉▉▉▉▉▉▉▉▉▉▉ they would suffer. There is no basis to exempt Plaintiffs from that requirement.

## STATEMENT OF FACTS

In July 2025, MZX acquired an existing industrial property at 2875 Stanton Road S., Southaven, Mississippi, with the intention of powering nearby high-performance computing facilities. Ex. 2 (Worthington Decl.) ¶ 5; Ex. 3 (Jacobson Decl.) ¶¶ 16–23. Before bringing any power-generation equipment to the site, MZX met with MDEQ to discuss its plans, including its forthcoming application for a Prevention of Significant Deterioration ("PSD") permit for the new power plant. Worthington Decl. ¶¶ 5–7. MZX also sought MDEQ's written guidance and authorization regarding the potential use of temporary, mobile turbines to power nearby computing facilities while permanent turbines were being permitted and installed. *Id.* ¶¶ 6–7; *see* Doc. 51-6.

On July 29, 2025, MDEQ responded with a formal determination letter confirming that the portable turbines constitute "mobile" sources under Mississippi's federally approved State Implementation Plan ("SIP"). Doc. 51-7. Thus, in MDEQ's view, the temporary turbines "are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D," and no permit would be required to use them at the Stanton Road site. *Id.* MDEQ's position was based on the fact that each turbine would "remain affixed to a portable unit (i.e., a flatbed trailer) and [would be] 'temporary,'" i.e., would "remain on-site . . . for less than twelve (12) months." *Id.* Although no permit was required, MDEQ urged MZX to use such emission control technology as may be "available and applicable to portable combustion turbines," and to advise the agency of "any additional emission control technology that will be utilized during [the temporary turbines'] operation." *Id.*

5

Relying on MDEQ's formal determination, MZX brought the first portable temporary turbines to the Stanton Road site on August 1, 2025. Worthington Decl. ¶ 8. In accordance with MDEQ's instructions, each temporary turbine is operated with appropriate emissions controls to limit air pollution. *See id.*, Ex. A (chart listing each temporary turbine). Three weeks later, MZX filed its PSD permit application with MDEQ for the future power plant. Doc. 51-9.

Over time, while development progressed at Stanton Road and the nearby computing facilities, MZX brought additional temporary turbines to the Stanton Road site. Worthington Decl. ¶ 13. Between November 2025 and June 2026, MZX brought additional temporary turbines to the site, for an expected total of 60 portable turbines by the end of June. *Id.* ¶¶ 14–15. MZX has kept MDEQ informed about the status of all temporary turbines at Stanton Road. *Id.* ¶ 16. More than a dozen are equipped with selective catalytic reduction emission controls; all the other temporary turbines reduce emissions using a sophisticated, tried-and-tested demineralized water control process. *Id.* ¶ 22 & Ex. A (chart). And MZX has already begun the process for installing permanent turbines at Stanton Road to replace the temporary turbines. *Id.* ¶¶ 11, 23–24.

On March 11, 2026, MDEQ issued MZX the final air permit for the construction and operation of the permanent turbines. Doc. 51-27. That permit authorizes MZX to construct and operate permanent combustion turbines with specified emissions controls, *id.* at 9-11, and an aggregate power generation capacity of 1.2 gigawatts. Worthington Decl. ¶ 9. Once operational, these permanent turbines ████████████████████████████████ will supply the site's electricity needs. *Id.* ¶¶ 10, 12.

████████████████████████████████████████████████████ *Id.* ¶ 11. Although manufacturer-driven construction delays have delayed the installation of some of the permanent turbines, MZX will start removing temporary turbines from the Stanton Road site by

August 1, 2026, with all such units removed before their respective 12-month marks of being on-site. *Id.* ¶ 20. ███████████████████████████████████

███████████████████████████████████████████████. *Id.* ¶¶ 23–24.

Today, the Stanton Road site is the operational backbone for Grok and other AI products serving hundreds of millions of customers in the United States and worldwide every month. Jacobson Decl. ¶¶ 14, 16, 19–23. The site currently constitutes the only power source for high-performance, neighboring computing facilities, which together comprise the densest deployment of AI computing hardware in the United States and perhaps the world. *Id.* ¶¶ 16–18, 23. Those facilities handle all of xAI's model training and products and provide services to other AI companies, including Anthropic, Google, and Cursor. *Id.* ¶¶ 19–22, 24–34. Defendants have invested ███████████ in that computing infrastructure and employ a highly-trained, specialized workforce—all of which currently depend on power from the temporary turbines at Stanton Road. Jacobson Decl. ¶¶ 27, 35–38; Ex. 5 (Trettel Decl.) ¶¶ 6, 8–9. An injunction shutting down the temporary turbines *now*, before permanent power is available, would shut down the computing facilities and largely disable the Grok AI tool, with catastrophic consequences for MZX's and xAI's businesses. Doing so would inflict ███████████ of harm on xAI, undercut the country's position in the global "AI race," and deprive hundreds of millions of users of the benefits of Grok and other AI services. Jacobson Decl. ¶¶ 24–34; Trettel Decl. ¶ 9.

## STANDARD OF REVIEW

"[A] preliminary injunction is an *extraordinary and drastic remedy* which should not be granted unless the movant *clearly* carries the burden of persuasion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (emphases added). The movant must clearly show:

(1) a substantial likelihood that plaintiff will prevail on the merits,

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and

(4) that granting the preliminary injunction will not disserve the public interest.

*Id*. When a movant fails "sufficiently to establish *any one* of the four criteria," the court must deny the request for a preliminary injunction." *Id.* at 905.

**ARGUMENT**

**I.      Plaintiffs have not shown that they will likely suffer irreparable harm.**

**A.      Data show that ambient air quality has met EPA standards since the turbines began operating, and that is not projected to change under even the most conservative modeling standards.**

Plaintiffs argue that they have shown irreparable harm because their members fear that the temporary turbine emissions may impact their health. But analyses of air quality monitoring data, backed up by rigorous computer modeling, demonstrate that the temporary turbines have had no significant impact on attainment with the National Ambient Air Quality Standards ("NAAQS") and other applicable federal and state health- and welfare-protective standards. The NAAQS most relevant to this case were most recently set by the EPA from 2010 to 2024, at levels determined to protect public health and welfare, including the most vulnerable populations, with an additional "margin of safety." 42 U.S.C. § 7409(b)(1). The EPA has for the last decade designated air quality in the Memphis metropolitan area (including the Southaven area) as "attainment," meaning the region's air quality complies with all the NAAQS, including for ozone, nitrogen dioxide ($NO_2$), and fine particulate matter ($PM_{2.5}$). *See* EPA, *Mississippi Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants*, https://tinyurl.com/5a77pu4w (last updated May 31, 2026). That attainment designation has been in effect at all times relevant here.

Operating temporary portable turbines at Stanton Road has not changed that reality. Recent air dispersion modeling shows that concentrations of $NO_2$ and $PM_{2.5}$ will remain below the

8

NAAQS, Ex. 4 (Gasparini Decl.) ¶ 53, and that concentrations of formaldehyde are far below the relevant effects screening levels. *Id.* ¶¶ 53, 56.[1] This modeling is inherently over-predictive and uses worst-case assumptions specifically designed to ensure that predicted impacts are protective of human health and the environment. *Id.* ¶ 54. And quantitative analysis of publicly reported, real-time air quality monitoring data shows that concentrations of the substances discussed by Plaintiffs (ozone, $NO_2$, and $PM_{2.5}$), measured at the air quality monitors selected by MDEQ and EPA as representative of ambient air quality around the Stanton Road site have not been adversely affected by the temporary turbines. *Id.* ¶¶ 42, 45, 49.[2] In short, the temporary turbines have had no material impact on the area's air quality and are therefore not causing any adverse impacts to human health—and that is not projected to change.

**B.      Plaintiffs have not shown irreparable harm.**

Plaintiffs have not even attempted to engage with this empirical record, and have not met their burden to prove that the continued temporary use of portable turbines at Stanton Road, while the site transitions to permanent power, will cause their members irreparable harm. Rather than engage with real-world data, Plaintiffs rely on (a) a generalized literature review purporting to show that *any amount* of $NO_2$ or $PM_{2.5}$—apparently even one molecule—harms human health; and (b) declarations by several members expressing subjective fears about potential health and welfare

---

[1] Plaintiffs' motion and declarations focus on potential harms from $NO_2$ and $PM_{2.5}$, and make no argument specific to formaldehyde. *E.g.*, Doc. 52 at 11–14, 23–25; Doc. 51-46 ¶ 11 (Suh Declaration does not attempt to address "health implications" associated with formaldehyde.). They may not add such an argument for the first time on reply. Regardless, modeling shows that formaldehyde emissions will not constitute irreparable harm.

[2] As MZX reported to MDEQ, even though these are mobile sources, their controlled emission levels comply with the stringent federal requirements for stationary combustion sources established under EPA's New Source Performance Standards. *Compare* Doc. 1-1 at 11 n.27 (noting that the company represented emission rates for $NO_X$ of 25 parts per million ("ppm") or less), *with* 91 Fed. Reg. 1,910, 1,925 (Jan. 15, 2026) ("The EPA finds 25 ppm to be the appropriate standard of performance for $NO_X$ emissions from temporary [stationary] combustion turbines.").

impacts. *See* Doc. 52 at 23–25.[3] Plaintiffs have not met their burden to prove a "substantial threat" of the claimed injury, or that any injury is irreparable. *Concepts in Prod., LLC v. Joiner*, No. 17-cv-118, 2018 WL 3419269, at *5 (N.D. Miss. July 13, 2018) (Brown, J.).

       1.       <u>The declarations do not establish a substantial threat of irreparable harm.</u>

Plaintiffs must show that irreparable harm is "likely," not merely possible. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). And "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Plaintiffs do not come close to meeting that standard.

The crux of Plaintiffs' irreparable harm arguments are two declarations by Dr. Helen Suh addressing potential health impacts of particulate matter, nitrogen dioxide, and other emissions. Doc. 51-46; Doc. 51-50. But those declarations only review literature, and make generalized statements, about the potential health effects from exposure to those pollutants. Dr. Suh offers no site-specific exposure assessment or analysis. *See generally* Doc. 51-46; Doc. 51-50. She does not attempt to (1) model actual ambient air quality concentrations at or near any declarant's residence, school, or gathering place; (2) calculate individual exposure doses; (3) provide any site-specific quantitative risk assessment; or (4) account for background emissions or ambient levels from other sources.[4] Rather, she opines that *any amount* of emissions may "cause foreseeable adverse public health impacts," Doc. 51-46 ¶ 20, based on her view that there is "no safe level" of $NO_2$ or $PM_{2.5}$, *id.* ¶ 19; Doc. 51-50 ¶ 9. Tellingly, her declaration does not discuss EPA regulations exempting temporary emission sources from assessing impacts on air quality, because those impacts are so

---

[3] For Court docket entries, Defendants cite to the PDF page number as shown in the ECF header.

[4] Plaintiffs' amended declaration from Kim Laufenberg relies on "potential to emit" calculations that assume all turbines operate at maximum capacity 24 hours a day, 365 days a year. That is a theoretical, "worst-case" screening metric, not evidence of actual emissions. Doc. 51-43 ¶¶ 8–10, 46.

short-lived. *See* 43 Fed. Reg. 26,380, 26,394 (June 19, 1978). This type of generic analysis about the potential risks of pollutant exposure cannot prove irreparable harm.

*West Virginia Rivers Coalition, Inc. v. Chemours Company*, No. 25-1924, 2026 WL 1579491, at *10 (4th Cir. June 3, 2026), is instructive. There, applying the *Winter* factors, the Fourth Circuit vacated a preliminary injunction for "clear error" where the record did not show that irreparable harm was "more likely than not." *Id.* at *10–11. As here, a plaintiff's expert asserted that incremental exposure to a pollutant would "increase[] the risk" of harm by "some uncertain amount." *Id.* at *9–10. The Fourth Circuit held that, "[a]s a matter of law, the risk [the expert] described isn't irreparable harm," because at most the exposure "made harm likelier, not more likely than not." *Id.* at *10. The expert "admitted she couldn't opine on the harm [any specific plaintiffs] would suffer," and had not considered individual exposure profiles. *Id.* at *11. So too here. Dr. Suh's "no safe level" theory rests on the notion that any emissions incrementally increase risk. She neither proves that irreparable harm is more likely than not, nor attempts to show irreparable harm to any specific individuals.

More broadly, Dr. Suh's "no safe level" theory cannot be squared with the legal framework governing air quality, in which EPA sets concentration levels (i.e., thresholds) that sufficiently protect human health, including a margin of safety. *See* Gasparini Decl. ¶ 27; 42 U.S.C. § 7409(b)(1). The practical consequences of Dr. Suh's theory would turn the preliminary-injunction standard on its head. If Dr. Suh were correct, *any* plaintiff near *any* emissions source of *any* magnitude (from a backyard barbecue to a home backup generator) could show irreparable harm. Emergency injunctions would be the norm, not an "extraordinary remedy" reserved for exceptional cases. *Winter*, 555 U.S. at 24; *see Holland Am.*, 777 F.2d at 997 ("Injunctive relief is . . . not to be granted routinely."). Dr. Suh's declarations, in short, cannot meet Plaintiffs' burden.

11

The subjective concerns of Plaintiffs' members (even if genuinely felt), and actions taken in response to those fears, cannot close the gap. For instance, Tiffany Millsap describes respiratory problems she has experienced since moving to the area *six* years ago (i.e., long before any temporary turbines at Stanton Road), and speculates that she "can't imagine how bad it will be if my symptoms get even worse because of more pollution." Doc. 51-38 (T. Millsap Decl.) ¶¶ 2, 13. Adrian Millsap reports that unnamed family members "seem[] to have" respiratory symptoms when they visit, and recounts "stories about [unnamed] people whose children are developing asthma problems." Doc. 51-37 (A. Millsap Decl.) ¶¶ 17–18, 22. Neither declarant provides any specific basis to connect their fears or symptoms to turbines at Stanton Road, as distinct from any other of the myriad emissions sources in the area, or other causes. *See id.*; *see also* Doc. 51-40 (Sheard Decl.) ¶ 16 (allergies "acting up" that "could be from the added pollution"). Alleged third-party harms also don't suffice. *Winter*, 555 U.S. at 21–23.

For her part, Stephanie Norvell catalogues pre-existing health conditions and is "*worried* that more pollution . . . will worsen my health conditions or lead to new conditions." Doc. 51-39 (Norvell Decl.) ¶ 9 (emphasis added). Tracy Thornton is "*worried* about how exposure to the pollution could harm my health." Doc. 51-41 (Thornton Decl.) ¶ 14 (emphasis added). And Robert Tipton is "*afraid* my sarcoidosis will come out of hibernation." Doc. 51-42 (Tipton Decl.) ¶ 15 (emphasis added); *see also* T. Millsap Decl. ¶¶ 14, 16; A. Millsap Decl. ¶ 18; Sheard Decl. ¶ 13. At most, the declarants offer the kind of "[s]peculative injury" and "unfounded fear[s]" that cannot carry the heavy burden necessary to support preliminary injunctive relief. *Holland Am.*, 777 F.2d at 997. Even taking the declarations at face value, "[s]peculative injury is not sufficient." *Id.*

2. The portable turbines' temporary status, and the ongoing transition to permanent power sources, cut further against finding irreparable harm.

12

Nor have Plaintiffs shown that irreparable harm is likely to occur during the limited time when temporary turbines will operate before removal. Plaintiffs must prove that any temporary impacts will cause lasting, permanent damage. *See W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) ("temporary effects" from pollution sources occurring for "33 months" were not "permanent or of [a] long duration"); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, No. 23-cv-58, 2023 WL 2759864, at *7 (D. Alaska Apr. 3, 2023) (impacts "short-lived"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (Jackson, J.) (effects not "permanent or irreversible").

MZX has already begun the process of installing the permanent turbines ███████████
████████████████████████████████. Worthington Decl. ¶¶ 11–12, 20, 23–24.
Specifically, ████████████████████████████████████████
██████████████████████████████████████████████████████.



*Id.* ¶¶ 11, 23. Plaintiffs thus face the difficult task of proving injury from incremental emissions that are already scheduled to decrease dramatically in the near future, and zero out completely not long thereafter. And although temporary turbines have operated for nearly a year, Plaintiffs adduce no concrete evidence of harms to human health, still less show that specific persons will likely suffer irreparable harm from the incremental, temporary emissions. *See* Doc. 51-46; Doc. 51-50.

C.      **The NAACP's delay in seeking injunctive relief undercuts their allegations of irreparable harm and precludes equitable relief.**

Plaintiffs' unexplained eight-month delay in seeking a preliminary injunction also weighs heavily against granting relief. "[A] plaintiff's undue delay . . . demonstrates that there is no apparent urgency to the request for injunctive relief." *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 17-cv-2, 2017 WL 3879095, at *10 (N.D. Miss. Sept. 5, 2017) (Brown, J.) (internal quotation marks omitted). Courts in this Circuit thus routinely "decline[] to grant injunctive relief where a

13

plaintiff, without sufficient explanation, delayed for five months or more." *Id.* at *10 (collecting cases). The NAACP's lengthy inaction undercuts claims of urgency or irreparable harm.

The NAACP's own exhibits show they could have acted far sooner. Starting in August 2025, in reliance on MDEQ's July 29, 2025 determination, MZX moved temporary portable turbines to the site. Doc. 51-7; Worthington Decl. ¶ 8 & Ex. A. The NAACP's counsel sought a public records disclosure from MDEQ on September 12, 2025, and received responsive documents almost immediately—on September 18 and October 6, 2025. Doc. 51-10; Doc. 51-11. Those documents disclosed: (a) that MZX had consulted with MDEQ in late July 2025 regarding the potential use of portable turbines at Stanton Road; (b) that MDEQ determined that portable temporary turbines did not need a permit; (c) that MZX had brought temporary turbines to the site over time; and (d) that MZX had applied for a PSD permit to construct permanent turbines. Doc. 51-6; Doc. 51-7; Doc. 51-9. Plaintiffs have thus known the material facts since September 2025 at the latest. Even accounting for the statutory citizen-suit notice period, Plaintiffs inexplicably did not seek preliminary injunctive relief until May 2026. Doc. 20.

While Plaintiffs dragged their feet, Defendants invested ▮▮▮▮▮▮▮▮▮▮ in computing facilities in reasonable reliance on Mississippi's determination that the temporary portable turbines did not need a permit. Hundreds of millions of users worldwide came to rely on the AI tools that the facilities support. MZX will have already started removing temporary turbines from Stanton Road by the time this Court hears argument on this motion, and MZX plans to remove most of the temporary turbines ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In this context, the NAACP's delay forecloses injunctive relief. *See Ronaldo*, 2017 WL 3879095, at *10.

## II. The NAACP has shown no likelihood of success on the merits.

Plaintiffs have not shown any substantial likelihood of success on the merits, because: (1) Plaintiffs lack statutory standing to sue on behalf of third parties; (2) CAA liability cannot

14

extend to conduct, like Defendants' here, undertaken in compliance with a federally approved SIP; (3) MZX's use of temporary turbines did not "begin actual construction" of any permanent emission unit; (4) Defendants lacked fair notice that their conduct violated the CAA; and (5) the CAA's citizen-suit provision violates Article II of the Constitution.

## A.      The NAACP lacks statutory standing.

The plain text of the CAA's citizen-suit provision precludes NAACP from bringing suit on behalf of its members. Statutory standing turns on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). The citizen-suit provision states that "any person may commence a civil action *on his own behalf*." 42 U.S.C. § 7604(a) (emphasis added). The plain meaning of "on his own behalf" indicates that a plaintiff may sue only for his "[b]enefit," not for the benefit of another. *Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968); *Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[O]n behalf of means 'in the name of, on the part of, as the agent or representative of.'"). The CAA specifically defines "person" to include an "association." 42 U.S.C. § 7602(e). So in providing that a person may sue "on his own behalf," the Act must mean that the person—including an association—cannot sue on another's behalf. Put differently, an organization may therefore sue "to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.6 (1998). Thus, the NAACP may not sue on its members' behalf, but must itself have suffered an organizational injury.[5]

---

[5] Courts strictly follow the plain text of other causes of action that prevent organizations from vindicating member rights. For example, the Fair Labor Standards Act only authorizes suits "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). As the Tenth Circuit and several other courts have concluded, "[t]he wording of this provision suggests that standing to pursue an action for liability is statutorily limited to employees only," and precludes suits by unions as representatives of employees. *United Food & Commercial Workers Union,*

The NAACP, however, does not allege that it has suffered any organizational injury sufficient to satisfy Article III, *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024), and it may not do so for the first time on reply. It instead brings this "suit on behalf of its members," relying solely upon a theory of associational standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In other words, the NAACP relies exclusively on alleged "harms to Plaintiffs' *members*." Doc. 52 at 11–14 (emphasis added). The statutory text forbids that sort of on-behalf-of-others suit. If "on his own behalf" means anything, it must mean that a plaintiff may not sue as a representative of a third party—but that is exactly what the NAACP attempts here. The NAACP therefore lacks a cause of action and cannot succeed on the merits.

**B.      Citizen-suit liability cannot extend to conduct, like Defendants' here, undertaken in compliance with a federally approved state SIP.**

Plaintiffs allege that Defendants are violating Mississippi's SIP, and the CAA, by deploying and using turbines without a permit. *See* Doc. 52 at 15–19. But where a SIP's language is clear and unambiguous, a court must enforce it as written. *See S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 369–70 (5th Cir. 2026). The CAA "does not authorize the imposition of sanctions for conduct that complies with a [SIP] that the EPA has approved." *United States v. Cinergy Corp.*, 623 F.3d 455, 458 (7th Cir. 2010). Rather, the CAA makes *states* primarily responsible for protecting air quality through state regulations that are approved by the EPA (i.e., EPA-approved SIPs); *see Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 560–61 (5th Cir. 2024) (recognizing that the CAA "operates as 'an experiment in cooperative federalism,'" and states have primary responsibility "for implementing [air quality] standards" (cleaned up)). Plaintiffs' claims fail because Mississippi's EPA-approved SIP excludes

---

*Local 1564 v. Albertson's, Inc.*, 207 F.3d 1193, 1200 (10th Cir. 2000). Similarly here, the natural reading of "on his own behalf" is that the NAACP may not sue as a representative of its members.

mobile sources from permitting requirements, and ordinary meaning, MDEQ's views, and common sense all confirm that MZX's trailer-mounted turbines are mobile sources.

Under Mississippi's SIP, "[m]obile sources" are "[c]ategorical[ly]" "excluded from the requirement for a permit to construct and a permit to operate." 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013); *accord id.* R. 2.1(D)(2).[6] Because the SIP does not define the term "mobile source," it must be interpreted according to ordinary meaning. "Mobile" means "[c]apable of moving or being moved readily from place to place." *Mobile*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1129 (4th ed. 2000). A mobile source is therefore an emission source that can move or be moved. Plaintiffs argue the temporary turbines' size shows they are stationary sources, but Plaintiffs' own exhibits show that the turbines are mobile. The turbines are pictured on trailers being hauled down the highway, *see* Doc. 51-23 at 34; Doc. 51-45 at 2, and their manufacturers market them as "mobile" power solutions, *see* Doc. 51-45 at 4–5 (GE TM2500 spec. sheet offering "power potential on wheels" and as a "mobile, two-trailer assembly" that "can be transported via land, sea, and air"); *id.* at 2 (Solar SMT-130 advertised for "mobile and rapid deployment power generation," requiring "[n]o [c]oncrete [f]oundation"). MZX's turbines are "mobile sources" in the ordinary sense of that phrase: they are designed to serve as temporary power solutions that can be moved via flatbed trailer on and off a site as needed. Worthington Decl. ¶¶ 8, 17, 19–21, 24.

MDEQ reads its SIP the same way: "MDEQ understands that the referenced turbines will be 'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer) and 'temporary' as it is intended for each to remain on-site . . . for less than twelve (12) months." Doc. 51-7. As a

---

[6] EPA first approved this mobile-source SIP provision in March 2006. *See* 71 Fed. Reg. 14,658 (Mar. 23, 2006); MDEQ, *NSR/PSD Revision – Appendix G-6*, at PDF p. 29 (July 28, 2005), Doc. ID EPA-R04-OAR-2005-MS-0001-0004, https://perma.cc/MSC4-JHZQ. And EPA most recently approved Mississippi's SIP in February 2020. *See* 85 Fed. Reg. 10,070 (Feb. 21, 2020).

result, MDEQ determined that such "turbines are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D." *Id*. Given MDEQ's authority and unique expertise with the SIP and familiarity with the relevant facts, its position is entitled to careful consideration and real weight. *See Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 490–91 (2004) ("state agency's" application of SIP provisions should be sustained except where "not based on a reasoned analysis" (citation omitted)); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402–03 (2024) (agency views can be "especially informative" where determination "rests on factual premises within [the agency's] expertise").

This case aligns with *Cinergy*, where the Seventh Circuit found that compliance with a SIP precluded liability for an alleged failure to obtain a permit. 623 F.3d at 458. There, the United States alleged that Cinergy, the owner of a coal-fired electric power plant, violated the CAA—as implemented through then-current EPA regulations—by modifying its plant in ways that would increase actual, annual emissions. *Id.* at 456. Cinergy countered that a permit was not necessary because, under the federally approved version of Indiana's SIP in effect at the time of the alleged conduct, "hourly capacity rather than annual emissions determined whether a permit was required," and Cinergy's project increased annual emissions by increasing the hours of operation, not the hourly emissions rate. *Id.* at 457–58. The Seventh Circuit sided with Cinergy, holding that a "straightforward reading" of the SIP "permitted [Cinergy] without fear of sanctions to make modifications without a permit as long as they would not increase [the] plant's potential generating capacity, even if they would increase its annual output." *Id.* at 458. Accordingly, the United States could not "impos[e] . . . sanctions"—even for a violation of then-current EPA regulations—where the "conduct . . . complie[d]" with Indiana's SIP, which "EPA ha[d] approved." *Id.*; *accord Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*, 191 F. Supp. 3d 1287, 1293–96,

18

1301 & n.85 (D. Utah 2016) (citing *Cinergy* and holding that where a mine owner complied with an "unambiguous" SIP provision, citizen-suit plaintiffs could not impose "liability").[7]

The same holds true here. A "straightforward reading" of Mississippi's SIP shows that MZX's turbines fall within the ordinary meaning of "mobile source," just as MDEQ concluded. Because Defendants complied with the EPA-approved SIP, not even the United States could impose liability on Defendants for this conduct. *Cinergy*, 623 F.3d at 458 ("The Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a [SIP] that the EPA has approved."). After all, the CAA vests states with responsibility for enacting and enforcing SIPs and does not contemplate imposing sanctions for conduct that complies with a state plan. *E.g.*, 42 U.S.C. §§ 7410, 7413(a)(1), 7604(a). This case is no exception to that rule.

Instead of Mississippi's SIP, Plaintiffs point to a federal regulation. *See* Doc. 52 at 20–21 (quoting 40 C.F.R. § 51.50). But in *Cinergy*, although the federal regulation was more restrictive, the Seventh Circuit held that the company could not be sanctioned for conduct that complied with an EPA-approved SIP. *See* 623 F.3d at 458–49. So too here. Plaintiffs' remedy, if any, is to persuade Mississippi to modify its SIP, or perhaps to urge the EPA to revisit its approval of Mississippi's SIP. Plaintiffs may not, however, impose liability on Defendants for conduct that complied with Mississippi's federally approved SIP.[8]

---

[7] Although the Eighth Circuit distinguished *Cinergy* in *United States v. Ameren Missouri*, it did so based on differences in the underlying SIPs. *See* 9 F.4th 989, 1003 (8th Cir. 2021) (explaining that the Missouri SIP, unlike the Indiana SIP in *Cinergy*, expressly "incorporate[d]" certain federal rules and "expressly provide[d] that" federal rules "as set out in the Code of Federal Regulations supersede any conflicting provision in the state SIP"). Here, neither the mobile-source exclusion in Mississippi's SIP nor EPA's notice of approval of the same include any similar incorporation or superseding language.

[8] *Cf.* 42 U.S.C. § 7607(b)(2) (disallowing judicial review in enforcement proceedings of EPA SIP approval actions for which judicial review was available under 42 U.S.C. § 7607(b)(1)).

19

Plaintiffs briefly contend that the SIP's treatment of "facilit[ies] which will be located only temporarily at a site" shows that MZX's turbines are not categorically exempt, because MDEQ may issue permits for temporary facilities. *See* Doc. 52 at 22. That argument misunderstands the exemption, which addresses temporary *stationary sources*; it does not displace the SIP's categorical exclusion of *mobile sources*. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013). In any event, the cited provision is permissive, not mandatory, and MDEQ has not invoked that authority here. *See id*. (permit "may issue" for a temporary stationary source).

## C.     Defendants did not "begin actual construction."

Plaintiffs' claims fail for an additional, independent reason: they have not met their burden to prove that Defendants "began actual construction" on a stationary source. Under federal law, "[n]o new major stationary source . . . shall begin actual construction without a permit." 40 C.F.R. § 52.21(a)(2)(iii); *see* 42 U.S.C. § 7475(a).[9] By its plain terms, this provision defines when sources become subject to permitting requirements and, by negative implication, what activities may occur without a permit. Under Mississippi's SIP, absent an exclusion, "any new stationary source or modification of a stationary source must have a permit . . . before beginning actual construction." 11 Pt. 2 Ch. 2 Miss. Code R.2.1(D)(2) (2013). EPA regulations define "[b]egin actual construction" as the "initiation of physical on-site construction activities on an emissions unit which are *of a permanent nature*." 40 C.F.R. § 52.21(b)(11) (emphasis added); *see also* Draft Memorandum from Anne L. Idsal, EPA Principal Deputy Assistant Adm'r, to Reg' Air Div. Dirs. 1–2 (Mar. 25, 2020), https://tinyurl.com/2zhrud43.

---

[9] Mississippi adopted and incorporated 40 C.F.R. § 52.21, including the definitions in § 52.21(b), into its SIP. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1(B) (2013).

Plaintiffs have not met their burden to show that Defendants began actual construction on an emissions unit. Where a regulation's text "is unambiguous and does not lead to an absurd result," the interpretive inquiry ends there. *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 438 (5th Cir. 2011). "Permanent" means "continuing or enduring without fundamental or marked change." *Permanent*, WEBSTER'S NEW COLLEGIATE DICTIONARY 847 (1980), or "not subject to change, replacement, fluctuation, or transience," *Permanent*, BLACK'S LAW DICTIONARY (12th ed. 2024). The temporary turbines, and the activities MZX undertook to deploy them, are not "permanent." The turbines arrived and remain on wheeled trailers, were never affixed to permanent foundations, and will each operate for no more than one year before being removed. *See* Doc. 51-6; Doc. 51-7; Worthington Decl. ¶¶ 6–8, 20–21, 24. While MZX took other steps, such as pouring concrete pads (on which the wheeled trailers are parked, Worthington Decl. ¶ 19), running lines to bring gas to the turbines or transmit electric power away, and erecting certain buildings, *see* Doc. 52 at 22–23, these constructed items are not themselves emissions units. Because MZX did not perform any construction "on an emissions unit" (i.e., on the temporary turbines themselves) that is "of a permanent nature," the Plaintiffs' claim fails.

Plaintiffs contend that the ancillary work amounted to "begin[ning] actual construction," noting that construction includes "building supports and foundations, laying underground pipework and construction of permanent storage structures." *See* Doc. 52 at 22 (quoting 40 C.F.R. § 52.21(b)(11)). But as to the concrete pads, the portable turbines parked on the pads are not stationary sources and, in fact, do not require concrete foundations to operate. *See* Worthington Decl. ¶ 19. The gas and power lines are serving mobile sources, not the stationary sources to which the SIP's and the PSD program's preconstruction permit requirements apply. As to the "associated buildings," EPA guidance confirms that buildings that are neither emissions units nor emission-

21

control devices, may be constructed without a permit. *See* Letter from Aaron Szabo, Assistant Adm'r, EPA Region 9, to Philip McNeely, Dir., Maricopa Cnty. Air Quality Dep't (Sept. 2, 2025), https://tinyurl.com/4knpnwck. Plaintiffs have not alleged that the structures at the Stanton Road site are emissions units or emission-control devices.

Plaintiffs briefly suggest that Defendants violated the SIP by beginning operation without filing a "certification of construction" under Rule 2.5(D)(1) and (4). *See* Doc. 52 at 15–17. But, again, this requirement applies only "[u]pon the completion of construction" of stationary sources that required a preconstruction permit in the first instance. Because the portable turbines are exempt, no certification was required. *See* 11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(1), (4) (2024).

**D.      Fair notice principles bar liability, because Defendants reasonably relied on Mississippi's determination that no permit was required.**

Even if Plaintiffs could show a likelihood of success on their permit-related claims, fair notice principles shield Defendants from liability here. That is because they reasonably relied on MDEQ's July 2025 determination that the portable, temporary turbines did not require a permit.

Laws "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Fair notice "requires the agency to have stated with ascertainable certainty what is meant by the standards it has promulgated," *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (cleaned up). Courts, in turn, must not "validat[e] the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHA*, 790 F.2d 154, 156 (D.C. Cir. 1986); *see also Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 708–09 (7th Cir. 2013) (applying fair notice principles to a citizen suit under the Clean Water Act).

In assessing a fair notice defense, a court need not conclusively interpret relevant provisions or determine whether conduct violated the law. Rather, a court asks only whether the

22

party had fair notice of the interpretation being enforced against it. *See, e.g.*, *Gates & Fox Co.*, 790 F.2d at 156. Thus, the inquiry asks "whether [the regulated party] lacked reasonable notice." *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997). The starting point is whether a party received notice "in the most obvious way of all: by reading the regulations." *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

Defendants lacked fair notice that the mobile turbines required preconstruction permits. Those turbines are portable units mounted on flatbed trailers, designed to be rapidly deployed, operated temporarily, and wheeled in and out of sites as needed. These characteristics supported Defendants' reasonable expectation that the turbines are exempt from stationary-source permitting requirements under Mississippi's SIP. 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D)(3) (2013). That is especially true because Mississippi's regulators *told them as much*. The analysis should stop there.

To the extent federal law and regulations are pertinent, they did not provide fair notice either. The CAA defines "stationary source" to mean "any building, structure, facility, or installation" that emits covered air pollutants, while excluding "nonroad engines." *See* 42 U.S.C. §§ 7411(a)(3), 7602(z). A "nonroad engine" is an "internal combustion engine" that, inter alia, is not subject to a New Source Performance Standard ("NSPS") under Section 111 of the Act. *Id.* § 7550(10); *see* 40 C.F.R. § 1036.5(d). But Section 111, in turn, applies only to "stationary sources"—a term defined circularly to exclude "nonroad" engines. 42 U.S.C. § 7411.

EPA's implementing regulations compound the problem. They define a "nonroad engine" to include an internal combustion engine that is "portable or transportable, meaning designed to be and capable of being carried or moved from one location to another." 40 C.F.R. § 1068.30(1)(iii). Such an engine nevertheless "cease[s]" to be a nonroad engine—and instead becomes "stationary"—if it remains at one location for 12 months or is "otherwise regulated by a

23

federal [NSPS] promulgated under section 111." *Id*. § 1068.31(e)(1)–(2).[10] This circular array of definitions—where "nonroad engine" is defined by reference to "stationary source," and "stationary source" by reference to "nonroad engine"—yields profound uncertainty about whether the temporary use of portable turbines falls within the "nonroad engine" exemption.

Plaintiffs assert that these turbines are subject to NSPS Subpart KKKK, which applies to certain stationary combustion turbines with a heat-input capacity greater than 10 MMBtu/hr. *See* Doc. 52 at 20–21. But Subpart KKKK's definition of "stationary" turbines—encompassing turbines "not self-propelled or intended to be propelled while performing its function" even though they "may . . . be mounted on a vehicle for portability," 40 C.F.R. § 60.4420—only adds ambiguity. Certainly, nothing in the CAA or regulations foreclosed reading these provisions to exclude turbines that move around and are used temporarily. *See CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 445–46 (5th Cir. 2024); *Hoechst Celanese Corp*., 128 F.3d at 225.[11]

Given the importance of the issue and the enormous investments being contemplated, MZX reasonably sought confirmation from state regulators before deploying any turbines at Stanton Road. MDEQ confirmed that "the referenced turbines are exempt from permitting requirements" under Mississippi law because they would be "mobile" (by remaining affixed to trucks) and "temporary" (by remaining on-site for less than 12 months). Doc. 51-7. When a regulated party proactively seeks a determination from the agency responsible for interpreting and enforcing regulations, fair-notice principles entitle reliance on the agency's response. *See Hoechst Celanese*

---

[10] In other words, EPA itself recognized that portable equipment designed to move between locations within 12 months may not be subject to stationary source permitting requirements. This is not a "dreamed-up exemption." Doc. 52 at 21. It is codified in EPA's regulations.

[11] A 2026 EPA rulemaking preamble, *see* Doc. 52 at 20 n.42, could not have provided notice because it *postdates* MDEQ's determination, on which MZX relied here. *See Hoechst Celanese Corp.*, 128 F.3d at 224–30.

*Corp.*, 128 F.3d at 225; *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 49 (D.C. Cir. 2016) (Kavanaugh, J.) (where party seeks and receives prior official assurance that conduct would be legal, "[n]o one would seriously contend that the [government] had acted fairly or in a manner consistent with basic due process" if it later seeks to penalize that very conduct), *vacated on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) (en banc). Because even the government cannot perform such a bait-and-switch, it would be perverse to allow private parties to punish Defendants for conduct that state regulators sanctioned.

Notably, MDEQ's determination did not occur in isolation. Just weeks earlier, Tennessee regulators concluded that no CAA permit was needed for temporary use of portable turbines in Memphis, resting on a slightly different, but ultimately complementary, rationale. Ex. 6 at 3. The Tennessee regulators observed that EPA "is aware of and has not objected to the determination that the temporary turbines are not subject to stationary source air permitting requirements." *Id.*[12] Fair notice shields regulated parties from liability where regulators are clearly "aware" that parties are taking certain actions, but the agency "[takes] no steps to advise the public" that "the practice was questionable." *EOX Holdings*, 90 F.4th at 445 (quoting *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996)). Given state regulators' shared view that no permit was required, and the EPA's apparent acquiescence, Defendants reasonably relied on MDEQ's determination.

The Fourth Circuit's decision in *United States v. Hoechst Celanese Corporation* confirms the fair notice concern here. There, a plant operator faced regulatory ambiguity regarding EPA emissions regulations and sought guidance from the Texas Air Control Board ("TACB"). 128 F.3d

---

[12] In November 2024, EPA Region 4 acknowledged in writing that "EPA Region 4 permitting staff previously consulted with SCHD permitting staff" regarding the temporary turbines and had "provided informal feedback." Ex. 7 at 3. Although EPA stated those inquiries would "trigger a formal review process" leading to "a Regulatory Interpretation," *id.*, no such Interpretation has issued.

at 224–25. The TACB determined the facility was exempt, and although the EPA's Regional Office received TACB's letter, it "took no action to rescind or invalidate the exemption." *Id.* at 225. The Fourth Circuit held the company lacked fair notice that its conduct would violate the law, reasoning that the TACB's letter and the EPA's silence gave the company "reason to believe that its interpretation . . . was accurate," particularly given ambiguity in the regulations. *Id.* at 226.

The fair-notice defense here is even stronger. Unlike in *Hoechst*, where the operator extrapolated guidance about a Texas facility to a South Carolina plant, MZX received a formal determination from the agency with delegated authority to implement and enforce CAA permitting requirements in Mississippi, addressing turbines at the specific location. Moreover, MZX sought MDEQ's determination before bringing any turbines to the site. And MDEQ has not expressed any change in its interpretation even after a January 2026 EPA rulemaking on standards for temporary turbines.[13] *See* 91 Fed. Reg. at 1,927. In this context, it would violate fair-notice principles to issue an injunction predicated on the notion that Defendants violated the Clean Air Act by not obtaining a permit that Mississippi regulators told Defendants was not required.

**E.      The CAA's citizen-suit provision violates Article II of the U.S. Constitution.**

Plaintiffs' claims fail for the independent reason that the CAA's citizen-suit provision violates Article II and the separation of powers by allowing private parties to exercise law-enforcement authority vested in the Executive Branch.

---

[13] In December 2024, EPA published a proposed rule suggesting that Subpart KKKK applied to "portable turbines" that "meet other applicability criteria." 89 Fed. Reg. 101,306, 101,345 (Dec. 13, 2024). The phrase "other applicability criteria," however, left unclear which criteria applied and whether temporary operation affected applicability. The proposed rule also acknowledged longstanding ambiguity about the status of temporary turbines and solicited comment on whether exemptions should exist. *Id.* In any event, proposed rules do not provide interpretations "carrying the force of law" and should not be afforded any deference. *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 297–98 (5th Cir. 2022) ("a proposed regulation does not represent an agency's considered interpretation of its statute" (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986))).

Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In other words, "[t]he entire 'executive Power' belongs to the President alone." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *see* U.S. Const. art. II, § 1, cl. 1; *id.* § 3. This power has long been understood to include the core law-enforcement power to prosecute all public offenses, whether civil or criminal. *See* Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 800 (2003).

"[U]nder Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678–79 (2023) (cleaned up). This discretion includes civil enforcement. *See In re Aiken Cnty.*, 725 F.3d 255, 264 & n.9 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985). The Take Care Clause makes the President's authority over enforcement actions "conclusive and preclusive," thus "disabl[ing]" Congress from "acting upon the subject." *Trump v. United States*, 603 U.S. 593, 607, 620 (2024) (cleaned up).

The CAA vests law-enforcement power in private persons without regard to these bedrock constitutional principles. The citizen-suit provision states that "any person" may "commence a civil action on his own behalf" against "any" other "person . . . who is alleged to have violated . . . or to be in violation of" numerous CAA requirements, including emissions regulations and permitting requirements. 42 U.S.C. § 7604(a)(1), (a)(3), (f). And the "enforcement authority" in 42 U.S.C. § 7604 includes both sweeping injunctive relief and "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court"—"a quintessentially executive power." *Seila Law*, 591 U.S. at 219; *accord Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, No. 23-10520, 2026 WL 1689717, at *7 (5th Cir. June 11,

27

2026) ("The power[s] … to sanction [and] sue" are "quintessentially executive functions."). As courts have long recognized, citizen-suit plaintiffs are not ordinary civil litigants but act as enforcement authorities: "private attorneys general" who "seek relief not on their own behalf but on behalf of society as a whole." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004).

For decades, Justices of the Supreme Court have noted that "exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization" raise "[d]ifficult and fundamental questions" under "Article II of the Constitution." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *see also id.* at 209 (Scalia, J., joined by Thomas, J., dissenting); *Dep't of Transp. v. Ass'n. of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). This makes sense. Nobody elected the NAACP, no official appointed them, and they have taken no oath of allegiance. Yet they assert here authority to unilaterally "conduct[ ] civil litigation . . . for vindicating public rights," *Buckley v. Valeo*, 424 U.S. 1, 140 (1976), based on conduct that the United States has not sought to punish—and that Mississippi has approved.[14] Granted, some district courts have upheld the constitutionality of CAA (and CAA-style) citizen suits.[15] But these cases predate more recent Supreme Court decisions, which make clear that when "the Constitution vests the executive power in the President," that means *all* of it. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Today, there

---

[14] Unlike the False Claims Act ("FCA"), which creates a similar "private attorney general" action known as "*qui tam*," the CAA provides no express mechanism for the executive branch to direct or dismiss citizen suits it disagrees with. And even that check may not be enough. Three Justices have signaled that private *qui tam* actions under the FCA may violate Article II. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *id.* at 449 (Thomas, J., dissenting). The CAA's citizen-suit provision is *a fortiori* unconstitutional because it lacks FCA's express mechanisms intended to protect executive discretion.

[15] *E.g., N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555–56 (E.D. N.C. 2001); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001).

is no longer any question: CAA citizen suits violate Article II, because they give core executive law enforcement power to private parties. Thus, none of Plaintiffs' claims are likely to succeed.

**III.    Catastrophic harms to Defendants and the public outweigh any injuries to Plaintiffs.**

**A.    Any impacts to Plaintiffs' members from temporary, incremental emissions in an attainment area are dwarfed by the catastrophic harms an injunction would inflict on Defendants and hundreds of millions of AI users worldwide.**

The NAACP's claimed injuries are vastly outweighed by the catastrophic and incalculable harms an injunction would cause to Defendants and millions of people and businesses worldwide that depend on xAI's tools and services. "[T]he award of an interlocutory injunction . . . has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (cleaned up). "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (cleaned up). A movant's injuries must not only be irreparable, but must also *outweigh* harms to the defendant and others. *See Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *SO Apartments, L.L.C. v. City of San Antonio*, 109 F.4th 343, 348 (5th Cir. 2024). Plaintiffs cannot make that showing.

Consider first the devastating impact of any injunction on Defendants and their customers. Issuing an injunction and precipitously shutting down the Stanton Road facility, even temporarily, would cause profound, irreparable, and incalculable harms to MZX, xAI, and the hundreds of millions of customers and users who depend on xAI's services and those of other AI providers. The Tulane Road and Stateline computing facilities together comprise the most dense deployment of advanced Graphic Processing Units anywhere in the United States and possibly the world— representing an investment of ███████████ in computing infrastructure. Jacobson Decl. ¶¶ 17–18, 27; Trettel Decl. ¶¶ 4–6, 9. ███████████████████████ ███████████████████████. Jacobson Decl. ¶ 26. Shutting down the temporary turbines

29

before permanent power comes online would deprive those computing facilities of the power needed to run, halting essentially all AI model training, refinement, and development at those sites. *Id.* ¶¶ 23–32. xAI's ability to serve an estimated ███████████ ████████████ users of Grok would be severely impaired, and the shutdown would create a substantial risk of Grok becoming effectively useless. *Id.* ¶¶ 14, 25, 29–31, 33.

The longer a shutdown lasts, the greater the likelihood that xAI will suffer *permanent* competitive damage, from its AI model falling behind its competitors' models, and will lose customers, at a time when AI models are locked in fierce global competition. *Id.* ¶¶ 27–34. Harms would continue long after a temporary power outage is restored. Data, storage, and training runs could not be accessed during the outage; partially trained models would grow stale; data and hardware would risk corruption from an abrupt loss of power. *Id.* ¶¶ 27–30. Restarting training runs, frozen in time from a shutdown, may not even be possible, and the work done across ███████ ███████ could be permanently lost, requiring starting from scratch. Every frontier AI company releases new models at least every few weeks, as training and refinement is a continual process; models that are not continuously trained become obsolete relative to competitors. *Id.* ¶¶ 13, 20, 28–29. xAI is no exception; ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████. *Id.* ¶ 31. Shutting down Stanton Road ██████████████ ████████████. This description of harms is likely underinclusive: a prolonged, full shutdown of a computing facility of this sort is, to Defendant's knowledge, unprecedented. *Id.* ¶¶ 19, 26, 28.

Nor would the cascading harms end there. A lengthy outage could also lead xAI to lose its highly skilled and specialized workforce, together with local construction contractors and

30

hundreds of salaried maintenance personnel. Jacobson Decl. ¶¶ 35–38; *see Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (harms to movant in lost jobs and public interest in maintaining jobs weighed against injunction); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (lost jobs are "properly . . . weighed against" environmental harms in preliminary-injunction analysis).

Moreover, other AI companies, including Anthropic, Google, and Cursor, use the computing facilities powered by Stanton Road. Jacobson Decl. ¶¶ 22, 32. For example, xAI has contracts to provide computing power to support Anthropic's AI model "Claude," and Google's Gemini AI platform. *Id*. ¶ 22. Because the temporary turbines are currently the only available power source for the Tulane Road and Stateline computing facilities, a forced shutdown would also disrupt these other companies' access to this computing power.

Large language models like Grok also play a critical role in maintaining America's global advantage in AI. Because xAI and other U.S. companies rely on the uniquely large-scale computing infrastructure powered by Stanton Road, a shutdown could erode the U.S. edge over countries like China, with adverse national-security implications. *Id.* ¶¶ 24, 32; *see Save RGV v. Space Expl. Techs. Corp.*, No. 24-cv-00148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024) (injunction could "impact national security by halting" or "delaying" programs "relied on by multiple government agencies").

In sum, shutting down the temporary turbines before permanent power is online would bring xAI's core operations to a standstill, inflict lasting damage, and harm other major companies. Devastating damage to "business operations" and customer relationships is the kind of "severe harm[]" that cuts against injunctive relief. *Optimus Steel LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 726–27 (E.D. Tex. 2020). Plaintiffs' generalized and speculative allegations about

31

incremental and short-term risks to health are thus vastly outweighed by the certain, catastrophic, and irreparable harms to xAI, MZX, other AI companies, and hundreds of millions of users worldwide. *See id.* at 727; *see also Winter*, 555 U.S. at 23–31.

**B.      An injunction would disserve the public interest.**

Plaintiffs' massively disruptive and destructive injunction would ill-serve the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312; *see Winter*, 555 U.S. at 24–26 (reversing lower courts for "understat[ing]" an "injunction's consequent adverse impact on the public interest"). Plaintiffs thus err in ignoring many countervailing interests and suggesting that enforcing environmental laws, and wielding the Clean Air Act to reduce incremental emissions, always serves the public interest. *See* Doc. 52 at 27.

First, an injunction would frustrate U.S. AI policy by impairing access to critical AI infrastructure. Executive Order 14179 established a national policy "to sustain and enhance America's global AI dominance" to promote "economic competitiveness, and national security." 90 Fed. Reg. 8,741, 8,741 (Jan. 31, 2025). The White House has emphasized that the U.S. "must aggressively adopt AI within its Armed Forces" to "maintain its global military preeminence." WHITE HOUSE, WINNING THE RACE: AMERICA'S AI ACTION PLAN 11 (2025), https://tinyurl.com/6rrx2kbk. Critically, the military uses xAI's tools in service of national defense. *See*, *e.g.*, Press Release, U.S. Dep't of War, The War Department to Expand AI Arsenal on GenAI.mil With xAI (Dec. 22, 2025), https://tinyurl.com/3ek875j9. Defendants' "bring your own power" model aligns with the President's directive that AI companies "build, bring, or buy new generation resources" to avoid straining the public grid. *See* WHITE HOUSE, FACT SHEET: PRESIDENT DONALD J. TRUMP ADVANCES ENERGY AFFORDABILITY WITH THE RATEPAYER PROTECTION PLEDGE (Mar. 4, 2026), https://tinyurl.com/42ced4xp. Shutting down the Stanton

Road turbines, and with them the two nearby computing facilities, would frustrate these national priorities. *See Haig v. Agee*, 453 U.S. 280, 292 (1981); *Save RGV*, 2024 WL 5357188, at *4.

Second, an injunction would disserve the public interest in fair and predictable enforcement of environmental laws. Shutting down Stanton Road would punish MZX and xAI for actions and investment undertaken in reasonable reliance on Mississippi's determination that the portable turbines do not need air permits. The public interest protects "rights guaranteed under the Constitution," including due process. *McMillen v. Itawamba Cnty. Sch. Dist*., 702 F. Supp. 2d 699, 705 (N.D. Miss. 2010). Plaintiffs' hyperbolic suggestion that Defendants built "personal power plants" without permits "in hopes" of simply paying a penalty later, Doc. 52 at 27, misstates the record. MZX received MDEQ's formal determination that no permit was required to use portable turbines, before bringing any such units to Stanton Road. MZX has kept MDEQ apprised of all additional temporary turbines, all of which satisfy the conditions in the July 2025 letter. MDEQ has consistently maintained its position that no permit is required. Worthington Decl. ¶¶ 6–8, 16. Preliminarily enjoining operation of the portable turbines would undermine the CAA's cooperative federalism scheme, be profoundly inequitable, and disserve the public interest. *See Sierra Club*, 990 F. Supp. 2d at 43 (public interest weighed against enjoining a project that would "cast[] doubt" on the statutory permitting process); *Optimus Steel LLC*, 492 F. Supp. 3d at 727 ("public interest in allowing energy infrastructure to develop").

Third, an injunction would harm Mississippi's sovereign interests. "[A]ny time a State is enjoined by a court from effectuating [its] statutes . . . , it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (applying that principle in injunction context to state executive-branch action). MDEQ determined that these temporary turbines were mobile

33

sources exempt from preconstruction permitting. Granting Plaintiffs relief would effectively override Mississippi's determination and nullify the state's regulatory action, contrary to the state's prerogative to interpret and enforce its own laws. *See E.T.*, 19 F.4th at 770.

**IV.     Any injunction must be conditioned on the NAACP posting bond.**

The motion should be denied. But if the Court contemplates granting relief, it should require Plaintiffs to post bond. An injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c); 42 U.S.C. § 7604(d) (applying bond requirement to CAA citizen-suits). Plaintiffs cannot avoid this requirement simply by calling their case "public interest" litigation. Rule 65(c) "not only contains no such exception but also states flatly" that an injunction may issue "only if the movant gives security." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010). A party "is not entitled to a preliminary injunction unless [they] post[] security indemnifying [the enjoined party] against the financial losses it might suffer," and "failure to require the posting of a bond . . . constitutes grounds for reversal of an injunction." *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) (cleaned up). An injunction shutting down Stanton Road during pendency of this litigation would inflict annualized financial losses on xAI of approximately ███████. Trettel Decl. ¶ 9. And because the full scope of harms to Defendants exceeds even this financial estimate, if the Court is inclined to grant any injunctive relief, it should hold a separate hearing and allow supplemental briefing on the bond amount, before any injunction takes effect.

**CONCLUSION**

The Court should deny Plaintiffs' amended motion for a preliminary injunction. If the Court concludes that any preliminary injunctive relief is warranted, it should require a bond commensurate with Defendants' likely losses and harms.

34

Dated: June 15, 2026

Respectfully submitted,

/s/ Daniel W. Van Horn

Patrick D. Traylor* (D.C. Bar No. 449350)　Daniel W. Van Horn (MS Bar No. 102105)
Jeremy C. Marwell* (D.C. Bar No. 1000299)　BUTLER SNOW LLP
VINSON & ELKINS LLP　6075 Poplar Ave., Suite 500
2200 Pennsylvania Ave. NW　Memphis, TN 38187
Suite 500 West　(901) 680-7331
Washington, D.C. 20037　danny.vanhorn@butlersnow.com
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com　P. Ryan Beckett (MS Bar No. 99524)
　Keri E. Herrington (MS Bar No. 106815)
Michael B. Buschbacher*　BUTLER SNOW LLP
BOYDEN GRAY PLLC　1020 Highland Colony Pkwy., Suite 1400
800 Connecticut Ave. NW, Suite 900　Ridgeland, MS 39157
Washington, D.C. 20006　(601) 948-5711
(202) 955-0620　(601) 948-5177
mbuschbacher@boydengray.com　keri.herrington@butlersnow.com
　ryan.beckett@butlersnow.com

*Pro Hac Vice

*Attorneys for X.AI Corp. and MZX Tech LLC*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2026, I filed the foregoing document with the Clerk of the U.S. District Court for the Northern District of Mississippi through the Court's CM/ECF system, which shall send notification of such filing to all parties of record in this case.

*/s/ Daniel W. Van Horn*
Daniel W. Van Horn
