**EXHIBIT A**

**BRIEF OF THE STATE OF MISSISSIPPI AS AMICUS CURIAE SUPPORTING DEFENDANTS AND OPPOSING PLAINTIFFS' PRELIMINARY-INJUNCTION MOTION**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** | **PLAINTIFFS** |
| **v.** | **No. 3:26-cv-00074-DMB-JMV** |
| **X.AI CORP.; and MZX TECH LLC** | **DEFENDANTS** |

**BRIEF OF THE STATE OF MISSISSIPPI AS AMICUS CURIAE
SUPPORTING DEFENDANTS AND OPPOSING PLAINTIFFS'
PRELIMINARY-INJUNCTION MOTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION, INTEREST OF AMICUS CURIAE,
AND SUMMARY OF ARGUMENT .................................................................... 1

BACKGROUND ................................................................................................. 2

ARGUMENT ....................................................................................................... 5

    This Court Should Deny The Preliminary-Injunction Motion ......................... 5

        A.      An Injunction Would Defy The Clean Air Act And Usurp State
                Authority ................................................................................................... 5

        B.      An Injunction Would Irreparably Harm The State And Have
                Profound Negative Ramifications For Its Citizens .............................. 10

CONCLUSION ................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
585 U.S. 579 (2018) .................................................................................... 10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ................................................................................... 11

*BCCA Appeal Group v. EPA,*
355 F.3d 817 (5th Cir. 2003) ..................................................................... 2

*BST Holdings, LLC v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ..................................................................... 12

*Florida Power & Light Co. v. Costle,*
650 F.2d 579 (5th Cir. 1981) ...................................................................... 9

*Luminant Generation Co. v. EPA,*
675 F.3d 917 (5th Cir. 2012) ............................................................ 2, 6, 10

*Ohio v. EPA,*
603 U.S. 279 (2024) ............................................................................... 9, 10

*Sierra Club v. Otter Tail Power Co.,*
615 F.3d 1008 (8th Cir. 2010) .................................................................... 6

*Texas v. EPA,*
690 F.3d 670 (5th Cir. 2012) ......................................................... 6, 7, 9, 10

*Texas v. EPA,*
829 F.3d 405 (5th Cir. 2016) .............................................................. 2, 5, 6

*Texas v. United States,*
787 F.3d 733 (5th Cir. 2015) .................................................................... 10

*Train v. NRDC,*
421 U.S. 60 (1975) ............................................................................... 6, 11

**Statutes**

42 U.S.C. § 7401.................................................................................. 1, 2, 6, 9

ii

42 U.S.C. § 7401 *et seq.* ....................................................................................... 2

42 U.S.C. § 7407 ............................................................................................. 2, 3, 5

42 U.S.C. § 7408 .................................................................................................... 5

42 U.S.C. § 7409 .................................................................................................... 5

42 U.S.C. § 7410 ................................................................................................. 3, 6

42 U.S.C. § 7475 .................................................................................................... 6

42 U.S.C. § 7503 .................................................................................................... 6

42 U.S.C. § 7661 .................................................................................................... 6

Miss. Code Ann. § 49-17-7 ..................................................................................... 3

Miss. Code Ann. § 49-17-13 ................................................................................... 3

Miss. Code Ann. § 49-17-17 ................................................................................... 3

**Regulations**

11 Miss. Admin. Code Pt. 1, Ch. 1 Introduction ...................................................... 3

11 Miss. Admin. Code Pt. 2, R. 2.1 ........................................................................ 3

11 Miss. Admin. Code Pt. 2, R. 2.1-2.17 .............................................................. 3, 7

11 Miss. Admin. Code Pt. 2, R. 2.13 ................................................... 3, 4, 7, 8, 11

40 C.F.R. § 52.1270 ............................................................................................ 3, 7

85 Fed. Reg. 10070 (Feb. 21, 2020) ....................................................................... 3

**Other Authorities**

Adam Babich,
    The Supremacy Clause, Cooperative Federalism,
    and the Full Federal Regulatory Purpose,
    64 Admin. L. Rev. 1 (2012) ............................................................................... 7

Environmental Protection Agency,
   Mississippi Nonattainment/Maintenance Status ................................................ 13

Gov. Reeves Announces Largest Corporate Investment In Mississippi History,
   WLBT News (Jan. 8, 2026) ................................................................................. 12

Kira R. Fabrizio,
   The Effect of Regulatory Uncertainty on Investment:
   Evidence from Renewable Energy Generation,
   29 J. Law, Econ., & Org. 765 (2013) ................................................................. 12

Mississippi Department of Environmental Quality,
   Air Quality Data Summary for Calendar Year 2025 (Mar. 2026) ....................... 13

Scott R. Baker et al.,
   Measuring Economic Policy Uncertainty,
   131 Q.J. Econ. 1593 (2016) ................................................................................. 12

Tech Leader xAI Investing More Than $20 Billion In Southaven,
   Office of Gov. Tate Reeves (Jan. 8, 2026) ........................................................... 11

Webster's Third New International Dictionary (1993) ............................................ 7, 9

xAI Investing More Than $20 Billion In Southaven Data Center,
   Magnolia Tribune (Jan. 8, 2026) ................................................................... 11-12

xAI Southaven Operations Fact Sheet,
   Office of Gov. Tate Reeves .................................................................................. 11

## INTRODUCTION, INTEREST OF AMICUS CURIAE, AND SUMMARY OF ARGUMENT

Plaintiffs seek relief that would usurp Mississippi's authority and inflict profound and lasting damage on the State and its citizens. The State therefore submits this amicus curiae brief opposing plaintiffs' preliminary-injunction motion, Dkt. 51. The motion fails on the merits and on the equities.

Plaintiffs seek to block defendants' temporary operation of portable power-generating turbines at their property in Southaven, Mississippi. Defendants are using those turbines to power advanced-computing operations while a permanent power plant is built. Plaintiffs claim that, under state regulations adopted in line with the Clean Air Act, defendants were required to obtain an air-pollution-control permit from the Mississippi Department of Environmental Quality before using those turbines. In pressing that claim, plaintiffs urge this Court to reject MDEQ's reasoned determination that, under its regulations, no permit was required.

Granting plaintiffs relief would defy the governing legal framework. The Clean Air Act gives "primary responsibility" for air-pollution "prevention" and "control" to the States. 42 U.S.C. § 7401(a)(3). States fulfill that responsibility by adopting and enforcing pollution-control regulations—known as state implementation plans (or SIPs). The Environmental Protection Agency has approved Mississippi's SIP, which includes permitting requirements for building and operating equipment that produces air pollution. Here, MDEQ determined that defendants' use of portable turbines falls within the permitting exemption in Mississippi's SIP for mobile sources. That determination was reasonable, and by law it was MDEQ's to make. Plaintiffs give no sound reason to reject it. That dooms their motion.

1

Granting plaintiffs relief would also flout the equities and subvert the public interest. An injunction would scrap the reasoned outcome of the State's duly adopted—and federally blessed—regulatory process, on a project of massive consequence to the State and its citizens. The relief that plaintiffs demand would thus override the State's sovereign authority, imperil the massive economic benefits to the State and its citizens that defendants' operations provide, risk thousands of jobs and billions of dollars in investment and tax revenue, and, by sowing profound uncertainty over whether Mississippi is a reliable venue for investment, threaten the State's ability to attract future projects that benefit its residents. Plaintiffs show no awareness of the chaos that an injunction would inflict. That confirms that they have not carried their burden and cannot be granted the extraordinary relief they seek.

This Court should deny the preliminary-injunction motion.

## BACKGROUND

1. The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Group v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). The Act is "an experiment in cooperative federalism" that assigns duties and entrusts powers to the federal government and to States. *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016). The Act requires the federal Environmental Protection Agency to "identify[ ] air pollutants" and to "establish[ ]" national air-quality standards for them. *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012). And the Act entrusts States with "assuring air quality" by "implementing those standards." *Ibid.*; *see also* 42 U.S.C. §§ 7401(a)(3), 7407(a). States adopt regulations—known as

2

state implementation plans (or SIPs)—that "specify" how they will "achieve[ ] and maintain[ ]" "air quality standards." 42 U.S.C. § 7407(a). The EPA "shall approve" those regulations if they "meet[ ] all of the applicable requirements of" the Clean Air Act. *Id.* § 7410(k)(3). When the EPA approves a State's plan, it is up to the State to apply, enforce, and implement the plan. *See id.* § 7410(a)(2)(C).

Consistent with this framework, Mississippi law empowers the Mississippi Department of Environmental Quality to administer air-pollution-control programs and regulations under the Clean Air Act—that is, to prepare and implement the State's SIP. *See, e.g.*, Miss. Code Ann. §§ 49-17-7, 49-17-13, 49-17-17; 11 Miss. Admin. Code Pt. 1, Ch. 1 Introduction. Through its Permit Board, MDEQ issues "air pollution control permits," which generally are required for entities that "construct" or "[o]perate" "equipment" that emits regulated air pollutants. 11 Miss. Admin. Code Pt. 2, R. 2.1.D. State regulations set forth the standards governing those permits. *See id.* Pt. 2, R. 2.1-2.17. Those regulations also include—in Rule 2.13.D—a list of "[c]ategorical [e]xclusions" from permitting requirements. *Id.* Pt. 2, R. 2.13.D. Equipment that falls within any of Rule 2.13.D's exclusions is exempt from the "requirement for a permit to construct and a permit to operate." *Ibid.* Rule 2.13.D exempts (for example) most "[a]ir conditioning, space heating, or ventilating systems," "[f]eed milling facilities," "[s]awmills" and "woodworking plants," and "[g]asoline service stations." *Ibid.* Rule 2.13.D also exempts "[m]obile sources." *Ibid.* The EPA approved these regulations—including Rule 2.13.D's exclusions—as part of the State's SIP. *See* 40 C.F.R. § 52.1270(c) (citing 85 Fed. Reg. 10070 (Feb. 21, 2020)).

3

2. In line with state regulations, in August 2025 defendants applied to MDEQ for a permit to build and operate equipment for a new power plant in Southaven, Mississippi. *See* PI Br. 4 n.5 (Dkt. 52). The plant will power defendants' nearby advanced-computing operations, which include data centers and AI computing hardware. *Id.* at 4; PI Opp. 7 (Dkt. 61). The same month, defendants began bringing portable, trailer-mounted turbines to the Southaven site to generate power until the permanent plant is built. Complaint 2 (¶ 4) (Dkt. 1); PI Br. 5. Before bringing the portable turbines on-site, defendants told MDEQ of their plans to do so. *See* Dkt. 1-2 (exhibit to complaint); PI Opp. 5.

In a July 29, 2025 letter, MDEQ confirmed to defendants that the portable turbines fall within Rule 2.13.D's exclusion for mobile sources and so "are exempt from permitting requirements" under the State's SIP. Determination (Dkt. 1-2). MDEQ made that determination "contingent upon" "two ... criteria remaining valid": that the turbines will be (1) "'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer)" and (2) "'temporary' as it is intended for each to remain on-site ... for less than twelve (12) months." *Ibid.* MDEQ also urged defendants to operate the turbines "in a manner that minimizes" emissions, such as by "implement[ing]" "additional emission control technology." *Ibid.*

In March 2026, MDEQ approved a permit for the Southaven power plant. Dkt. 51-27. Construction of the plant is underway. *See* PI Opp. 6.

3. On April 14, 2026, plaintiffs filed this lawsuit. They claim that defendants violated the Clean Air Act and Mississippi's SIP by operating the portable turbines

4

without obtaining a permit from MDEQ. Complaint 38-42 (¶¶ 221-55). They seek an injunction barring defendants from operating the turbines. Dkts. 51, 52.

## ARGUMENT

**This Court Should Deny The Preliminary-Injunction Motion**.

The law and the equities defeat plaintiffs' request for injunctive relief.

### A. An Injunction Would Defy The Clean Air Act And Usurp State Authority.

In pressing for injunctive relief, plaintiffs ask this Court to upend the Clean Air Act's cooperative-federalism framework and override the responsible state agency's reasoned application of the State's EPA-approved regulations. This Court should reject that plea. The Clean Air Act gives States primary authority to prevent and control air pollution. Mississippi has adopted regulations that do what the Act requires. The EPA agrees. And the State's implementing agency reasonably determined that defendants' challenged conduct comports with those regulations. That array of actions showcases how the Clean Air Act is supposed to work. There is no basis to fault that process or to discard the sound state-agency determination that it produced. This Court should deny the preliminary-injunction motion.

1. The Clean Air Act is "an experiment in cooperative federalism," but it entrusts to States the primary authority to regulate and combat air pollution. *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (*Texas 2016*). The Act assigns to the EPA the responsibility of identifying air pollutants and setting air-quality standards. *See* 42 U.S.C. §§ 7408-7409. But the Act reaffirms that "[e]ach State shall have the primary responsibility for assuring air quality within [its] entire geographic area." *Id.* § 7407(a). So States "drive the regulatory process," *Texas 2016*, 829 F.3d at 411,

5

and the Act ensures that States retain the "primary responsibility" for air-pollution "prevention" and "control," 42 U.S.C. § 7401(a)(3).

Under this framework, States have "wide discretion in formulating" and "implementing" their "plan[s]" for achieving the air-quality standards set by the EPA. *Texas 2016*, 829 F.3d at 411. The Act supplies "the goals and basic requirements of state implementation plans, but the [S]tates have broad authority to determine the methods and particular control strategies they will use to achieve the [Act's] requirements." *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) (*Texas 2012*). This "great flexibility accorded the [S]tates" is confirmed by the EPA's "sharply contrasting, narrow role" in "implementation," which is "confine[d]" to the "ministerial function of reviewing" a State's SIP "for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012). "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train v. NRDC*, 421 U.S. 60, 79 (1975).

The Act directs that States adopt certain permitting programs as part of their regulation of air-pollution emissions. *E.g.*, 42 U.S.C. §§ 7475, 7503, 7661. So a State can adopt permitting regulations as part of its SIP, which the EPA "shall approve" if it "meets all of the applicable requirements of" the Act. *Id.* § 7410(k)(3). As with other mechanisms of pollution control, the Act envisions that permitting requirements be "primarily implemented by the [S]tates." *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010). Thus, "[o]nce a [S]tate's [SIP] is approved" by the

6

EPA, "the [S]tate's regulations apply" to permitting decisions and the State "becomes the primary issuer and enforcer of [environmental] permits." Adam Babich, The Supremacy Clause, Cooperative Federalism, and the Full Federal Regulatory Purpose, 64 Admin. L. Rev. 1, 26 (2012).

The regulatory process here—and the result it produced—satisfied this framework. Consistent with the Clean Air Act, Mississippi has adopted permitting regulations for building and operating equipment that emits pollutants. 11 Miss. Admin. Code Pt. 2, R. 2.1-2.17. Those regulations contain several "[c]ategorical [e]xclusions" from permitting requirements, including an exemption for "[m]obile sources." *Id.* Pt. 2, R. 2.13.D. The EPA approved Mississippi's permitting regulations—including the exemption for "[m]obile sources"—as part of the State's SIP. *See* 40 C.F.R. § 52.1270(c). Exercising the State's authority to implement and enforce its SIP regulations, MDEQ then applied those regulations to the conduct challenged here. MDEQ determined that defendants' portable turbines—each of which "will remain affixed to a portable unit (i.e., a flatbed trailer)" and will remain in use "for less than twelve (12) months," Determination—fall within the plain text of the Mississippi SIP's mobile-source exemption and so do not require a permit. *Cf.* Webster's Third New International Dictionary 1450 (1993) (*mobile* means, *e.g.*, "capable of moving or being moved about readily"; "equipped for ready movement ... as by truck"; "mounted on a vehicle"). That sound, straightforward determination is entitled to respect and deference in view of the State's "broad authority" to administer its EPA-approved pollution-control strategies. *Texas 2012*, 690 F.3d at 675. There is no basis for upsetting or discarding that determination.

2. Plaintiffs recognize that the State's permitting regulations include an exemption for mobile sources, they recognize that the EPA approved those regulations and that exemption, and they do not dispute that the State (through MDEQ) is empowered to interpret and apply its permitting regulations in cases like this one. *See* PI Br. 2, 18. Yet plaintiffs seek an injunction that would scrap MDEQ's reasoned application of its regulations. That relief would upend the Clean Air Act's cooperative-federalism framework. Plaintiffs arguments for that relief fail.

First, plaintiffs cite EPA regulations and recent federal rulemaking that (plaintiffs say) describe "mobile sources" in ways that are inconsistent with reading the State's mobile-source exemption to cover defendants' portable turbines. *See* PI Br. 18-19 & n.42. But plaintiffs do not show that Mississippi's mobile-source exemption incorporates or relies on those federal regulations—some of which post-date the mobile-source exemption's adoption by the State (and approval by the EPA). Nor do they cite anything to show that in approving Mississippi's mobile-source exemption the EPA imported these other regulations into Mississippi's SIP.

Second, plaintiffs fault MDEQ's reference to defendants' "temporary" use of the portable turbines, claiming that no relevant permitting exemption "exist[s]" for "temporary" sources. PI Br. 17, 19; *see id.* at 19-21. But MDEQ's decision does not purport to apply a standalone exemption for "temporary" sources. That decision cites only the subsection of Mississippi's SIP that contains the "[m]obile source[ ]" exemption. *See* Determination (citing 11 Miss. Admin. Code Pt. 2, R. 2.13.D). The best reading is that the reference to defendants' "temporary" operation of the turbines supports the assessment that the turbines are (and will remain) mobile sources under

8

the SIP. *Compare* Webster's Third 2353 (*temporary* means, *e.g.,* "impermanent," "transitory") (formatting altered), *with id.* at 1450 (*mobile* means, *e.g.*, "capable of ... being moved about readily"; "not restricted or committed"; "tending to change").

Last, plaintiffs contend that applying Mississippi's mobile-source exemption here "stretches" the Clean Air Act "beyond the breaking point." PI Br. 18; *see id.* at 17-19. But as explained, MDEQ's determination flows from the plain meaning of *mobile sources*. And when that is so, the Clean Air Act requires that the State's determination stand. The Act embraces States' "primary responsibility" over air-pollution prevention and control. 42 U.S.C. § 7401(a)(3). That States have "primary responsibility" over pollution-control decisions does not mean that they simply get to move first and make a determination that others—federal regulators, industry groups, private litigants, other interested parties, or courts—may freely discard. Rather, it means that reasonable state actions must stand. That is what it means for States to have "great flexibility" and authority in how they regulate air pollution, *Florida Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981)—including in their "enforcement of their prescribed measures" for emission limitations and control, *Ohio v. EPA*, 603 U.S. 279, 283 (2024).

Allowing "the EPA [to] run roughshod over" the States' "initiative and ... broad responsibility" upends the Clean Air Act's "experiment in federalism." *Texas 2012*, 690 F.3d at 675. The same is true for private litigants. Allowing private plaintiffs to enlist federal courts in overriding a state agency's reasonable application of SIP regulations would "transgress[ ]" the Act's "specific vision" for States' "duties and

9

responsibilities" in air-pollution control. *Id.* at 686. Yet that is what plaintiffs seek. Their merits position defies the Act. This Court should reject it and deny relief.

### B. An Injunction Would Irreparably Harm The State And Have Profound Negative Ramifications For Its Citizens.

The equities independently doom plaintiffs' plea for an injunction. The relief that plaintiffs demand would override the State's sovereign authority, imperil massive economic benefits to the State and its citizens, cast uncertainty on thousands of jobs and billions of dollars in investment and tax revenue, and threaten the State's ability to attract future projects that benefit its residents. Plaintiffs offer nothing comparable—and show no awareness of the damage their injunction would inflict. They cannot be granted extraordinary injunctive relief.

1. An injunction would irreparably harm the State and its citizens. Those harms vastly outweigh any harms that plaintiffs hypothesize.

First, granting an injunction would scrap a duly authorized state agency's considered permitting determination. That alone would profoundly harm the State. States have a "sovereign interest" in establishing and enforcing a legal regime. *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). When a court blocks part of that regime, it irreparably harms the State. *Cf. Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Here, those principles have special force. As explained, the Clean Air Act embraces States' authority to adopt pollution-control regulations. A State's SIP reflects its "choices" of how best to "implement[ ], maint[ain], and enforce[ ]" emission standards in that State's "jurisdiction[ ]." *Ohio*, 603 U.S. at 283-84. A State thus has "great flexibility" over its regulatory choices, *Luminant*, 675 F.3d at 921, and a keen

10

interest in ensuring that those choices are carried out in a way that is "best suited to its particular situation." *Train*, 421 U.S. at 79. In line with that framework, Mississippi adopted—and the EPA approved—a SIP that "[c]ategorical[ly] [e]xclu[des]" "[m]obile sources" from environmental-permitting requirements. 11 Miss. Admin. Code Pt. 2, R. 2.13.D. The relief that plaintiffs seek would condemn a state agency's administration of its SIP. Granting that relief would undermine the State's authority and its interest in applying its own laws—and thus profoundly damage the State as a sovereign.

Second, granting an injunction would imperil the many benefits that defendants' operations provide to the State and its citizens. States have a strong interest "in the health and well-being—both physical and economic—of [their] residents." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). Here, defendants' advanced-computing operations provide an extraordinary boon to Mississippians. Those operations amount to "the largest economic development project in Mississippi's history," Tech Leader xAI Investing More Than $20 Billion In Southaven, Office of Gov. Tate Reeves (Jan. 8, 2026), bit.ly/4ecK9L0, which will "support[ ] innovation, workforce development[,] and long-term economic growth" in the State, xAI Southaven Operations Fact Sheet 1, Office of Gov. Tate Reeves, bit.ly/4ep04oh. Those operations promise to create "[h]undreds of permanent jobs" and "[t]housands of indirect subcontracting jobs," draw "up to $20 billion" in private investment, and generate "[s]ignificant tax revenue," which can fund "public safety, education, health services, parks[,] and infrastructure" and "strengthen[ ]" the State's "role as a technology leader." *Ibid.*; *see, e.g.*, xAI Investing More Than $20

11

Billion In Southaven Data Center, Magnolia Tribune (Jan. 8, 2026), bit.ly/3ShkZ5n ("Mississippi's largest corporate investment to date" is expected to "create hundreds of permanent jobs" and "creat[e] a new economy in Mississippi"); Gov. Reeves Announces Largest Corporate Investment In Mississippi History, WLBT News (Jan. 8, 2026), bit.ly/43QUnut (this "substantial investment" will "provide tax revenue" that "benefit[s]" the State). An injunction would "materially slow or outright stop the largest private investment in Mississippi's history" and "create an immediate and substantial disruption to the State's economy." Letter from Gov. Tate Reeves 1 (May 29, 2026) (Dkt. 58-2). Such "economic upheaval" disserves "the public interest," *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), and weighs heavily against plaintiffs' motion.

Third, granting an injunction would imperil broader economic development in the State. Economic development and investment depend on a stable and predictable regulatory environment. *See, e.g.*, Scott R. Baker et al., Measuring Economic Policy Uncertainty, 131 Q.J. Econ. 1593, 1593-98, 1633-34 (2016) (regulatory and policy uncertainty can harm "macroeconomic performance," "investment rates," and "employment growth"); Kira R. Fabrizio, The Effect of Regulatory Uncertainty on Investment: Evidence from Renewable Energy Generation, 29 J. Law, Econ., & Org. 765, 765-67, 789, 790-93 (2013) (regulatory instability makes firms "less willing to invest in developing and adopting new technologies"). Plaintiffs' injunction would foster an antagonistic, unstable, and uncertain regulatory environment. They invite this Court to annul a reasoned decision of a State's pollution-control agency, nearly a year after the decision was made and after vast resources have been expended in

reliance on it. Doing that would sow instability, uncertainty, and confusion in the State's regulatory and economic landscape. That would damage not just this project but future projects, by causing companies and economic players to question whether to invest in the State at all. Equity does not support such a devastating, long-lasting blow to Mississippi's fortunes and its citizens' wellbeing.

2. Plaintiffs offer a different view of the equities, but their arguments fail.

Plaintiffs contend that an injunction is necessary to protect "health and recreational wellbeing." PI Br. 23; *see id.* at 21-25. Plaintiffs' delay in filing suit belies that claim. Defendants started deploying their turbines in August 2025. PI Opp. 1, 14; *see* Complaint 2 (¶ 4). Yet plaintiffs did not seek injunctive relief halting their operation until May 2026—eight months after defendants started using them. *See* PI Opp. 13-14. And plaintiffs' argument is unpersuasive on its own terms. The state regulatory process here accounts for Mississippians' health and wellbeing. That process has resulted in the State being in full attainment with EPA's air-quality standards. *See* MDEQ, Air Quality Data Summary for Calendar Year 2025 at 3 (Mar. 2026), bit.ly/44m3nYA; EPA, Mississippi Nonattainment/Maintenance Status, bit.ly/4gw24O0. And plaintiffs' alleged harms must be considered in view of defendants' representations on the pollution-control measures that they are employing. *E.g.*, MTD Br. 6 (Dkt. 55) (defendants' statements that they are deploying "state-of-the-art emission controls" and that their "controlled emission levels" "meet or exceed the stringent federal requirements for stationary combustion sources"); PI Opp. 8-9 & n.2. Defendants also report that "analyses of air quality monitoring data" and "computer modeling" show that the turbines have had "no material impact on"

13

"air quality" and have not caused "adverse impacts to human health." PI Opp. 8, 9. Plaintiffs do not refute that.

Plaintiffs' other arguments fail too. They state that "preliminary injunctions requiring Clean Air Act compliance are in the public interest." PI Br. 25. That conclusory assertion falls with plaintiffs' merits case. *Supra* Part A. Plaintiffs also claim that injunctive relief would serve the Clean Air Act's "public policy" of "combat[ing] air pollution." PI Br. 25. But the Act strikes a careful balance to achieve its pollution-control objectives. Respecting a State's duly adopted SIP—and a state agency's reasoned administration of that SIP—"combat[s] air pollution" in the way and to the extent that the Act demands.

Ultimately, plaintiffs' narrow and conclusory presentation on the equities reinforces that they are not entitled to equitable relief. Plaintiffs disregard the harm to the State from scrapping its agency's reasoned exercise of the State's primary authority over pollution control. They disparage and disregard the drastic consequences for the State and its citizens from disrupting one of the largest economic ventures in the State's history. And they show no awareness of the long-term damage that their injunction would inflict. That all shows that they have not carried their burden and cannot be granted extraordinary injunctive relief.

14

## CONCLUSION

This Court should deny the preliminary-injunction motion.

Dated: June 22, 2026

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART (MSB #106359)
  *Solicitor General*
JUSTIN L. MATHENY (MSB #100754)
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: scott.stewart@ago.ms.gov
*Counsel for Amicus Curiae*
  *State of Mississippi*

15

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing brief has been served on all counsel of record by ECF.

Dated: June 22, 2026

*s/ Scott G. Stewart*
SCOTT G. STEWART
*Counsel for Amicus Curiae*
*State of Mississippi*

16