**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

|  |  |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE, <br><br> Plaintiff, <br><br> v. <br><br><br> X.AI and MZX TECH LLC, <br><br> Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'**
**AMENDED MOTION FOR INTERVENTION AND DISMISSAL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

     A.     Legal background ............................................................................... 2

     B.     Factual background ............................................................................ 5

     C.     Procedural background ...................................................................... 6

ARGUMENT .................................................................................................................. 7

I.     The United States is entitled to intervene in this Clean Air Act citizen suit. ...................... 7

II.     Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action. ............................................................ 8

     A.     The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo. ............................ 10

     B.     Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act. .......................... 17

CONCLUSION .............................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases** Pages(s)

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ........................................................................................ 3, 4, 21

*Appalachian Power Co. v. EPA.*,
249 F.3d 1032 (D.C. Cir. 2001) ................................................................................. 2

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*,
299 F.3d 1007 (9th Cir. 2002) .................................................................................. 16

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (5th Cir. 2003) ..................................................................................... 2

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ........................................ 17

*Citizens for Clean Power v. Indian River Power, LLC*,
636 F. Supp. 2d 351 (D. Del. 2009) ......................................................................... 14

*Citizens for Resp. & Ethics in Wash. v. FEC*,
602 U.S. 406 (2024) .................................................................................................. 17

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) .................................................................................................. 22

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) .................................................................................................... 18

*Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*,
718 F.2d 1341 (5th Cir. 1983) .................................................................................. 10

*Dubois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) .................................................................................... 11

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) .......................................................................... 4, 14, 19

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) ................................................................... 4, 11, 14, 16

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) ........................................................... 11, 16, 19, 20

*EPA v. City of Green Forest*,
 921 F.2d 1394 (8th Cir. 1990) ................................................................................. 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000) ...................................................................... 13, 17, 18, 19, 20

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
 484 U.S. 49 (1987) ..................................................................... 4, 11, 12, 14, 16

*Hamker v. Diamond Shamrock Chem. Co.*,
 756 F.2d 392 (5th Cir. 1985) ........................................................................... 11, 13

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equipment Inc.*,
 434 F.3d 320 (5th Cir. 2005) .................................................................................... 8

*Heckler v. Chaney*,
 470 U.S. 821 (1985) ............................................................................... 9, 12, 14

*In re Aiken County*,
 725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 18, 22

*Jennings v. Rodriguez*,
 583 U.S. 281 (2018) ................................................................................................ 17

*Karr v. Hefner*,
 475 F.3d 1192 (10th Cir. 2007) ....................................................................... 14, 15

*Marcaida v. Rascoe*,
 569 F.2d 828 (5th Cir. 1978) .................................................................................. 10

*Merrick v. Diageo Ams. Supply, Inc.*,
 805 F.3d 685 (6th Cir. 2015) .................................................................................... 4

*Montgomery Env't Coal. v. Costle*,
 646 F.2d 595 (D.C. Cir. 1981) ................................................................................. 4

*NRDC, Inc. v. Train*,
 510 F.2d 692 (D.C. Cir. 1974) ............................................................................... 12

*Residents of Gordon Plaza, Inc. v. Cantrell*,
 25 F.4th 288 (5th Cir. 2022) .................................................................................... 4

*Riley v. St. Luke's Episcopal Hosp.*,
 252 F.3d 749 (5th Cir. 2001) ............................................................................ 20, 21

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020) ..................................................................................... 18, 19, 23

iii

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) .................................................................................................................. 23

*Stringer v. Town of Jonesboro,*
986 F.3d 502 (5th Cir. 2021) .................................................................................................. 14

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.,*
973 F.2d 1320 (7th Cir. 1992) .......................................................................................... 15, 17

*Tex. Workforce Comm'n v. U.S. Dep't of Educ.,*
973 F.3d 383 (5th Cir. 2020) .................................................................................................. 12

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .................................................................................................................. 22

*Trump v. United States,*
603 U.S. 593 (2024) .................................................................................................................. 18

*United States ex rel. Polansky v. Exec. Health Res., Inc.,*
599 U.S. 419 (2023) ............................................................................................................ 8, 9, 24

*United States v. EME Homer City Generation, L.P.,*
727 F.3d 274 (3d Cir. 2013) .................................................................................................... 11

*United States v. Ford Motor,*
814 F.2d 1099 (6th Cir. 1987) ................................................................................................... 3

*United States v. Hansen,*
599 U.S. 762 (2023) .................................................................................................................. 17

*United States v. Jones,*
109 U.S. 513 (1883) .................................................................................................................. 21

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) .................................................................................................................... 3

*West Virginia v. EPA,*
597 U.S. 697 (2022) .................................................................................................................... 3

**Statutes**

15 U.S.C. § 15 .............................................................................................................................. 22

15 U.S.C. § 15(a) ......................................................................................................................... 22

16 U.S.C. § 1540(g) ....................................................................................................................... 4

31 U.S.C. § 3730................................................................................................................20

31 U.S.C. § 3730(c)(2)(A) ................................................................................................20

33 U.S.C. § 1365................................................................................................................4

42 U.S.C. § 2000e-5(f)......................................................................................................22

42 U.S.C. § 2000e-5(g)(1) ................................................................................................22

42 U.S.C. § 6972................................................................................................................4

42 U.S.C. § 7401 *et seq.*....................................................................................................2

42 U.S.C. § 7401(a)(3).......................................................................................................21

42 U.S.C. § 7408................................................................................................................2

42 U.S.C. § 7409................................................................................................................2

42 U.S.C. § 7410................................................................................................................2

42 U.S.C. § 7410(a) ...........................................................................................................21

42 U.S.C. § 7410(a)(1)........................................................................................................3

42 U.S.C. § 7410(a)(2)(C) ..................................................................................................3

42 U.S.C. § 7410(k) ...........................................................................................................21

42 U.S.C. § 7412................................................................................................................3

42 U.S.C. § 7412(i)(1) ........................................................................................................3

42 U.S.C. § 7412(*l*)(1) ......................................................................................................4

42 U.S.C. § 7412(*l*)(7) ......................................................................................................4

42 U.S.C. § 7413................................................................................................................3

42 U.S.C. § 7413(a) ...........................................................................................................4

42 U.S.C. § 7413(a)(1)........................................................................................................4

42 U.S.C. § 7413(a)(1)-(3)..................................................................................................11

v

42 U.S.C. § 7413(b) ..................................................................................................... 4, 11

42 U.S.C. § 7413(c) ......................................................................................................... 4

42 U.S.C. § 7414 ............................................................................................................. 3

42 U.S.C. §§ 7470-7492 ................................................................................................. 3

42 U.S.C. § 7477 ............................................................................................................. 4

42 U.S.C. § 7604 ............................................................................................................. 4

42 U.S.C. § 7604(a) ......................................................................................................... 5

42 U.S.C. § 7604(a)(1)-(3) .............................................................................................. 5

42 U.S.C. § 7604(a)(3) ..................................................................................................... 5

42 U.S.C. § 7604(b)(1) ................................................................................................... 13

42 U.S.C. § 7604(b)(1)(A) ............................................................................................... 5

42 U.S.C. § 7604(b)(1)(B) ........................................................................................... 5, 22

42 U.S.C. § 7604(c)(2) ...................................................................................... 1, 5, 7, 10

42 U.S.C. § 7604(c)(3) ............................................................................................... 5, 13

42 U.S.C. § 7604(g) ....................................................................................................... 23

42 U.S.C. § 7604(g)(1) ..................................................................................................... 5

42 U.S.C. § 7604(g)(2) ................................................................................................... 23

42 U.S.C. § 9659 .............................................................................................................. 4

**Rules**

Fed. R. Civ. P. 24(a)(1) .................................................................................................... 1

Fed. R. Civ. P. 41(a) ...................................................................................................... 22

Fed. R. Civ. P. 41(a)(1)(A)(i) .......................................................................................... 1

Fed. R. Civ. P. 41(a)(1) ................................................................................................... 8

**Regulations**

40 C.F.R. §§ 63.6080–63.6175 ............................................................................... 3

11 Miss. Admin. Code Pt. 2, R. 2.1 (2024)................................................................ 2

11 Miss. Admin. Code Pt. 2, R. 5.2 (2024)................................................................ 2

**Other Authorities**

U.S. Constitution, Art. II, § 1 Cl. 1 & § 3.........................................................17, 18

S. Rep. No. 91-1196 (1970) ............................................................................... 15, 16

131 Cong. Rec. 6738 (1985) ................................................................................... 13

*Declaring a National Energy Emergency*
    Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) ...................................... 8

*Removing Barriers to American Leadership in Artificial Intelligence*
    Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025) ...................................... 8

Michael S. Greve, *The Private Enforcement of Environmental Law*,
    65 Tulane L. Rev. 339 (1990) ................................................................................. 20

**INTRODUCTION**

Through a citizen suit under the Clean Air Act, Plaintiffs NAACP and NAACP Mississippi State Conference (collectively, NAACP) seek to enforce federal law by obtaining civil penalties payable solely to the United States Treasury. In doing so, the NAACP threatens American national, economic, and energy security by seeking to shut off the power supply for artificial-intelligence innovation that supports the Department of War's military operations.

The power to execute federal law, however, belongs to the Executive Branch. Accordingly, the Clean Air Act affords the United States primacy over citizen-enforcers when it comes to enforcement discretion—as Article II of the Constitution mandates. The United States, acting on behalf of the Administrator of the U.S. Environmental Protection Agency, Lee M. Zeldin (together, the United States), thus moves to intervene in this Clean Air Act citizen suit as a plaintiff to inform the Court of the government's objection to this suit and request dismissal, pursuant to Rules 24(a)(1) and 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure.

There is no question the United States is entitled to intervene. A court shall grant intervention when a party has "an unconditional right to intervene," Fed. R. Civ. P. 24(a)(1), and the Clean Air Act mandates that the United States "may intervene as a matter of right at any time" in a citizen suit, 42 U.S.C. § 7604(c)(2).

The United States is equally entitled to dismiss this case. The NAACP may not pursue this Clean Air Act enforcement action over the United States' objection. The United States' statutory right to intervention encompasses the right to dismiss this case because, relative to citizen-enforcers like the NAACP, the statute affords the United States primacy over when and how the statute should be enforced. Article II of the Constitution also counsels in favor of that construction of the Clean Air Act by vesting the power to seek civil penalties on behalf of the United

1

States conclusively and preclusively in the Executive Branch. That includes the discretion to decide when such an enforcement action is unwarranted or inconsistent with federal enforcement priorities, and an interpretation that undermines that discretion would raise serious Article II concerns.

Accordingly, this Court should allow the United States to intervene as a plaintiff and then dismiss this case.

**BACKGROUND**

**A.      Legal background**

The Clean Air Act sets out a comprehensive program for regulating emissions of air pollutants. *See* 42 U.S.C. § 7401 *et seq.* The United States, through the Environmental Protection Agency (EPA), exercises broad powers to administer the Act. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). States likewise perform a coordinate role. *Id.* To start, we briefly describe the complex Clean Air Act programs that the NAACP seeks to enforce in this lawsuit. *See* Dkt. No. 1 at 38-42. We next describe the statute's enforcement mechanisms.

**1.** The NAACP's claims (*id.* at 38-41) relate to national ambient air-quality standards that EPA adopts as needed to protect public health and welfare. 42 U.S.C. §§ 7408, 7409. States adopt implementation plans (referred to as SIPs) to maintain EPA's standards within their borders, subject to EPA approval and oversight authority. *Id.* § 7410. SIPs may also "be revised at the EPA's insistence if found to be inadequate to ensure maintenance of the [national standards] or public health." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001).

Mississippi has an EPA-approved SIP that includes provisions to carry out the Clean Air Act's prevention of significant deterioration (PSD) program. *See* 11 Miss. Admin. Code Pt. 2,

2

Rs. 2.1, 5.2 (2024). The SIP and PSD programs require various permits before building or modifying certain stationary emission sources, plus monitoring as necessary to ensure continued compliance. *Id.* Rs. 2.1(D), 2.5(D); 42 U.S.C. §§ 7470-7492; *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308-09 (2014) (describing the PSD program).

The NAACP also alleges, Dkt. No. 1 at 41-42, violations of the Act's regulatory program for hazardous pollutants, which targets certain emissions that can be toxic to human health. 42 U.S.C. § 7412; *see West Virginia v. EPA*, 597 U.S. 697, 707-08 (2022) (describing that program). The hazardous-pollutant program, similar to the SIP and PSD programs, requires federal or state approval before building new major sources of the covered pollutants. 42 U.S.C. § 7412(i)(1). For certain stationary combustion turbines regulated under this program, EPA regulations set out emission limits and, again, impose monitoring, reporting, and recordkeeping requirements to ensure compliance. 40 C.F.R. §§ 63.6080-63.6175.

**2.** Investigating and enforcing compliance with these regulatory programs is the work of the federal and state regulators. As for state enforcement, under the statute's cooperative-federalism scheme, SIPs must provide for enforcement, including as to the modification or construction of new stationary sources. 42 U.S.C. § 7410(a)(1), (2)(C). "Although it is clear that the Clean Air Act contemplates very significant participation in air pollution control by state air pollution control agencies, it is equally clear that the final authority is vested in [EPA]." *United States v. Ford Motor Co.*, 814 F.2d 1099, 1102 (6th Cir. 1987). That is because the United States retains "broad oversight" and independent enforcement authority. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 468, 485 (2004) (*ADEC*); *see, e.g.*, 42 U.S.C. §§ 7413, 7414 (outlining federal investigative and enforcement powers).

For example, EPA has independent authority to enforce SIP requirements, such as through administrative orders, prescribing an administrative penalty, or filing a civil enforcement action for civil penalties or injunctive relief. 42 U.S.C. § 7413(a)(1), (b). EPA has similar authority when it "finds that a State is not complying with a [Clean Air Act] requirement governing construction of a pollutant source." *ADEC*, 540 U.S. at 468 (citing 42 U.S.C. § 7413(a)). Section 7477, "[d]irected specifically to the PSD program," provides that EPA can "take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction" of noncompliant facilities. *Id.* at 468-69 (quoting 42 U.S.C. § 7477). In addition to these provisions, the statute specifically reserves federal enforcement authority regarding hazardous pollutants, even where states have their own implementation program for such pollutants (which, again, must be EPA approved). 42 U.S.C. § 7412(*l*)(1), (7). Certain statutory violations also carry federal criminal sanctions. *Id.* § 7413(c).

To "supplement rather than to supplant" federal and state enforcement discretion, the Clean Air Act also includes a "citizen suit" provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987); 42 U.S.C. § 7604.[1] This provision enlists the aid of so-called "private attorneys general" to enforce the statute where government authorities purportedly "fail" to exercise enforcement responsibility. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461,

---

[1] Other major federal environmental laws with citizen-suit provisions include the Clean Water Act, 33 U.S.C. § 1365, Endangered Species Act, 16 U.S.C. § 1540(g), Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and Comprehensive Environmental Response, Compensation, and Liability Act, *id.* § 9659, among others. Those provisions are similar to the Clean Air Act's provisions, so precedent and context regarding other environmental citizen-suit provisions are "persuasive" here. *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act"); *see, e.g., Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 301 (5th Cir. 2022); *Montgomery Env't Coal. v. Costle*, 646 F.2d 595, 597 (D.C. Cir. 1981).

475-77 (6th Cir. 2004) (explaining Clean Air Act citizen suits' "interstitial" enforcement role). Private parties may "commence a civil action" to enforce the Act in three circumstances: (1) against persons for violations of emissions standards or limits, (2) against EPA for alleged failures to perform nondiscretionary duties, and (3) against persons for violations of permitting requirements. 42 U.S.C. § 7604(a)(1)-(3). In actions against private parties under subsections (a)(1) and (3), a court may order civil penalties payable to the United States Treasury, an injunction requiring compliance, or both. *Id.* § 7604(a), (g)(1).

Given private citizens' secondary enforcement role, the citizen-suit provision includes several procedural constraints designed to protect federal enforcement and policy interests. Upon filing *any* citizen suit, for example, the citizen "shall serve a copy of the complaint" on the U.S. Attorney General and EPA. *Id.* § 7604(c)(3). "[I]f not a party," the United States "may intervene as a matter of right at any time in the proceeding." *Id.* § 7604(c)(2). For subsection (a)(1) actions, specifically, the citizen must notify EPA, the relevant state, and the alleged violator 60 days before filing suit. *Id.* § 7604(b)(1)(A). EPA (or a state) may preclude the citizen's intended enforcement action by filing its own and "diligently prosecuting" that action. *Id.* § 7604(b)(1)(B).

## B.    Factual background

This case concerns how Defendants xAI and MZX Tech LLC (collectively, xAI) use temporary, gas-fired turbines to power data centers that support the Grok artificial-intelligence platform. Dkt. No. 1 ¶ 6; Dkt. No. 52 at 4-6. The Mississippi Department of Environmental Quality determined that the State's SIP did not require Clean Air Act permits for the turbines that help power Grok. Dkt. No. 1-2 at 5.

5

Grok's continued operation and availability "is a matter of paramount national security" for the reasons detailed in the attached declaration of Cameron Stanley, the Department of War's Chief Digital and Artificial Intelligence Officer (CDAO). Ex. A ¶ 8. Grok is "one of only four proprietary state-of-the-art" AI models that can support "national security applications," and "one of just three" suitable to support "mission-critical operations across Secret and Top-Secret classified networks." *Id.* ¶ 4. The Department specifically relies on xAI's "Grok Gov Model," which offers features "found in no other frontier AI model." *Id.* ¶ 5. For example, during Operation Epic Fury, Grok (through the Department's Maven Smart Systems) "enabled U.S. forces to deploy over 2,000 munitions to 2,000 distinct targets within 96 hours . . . , a testament to the greatly increased operational efficiency made possible by the Grok Gov Model." *Id.* ¶ 6. "If Grok Gov Model cannot be deployed, refined, and upgraded" across the Department to support future operations, "due to either limitations in energy supply or limited reserve compute capability, such as those requested by [the NAACP] in this matter," that would "severely impact[]" "many tools" used by the Department's military and civilian personnel. *Id.* ¶ 10.

The State of Mississippi has similarly determined that continued operation of xAI's data centers and turbines serves the State's interests. Ex. B. If the NAACP successfully shuts down xAI's turbines through this civil enforcement action, the State explained, that "would create an immediate and substantial disruption to the State's economy" and "disrupt the Clean Air Act's delicate balance of cooperative Federalism." *Id.*

C. **Procedural background**

The NAACP filed this Clean Air Act citizen suit on April 14, 2026. Dkt. No. 1. The complaint alleges that xAI is violating Mississippi's SIP, the PSD program, and EPA's hazardous-pollutant regulations because the gas-fired turbines lack certain permits and approvals, and

6

are allegedly not complying with emissions limits, employing certain pollution controls, or monitoring, reporting, and keeping records as necessary to ensure continued compliance. *E.g.*, *id.* ¶¶ 103, 112, 116, 226-227, 231, 251. Although the state agency determined that the SIP does not require permits for the turbines and has declined any enforcement, the NAACP disagrees with that determination. *Id.* ¶¶ 179-191. As relief, the NAACP seeks steep civil penalties—payable to the United States treasury—of $124,426 per day of violation, plus injunctive relief ordering xAI to stop operating its turbines "unless and until [xAI] obtain[s] the required permits," employ certain pollution controls allegedly mandated by the Clean Air Act, and take other mitigating measures. *Id.* ¶ 12; *id.* at 42.

On May 6, 2026, the NAACP moved to preliminarily enjoin xAI from operating the turbines that power xAI's data centers. Dkt. No. 20; *see also* Dkt. Nos. 51, 52. On May 13, 2026, the Court held a status conference. Dkt. No. 36. Prior to the status conference, the United States filed a notice informing the Court that the United States "is evaluating possible intervention or amicus participation in this lawsuit." Dkt. No. 35 at 1. As a result, the Court entered a briefing schedule ordering (1) xAI to respond to the preliminary injunction motion and to file any motion to dismiss by June 15, 2026, and (2) the United States to file any intervention or substantive motion also by June 15. Dkt. No. 40. On May 26, 2026, the Court scheduled an evidentiary hearing on the NAACP's preliminary-injunction motion for August 24, 2026. Dkt. No. 42.

## ARGUMENT

### I. The United States is entitled to intervene in this Clean Air Act citizen suit.

The Clean Air Act provides that the Administrator of EPA "may intervene as a matter of right at any time" in a citizen-suit proceeding. 42 U.S.C. § 7604(c)(2). Because the United States is acting on behalf of the EPA, the United States is entitled to intervene.

7

**II.** **Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action.**

The United States moves to dismiss the NAACP's complaint and is entitled to do so under Federal Rule of Civil Procedure 41(a)(1). That rule provides an "absolute right" to dismiss this action because xAI has not yet filed an answer or motion for summary judgment. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 324 (5th Cir. 2005); *cf. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).

In its prosecutorial discretion, the United States, through the Department of Justice, has determined that dismissal of this civil enforcement action accords with federal policy, national security, and the public interest. Pertinent federal policies include the President's determination that expansion of our energy infrastructure is "an immediate and pressing priority" for our national and economic security. Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025). The President has also determined that "[i]t is the policy of the United States to sustain and enhance America's global AI dominance in order to promote human flourishing, economic competitiveness, and national security." Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025). Similarly, the President's June 5, 2026, National Security Presidential Memorandum explained that "[p]revious administrations imposed undue bureaucracy that hampered the pace of AI adoption, fostered dangerous dependencies on single vendors, and made it challenging for our warfighters

8

to adopt the most advanced technologies." NSPM-11 (https://perma.cc/TV5X-F3VU). And supporting the Nation's artificial-intelligence capabilities is a pillar of the EPA Administrator's "Powering the Great American Comeback" initiative.[2]

The claims pressed and the relief sought by the NAACP's complaint threaten artificial-intelligence innovation, plus the energy needed to power it. The NAACP's attempt to cut off the power that supports Grok also threatens national security because, for the reasons expressed in CDAO Stanley's declaration, Grok provides critical support for the Department of War's military operations. Ex. A. For its part, the State of Mississippi—the Clean Air Act's other primary enforcer on this case's facts—agrees with the United States' determination that the NAACP's attempted enforcement is unwarranted and opposes this citizen suit. Ex. B.

To be clear, the United States' reasons for *why* the NAACP's attempted enforcement action is irreconcilable with federal policy do not dictate whether this Court should dismiss this case. Where "Rule 41 entitles the movant to a dismissal," a "district court has no adjudicatory role." *Polansky*, 599 U.S. at 436 n.4. In this context—where the United States is dismissing an enforcement action—reviewing the government's reasons for dismissal would also be inconsistent with the principle that federal "decisions to refuse enforcement" are "unsuitab[le]" for judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The dispositive point is that the United States seeks to exercise its preclusive enforcement discretion to dismiss this lawsuit in its entirety.

---

[2] *See* EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative (Feb. 4, 2025) (https://perma.cc/B8RX-YS3F). EPA has also reiterated that "enforcement activities must properly consider Executive Orders." Memorandum from the Acting Assistant Administrator, EPA Office of Enforcement and Compliance Assurance (Dec. 5, 2025) (https://perma.cc/PVM3-RSLM).

9

Nor does it make any difference whether NAACP objects to dismissal. The United States' express and unconditional right to intervene in this citizen suit necessarily includes the right to unilaterally dismiss the case in its entirety. That is true for two reasons. First, permitting the NAACP to pursue this Clean Air Act enforcement action seeking civil monetary penalties payable exclusively to the United States over the United States' objection is irreconcilable with the statute's assignment of enforcement authority. Second, interpreting the Clean Air Act to allow the enforcement action to proceed over the United States' objection would give rise to significant questions under the Vesting and Take Care Clauses in Article II of the Constitution. By contrast, interpreting the United States' intervention right as including the right to dismiss would avoid grave doubts about the citizen-suit provision's constitutionality.

### A. The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo.

The United States' statutory "right" to intervene "at any time" in citizen suits includes the right to dismissal. 42 U.S.C. § 7604(c)(2). When a party intervenes as a matter of right, it is afforded the status of an original party. *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978). That status, in turn, means that the United States' statutory intervention right necessarily encompasses other procedural rights that are inherent in "fully" litigating a matter. *Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*, 718 F.2d 1341, 1350-51 (5th Cir. 1983). In the specific context at issue here—where the Clean Air Act entitles the United States to intervene so that the government can protect federal policy interests from private enforcers' conflicting interests—the United States' procedural rights must be interpreted to include the right to dismiss the citizen suit.

10

The Clean Air Act's structure and allocation of enforcement authority confirm that interpretation. Nothing in the statute suggests that Congress, when enacting the citizen-suit provision, deputized citizens to "commandeer the federal enforcement machinery," especially where the United States has determined that a citizen's suit would not serve the public interest. *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987) (rejecting view that citizen-suit provisions' purpose is to "giv[e] the 'little guy' access to enforcement power of the federal government" (citation omitted)). Instead, statutory structure and precedent establish that the United States' enforcement prerogatives supersede those of citizen-enforcers. That means "the statute authorizes citizen suits only with the consent of governing authorities." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 375 n.32 (5th Cir. 2024) (en banc) (Jones, J., dissenting). And citizens may not seek relief that government enforcers deliberately choose "to forgo." *Gwaltney*, 484 U.S. at 61.

**1.** The Clean Air Act vests "primary enforcement authority" in the United States, along with state regulators—not private parties. *Env't Conservation Org.*, 529 F.3d at 528 (discussing the Clean Water Act's materially similar division of authority); *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 288-89 (3d Cir. 2013) ("primary enforcers"). The United States enjoys wide discretion in deciding how aggressively to induce statutory compliance in light of its policy priorities—whether, for example, issuing an EPA administrative compliance order, displacing state implementation decisions found to be inadequate, or filing a civil action for civil penalties and injunctive relief. 42 U.S.C. § 7413(a)(1)-(3), (b); *see Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 395 (5th Cir. 1985) (interpreting materially similar Clean

11

Water Act provisions to conclude that the federal government "plays the central role" in "enforcement"). And, as outlined above, the United States retains independent oversight and enforcement authority even as the statute also provides for state participation.

This discretion allows the United States to tailor remedies to the particular facts and achieve the desired level of deterrence. The federal government's decisions not to enforce "often involve[] a complicated balancing of a number of factors which are peculiarly within its expertise," such as how "the particular enforcement action" "best fits the [government]'s overall policies." *Heckler*, 470 U.S. at 831. Allowing this citizen suit to proceed over the United States' objection would enable citizen-enforcers to marshal federal enforcement machinery—complete with penalties payable to the United States Treasury—without regard for the suit's impacts on federal interests and its implications beyond this case.

Congress did not contemplate that result. Where, as here, the United States has determined a citizen's attempted civil enforcement action is inconsistent with federal policy and the public interest, the United States' primary enforcement role entitles it to dismissal. Any contrary interpretation of the citizen-suit provision would allow citizens to curtail the United States' considered enforcement discretion and transform "citizens' role from interstitial" to "intrusive." *Gwaltney*, 484 U.S. at 61. Declining to dismiss this action would also render ineffective the express procedural constraints Congress enacted to protect against "the obvious danger [of] unlimited public actions" and confine citizen suits to their interstitial, secondary role. *NRDC, Inc. v. Train*, 510 F.2d 692, 700 (D.C. Cir. 1974); *see Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (an "interpretation that furthers rather than obstructs the [text]'s purpose should be favored").

12

Those constraints include the United States' unconditional right to notice of any citizen-suit complaint upon filing, its right to 60-days' notice before filing any complaint alleging violations of emission standards or limitations, and its entitlement to intervene "as a matter of right at any time." 42 U.S.C. § 7604(b)(1), (c)(2), (3). Congress even provided an additional notice-and-intervention mechanism when there is a proposed consent judgment between private parties and alleged violators, forbidding a court from adopting such a judgment without affording the United States an opportunity to review it. *Id.* § 7604(c)(3). This set of notice-and-intervention requirements "strongly indicates" that federal officials are "of central importance in the enforcement of the Act" and "highlights their primary role." *Hamker*, 756 F.2d at 395-96. In fact, the requirements were designed in part for the precise situation here—to facilitate the United States' opposition to citizen suits that are inconsistent with federal policy. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000) ("if the Executive Branch opposes a particular citizen suit," the United States may intervene to "bring the Government's views to the attention of the court"); 131 Cong. Rec. 6738 (1985) (service of a citizen-suit complaint on the United States protects the government's ability to "point out to a court where some ruling or decree would be inconsistent with the government's enforcement program"). Through this motion, the United States does just that.

Reinforcing the federal government's preeminent enforcement discretion, Congress expressly envisioned that the United States could preclude citizen-enforcement actions. Section 7604(b)(1) allows the United States, upon receiving 60-days' notice of a subsection (a)(1) citizen suit, to displace any planned citizen action by filing a federal civil action and "diligently prosecuting" that action. 42 U.S.C. § 7604(b)(1) The "diligent prosecution" bar allows the United States to chart its own course in enforcement, including in circumstances where the

13

United States determines that a pre-citizen suit settlement agreement is appropriate. *See Karr v. Hefner*, 475 F.3d 1192, 1194-95, 1197-98 (10th Cir. 2007); *Citizens for Clean Power v. Indian River Power, LLC*, 636 F. Supp. 2d 351, 354-58 (D. Del. 2009). Any other interpretation would grossly intrude on core prosecutorial functions of the Executive Branch, as explained below. *Infra* Part II.B. Thus, the diligent-prosecution bar reinforces, rather than divests, the United States' inherent discretion to decide the statute should not be enforced in a particular case. *Cf. Heckler*, 470 U.S. at 831-32. Like the notice-and-intervention provisions, the diligent-prosecution bar "confirm[s] the supplemental role of citizen suits." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 506 (5th Cir. 2021).

**2.** Numerous courts have recognized that the federal government's enforcement prerogatives carry the day over citizens' contrary enforcement preferences. In *Gwaltney*, for example, the Supreme Court stressed the "danger" of allowing citizens to supplant federal enforcement decisions in the materially similar Clean Water Act context: "Suppose that the [EPA] Administrator identified a violator" of the statute and "issued a compliance order," but "agreed not to assess or otherwise seek civil penalties." 484 U.S. at 60-61. Allowing citizens to seek the relief that the United States "chose to forgo," the Court explained, would "curtail[] considerably" the government's "discretion to enforce the Act in the public interest." *Id.* at 61.

Following *Gwaltney*'s lead, the Fifth Circuit and other courts have stressed the primacy of the United States' enforcement discretion when citizen enforcers seek remedies beyond what the government deems proper. *See, e.g.*, *Env't Conservation Org.*, 529 F.3d at 528 (concluding that citizen suit was moot because, after it was filed, EPA induced compliance, and allowing the citizens to seek additional relief "would effectively cede primary enforcement authority" to citizens); *Ellis*, 390 F.3d at 477 (reasoning that citizens' desired relief, "more stringent" than what

14

EPA obtained, would inappropriately "second-guess[]" EPA's "assessment of an appropriate remedy"); *EPA v. City of Green Forest*, 921 F.2d 1394, 1403 (8th Cir. 1990) (concluding that consent decree "in a later-filed EPA action" precluded "citizens' claims brought prior to [the] government action"); *Karr*, 475 F.3d at 1197 (emphasizing how diligent prosecution need not "be far-reaching or zealous," "[n]or must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff"); *cf. Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (rejecting argument that the United States does not diligently prosecute an action where "it does not sue the persons, or use the theories, the private plaintiff prefers" because that argument "would strip EPA of the control the [Resource Conservation and Recovery Act] provides").

The intrusion of allowing this action to proceed over the United States' objection would be no less significant. If anything, the intrusion would be more pronounced than the circumstances that the Supreme Court considered in *Gwaltney* and those addressed by other courts. Here, the United States does not simply prefer less stringent enforcement than the private enforcers. Rather, the United States has determined that *no* relief sought by this civil enforcement action—for any civil penalty or any type of injunctive relief to shutdown xAI's turbines—is consistent with federal policy and the public interest. To the contrary, any such relief would be highly detrimental to both. Allowing the NAACP to substitute its enforcement decision—that subjecting xAI to civil litigation to impose civil penalties and an injunction to shut down the turbines *is* warranted—impermissibly overrides the government's discretion to decide when and how enforcing the Clean Air Act against a particular defendant for a particular activity is contrary to the public interest. *Cf.* S. Rep. No. 91-1196, at 37 (1970) (stressing that Clean Air Act citizen suits should not yield "inconsistent" federal policy).

15

Accordingly, any suggestion that this suit should go forward *because* the federal and state governments are declining to enforce gets things backwards. *See* Dkt. No. 52 at 13 (citing a description of citizen suits' "purpose" from *Association to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1011-12 (9th Cir. 2002)). The Clean Air Act's citizen-suit provision does not allow private enforcement in each and every case where governmental actors decline to enforce. *See* S. Rep. No. 91-1196, at 37 (recognizing there may be situations where "the agency had not initiated abatement proceedings" but "courts would be expected to consider [the citizen suit] against the background of the agency action" and order "dismissal"). Citizen suits "are proper only 'if the Federal, State, and local agencies *fail* to exercise their enforcement responsibility.'" *Env't Conservation Org.*, 529 F.3d at 528 (emphasis added) (quoting *Gwaltney*, 484 U.S. at 60).

Here, the United States is not "fail[ing]" to exercise its enforcement responsibility. Instead, the United States has considered this civil-enforcement action in light of Executive Branch policy, found the action contrary to the public interest, and intervened to inform the Court of that determination. Even more, the Clean Air Act's statutory process was carried out: the State of Mississippi reviewed xAI's notice last year in light of its own SIP's permitting provisions and agrees with the United States' enforcement determination. Ex. B. Because citizens are "not permitted to upset the primary enforcement role" of the United States, *Env't Conservation Org.*, 529 F.3d at 531, the United States' determination is controlling, *see ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).

*　　*　　*

In short, the Clean Air Act's citizen-suit provision "belongs to a genre common to environmental laws under which citizen suits serve as goads to both the EPA and polluters without

16

displacing the federal agency as the principal enforcer." *Heritage Grp.*, 973 F.2d at 1324. Allowing this action to proceed over the United States' objection would essentially cede principal enforcement authority to the NAACP. The Clean Air Act does not contemplate, let alone require, that result. The citizen-suit provision's authorization for federal intervention must be interpreted to include the right to dismiss the case.

**B.**     **Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act.**

Article II commits Executive enforcement power to the President: "The executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 1 Cl. 1 & § 3. But interpreting the Clean Air Act to authorize citizen enforcement actions that seek civil penalties payable to the United States over the United States' objection would "deprive[]" the United States of "discretion to decide that a given violation" (assuming any occurred) "should not be the object of suit at all." *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting). That would be "constitutionally bizarre." *Id*. Because interpreting the Clean Air Act's federal intervention right to entitle the United States to dismissal is consistent with the statute's structure and avoids that serious Article II concern, that interpretation should be favored.

When a statute and the Constitution "brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). To that end, the "well-established" canon of constitutional avoidance counsels that courts should not adopt a statutory interpretation—even if "otherwise acceptable"—that "would raise serious constitutional problems." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc) (citation omitted), *aff'd*, 602 U.S. 406 (2024). In other words, courts must "shun" interpretations that raise "serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

17

The constitutional concerns with allowing the suit to proceed over the United States' objection are significant.  Under Article II, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'"  *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, §§ 1, 3).  The President's power to faithfully execute the law includes "[t]he Presidential power of prosecutorial discretion" and, in turn, the "*unilateral* power[]" "not to seek charges against violators of a federal law."  *In re Aiken County*, 725 F.3d 255, 262-64 (D.C. Cir. 2013) (Kavanaugh, J.).  And because "prosecutorial decision-making" is a "special province of the Executive Branch," it "implicates conclusive and preclusive" authority, *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (marks omitted), regarding both criminal and "[c]ivil enforcement actions," *Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 888 (D.C. Cir. 2021).  Indeed, "[l]ike the decision not to prosecute in criminal cases," "[c]ivil enforcement actions are presumptively committed to the agency's discretion" and cannot be second-guessed by courts, much less private citizens.  *Id.*

In light of Article II's commitment of federal enforcement power to the Executive, several Supreme Court Justices have identified "[d]ifficult and fundamental questions" about whether citizen-suit provisions impermissibly transfer Executive enforcement discretion to private parties.  *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring); *see also id.* at 209-10 (Scalia, J., joined by Thomas, J., dissenting); *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring).  So too have many Fifth Circuit judges.  In a case brought under

18

the Clean Air Act's citizen-suit provision, Judge Jones—joined by seven other judges—recognized citizen suits' "potential to usurp the Executive Branch's principal prosecutorial responsibility." *ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).[3]

The NAACP's civil enforcement action illustrates why those concerns are well founded. "As a starting point, it is well to remember that the Clean Air Act primarily serves public, not private, interests," and thus "[c]itizens acting as 'private attorneys general' . . . seek relief not on their own behalf but on behalf of society as a whole." *Ellis*, 390 F.3d at 477. Permitting the NAACP to seek civil penalties payable to the United States on terms to which the United States objects raises serious concerns under Article II. Punishing unlawful conduct through civil penalties payable to the Treasury on behalf of the United States is "a quintessentially executive power." *Seila Law*, 591 U.S. at 219. The NAACP's complaint asks this Court to impose staggering penalties necessarily payable to the Treasury—relief that does not meaningfully differ from a civil enforcement action brought on behalf of the United States, and that bears only the most attenuated relationship, if any, to the plaintiff's own asserted injuries. Dkt. No. 1 ¶¶ 229, 246, 255. It is highly doubtful that the NAACP's attempted "exaction[] of public fines" over federal opposition is "permissible in view of the responsibilities committed to the Executive by Article II." *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring).[4]

---

[3] Judge Davis, joined by six other judges, disagreed that the *ExxonMobil* citizen suit posed an Article II concern for "three main reasons": (1) the Clean Air Act "sets clear limits . . . to ensure that [citizens] do not overstep their role," (2) the United States "support[ed]" the citizen suit, and (3) Congress desired citizen enforcement. *See* 123 F.4th at 342-44. The second key factor—the United States' support—is absent here.

[4] This Court, of course, is bound by *Laidlaw*'s holding that civil penalties payable to the U.S. Treasury can redress private injuries by deterring future violations, but the United States expressly preserves the argument for future appellate proceedings that that holding was incorrect for the reasons stated in Justice Scalia's dissent. In the interim, this Court need not and should not exacerbate that error by extending *Laidlaw*'s flawed reasoning on a question of Article III redressability into the distinct context of Article II.

19

There is no Founding-era evidence showing a history or tradition of citizens exercising this type of enforcement power. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752-53 (5th Cir. 2001) (en banc) (explaining how Founding-era acceptance of qui tam actions was "certainly a touchstone illuminating" their consistency with Article II (marks and citation omitted)). That is because civil penalties payable only to the United States Treasury "do[] not provide a mechanism for individual relief in any traditional sense," even assuming those penalties indirectly provide "some incidental benefit to the plaintiff." *Laidlaw*, 528 U.S. at 204, 209 (Scalia, J., dissenting); *see also ExxonMobil*, 123 F.4th at 396 n.3 (Oldham, J., dissenting) (highlighting similar concerns as to the Clean Air Act). The "traditional business of Anglo-American courts is relief specifically tailored to the plaintiff's injury," but a civil penalty is "a public fine diverted to a private interest." *Laidlaw*, 528 U.S. at 204, 209-10 (Scalia, J., dissenting). Allowing the NAACP to seek those penalties "without meaningful public control" is thus tantamount to making the organization "a self-appointed mini-EPA." *Id.* at 209-10; *see also* Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tulane L. Rev. 339, 349-50 (1990) (explaining how the "independence" of environmental citizen-enforcers is unique).[5]

Indeed, while the Clean Air Act sharply increased federal authority in the field, air-pollution regulation and enforcement was traditionally the primary responsibility of state and local

---

[5] *Riley*'s conclusion that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law" does not undermine the United States' position here. 252 F.3d at 753. *Riley* made that statement in upholding the False Claims Act's qui tam provisions, which allow private plaintiffs (called "relators") to pursue actions for fraudulent claims in the United States' name and share in any monetary recovery. *See* 31 U.S.C. § 3730. Clean Air Act citizen suits lack the historic pedigree that was critical to the Fifth Circuit's analysis. *See Riley*, 252 F.3d at 752; U.S. Intervenor Br. at 22-30, *United States ex rel. Taylor v. Healthcare Assocs. of Tex. LLC*, No. 25-10842 (5th Cir. Mar. 23, 2026). The False Claims Act also expressly retains the United States' ability to "assume control" over qui tam litigation, such as "the unilateral power to dismiss an action." *Riley*, 252 F.3d at 753; 31 U.S.C. § 3730(c)(2)(A).

20

governments. 42 U.S.C. § 7401(a)(3). To the extent the Clean Air Act's scheme of cooperative-federalism relies on state enforcement, the federal government, "from the time of its establishment," "has been in the habit of using, with the consent of the states, their officers, tribunals, and institutions as its agents." *United States v. Jones*, 109 U.S. 513, 519 (1883). The statute also includes detailed control mechanisms that preserve Executive oversight authority and enforcement discretion. *See*, *e.g.*, 42 U.S.C. § 7410(a), (k) (providing for EPA approval of SIPs); *ADEC*, 540 U.S. at 469 (holding that EPA may "act to block construction" of a new facility "permitted by [a state agency]"). But the Clean Air Act's private-attorney-general model is different in kind, and it lacks the historic tradition that supports the constitutionality of cooperative-federalism.

Dismissal is necessary regardless of the fact that the NAACP seeks not just civil penalties but also injunctive relief—shutting down the data centers' power source until xAI obtains government permits and approval that Mississippi says it does not need. Dkt. No. 1 at 42. For the reasons explained above, the citizen-suit provision's authorization of civil penalties payable to the Treasury independently warrants interpreting the provision to allow the United States a right to dismissal. Because interpreting the statute to include a right of dismissal entitles the United States to dismiss *the entire action*, there is no plausible basis to distinguish a citizen suit that seeks only penalties from one that seeks penalties and injunctive relief. That means the NAACP's request for injunctive relief in addition to penalties does not save its complaint from dismissal.

Interpreting the Clean Air Act to provide the control mechanism that the United States invokes here—the ability to dismiss the citizen suit—would avoid these serious Article II concerns. *Cf. Riley*, 252 F.3d at 753 (citing the Executive's "significant amount of control over [qui tam] litigation" as a factor supporting its constitutionality). Conversely, allowing this citizen suit

to proceed unchecked by federal control would impermissibly intrude on Executive Branch prerogatives, including the ability to align the enforcement of federal law with broader public interests, as ultimately determined by the President.

Without the right of dismissal under Rule 41(a) here, the only way that the Executive could preclude the citizen suit is by "diligently prosecuting" its own enforcement action. *See* 42 U.S.C. § 7604(b)(1)(B). But that would only exacerbate the Article II violation by stripping the Executive Branch of discretion to determine that *no* enforcement action is the proper course. *See Citizens for Resp. & Ethics*, 993 F.3d at 888 (stressing that such civil-enforcement decisions lie with the Executive). Requiring the Executive to diligently prosecute the action to dispose of it would violate Article II because "Congress may not *mandate* that the President prosecute a certain kind of offense or offender," *Aiken Cnty.*, 725 F.3d at 263, and "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" lies with "the Executive Branch," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

The United States does not dispute that Congress has the power to authorize private parties who have suffered Article III injury to sue to enforce certain federal statutes. *See*, *e.g.*, *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' . . . antidiscrimination statutes[.]"). Private suits under such provisions, like Title VII of the Civil Rights Act and the antitrust laws, generally do not raise Article II concerns even if Congress created the private right of action for the purpose of supplementing government enforcement actions. *See*, *e.g.*, 42 U.S.C. § 2000e-5(f); 15 U.S.C. § 15. But traditional private rights of action ordinarily provide some form of highly personalized relief, like a mechanism to compensate monetary harms that the plaintiff personally suffered. *See*, *e.g.*, 42 U.S.C. § 2000e-5(g)(1) (Civil Rights Act, providing for reinstatement and backpay); 15 U.S.C. § 15(a) (Clayton

22

Act, providing that "person[s] who shall be injured in his business or property" can recover treble "damages by him sustained").

The differences between other statutes' private rights of action (for more individualized relief) and Clean Air Act citizen suits that do not compensate any specific injury to the citizen-plaintiff heighten the Article II concerns as to citizen suits. Unlike private rights of action in statutes like the Civil Rights Act and the Clayton Act, the Clean Air Act does not provide for compensatory monetary relief. *See* 42 U.S.C. § 7604(g). It instead authorizes private citizens to pursue monetary penalties generally payable only to the Treasury—again, a quintessentially executive power that "vindicat[es] the rule of law" rather than compensating any personal monetary harm. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998); *see also Seila Law*, 591 U.S. at 219.[6]

For all those reasons, the best interpretation of the Clean Air Act—which ensures the Executive Branch retains its primacy over the enforcement of federal law—is also necessary to avoid grave constitutional problems with the statute's citizen-suit provisions. The Constitution, the Clean Air Act, and precedent all point to the same conclusion: the NAACP cannot wrestle enforcement responsibility away from the Executive Branch.

---

[6] The citizen-suit provision contains a limited exception to the general rule that penalty proceeds are payable to the Treasury—no more than $100,000 may be used to fund "beneficial mitigation projects" that "enhance the public health or the environment." *See* 42 U.S.C. § 7604(g)(2). So, even when that exception applies, penalties do not compensate monetary harms personal to citizen-enforcers. The NAACP also seeks civil penalties far exceeding $100,000. *See, e.g.*, Dkt. No. 1 at 42.

23

**CONCLUSION**

For the foregoing reasons, the United States moves to intervene as a matter of right and respectfully requests that this Court dismiss the case. While the Court's role in acting on this filing is limited, *see Polansky*, 599 U.S. at 436 n.4, the United States stands ready to present oral argument if oral argument would assist the Court's review.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568  (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

July 7, 2026

25