**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>　　　　　　**Plaintiffs,**<br>　　**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>　　　　**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

      A.     The Clean Air Act regulates air pollution emissions to prevent serious
           harm to our health and environment. .....................................................3

      B.     The federal government, states, and individuals play different roles
           in ensuring new sources comply with Clean Air Act standards. .................6

      C.     When xAI tried to develop an unpermitted power plant in Tennessee,
           it faced a groundswell of opposition and was notified its plan violated
           the Clean Air Act. ...............................................................................9

      D.     xAI's construction of the Colossus Gas Plant triggers the health
           protections and pollution prevention obligations imposed by the
           Clean Air Act. ...................................................................................10

      E.     To protect its members' health, NAACP sued under Section 7604...........13

ARGUMENT ......................................................................................................... 13

    I.      Section 7604(a) Provides a cause of action for associations to sue to abate
        harms to their members from air pollution. ............................................. 14

    II.     Counts 1 and 2 of NAACP's complaint state a claim for relief............................. 18

      A.     The turbines that comprise the Colossus Gas Plant are stationary sources,
           not mobile sources, under the relevant Clean Air Act regulations. ...........18

      B.     Mississippi's SIP adopts federal PSD regulations; it does not conflict
           with them............................................................................................19

      C.     xAI cannot evade liability entirely with a Motion to Dismiss by
           claiming it lacked notice its conduct violated the law. ............................... 24

    III.    The Clean Air Act's citizen suit provision violates neither Article II nor the
        private nondelegation doctrine............................................................................... 26

CONCLUSION...................................................................................................... 35

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. BP Expl. & Prod. Inc.*,
781 F. Supp. 2d 453 (S.D. Tex. 2011) ...................................................................23

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .............................................................................35

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*,
299 F.3d 1007 (9th Cir. 2002) .........................................................................22, 23

*Atl. States Legal Found. v. Buffalo Envelope*,
823 F. Supp. 1065 (W.D.N.Y. 1993) .....................................................................26

*Buckley v. Valeo*,
424 U.S. 1 (1976).................................................................................................29

*Campaign Legal Ctr. v. Iowa Values*,
573 F. Supp. 3d 243 (D.D.C. 2021) .......................................................................26

*Capitol Records v. Alaujan*,
626 F. Supp. 2d 152 (D. Mass. 2009) .....................................................................26

*Chesapeake Bay Found. v. Bethlehem Steel Corp.*,
652 F. Supp. 620 (D. Md. 1987).............................................................................26

*Coho Salmon v. Pac. Lumber Co.*,
30 F. Supp. 2d 1231 (N.D. Cal. 1998) .....................................................................16

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*,
686 F. Supp. 2d 663 (E.D. La. 2010)..................................................................14, 16

*Conservation Law Found. of New England, Inc. v. Browner*,
840 F. Supp. 171 (D. Mass. 1993).....................................................................15, 27

*Cox v. City of Dallas*,
256 F.3d 281 (5th Cir. 2001) .................................................................................28

*Davis v. Passman*,
442 U.S. 228 (1979)..............................................................................................26

*Decker v. Nw. Env't Def. Ctr.*,
568 U.S. 597 (2013)..............................................................................................16

ii

*Ecological Rts. Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ...................................................................................17

*Ellingburg v. United States*,
607 U.S. 163 (2026)....................................................................................................29

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ...............................................................................23, 31

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000).............................................................................................. *passim*

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995)...................................................................................25

*United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*,
157 F.4th 758 (5th Cir. 2025) (Ho., J., concurring)..................................................30

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)...................................................................................................7, 8

*Heckler v. Chaney*,
470 U.S. 821 (1985)..............................................................................................34, 35

*Howmet Corp. v. EPA*,
614 F.3d 544 (D.C. Cir. 2010)...................................................................................25

*HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue*,
296 So. 3d 668 (Miss. 2020)......................................................................................22

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986)....................................................................................................14

*Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*,
568 U.S. 78 (2013)......................................................................................................16

*Louisiana Env't Action Network v. Exxon Mobil Corp.*,
No. CV 16-144-SDD-RLB, 2017 WL 2773875 (M.D. La. June 26, 2017) .............16

*Medina v. Planned Parenthood S. Atl.*,
145 S. Ct. 2219 (2025)................................................................................................27

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981)........................................................................................................27

*United States ex rel. Montcrief v. Peripheral Vascular Assocs.*,
133 F.4th 395 (5th Cir. 2025) (Duncan, J., concurring) ...........................................29

iii

*N. Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.,*
200 F. Supp. 2d 551 (E.D.N.C. 2001)............................................................................33

*Nat. Res. Def. Council, Inc. v. Train,*
510 F.2d 692 (D.C. Cir. 1974)......................................................................................15

*Nat. Res. Def. Council v. Outboard Marine Corp.,*
692 F. Supp. 801 (N.D. Ill. 1988).................................................................................26

*Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.,*
502 F.3d 1316 (11th Cir. 2007) ....................................................................................15

*National Horsemen's Benevolent and Protection Association v. Black,*
178 F.4th 224 (5th Cir. 2026) ..................................................................................31, 32

*New York v. EPA,*
413 F.3d 3 (D.C. Cir. 2005)..........................................................................................20

*Orange Env't, Inc. v. Cnty. of Orange,*
923 F. Supp. 529 (S.D.N.Y. 1996)................................................................................31

*Riley v. St. Luke's Episcopal Hosp.,*
252 F.3d 749 (5th Cir. 2001) (en banc) ..........................................26, 28, 29, 30, 34

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality,*
165 F.4th 356 (5th Cir. 2026) .......................................................................................20

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020)..........................................................................................30, 31, 32

*Sierra Club v. Aluminum Co. of Am.,*
585 F. Supp. .................................................................................................................17

*Sierra Club v. Aluminum Co. of Am.,*
585 F. Supp. 842 (N.D.N.Y. 1984)...............................................................................15

*Sierra Club v. Cedar Point Oil Co.,*
73 F.3d 546 (5th Cir.1996) ...........................................................................................23

*Sierra Club v. Franklin Cnty. Power of Ill.,*
2006 WL 8455938 (S.D. Ill. 2006)...............................................................................26

*Sierra Club v. Oklahoma Gas & Elec. Co.,*
816 F.3d 666 (10th Cir. 2016) ......................................................................................15

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) (Thomas, J., concurring) .............................................................27

*St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Ref., L.L.C.*,
354 F. Supp. 2d 697 (E.D. La. 2005)................................................................16

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998)................................................................................16, 27, 32

*Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto Co.*,
600 F. Supp. 1474 (D.N.J. 1985)........................................................................26

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207
F.3d 789 (5th Cir. 2000) ....................................................................................16

*TransUnion v. Ramirez*,
594 U.S. 413 (2021)............................................................................................26

*Trinity Broadcasting of Florida v. FCC*,
211 F.3d 618 (D.C. Cir. 2000)............................................................................25

*Trump v. Slaughter*,
No. 25-332, 2026 WL 1855612 (June 29, 2026) ..............................................32

*Trump v. United States*,
603 U.S. 593 (2024)............................................................................................35

*U.S. Dep't of Energy v. Ohio*,
503 U.S. 607 (1992)............................................................................................27

*United Food & Commercial Workers Union, Local 1564 of New Mexico v.
Albertson's, Inc.*, 207 F.3d 1193 (10th Cir. 2000)............................................17

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 ........................................................................................26

*United States v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) ............................................................................22

*Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000)............................................................................................30

*Water Keeper All. v. Smithfield Foods*,
2001 WL 1715730 (E.D.N.C. Sept. 20, 2001)..................................................26

*Weiler v. Chatham Forest Products, Inc.*,
392 F.3d 532 (2d Cir. 2004)..............................................................................23

**Statutes**

12 U.S.C. § 5511(a) ...............................................................................................32

v

29 U.S.C. § 216(b) ...........................................................................................................17

33 U.S.C. § 1365(g) .........................................................................................................28

42 U.S.C. § 7604(b)(1) .....................................................................................................34

42 U.S.C. § 7401(b)(1) .......................................................................................................2

42 U.S.C § 7401(c) .............................................................................................................2

42 U.S.C. § 7409(a)-(b) ......................................................................................................3

42 U.S.C § 7410(a) .............................................................................................................3

42 U.S.C § 7412(b) .............................................................................................................4

42 U.S.C § 7412(d) .............................................................................................................3

42 U.S.C. § 7412(d)(1)-(3) .................................................................................................6

42 U.S.C. § 7413 .................................................................................................................6

42 U.S.C. § 7470(1) ............................................................................................................5

42 U.S.C. §§ 7470-7492 ..................................................................................................5, 6

42 U.S.C § 7475(a)(1) .........................................................................................................6

42 U.S.C §7475(a)(3) ..........................................................................................................6

42 U.S.C § 7475(a)(4) ......................................................................................................5, 6

42 U.S.C § 7475(a)(7) .........................................................................................................6

42 U.S.C § 7479(3) .............................................................................................................5

42 U.S.C. § 7543 ...............................................................................................................18

42 U.S.C. §§ 7550(2) .........................................................................................................18

42 U.S.C. § 7550(10) .........................................................................................................18

42 U.S.C. § 7602(e) ......................................................................................................14, 27

42 U.S.C § 7604(a) ..............................................................................................7, 8, 14, 27

42 U.S.C. § 7604(b)(1)(A) ..................................................................................................8

42 U.S.C. § 7604(b)(1)(B) ..................................................................................................8

42 U.S.C. § 7604(c)(2)-(3)...........................................................................................8

42 U.S.C § 7604(c)(3)..................................................................................................8

42 U.S.C § 7604(g) .....................................................................................................8

**Federal Rules and Regulations**

40 C.F.R. § 51.50 ..............................................................................................18, 19, 20

40 C.F.R. § 51.166(k) ..................................................................................................6

40 C.F.R. § 51.166(m) .................................................................................................6

40 C.F.R. §§ 51.491 & 51.50 ......................................................................................20

40 C.F.R. § 52.01 .......................................................................................................20

40 C.F.R. § 52.21 .....................................................................................................5, 20

40 C.F.R. § 52.1270(c)..................................................................................................3

40 C.F.R. §§ 63.6080–63.6175 ..................................................................................11

40 C.F.R. § 1068.30(2)(iii) .........................................................................................18

76 Fed. Reg. 54294 (Aug. 31, 2011)........................................................................3, 4

80 Fed. Reg. 65292 (Oct. 26, 2015)............................................................................4

83 Fed. Reg. 17226 (Apr. 18, 2018) .........................................................................3, 4

89 Fed. Reg. 16202 (Mar. 6, 2024)..............................................................................4

90 Fed. Reg. 316 (Jan. 3, 2025) ..................................................................................4

91 Fed. Reg. 1910 (Jan. 15, 2026) ...............................................................11, 19, 24

Federal Rule of Civil Procedure 12(b)(6) .................................................................25

**State Rules and Regulations**

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 B (2013) ...............................................................20

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (27) (2013)..........................................................4

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013) .............................................................4, 20

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (5) (2013) .........................................................22

11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (10) (2013)...............................................................5

11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (7) (2013)................................................................5

11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (2013) ...........................................................18, 21

11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (5) (2013) ...........................................................21

11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (6) (2013) ...........................................................21

11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (7) (2013) ...........................................................21

11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (9) (2013) ...........................................................21

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)....................................................................15

Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114
    Cal. L. Rev. 131 (2026) ....................................................................27, 29, 30, 34

Rep. Henry Waxman, *An Overview of the CAA Amendments of 1990*, 21 Envtl. L.
    1721, 1748 (1991).......................................................................................7

Restatement (Second) of Torts § 821C Comments d & 3 ...........................................28

Restatement (Second) of Torts § 821C Comments d & e............................................28

S. Rep. No. 93-18, A Legislative History of the Clean Air Amendments of 1970,
    at 355 (1974)...........................................................................................7, 8

Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 578
    (2005)....................................................................................................34

Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L.
    Rev. 701, 803–04 (2003) ............................................................................33

3 William Blackstone, *Commentaries* ...............................................................28, 30

**INTRODUCTION**

This is not the first time xAI has been told that its unpermitted gas turbines violate the Clean Air Act. In 2024, xAI began installing unpermitted turbines beside the historically Black community of Boxtown in Memphis, Tennessee. A groundswell of opposition met them, as NAACP and its members, alongside other community groups such as Young, Gifted, and Green, Memphis Community Against Pollution, Safe and Sound, and Protect Our Aquifer held public meetings and town hall events. In June of 2025, NAACP sent xAI a Notice of Intent to Sue outlining the many ways its unpermitted power plant violated the Clean Air Act's requirements for pollution prevention and public health protection.

xAI did it again anyway. Just a few miles away in Southaven, Mississippi, the company proceeded to construct a power plant capable of such pollution as to rank among the largest $NO_x$ sources in the nation—all without the public transparency, emissions limits, pollution controls, and air quality monitoring that the Clean Air Act requires. It expanded its Colossus Gas Plant even after NAACP sent another Notice of Intent to Sue regarding this new site. And expanded again after the complaint in this case was filed. And expanded yet again after Plaintiffs filed their motion for a preliminary injunction. And all the while, frontline communities in the Memphis area, including NAACP members, have been forced to bear the burden of its pollution.

In its Motion to Dismiss (Dkt. No.55) xAI does not contest that its power plant is massive (with more than a gigawatt of generating capacity) or that its potential to emit $NO_x$ dwarfs any other source in the area. Rather, with its Motion to Dismiss, xAI aims to silence all dissent and write its own rules of compliance.

First, xAI says that the Clean Air Act does not allow NAACP to sue behalf of its members, or to secure—for its members—the health and welfare protections that have been enshrined in the

1

law for 50 years. In xAI's view, the statute's explicit authorization of citizen suits by "associations" is an empty promise.

Second, xAI argues Mississippi authorized a special exemption that allows for the "temporary" use of these "mobile" turbines without any oversight whatsoever. The exemption it claims is without legal basis or a limiting principle.

Third, xAI claims the citizen suit provision of the Clean Air Act is unconstitutional under Article II. Every court to address that argument has rejected it, and this Court should not be the first to hold otherwise. As xAI concedes, Article II permits Congress to authorize private parties to sue for violations on their own behalf to redress their own harms, and the Clean Air Act's text and common-law antecedents show that's exactly what a citizen suit brought under the Clean Air Act is.

In its Motion to Dismiss, xAI insists its Colossus Gas Plant is above the law and that communities harmed by its pollution have no recourse to secure the health protections afforded by Congress. The Clean Air Act's text, structure, purpose, and history—and decades of precedent— say otherwise. xAI's Motion to Dismiss should be denied.

## BACKGROUND

The Clean Air Act exists "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). A "primary goal" of the Act "is to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention." *Id.* § 7401(c). The Act achieves these goals by giving the federal and state governments—and also the people the Act exists to protect—specific roles in order to ensure that its protections function

2

in practice, not just on paper. This case shows exactly why Congress structured the Act in this way and the risks of rewriting that structure to cut out the people that pollution affects the most.

**A. The Clean Air Act regulates air pollution emissions to prevent serious harm to our health and environment.**

The Clean Air Act programs relevant here both start by requiring the creation of standards that provide a basic level of protection for people who will breathe in the regulated pollutants. Under the National Ambient Air Quality Standards (NAAQS) program, the EPA Administrator must set standards (i.e., the NAAQS) for criteria pollutants at a level protective of health and welfare. *See* 42 U.S.C. § 7409(a)-(b). These standards then get implemented at the state level in state implementation plans (SIPs), which must include, among other things, standards and processes for issuing permits that will ensure that pollution sources will meet applicable emissions limits. *Id.* § 7410(a), (k); *see also* 40 C.F.R. § 52.1270(c) (setting out the EPA-approved SIP for Mississippi). Under the hazardous air pollutants program, the Administrator must set National Emission Standards for Hazardous Air Pollutants (NESHAPs) on a category-of-source basis for sources that emit these pollutants. *See id.* § 7412(d).

These standards exist because the air pollutants they regulate pose real threats to our health. *See* Dkt. No. 1 (Compl.) ¶¶ 79, 82, 85, 87. For example, even short-term exposure to carbon monoxide (a criteria pollutant) is linked to serious heart problems. *See* Review of National Ambient Air Quality Standards for Carbon Monoxide, 76 Fed. Reg. 54294, 54298–299 (Aug. 31, 2011). Nitrogen dioxide and ozone (two other criteria pollutants) both harm, among other things, lung health. *See* Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17226, 17233, 17240 (Apr. 18, 2018) (concluding that short- and long-term exposure cause respiratory harm, such as worsening asthma); National Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65292, 65302, 65305–308 (Oct. 26, 2015) (noting that short-

3

term ozone exposure causes decreased lung function and worsened asthma symptoms, and long-term exposure causes irreversible lung damage). Fine particulate matter (a fourth criteria pollutant) can cause premature death. *See* Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16202, 16224, 16227 (Mar. 6, 2024). Formaldehyde is considered a "hazardous air pollutant" (42 U.S.C § 7412(b)) and is a human carcinogen that also causes respiratory harm. *See* Formaldehyde; Risk Evaluation Under the Toxic Substances Control Act (TSCA); Notice of Availability, 90 Fed. Reg. 316, 317 (Jan. 3, 2025).

The people most harmed by exposure to these pollutants are already our most vulnerable. For example, young children and those with preexisting health conditions are most affected by carbon monoxide exposure. *See* 76 Fed. Reg. at 54298–299. And people with asthma, children, older adults, and those who spend large amounts of time in areas with elevated nitrogen dioxide levels (such as near roadways) are at a higher risk. *See* 83 Fed. Reg. at 17246.

Under the Act and the State's implementing regulations, new sources receive particular attention to ensure that they are built with the best pollution control technology in place. Congress in the Clean Air Act and Mississippi in its SIP recognized that all *new* stationary sources of air pollution pose both *new* and *additional* risks to the health and welfare of fenceline communities. Pertinent here, Mississippi's SIP requires that all new stationary sources of criteria pollutants—including nitrogen oxides ($NO_x$) and fine particulate matter ($PM_{2.5}$)—must apply for and obtain permits prior to construction and operation unless specific, enumerated exemptions apply. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013). "Stationary source" is defined as "any building, structure, facility, or installation which emits or may emit regulated air pollutant(s)." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (27) (2013). Permits to construct include emissions limitations based on Clean Air Act requirements. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (10) (2013). Any later issuance of a permit

from the Mississippi Permit Board "does not release the permittee from liability for constructing or operating air emissions equipment" without first obtaining a permit to construct. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (7) (2013).

In addition, the Clean Air Act requires that new sources located in areas classified as in "attainment" with the relevant NAAQS must comply with the Prevention of Significant Deterioration (PSD) program's requirements, which also include pre-construction permits. 42 U.S.C. §§ 7470-7492.[1] EPA promulgated template regulations to implement the PSD program, and, as xAI notes in its own brief (at 4), Mississippi's SIP "incorporates federal [PSD] regulations . . . and it provides that [Mississippi Department of Environmental Quality] will apply these regulations to new stationary sources." Dkt. No. 55 at 4. Those PSD regulations require new "major" sources of criteria air pollutants to obtain permits and comply with stringent emission limits that reduce pollution in order to "protect public health and welfare from any actual or potential adverse effect" from that air pollution. 42 U.S.C. § 7470(1); 40 C.F.R. § 52.21.

The PSD program's strict pollution limits are referred to as "best available control technology" or "BACT," and are defined as "an emission limitation" that restricts pollutant discharges "on a continuous basis." *Id.* §§ 7475(a)(4), 7479(3), 7602(k). Set case-by-case, BACT must achieve the maximum pollution reduction possible considering "energy, environmental and economic impacts and other costs." *Id.* § 7479(3). The BACT requirement reflects Congress' design to "prevent" the "deterioration" of air quality, 42 U.S.C. §§ 7470–7492, so BACT limits

---

[1] The area this case concerns is classified as in attainment. *See* Dkt. No. 1 (Compl.) ¶ 72. But that does not mean its air quality is safe. The number of high ozone days has increased annually for the past seven years, and over the past few years, air monitoring data in DeSoto County and Memphis show that concentrations of ground-level ozone exceed the NAAQS. *Id.* ¶¶ 172–174. And in 2024, DeSoto County received an "F" for its ozone pollution from the American Lung Association. *Id.* ¶ 175.

must be set by permits *before* the new source is constructed, *id.* § 7475(a)(1), and the source must comply with the limitation during its operations thereafter. *Id.* § 7475(a)(4). No such permit can be issued for a new major source unless the owner or operator of the facility demonstrates through air modeling that the facility will not cause or contribute to air pollution in excess of regional air quality standards, *id.* §7475(a)(3). Operators must establish air quality monitoring to track the facility's air pollution impacts. *Id.* § 7475(a)(7); *see also* 40 C.F.R. §§ 51.166(k), (m).

Finally, new major sources of hazardous air pollutants like formaldehyde are subject to EPA standards known as National Emission Standards for Hazardous Air Pollutants ("NESHAPs"). Each NESHAP is specific to a particular kind of air pollution source and establishes limits for each listed hazardous air pollutant emitted by the relevant kind of source, as well as related monitoring, recordkeeping, and reporting requirements. *See* 42 U.S.C. § 7412(d)(1)-(3). EPA promulgated a NESHAP for turbines like those used at the Colossus Gas Plant at 40 C.F.R. Part 63, Subpart YYYY, which requires emissions limits based on "maximum achievable control technology," monitoring, and recordkeeping. Dkt. No. 1 ¶¶ 114–116.

These are long established requirements, and the other major air pollution sources across Mississippi have been bound by them.

### B. The federal government, states, and individuals play different roles in ensuring new sources comply with Clean Air Act standards.

The Act assigns a role in securing compliance to the federal government, the relevant state government, and the people whom polluters harm by evading pollution limits. States and the federal government have several options available to them: They may, for example, address violations that occurred in the past but have ceased, may use administrative processes as an alternative (or precursor) to judicial proceedings, and may sue polluters. *See* 42 U.S.C. § 7413.

But Congress recognized that there might be circumstances where these governmental actors "cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). Because it would be "impossible for government enforcement to control all significant acts of pollution," Congress extended a "private right" to "persons directly affected or concerned" so that their "rights cannot be violated with impunity." S. Rep. No. 93-18, A Legislative History of the Clean Air Amendments of 1970, at 355 (1974) (hereinafter *"Legislative History"*) (Sen. Hart quoting testimony of former Attorney General Ramsey Clark). Citizens would bring such suits, reasoned the Act's supporters, because of their "incentive[] to protect the health and welfare of those suing." *Id.* (Sen. Hart). In this way, citizen suits would not be a one-to-one "substitute" for "the enforcement efforts of the responsible administration agencies," but a way to "complement and encourage the abatement activities of government agencies." *Id.* at 263 (Sen. Spong); *see also id.* at 355 (Sen. Hart); *id.* at 436 (Sen. Rpt.).[2]

Accordingly, the Act gives those harmed by unlawful emissions the option to sue to abate those violations. "[A]ny person" may bring "a civil action on his own behalf" against a polluter "alleged . . . to be in violation of" "an emission standard or limitation under" the Act or an "order" respecting "a standard or limitation." *Id.* § 7604(a)(1). Under this provision, people sue to address "harm" that "lies in the present or the future, not in the past"—that is, ongoing harm. *See Gwaltney*, 484 U.S. at 59 (interpreting parallel Clean Water Act provisions). Put simply, Congress authorized "a plaintiff who is injured or faces the threat of future injury due to illegal conduct"—

---

[2] The citizen suit powers were intentionally expanded in the 1990 Clean Air Act Amendments, in order to assure the Act's provisions were "implemented as Congress intended." Rep. Henry Waxman, *An Overview of the CAA Amendments of 1990*, 21 Envtl. L. 1721, 1748 (1991).

that is, violations of the Clean Air Act—to sue. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000).

The Act imposes procedural requirements on these suits that are designed to incentivize state and federal governments to address violations in the first instance. A person must give the violator, the relevant state, and the EPA Administrator 60 days' notice before suing. *See* 42 U.S.C. § 7604(b)(1)(A). This gives the polluter the "opportunity to bring itself into complete compliance" and "render [the suit] unnecessary" and also allows the governments a chance to consider the violations and decided whether to act themselves. *Gwaltney* 484 U.S. at 59–60. If a government does act and "has commenced and is diligently prosecuting a civil action . . . to require compliance," a person may not sue. 42 U.S.C. § 7604(b)(1)(B). In this way, citizen suits are not just a way for those harmed by pollution to vindicate their rights, but also a "useful instrument for detecting violations and bringing them to the attention of the enforcement agencies." *Legislative History*, at 280 (Sen. Muskie).

A person who clears these hurdles may proceed with the suit, though as he does, the Clean Air Act contains multiple provisions that ensure the federal government can participate in the case. The federal government must be served with the complaint, and the EPA Administrator may intervene in the case as a matter of right, and at any time. *See* 42 U.S.C. § 7604(c)(2)-(3). The Attorney General and EPA Administrator must also receive notice and have a chance to weigh in on the proposal before any consent judgment enters. *See id.* § 7604(c)(3).

As to remedies, the Act authorizes the person to obtain relief in two ways. A court may order injunctive relief. *See id.* § 7604(a). The court may also "apply any appropriate civil penalties," to be paid into a U.S. Treasury fund. *Id.* §§ 7604(a)(3) & (g). This type of civil penalty can "encourage defendants to discontinue current violations and deter them from committing

future ones," thereby "afford[ing] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." *Laidlaw*, 528 U.S. at 186. Courts may use one or both of these remedies to craft relief appropriate to a given case.

**C. When xAI tried to develop an unpermitted power plant in Tennessee, it faced a groundswell of opposition and was notified its plan violated the Clean Air Act.**

In 2024, xAI and its affiliate CTC Property LLC began to develop the Colossus 1 data center in Memphis, Tennessee, beside the historically Black community of Boxtown. Dkt. No. 1. ¶¶ 193–96. By March, 2025, xAI had installed thirty-five turbines at the site with a total generating capacity of 421.4 megawatts—a mid-sized base-load power plant. *Id.* ¶ 198. xAI had not received—or even applied for—a Clean Air Act permit for the work. *Id*. ¶ 197. Upon learning of the development, NAACP and its members, alongside groups such as Young, Gifted, and Green, Memphis Community Against Pollution, and Protect Our Aquifer, held and attended numerous large public meetings and town hall events, wrote hundreds of letters and public comments, and repeatedly called for action to stop the operation of the unpermitted turbines and advocated for the pollution prevention measures the law requires in southwest Memphis—an area long over-burdened by industrial emitters. *Id*. ¶ 200.[3]

Citizen groups sent xAI, the State, and the federal Government a Notice of Intent to Sue in June 2025, detailing the ways in which the company's ad hoc power plant construction process in Tennessee violated the Clean Air Act's protections.[4] Even so, xAI representatives promised to "copy and paste" this power development plan for its second data center in the area: Colossus 2. Eventually, the Colossus 1 facility obtained a Tennessee permit for a configuration of gas turbines.

---

[3]   *See also* Dkt. No. 51-42 (Tipton Decl.) ¶¶ 9–10 (describing community organizing).

[4]   Notice of Intent to Sue re Colossus 1 (June 17, 2025) ("Tenn. NOI"), available at https://perma.cc/2E68-GGKR.

9

Dkt. No. 1 ¶ 203.  Even with its shortcomings,[5] the stationary source permit for 15 turbines set a

NO$_x$ emissions limitation of 87 tons per year.  Dkt. No. ¶ 204.

### D. xAI's construction of the Colossus Gas Plant triggers the health protections and pollution prevention obligations imposed by the Clean Air Act.

In August 2025—again without any Clean Air Act preconstruction permit—xAI began

installing combustion gas turbines at the site of what is now the Colossus Gas Plant in Southaven,

Mississippi, which is in DeSoto County and part of the greater Memphis area.  *Id*. ¶ 4.[6]  By

December, the company had installed twenty-seven turbines.  *Id*. ¶¶ 4, 136–137.  These turbines

sit on newly laid concrete pads, with transformers, electrical lines, gas supply lines, and water

injection lines installed to make up the plant.  *Id*. ¶ 153.  Emissions stacks stand three stories tall

or more. Each building-sized gas turbine could power a neighborhood, and together the fleet could

power a city.

 

*Figures* 4 (left) and 5 (right) of NAACP's Complaint, Dkt. No. 1 at 26 & 29, respectively.

---

[5]    *See* Dkt. 51-30 (NAACP and Young, Gifted and Green's Permit Appeal).

[6]    Allegations in the complaint must be taken as true for the purposes of deciding this motion to dismiss, and this opposition brief focuses on the complaint for that reason. The number of turbines—and thus the amount of pollution—continues to grow.  As xAI admits, the plant now comprises 60 turbines, and its potential to emit nitrogen oxide pollution dwarfs all sources in the area and may be among the largest sources in the country. *Compare* Dkt. No. 60-4 (Gasparini Decl.) at 6 tbl.1 with Dkt. No. 51-43 (Engineering Analysis) ¶ 53.

The Colossus Gas Plant walks, talks, and produces power like other power plants that must undergo review to comply with Clean Air Act requirements before construction. At the time of the complaint, the Plant's more than 495-megawatt generating capacity compared to a medium-sized power plant that could power up to 400,000 homes. *See* Dkt. No. 51-43 (Engineering Analysis) ¶ 7; Dkt. No. 1 ¶ 143. All told, the facility had the potential to emit over 1,700 tons of smog-forming nitrogen oxides, likely making the Colossus Gas Plant the largest industrial source of nitrogen oxides in the greater Memphis area. Dkt. No. 1 ¶ 8.[7]

The EPA has explained that turbines of the kind that xAI has installed at the Colossus Gas Plant are stationary sources for the purposes of the programs at issue here. Under the hazardous air pollutant program, it has issued NESHAPs for stationary combustion turbines, to formaldehyde, toluene, benzene, acetaldehyde, and other pollutants. *See* 40 C.F.R. §§ 63.6080–63.6175. The relevant regulations define stationary to mean "that the combustion turbine is not self-propelled or intended to be propelled while performing its function." *Id.* § 63.6175. Earlier this year, EPA confirmed that "[h]istorically" it "has not regulated combustion turbines, even those that may be portable, as nonroad engines, but rather as stationary sources." New Source Performance Standards Review for Stationary Combustion Turbines and Stationary Gas Turbines, 91 Fed. Reg. 1910, 1926–27 (Jan. 15, 2026).

Even so, xAI did not seek and obtain the required Clean Air Act permits before constructing the Colossus Gas Plant. Instead, it informed the Mississippi Department of Environmental Quality of its plans to construct the plant on July 25, 2025, via email, without seeking a permit. Dkt. No. 1 ¶ 132. Four days later, the agency wrote back, stating that based on information at a prior meeting

---

[7] Indeed, even with 27 turbines, the plant had the potential to emit more than twice the nitrogen oxide air pollution of the next largest source in the tri-state area—the Memphis International Airport. Dkt. 51-43 (Engineering Analysis) ¶ 53.

and the email, it considered the turbines to be "mobile" because they would "remain affixed to a portable unit (i.e., a flatbed trailer)" and also "temporary" because they were "intended . . . to remain on-site . . . for less than twelve (12) months." Dkt. 51-7 at 2. For that reason, the agency claimed that the turbines were exempt from permitting requirements.

This failure to obtain a permit—and therefore to comply with the most fundamental Clean Air Act processes and provisions that exist to protect human health and the environment—is causing real harm to families across the Memphis area. The Colossus Gas Plant emits significant amounts of harmful pollutants, including nitrogen oxides and formaldehyde, which are tied to increases in asthma, respiratory diseases, heart problems, and certain cancers in persons exposed to them. Dkt. No. 1 ¶ 7. Tens of thousands of people live, worship, study and work in the homes, churches, and schools that immediately surround the Colossus Gas Plant. *Id*. ¶ 5. A Clean Air Act permit for a pollution source as large as the Colossus Gas Plant would require application of best available control technology controls to reduce emissions; not applying for a permit means xAI avoided those controls for its turbines. *Id*. ¶ 9.

Plaintiffs' members have experienced the effects of the plant first-hand. *Id*. ¶¶ 31–43. That includes a member who is exposed to pollution at her home, every day, when she waters her plants or relaxes on her patio. *Id*. ¶¶ 33–34. It also includes another nearby family, which has been forced by the plant to rethink the amount of time they spend outside working in their gazebo, tending their garden, and even walking their dog in light of one family member's serious pre-existing respiratory issues. *Id*. ¶¶ 36–39. And it includes a man who had once spent most of his time working outside on his property, but now must limit doing so because the Plant's pollution threatens to aggravate his health conditions. *Id*. ¶¶ 41–42.

12

### E. To protect its members' health, NAACP sued under Section 7604.

NAACP complied with the Act's procedural requirements and then sued to abate the harm so many of its members are suffering from xAI's unlawful actions. NAACP first brought these Clean Air Act violations to the attention of xAI, the federal government, and Mississippi per the Act's notice provisions. *Id*. ¶ 15. xAI did not correct the violations.[8] And neither Mississippi nor the U.S. Environmental Protection Agency acted to abate these harmful violations. *Id*. ¶ 191. NAACP thus sued in April 2026, and in May, it moved for a preliminary injunction. xAI has now moved to dismiss.

### ARGUMENT

xAI seeks dismissal first (at 7–9) by arguing that NAACP, as an association, does not have statutory standing under the Clean Air Act because the citizen suit provision explicitly allows for "associations" to pursue relief on their own behalf. This through-the-looking glass argument ignores the text, context, and plain purpose of the Clean Air Act, as well as decades of precedent.

Next, xAI argues (at 9–13) that claims 1 and 2 must be dismissed because its Colossus Gas Plant is exempt from the Clean Air Act's permitting requirements—or at least that the company did not have fair notice that the Plant's construction might trigger such obligations. But the exemptions it claims lack a textual basis in the regulations or any limiting principle. And its "no notice" argument ignores EPA's explicit statements that *these* types of combustion turbines were stationary sources (and so required stationary source permitting), and warnings *this*

---

[8] In fact, unbeknownst to NAACP—or even, apparently, State regulators—xAI continued to build out its Colossus Gas Plant. *See* Dkt. No. 49 (Motion to Amend PI) at 1.

13

community provided *xAI* that the company's nearly identical conduct at a nearby Memphis site violated the Clean Air Act.

Finally, xAI argues (at 13–18) that the Clean Air Act's citizen suit provision is unconstitutional, so no suit brought under its authority should be allowed to proceed. Every court to confront that argument has rejected it, and with good reason: Article II allows Congress to authorize private parties to sue on their own behalf for violations of federal law, and the Clean Air Act's text and common-law antecedents show that's exactly what kind of suit a citizen suit is.

## I.     Section 7604(a) Provides a cause of action for associations to sue to abate harms to their members from air pollution.

Section 7604(a) of the Clean Air Act authorizes "any person" to "commence a civil action on his own behalf" to abate certain violations of emissions limits. 42 U.S.C. § 7604(a). The Act defines a "person" to "include[] an individual, corporation, partnership, association," and certain government actors or entities. *Id.* § 7602(e). When an association sues to protect the interests of its members, it is protecting its own interests and therefore commencing an action on its "own behalf." Associations like NAACP exist, after all, to vindicate the interests of their members. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) ("[T]he primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."). An association that acts in its members' interests also acts in its own interest. The Act thus plainly authorizes associations, such as NAACP, to sue under Section 7604(a). *See Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 668 (E.D. La. 2010) ("It is clear that nonprofit corporations may invoke the Clean Air Act's citizen suit provision.").

xAI's contrary view (at 8) ignores this connection between an association's interest and the interests of its members. It cites Black's Law Dictionary, which states that "on behalf of means

14

'in the name of, on the part of, as the agent or representative of.'" Behalf, Black's Law Dictionary (12th ed. 2024). xAI thinks that an association who sues to vindicate its members' interests is not acting in its own name, on the part of itself, or as the representative of the association, but none of those things are true. Again, an association like NAACP is formed to channel its members' interests, and so it acts in its own interest when it acts in its members' interest. *See* Dkt. No. 1 ¶¶ 31–44.

xAI's contrary view also ignores the function the "on his own behalf" language serves. It establishes that a citizen plaintiff, "does not, merely by virtue of filing suit under the statute in question, represent the public at large in the same sense that [government] does when it brings an enforcement action." *Conservation Law Found. of New England, Inc. v. Browner*, 840 F. Supp. 171, 175 (D. Mass. 1993) (citing *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 723–30 (D.C. Cir. 1974)); *cf. Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1327 (11th Cir. 2007) (relying on this language to find that a government exception to the concurrent remedy doctrine did not apply to Section 7604(a) because plaintiffs "do not represent the public at large"); *Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d 666, 676 (10th Cir. 2016) (same). To the extent the "on his own behalf" language was meant to exclude anything, it was class action suits, not suits by representative organizations. *See Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. 842, 847–48 (N.D.N.Y. 1984) (stating that "[t]here is simply no support for" the position that the "on his own behalf" language in the Clean Water Act "precludes citizen suits by representative organizations" and that it "was intended only to exclude class action suits"); *Conservation Law Found.*, 840 F. Supp. at 176–177.

xAI relies (at 8) on dicta in a footnote in a Supreme Court decision, but that dicta does not answer this question. There, the Court noted that the cause of action in the Emergency Planning

15

and Community Right to Know Act—the statute at issue in that case—referred to suing "on his own behalf" and that it was "arguable that" the phrase "permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 n.6 (1998). But diving further would "make[] no difference to [the] disposition of the case," so the Court did not. *Id.* To state the obvious: noting that something is "arguable" is not a holding, or even persuasive dicta.

Courts faced with the issue following *Steel Co.* have rejected xAI's argument. These courts have recognized that an association is acting on its own behalf when its suit is a vehicle for its members' interests. *See, e.g.*, *Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp. 2d 1231, 1240 (N.D. Cal. 1998) ("[T]he association has a stake in the resolution of the dispute and serves as the defendant's natural adversary, the association, in representing the interests of its members, stands in its members' stead rather than asserting the generalized interests of a third party unconnected to the association."). "[R]eliance on the ruminations of the *Steel Co.* court" is therefore misplaced. *Id.* at 1239. Indeed, the Supreme Court itself has gone on to address suits brought by associations under provisions with parallel language without re-raising the *Steel Co.* rumination. *See Laidlaw* 528 U.S. at 180–181 (2000); *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 606–609 (2013); *Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 81 (2013). The Fifth Circuit has also—post-*Steel Co.*—accepted that associations can bring suit under Section 7604(a) of the Clean Air Act. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792–94 (5th Cir. 2000).[9] Thus, xAI's argument that a statute's

---

[9] District courts within the Fifth Circuit have followed suit. *Concerned Citizens*, 686 F. Supp. 2d at 668; *St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Ref., L.L.C.*, 354 F. Supp. 2d 697, 706 (E.D. La. 2005); *Louisiana Env't Action Network v. Exxon Mobil Corp.*, No. CV 16-144-SDD-RLB, 2017 WL 2773875 (M.D. La. June 26, 2017).

requirement that a plaintiff sue on his own behalf "does not allow for organizations to sue in their capacity as representatives of their members' interests is necessarily foreclosed." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 n.5 (9th Cir. 2000) (noting that *Laidlaw* was "itself . . . brought by several environmental organizations on behalf of their members").

xAI's reliance (at 8) on a Fair Labor Standards Act case does not help it either. That statute limits certain causes of action to "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." *United Food & Commercial Workers Union, Local 1564 of New Mexico v. Albertson's, Inc.*, 207 F.3d 1193, 1200 (10th Cir. 2000) (citing 29 U.S.C. § 216(b)). The Tenth Circuit read this language to mean that only an employee may be a plaintiff under the provision. *See id.* But that conclusion stemmed from the text's reference to "employees"; the court did not reference the "for and in behalf of himself or themselves and other employees similarly situated" language, nor was doing so required to reach its conclusion.[10] The Clean Air Act, by contrast, refers to a "person" as the proper plaintiff and defines person to include associations. *Albertson's* thus has no bearing on Section 7604(a).

NAACP and the Mississippi State Conference of the NAACP are both "person[s]" within the plain meaning of Section 7604(a) because they are non-profit associations, suing in their own names. Dkt. No. 1 ¶¶ 23, 30. They are authorized by statute to commence this suit.

---

[10] The Tenth Circuit also emphasized that the Fair Labor Standards Act requires any employee participating in a suit to "give[] his consent in writing to become such a party." *See id.* (quotation omitted). That language is nowhere in the Clean Air Act. The Tenth Circuit sought to assure itself that "Congress's intent to bar representative suits [was] quite clear," and noted "overwhelming support in the caselaw for th[at] conclusion." *Id.* at 1201. Here, Defendants make no similar case that Congress, despite defining "person" to include "association," meant to prohibit associational standing, and indeed, other courts that have examined the legislative history of "on his own behalf" in citizen suits find it unsupportive of their claim. *See, e.g.*, *Sierra Club v. Aluminum Co. of Am.*, 585 F. Supp. at 844–849.

**II.  Counts 1 and 2 of NAACP's complaint state a claim for relief.**

xAI seeks to dismiss Counts 1 and 2 (but not 3) of NAACP's complaint, arguing that its Colossus Gas Plant is not subject to the pre-construction permitting requirements from either the PSD program or from Mississippi's SIP.  Its argument takes three forms (at 9–12): (1) that the Colossus Gas Plant is a "mobile" source under Mississippi's SIP and not a "stationary source"; (2) that this understanding of the Mississippi SIP controls over any contrary federal regulations; and (3) that, even if neither of those are correct, the counts should be dismissed because xAI was not sufficiently on notice that it might need to obtain pre-construction permits.  Each of these arguments is wrong; none supports dismissing Counts 1 and 2 of the complaint.

**A.  The turbines that comprise the Colossus Gas Plant are stationary sources, not mobile sources, under the relevant Clean Air Act regulations.**

Federal regulations define "mobile source" as it is used by the Clean Air Act and Mississippi's SIP.  Those regulations make plain that "mobile" means exactly what an ordinary person would understand it to mean: "a motor vehicle, nonroad engine or nonroad vehicle."  40 C.F.R. § 51.50; *see also* 42 U.S.C. §§ 7550(2) (defining "motor vehicle"), 7550(11) (defining "nonroad vehicle").  The Colossus Gas Plant's turbines are not "motor vehicles" or "nonroad vehicles" because they are neither "self-propelled" nor "vehicle[s]" that carry or move anything.  *Id.*  That leaves "nonroad engine," which is defined as "an internal combustion engine" that, among other things, "is not affected by sections 111 or 202 of the Clean Air Act."  40 C.F.R. § 51.50; *see also* 42 U.S.C. § 7550(10).[11]

---

[11]  Neither xAI in its brief nor MDEQ in its letter provide a citation for the notion that there is a 1-year exemption for "temporary" installations, likely because there is no such exemption listed anywhere in the SIP.  And there is no catch-all or discretionary exception for other types of sources not listed in the state law, either.  See 11 Pt. 2 Miss. Code R. 2.13 D.  In any event, if the "temporary" exemption they claim was meant to be an exemption on the theory that the turbines are "nonroad engines," 40 C.F.R. § 1068.30(2)(iii), such an exemption fails because, as discussed below, these turbines are explicitly excluded from that definition. And the Clean Air Act does not

18

The problem for xAI is that its turbines are explicitly excluded from the definition of nonroad engines.  The Colossus Gas Plant's turbines *are* affected by Section 111 of the Clean Air Act, which governs new source performance standards (NSPS) for stationary sources.  The Colossus Gas Plant turbines have a heat-input capacity orders of magnitude greater than the regulatory NSPS threshold of 10 MMBtu/hr.  *See* Dkt. No. 1 ¶ 66; Dkt. No. 51-43 (Engineering Analysis) ¶¶ 6, 29; 40 C.F.R. Pt. 60, Subpart KKKK.  As such, Section 111 applies to them, which means they do not qualify as "nonroad engines," and so cannot qualify as "mobile sources."  40 C.F.R. § 51.50.  As EPA confirmed in a rule finalized just this year, "EPA has not regulated combustion turbines, even those that may be portable, as nonroad engines, but rather as stationary sources."  NSPS Review for Stationary Combustion Turbines and Stationary Gas Turbines, 91 Fed. Reg. 1910, 1926–27 (Jan. 15, 2026).  It makes sense to treat them as "stationary" sources, EPA explained, because they are "not self-propelled or intended to be propelled while performing its function," even though the agency recognized that that such sources "may, however, be mounted on a vehicle for portability."  *Id.* at 1914.

## B.    Mississippi's SIP adopts federal PSD regulations; it does not conflict with them.

xAI does not grapple with any of this.  Instead, it tries to ignore the applicable definitions entirely.  It states (at 10) that Mississippi's SIP exempts mobile sources from pre-construction permitting requirements but does not define "mobile source," and then states (at 11) that the phrase should include turbines that are "intended and designed to be moved via a flatbed trailer" and are "marketed and deployed as a temporary power solution."  All of this is wrong.

---

allow MDEQ to adopt additional nonroad engine exemptions that do not appear in the federal regulations.  42 U.S.C. § 7543.

19

It is true that Mississippi's SIP for the PSD program does not independently define a "mobile source." But, as xAI admits, the SIP "incorporates federal [PSD] regulations . . . and it provides that [Mississippi Department of Environmental Quality] will apply these regulations to new stationary sources." Dkt. No. 55 (xAI MTD Br.) at 4.[12] And as described above, federal regulations *do* define "mobile source." *See* 40 C.F.R. § 51.50. So, the first premise of xAI's argument—that the SIP's use of "mobile source" is undefined—is wrong.

This makes xAI's reference (at 10) to an approved state SIP controlling over conflicting federal regulations irrelevant. Mississippi's SIP incorporates federal PSD regulations, it does not conflict with them, so the precedent on which xAI relies does not even come into play. *See* xAI MTD Br. at 10 (citing *S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 369 (5th Cir. 2026)). When (with EPA's approval) Mississippi adopted the federal PSD rules as part of its State Implementation Plan, it did not do so wholesale. Mississippi's SIP made some adjustments to the definitions of terms and provisions it was adopting. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D. If the State wanted to deviate from the federal template with regard to its definition of "mobile source," it clearly knew how to do so.[13] But the SIP includes no such adjustment. Its silence on the matter means that one should look to the federal regulatory provisions the State

---

[12] In particular, and as Defendants admit elsewhere, "Mississippi adopted and incorporated 40 C.F.R. § 52.21" into its SIP. Dkt. No. 61 (PI Opp. Br.) at 20 n.9 (citing 11 Pt. 2 Ch. 2 Miss. Code R. 2.1(B) (2013)). Section 52.21 in turn uses but does not define "mobile source" in subsection 52.21(18) (describing "secondary emissions"). However, 40 C.F.R. § 52.01 leads off by noting all terms "used in this part [52] but not defined herein shall have the meaning given them in . . . parts 51 and 60" of the chapter. Part 51 *does* define "mobile source" at 40 C.F.R. §§ 51.491 & 51.50.

[13] Then again, such an attempt would have been futile, even if EPA approved the effort. See *New York v. EPA*, 413 F.3d 3, 41 (D.C. Cir. 2005) (EPA lacks authority to approve exemptions from major source permitting rules like the PSD program unless Congress has authorized such exemptions in the statute itself).

aimed to adopt to understand the phrases there. [14] It does not mean that one should *invent* a conflict between the regulatory programs where there is no daylight between the two, as xAI tries to do. *See* xAI MTD Br. at 10 (reciting an American Heritage Dictionary definition to do so).

What little context the SIP does supply for its "mobile source" exemption does not support xAI's argument. In Mississippi's SIP, "mobile sources" are included as one of a string of "categorical exemptions" from construction and operating permits. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D). Other items on the list include residential heating, cooking, cleaning, and yard equipment, air conditioning and refrigeration, restaurants, and bakeries. *Id.* Those more industrial sources listed have strict limitations—feed milling facilities that serve local retail but not wholesale distribution (Rule 2.13(D)(6)), low-yield sawmills without drying kilns (Rule 2.13(D)(7)), auto body shops with only one spray booth (Rule 2.13(D)(9)). The one generic entry for "stationary sources[] other than incinerators" limits their potential emissions to 10 tons per year of criteria pollutants like $NO_x$. *See id.* Rule 2.13(D)(5). The thrust of this list makes plain that the exemptions were *small*—not baseload power plants with a potential to emit air pollution among the largest in the country. That's in keeping with EPA's review and approval of other SIPs implementing the Clean Air Act. EPA has approved 28 state (or local) implementation plans that flesh out what "mobile" means when implementing the Clean Air Act. *See* Ex. 1 (Survey of State SIPs). All of them describe a mobile source as a moving source, vehicle, vessel, self-propelled machine, or machine that operates in transit. *See id*. None suggest a usage that would cover the unpermitted turbines used at the Colossus Gas Plant.

The fact xAI sought and received a letter from MDEQ does not change things. As an initial matter, MDEQ's short letter to xAI "acknowledg[ing]" the company's construction plans were

---

[14] *See supra* n.12.

exempt from Clean Air Act permitting does not erase the law's substantive requirements. MDEQ's letter—like xAI's brief—cites the SIP's permitting exemption for "mobile sources" but ignores the definition of that term. *See* Dkt. 51-7. The letter also asserts an exemption for "temporary" installations even though the SIP explicitly includes a provision requiring that temporary sources still undergo permitting and operate pollution controls. *Id.*; 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (5) (2013) (permits need not include operating addresses for a "facility which will be located only temporarily at a site"). Untethered to the language of the statute or the regulations, MDEQ's letter is unpersuasive and should be given no deference.[15]

Rather than defend the substance of the MDEQ's letter, xAI claims (at 11–12) that the mere existence of the letter should settle the matter, citing *United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010), and arguing that "courts have long held that the SIP controls even over conflicting general federal regulations." But again, this is not a case where the SIP *conflicts* with federal regulations. Rather, the SIP *adopts* federal regulations. *Cinergy* is inapposite; this Court—unlike the *Cinergy* court—has not been presented with a conflict between state and federal regulations.

Instead, this Court has been asked to address a situation where both the regulating authority and the regulated facility's operator failed to implement the law's protections. To that end, the Ninth Circuit's decision in *Hammersley* is instructive. There, a citizen group followed the Clean Water Act's process for initiating a citizen suit: it notified state and federal authorities of its claims, waited the requisite time for action by either agency, then decided to pursue the private right of action afforded by the statute. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1011–12 (9th Cir. 2002). The defendant argued that citizens should not have

---

[15] *Accord HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue*, 296 So. 3d 668, 677 (Miss. 2020) (agency interpretations of statutes should not "receive deferential treatment," and "the interpretations and opinions of administrative agencies are not controlling on courts").

be allowed to sue under the Clean Water Act when state and federal authorities had indicated they "would neither accept nor process" the permit application for the pollution permit citizens alleged was missing. *Id.* at 1012. The Court disagreed, reasoning that, where the federal and state regulatory agencies declined enforcement, "they have no statutory or common law right to veto environmental review sought by a citizen who otherwise has complied with the Act. To the contrary, we must honor the Act's express provisions authorizing citizen suits in appropriate cases where procedural requirements are met." *Id.* (citing *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 566–67 (5th Cir.1996)); *see also Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 469 (S.D. Tex. 2011) (citing *Hammersley*).

Likewise, in a Clean Air Act case, the Second Circuit considered a defendant's argument that a citizen suit should be dismissed because answering the question whether defendants failed to obtain the necessary preconstruction permit would frustrate the state agency's ability to regulate industry. The Second Circuit thoroughly rejected the argument: "Congress has required both state agencies and private entities to meet the demands of the [Clean Air Act.] The plaintiffs allege that both the agency and the private entity have not met their responsibilities; we do not see why the private entity should be immune from this suit." *Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 538–39 (2d Cir. 2004).[16]

---

[16]  *See also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 566 (5th Cir. 1996) (holding in a CWA case that "a citizen may also bring an action against a person that is discharging an alleged pollutant without a permit even where EPA has failed to issue a permit or promulgate an effluent limitation to cover the discharge"); *accord Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 481 (6th Cir. 2004) (agreeing citizens "may sue companies that fail to obtain a PSD permit" under the citizen suit provision when a state agency determines a "permit is not required").

**C.     xAI cannot evade liability entirely with a Motion to Dismiss by claiming it lacked notice its conduct violated the law.**

xAI claims it lacked notice that is construction of unpermitted turbines violated the Clean Air Act.  But xAI was warned in EPA rulemakings and by citizen notices that methane gas turbines like those of its Colossus Power Plant require Clean Air Act permits.  At best, xAI claims it lacked fair notice that its conduct was prohibited by the Clean Air Act and its implementing regulations. But, even if its defense had merit, it is not grounds for dismissal.

As an initial matter, xAI (along with all other turbine owners and operators) had explicit— and recent—notice that turbines like those used at the Colossus Gas Plant were not exempted from the Clean Air Act's stationary source permitting requirements.  As xAI admits in a footnote, EPA published a proposed rule that discussed the use of "portable" turbines in December of 2024— months before MZX acquired the Colossus Gas Plant property and months before xAI asked MDEQ for an exemption.  See Dkt. No. 61 at 26 n.13.  There, EPA sought public commentary on whether an exemption should be developed.  Obviously, there is no need to develop one if it already exists.  And in January, 2026, EPA confirmed in its final rule what it had already said: temporary turbines aren't "mobile" sources, and they aren't exempt from NSPS.  91 Fed. Reg. 1910, 1914 (Jan. 15, 2026).

Moreover, xAI was directly warned that these sorts of construction projects ran afoul of the Clean Air Act.  On June 17, 2025, NAACP sent xAI a Notice of Intent to Sue the company for its unpermitted construction and operation of portable turbines in Shelby County, Tennessee.  That letter fully briefed this issue, including the summation that "any turbine with a heat input greater than 10 MMBtu/hr is by definition a **stationary source** subject to a [Clean Air Act] Section 111 standard and is therefore subject to air permitting requirements under the CAA."  Tenn. NOI at 13. Having faced allegations of Clean Air Act violations and calls for pollution controls from many of

24

the same frontline community groups and for essentially the same conduct not ten miles from the site of its Colossus Gas Plant, xAI chose to copy and paste its business plan anyway. *See* Dkt. No. 1 (Complaint) ¶ 200, 201. MDEQ's letter "acknowledging" xAI's exemption claim does not deprive the company of notice it already had or change the plain language of the applicable laws.

xAI's argument seems to be that, in light of MDEQ's letter, it lacked fair notice that its construction project required a preconstruction permit. The fair notice doctrine is an administrative law principle that echoes constitutional due process protections, and that addresses the fairness of imposing a penalty or punitive remedy in a specific case. *See Howmet Corp. v. EPA*, 614 F.3d 544, 553 (D.C. Cir. 2010) (fair notice "preclude[s] an agency from penalizing a private party for violating a rule without first providing adequate notice of [its] substance" (quotations omitted)); *see also Trinity Broadcasting of Florida v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995). The doctrine is best understood as an equitable measure that allows courts to withhold or modify punishments in a specific case. Where a defendant lacks fair notice, a Court may adjust the remedy appropriate for that defendant; it should not take the reins of the regulatory program and adjust the liability calculus for all possible defendants, nor overturn what compliance requires under the law generally.

Here, xAI makes no argument that the regulations are confusing or ambiguous. Instead, the company simply ignores them. But even if xAI could muster an argument that the regulations were ambiguous with regard to its conduct, the appropriate measure would be to tailor any relief granted accordingly, not to dismiss a well-pled complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Whatever failures of notice xAI may claim, it cannot undermine the justiciability of the complaint.

**III.    The Clean Air Act's citizen suit provision violates neither Article II nor the private nondelegation doctrine.**

Defendants' final argument is that the Clean Air Act's Citizen Suit provision violates Article II and the private nondelegation doctrine.  Dkt. No. 55 (xAI MTD Br.) at 13–19.  As Defendants acknowledge (at 16–17), these kinds of arguments have been rejected whenever they have been raised.[17]

Understandably so:  As explained in greater detail in response to the United States's motion, the premise of Defendants' Article II and private nondelegation arguments—that citizen suits "give core executive law-enforcement powers to private parties," (at 17)—is unsupportable.  *See* Opp. to U.S. Br. § III.  Defendants concede, as the United States does, that Congress can "authorize[] rights of action allowing private parties to sue others for damages and equitable relief based on violations of private rights."  xAI MTD Br. at 14.  As they must:  While a "regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law" might raise Article II concerns, *TransUnion v. Ramirez*, 594 U.S. 413, 429 (2021), Article II "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law."  *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc); *see Davis v. Passman*, 442 U.S. 228, 241 (1979) ("[I]t is entirely appropriate for Congress in

---

[17] *See, e.g.*, *Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto Co.*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985) (Clean Water Act); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623–25 (D. Md. 1987) (Clean Water Act); *Nat. Res. Def. Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 815–17 (N.D. Ill. 1988) (Clean Water Act); *Water Keeper All. v. Smithfield Foods*, 2001 WL 1715730, at *5 (E.D.N.C. Sept. 20, 2001) (Clean Water Act); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (Clean Air Act); *Sierra Club v. Franklin Cnty. Power of Ill.*, 2006 WL 8455938, at *9–10 (S.D. Ill. 2006) (Clean Air Act); *Atl. States Legal Found. v. Buffalo Envelope*, 823 F. Supp. 1065, 1074–76 (W.D.N.Y. 1993) (Emergency Planning and Community Right-to-Know Act); *Capitol Records v. Alaujan*, 626 F. Supp. 2d 152, 154 (D. Mass. 2009) (Copyright Act); *Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 256 (D.D.C. 2021) (Federal Election Campaign Act).

creating [federal] rights and obligations to determine, in addition, who may enforce them and in what manner."). Congress can also allow "private parties to enforce the law through civil litigation." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025). Congress has exercised this authority to create private rights of action to supplement government enforcement actions in "almost every area of public law," from civil rights to antitrust. *See* Nitisha Baronia, Jared Lucky, and Diego A. Zambrano, *Private Enforcement at the Founding and Article II*, 114 Cal. L. Rev. 131, 140–44 (2025) (hereinafter "*Private Enforcement*").

The Clean Air Act's citizen suit provision is such a right of action. It authorizes a citizen plaintiff to "commence a civil action on his own behalf," 42 U.S.C. § 7604(a), not on behalf of the federal government. *See also Conservation Law Found*, 840 F. Supp. at 175.[18] Further, citizen suit provisions "apply only to persons who can claim some sort of injury." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16–17 (1981); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 129 (1998) (Stevens, J., concurring) (reasoning that "EPCRA's citizen-suit provision" does not "impinge[] on the power of the Executive" where the plaintiff does not "merely possess[] the 'undifferentiated public interest' in seeing EPCRA enforced" but instead alleges "a particularized injury"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 347 (2016) (Thomas, J., concurring) ("The separation-of-powers concerns underlying our public-rights decisions are not implicated when private individuals sue to redress violations of their own private rights."). To that

---

[18] That same preamble authorizes suit not just against polluters, see 42 U.S.C. § 7604(a)(1), (3), but also against the federal government when it pollutes or fails to perform a nondiscretionary duty, 42 U.S.C. § 7604(a)(1), (2), underscoring that Congress did not conceive of such suits as always being on behalf of the federal government. Moreover, it makes little sense to view suits under the provision as always being on the federal government's behalf where the set of "person[s]" who "may commence a civil action" under the provision includes other government actors, like "States[s]" and "municipalit[ies]." 42 U.S.C. §§ 7602(e), 7604(a); *see U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 614, 616 (1992).

end, Congress provided, in the analogous Clean Water Act citizen suit provision, that inherent in the word "citizen" is a "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). And citizen plaintiffs may seek only remedies that "redress" those "injuries by abating current violations and preventing future ones." *Laidlaw*, 528 U.S. at 187.

That understanding of citizen suits—that they are on behalf of the private plaintiff, not the government—also draws support from consideration of citizen suits' historical antecedents. *See Riley*, 252 F.3d at 753 (a "historical perspective provides us with a helpful bridge into the workings of the statute itself"). Modern environmental statutes are based on common-law nuisance actions, which permitted private plaintiffs to bring suit only when they were harmed directly. *Cox v. City of Dallas*, 256 F.3d 281, 289, 291 (5th Cir. 2001). Private plaintiffs could bring suit for private nuisance where pollution harmed them by causing an "invasion" of the plaintiff's "interest in the private use and enjoyment of land." *Id.* at 289; *see also* 3 William Blackstone, *Commentaries* *217 (private nuisance where operation of "smelting house for lead" resulted in "vapor and smoke" that harmed property and livestock); Restatement (Second) of Torts § 821D cmts. b, c, and Reporter's Note. Even where that pollution also resulted in a "public nuisance," which generally involved an "unreasonable interference with a right common to the general public," a private plaintiff still could sue under either of two theories. *See Cox*, 256 F.3d at 289; Restatement (Second) of Torts § 821C cmts. d & e; 3 William Blackstone, *Commentaries* *219–20. A private plaintiff could sue (1) if the public nuisance also qualified as a private nuisance—that is, if it also interfered with "the use and enjoyment of the plaintiff's land—or (2) if the public nuisance caused particularized harm to the plaintiff. Restatement (Second) of Torts § 821C cmts. d & 3. In other words, citizen suits trace their lineage to a context where a "single act" could give rise to both a "private wrong and a public wrong"; a "private suit" would "vindicate[] the private wrong, and the

28

public prosecution brought by the sovereign" would "vindicate[] the public wrong." *Ellingburg v. United States*, 607 U.S. 163, 179–80 (2026) (Thomas, J., concurring).

Defendants thus are wrong that Plaintiffs are asserting "authority to unilaterally 'conduct[] civil litigation . . . for vindicating public rights.'" xAI MTD Br. at 16 (quoting *Buckley v. Valeo*, 424 U.S. 1, 140 (1976)). As the foregoing makes clear, just because a private suit seeks relief under the same standard the federal government would enforce does not mean that private suit is vindicating only a public right. *Id.* at 16, 18. Rather, Plaintiffs seek to vindicate a private right that arises from the same unlawful action from which a public suit could arise. Plaintiffs sued because the Plant's pollution interferes with how their members use their land and harms their health. Dkt. No. 1 ¶¶ 33–34, 36–39, 41–42. To be sure, the private suit likewise furthers the public interest, but only in the indirect way that other kinds of private suits do: The "adjudication of private rights" both "redress[es] injuries *and* deter[s] harmful behavior." *Private Enforcement*, 114 Cal. L. Rev. at 150 (analogizing to deterrent effect of tort law). In short, Plaintiffs need not establish that Congress could give "'any person' the authority to enforce the entire U.S. code" or that Congress can "assign core law enforcement power to private parties," xAI MTD Br. at 18, because here, Congress has granted citizen plaintiffs only the right to pursue their private right to redress particularized harms they face.

These features of citizen suits—that they are on behalf of people, not the government, and secure relief to redress particular harms to those plaintiffs—place them on even firmer constitutional ground than qui tam suits, which the en banc Fifth Circuit has already upheld from Article II challenge. *Riley*, 252 F.3d at 751, 753–57; *see United States ex rel. Montcrief v. Peripheral Vascular Assocs.*, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring) (recognizing that Riley precludes even the Fifth Circuit from reevaluating whether there are

29

"constitutional flaws in the FCA's quit tam device"); *United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*, 157 F.4th 758, 766–67 (5th Cir. 2025) (Ho., J., concurring) (similar). Qui tam suits, unlike citizen suits, are brought "in the name of the Government" and seek to vindicate "an injury in fact suffered by the United States." *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 769–70, 771 (2000). Such qui tam provisions "raise the most direct constitutional questions," *Private Enforcement*, 114 Cal. L. Rev. at 181, but even they do not "violate the constitutional separation of powers doctrine under the Take Care and Appointments Clauses of Article II." *Riley*, 252 F.3d at 751. Because citizen suits are not brought in the United States's name, they do not even raise such constitutional questions in the first place.

None of Defendants' contrary arguments work. Defendants largely focus on remedies, emphasizing that citizen suit enforcement authority includes the power "to seek expansive injunctive relief and 'the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court.'" Dkt. No. 55 (xAI MTD Br.) at 15 (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020)); *see also id*. 16. But both the injunctive relief and civil penalties sought here are designed to vindicate Plaintiffs' private rights.

In suggesting that injunctive relief is constitutionally suspect, Defendants make an extreme argument that even the United States does not embrace. *Id.* at 21. The ability to seek injunctive relief is not an exclusive executive prerogative. To that end, there is nothing unusual about private plaintiffs securing injunctive relief in exactly this context: At common law, plaintiffs were entitled to a "judgment . . . to have the nuisance abated." *See* 3 William Blackstone, *Commentaries* *221. And plaintiffs have continued to secure that relief, including in cases where personalized "injury [was] occasioned by a public nuisance," in the decades leading up to the enactment of the Clean Air Act. *See Soap Corp. of Am. v. Reynolds*, 178 F.2d 503, 504, 506–07 (5th Cir. 1949) (in case

30

relating to "foul and obnoxious vapors . . . causing plaintiffs irreparable damage in their persons and properties," plaintiffs "may, in the one action, restrain the source of the damage" rather than bring "successive suits for recurring damages"). Defendants suggest that the breadth of the injunctive relief requested here reveals that Plaintiffs are pursuing only generalized relief to benefit the public at-large. xAI MTD Br. at 15–16. Not so: The requested injunctive relief addresses the particularized harms Plaintiffs allege. *See* Dkt. No. 1 ¶¶ 35, 40, 44; *see also* Dkt. 52 at 21–23.

In short, even if a citizen suit seeking civil *penalties* might raise Article II concerns, there is no argument that a suit seeking injunctive relief does the same. Accordingly, this Court should not dismiss this case in its entirety on Defendants' Article II theory, because, at a minimum, claims for injunctive relief should remain. *See also* Opp to U.S. MTD 31.

But the Court need not dismiss the civil penalties claims either, because Defendants' argument about civil penalties fares no better. True, "citizen plaintiffs are assigned no portion of the penalty award," xAI MTD Br. at 15, but penalties still provide particularized relief to those plaintiffs. Penalties, like injunctive relief, provide "a form of redress" for "future injury" because they are "a sanction that effectively abates" the harmful conduct "and prevents its recurrence." *Laidlaw*, 528 U.S. at 185–87. To claim that plaintiffs are nonetheless "seek[ing] relief not on their own behalf on behalf of society as a whole," Defendants quote a Sixth Circuit decision relying on a district case that predated *Laidlaw*'s rejection of the theory that citizen suits do not require "'personalized remedies.'" *See Ellis*, 390 F.3d at 477 (citing *Orange Env't, Inc. v. Cnty. of Orange*, 923 F. Supp. 529, 539 (S.D.N.Y. 1996)).

Defendants also cite the Supreme Court's decision in *Seila Law* and the Fifth Circuit's decision in the *National Horsemen's Benevolent and Protection Association v. Black*, 178 F.4th 224 (5th Cir. 2026), but overread both. xAI MTD Br. at 15. *Seila Law*'s description of the pursuit

31

of penalties as being a "quintessentially executive power," (at 15 (quoting *Seila Law*, 591 U.S. at 219)), arose when describing the use of those powers by an "independent administrative agency" designed to pursue the public interest broadly, by "implement[ing] and enforc[ing]" a large body of financial consumer protection laws." 591 U.S. at 203, 206 (quoting 12 U.S.C. § 5511(a)); *see also Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *4 (June 29, 2026) (discussing "in-house adjudications" and "fil[ing] suits on behalf of the United States"). Those monetary penalties were not intended to address any particularized harm to the entity bringing suit, but the public interest more generally. *Seila Law*, 591 U.S. at 219. But that does not in any way undermine the Supreme Court's recognition that private parties can use such penalties to seek personalized relief: abating "the threat of future injury" to them. *Laidlaw*, 528 U.S. at 185–87; *Steel Co.*, 523 U.S. at 129 (Stevens, J., concurring).

*National Horsemen's* is similarly distinguishable. There, the Fifth Circuit was considering a private corporation empowered by Congress to both "write[] all the rules" regarding thoroughbred horseracing across the country and enforce those rules, including by seeking civil sanctions. 178 F.4th at 231. In other words, that entity functioned as a private, nonprofit equivalent to a full-blown federal agency that exercises executive authority and thus had to be sufficiently "subordinate" to executive branch control. *Id.* at 238–39 & n.9, 247. That private entity is nothing like a citizen suit plaintiff who sues and seeks penalties on his own behalf, to redress particularized harms to him. *See Laidlaw*, 528 U.S. at 185–87. While the executive must maintain control over suits private entities bring on behalf of the government—including suits brought by a private agency-equivalent or qui tam plaintiffs, *see National Horsemen's*, 178 F.4th

at 245 n.20, 247—no similar control is needed over citizen suits, which are brought on a plaintiff's own behalf. *See supra* at 29–30.[19]

Defendants' resort to history (at 13–14) does not improve its argument. Evidence that the "executive Power" includes "core law enforcement authority to prosecute all federal public offenses," xAI MTD Br. at 13, is incomplete, in two ways. First, it does not answer the critical question here: Whether, as a historical matter, a private suit like this one would be viewed as prosecuting a public offense. The answer comes from the portions of Blackstone Defendants have overlooked (and other sources describing the common law), which makes clear that even when private plaintiffs brought suit for the kind of violation at issue here, they pursued relief on their own behalf, not on behalf of the public. *See supra* at 28–29. That history is fatal to Defendants' argument because it confirms that those bringing citizen suits are not exercising "executive Power" in any sense.

Second, even if citizen suits were viewed as private enforcement of purely public offenses, Defendants overlook Founding-era evidence showing that such enforcement schemes were perfectly consistent with early views of the scope of executive power. Defendants' own historical source recognized that "the presence of qui tam statutes in the early years of the Republic" could show that executive control over the enforcement of public law was not absolute. Saikrishna

---

[19] Defendants' reliance on these cases to resist earlier cases confirming the constitutionality of citizen suits is thus misplaced. xAI MTD Br. at 17. Even if these cases show some "reinvigoration of the unitary executive," *id.* at 17, they do nothing to support the claim that allowing private plaintiffs to bring suit to redress particularized harm violates Article II. To that end, Defendants' attempt to brush away these cases as dealing only with the question whether citizen suits violated "the separation of *governmental powers*" as between Congress and the Executive (at 17 (cleaned up)), ignores that these cases operated from the same premise that disposes of the cases it now cites: Citizen suit enforcement mechanisms are just like any other private suit an individual can bring on his own behalf, for example, under "Title VII" and the "securities Acts." *See, e.g.*, *N. Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 556 (E.D.N.C. 2001).

33

Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 803–04 (2003); *accord Riley*, 252 F.3d at 753. Indeed, that scholar's analysis overlooked instances where the executive was unable to use "either a pardon or a *nolle presequi*" to reject a private action duly authorized by statute, xAI MTD Br. at 14 (quoting Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 578 (2005)), including for the "suits most directly relevant to modern private enforcement." *See Private Enforcement*, 114 Cal. L. Rev. at 155 ("[B]oth the *nolle prosequi* and the pardon were inapplicable against the Founding Era suits most directly relevant to modern private enforcement . . . ."); *see also id.* at 155–56, 158, 164–65, 186 (describing other limits on executive control of private enforcement). Plainly the "executive Power" did not include perfect control over the private prosecution of federal public offenses. *Contra* xAI MTD Br. at 13.

History aside, Defendants also have little to say about the mechanisms the executive has to shape citizen suit enforcement. As the Supreme Court has emphasized, the United States "retains the power to foreclose a citizen suit by undertaking its own action," and, if the Executive Branch "opposes a particular citizen suit, the statute allows" it to "'intervene as a matter of right' and bring the Government's views to the attention of the court." *Laidlaw*, 528 U.S. at 188 n.4; *see* 42 U.S.C. 7604(b)(1). Accordingly, even if citizen suits were on behalf of the Executive, these mechanisms ensure the Executive retains the ability to either preclude a suit through diligent prosecution or otherwise persuade a court why relief should not be granted.

Finally, Defendants suggest that citizen suits uniquely interfere with the Executive Branch's prosecutorial discretion, which allows it, and it alone, to determine "how aggressively to pursue legal actions against defendants who violate the law." xAI MTD Br. at 14–15, 16. Nothing about allowing private suits like these to go forward interferes with the Executive's ability to decide whether (or not) to enforce in its own name. *See Heckler v. Chaney*, 470 U.S. 821, 831

34

(1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). If what Defendants instead suggest is that the Executive must have an absolute right to determine whether anyone enforces federal law, that would not only be ahistorical (*see* above), it also is not supported by any case Defendants cite. The Supreme Court's decision in *Trump v. United States*, 603 U.S. 593 (2024), recognized that, at most, the President's authority would be "preclusive" in this sense only with respect to the "investigation and prosecution of *crimes*." *Id.* at 620 (cleaned up) (emphasis added). While the Executive enjoys discretion to determine whether it will civilly enforce a given federal standard, *see Heckler*, 470 U.S. at 831, those choices need not have preclusive effect on any private enforcement of the same standard. *Cf. In re Aiken Cnty.*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (recognizing that prosecutorial discretion may work differently with respect to "civil enforcement actions"). In the end, because the U.S. Code regularly allows both private parties and the executive to enforce the same legal standard (not just in the citizen suit context, but also in cases where Congress has allowed for compensatory relief), the Executive must accept that it will not have absolute control over the enforcement of federal law.

## CONCLUSION

For these reasons, this Court should deny the United States's motion to dismiss the complaint.

35

Dated: July 10, 2026                     Respectfully submitted,

/s/ Carroll Rhodes

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
  OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

/s/ Elias L. Quinn                  /s/ Benjamin Grillot

Elias L. Quinn (CO Bar No. 42159)    Benjamin Grillot (DC Bar. No. 982114)
(Pro Hac Vice) – Lead Counsel      (Pro Hac Vice) – Lead Counsel
Mary Rock (IL Bar No. 6332240)     SOUTHERN ENVIRONMENTAL LAW CENTER
(Pro Hac Vice)                   500 New Jersey Ave., Suite 600
EARTHJUSTICE                Washington, DC 20001
D.C. Regional Office            bgrillot@selc.org
1250 I Street, 4th Floor         Phone: 202-828-8382
Washington, DC 20005
mrock@earthjustice.org        Patrick Anderson (GA Bar No. 226260)
equinn@earthjustice.org       (Pro Hac Vice)
Phone: 202-667-4500          SOUTHERN ENVIRONMENTAL LAW CENTER
                              Ten 10th Street NW, Suite 1050
Lauren Godshall (LA Bar No. 31465)   Atlanta, GA 30309
(Pro Hac Vice)                   panderson@selc.org
Rebecca Ramirez (TX Bar No. 24126749) Phone: 404-521-9900
(Pro Hac Vice)
EARTHJUSTICE                Elizabeth Putfark (VA Bar No. 100358)
Gulf Regional Office           (Pro Hac Vice)
845 Texas Ave., Suite 200      SOUTHERN ENVIRONMENTAL LAW CENTER
Houston, TX 77002           120 Garrett Street, Suite 400
lgodshall@earthjustice.org      Charlottesville, VA 22902
rramirez@earthjustice.org       eputfark@selc.org
Phone: 773-828-0836          Phone: 434-977-4090

*Counsel for Plaintiffs*

36