## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE** | |
| **Plaintiffs,** | |
| **v.** | **No. 3:26-cv-00074-DMB-JMV** |
| **X.AI CORP. and MZX TECH LLC** | |
| **Defendants.** | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES'S MOTION FOR INTERVENTION AND DISMISSAL

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

      A.   The Clean Air Act regulates air pollution emissions to prevent serious
           harm to our health and environment.................................................................. 3

      B.   The federal government, states, and individuals each play a role in
           ensuring compliance with Clean Air Act standards. ......................................... 5

      C.   xAI constructed its Colossus Gas Plant without obtaining Clean Air
           Act permits ....................................................................................................... 8

      D.   xAI's Clean Air Act violations harm the community around the plant. .......... 10

      E.   To protect its members' health, NAACP sued under Section 7604. ................ 10

ARGUMENT .................................................................................................................... 11

I.      Rule 41 does not grant the United States a unilateral right to dismiss Plaintiffs'
      action.............................................................................................................................. 11

II.     The Clean Air Act does not grant the United States a unilateral right to dismiss
     the entire action. ............................................................................................................ 14

      A.   The text does not support the United States's view. ....................................... 15

      B.   Precedent does not support the United States's view...................................... 18

      C.   The United States's remaining arguments lack merit. .................................... 19

III.    The constitutional avoidance canon does not support interpreting the Clean Air
    Act to grant the United States a unilateral right to dismiss........................................ 24

      A.   Section 7604 does not raise constitutional concerns. ..................................... 24

      B.   The United States's contrary arguments lack merit. ....................................... 30

CONCLUSION................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re *Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ........................................................................................20

*Atl. States Legal Found. v. Buffalo Envelope*,
   823 F. Supp. 1065 (W.D.N.Y. 1993) ..............................................................................25

*Campaign Legal Ctr. v. Iowa Values*,
   573 F. Supp. 3d 243 (D.D.C. 2021) ................................................................................25

*Capitol Records v. Alaujan*,
   626 F. Supp. 2d 152 (D.D.C. 2009) ................................................................................25

*Chesapeake Bay Found. v. Bethlehem Steel Corp.*,
   652 F. Supp. 620 (D. Md. 1987) .....................................................................................25

*United States ex rel. CIMZNHCA v. UCB, Inc.*,
   970 F.3d 835 (7th Cir. 2020) ..........................................................................................12

*United States ex rel. Clarissa Zafirov v. Fla. Med. Assocs.*
   (11th Cir. Jan. 6, 2025) ...................................................................................................32

*Conservation Law Found. of New England, Inc. v. Browner*,
   840 F. Supp. 171 (D. Mass. 1993) ..................................................................................26

*Cook v. Gralike*,
   531 U.S. 510 (2001) ........................................................................................................17

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) ........................................................................................................13

*Cox v. City of Dallas*,
   256 F.3d 281 (5th Cir. 2001) .....................................................................................28, 29

*Curry v. Regents of the Univ. of Minn.*,
   167 F.3d 420 (8th Cir. 1999) ..........................................................................................21

*Davis v. Passman*,
   442 U.S. 228 (1979) ........................................................................................................25

*Dubois v. Thomas*,
   820 F.2d 943 (8th Cir. 1987) ..........................................................................................20

ii

*Ellingburg v. United States*,
607 U.S. 163 (2026)..................................................................................................29

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ..............................................................................19, 27

*Elmore v. Henderson*,
227 F.3d 1009 (7th Cir. 2000) ...................................................................................12

*Enbridge Energy, LP v. Nessel*,
146 S. Ct. 1074 (2026)...............................................................................................23

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) ........................................................................16, 18, 19

*Environment Texas Citizen Lobby, Inc. v. Exxon Mobil Corp.*
(5th Cir. Jan. 17, 2023) ..............................................................................................32

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990) ..............................................................................18, 19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)........................................................................................... *passim*

*United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*,
157 F.4th 758 (5th Cir. 2025) ....................................................................................30

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)..........................................................................6, 7, 18, 19, 26

*Hall v. Hall*,
584 U.S. 59 (2018)......................................................................................................13

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989)......................................................................................................16

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*,
434 F.3d 320 (5th Cir. 2005) ................................................................................13, 14

*Heckler v. Chaney*,
470 U.S. 821 (1985)..............................................................................................19, 20

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)....................................................................................................24

*Karr v. Hefner*,
475 F.3d 1192 (10th Cir. 2007) ..................................................................................19

iii

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025)..................................................................................................25

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981)......................................................................................................27

*United States ex rel. Montcrief v. Peripheral Vascular Assocs.*,
133 F.4th 395 (5th Cir. 2025) ...................................................................................30

*N. Carolina Shellfish Growers Ass'n & N. Carolina Coastal Fed'n v. Holly Ridge*,
No. 7:01-cv-36 (E.D.N.C. Aug. 15, 2001)................................................................32

*Natural Res. Def. Council v. Outboard Marine Corp.*,
692 F. Supp. 801 (N.D. Ill. 1988) .............................................................................25

*Orange Env't v. Cnty. of Orange*,
923 F. Supp. 529 (S.D.N.Y. 1996) ...........................................................................27

*Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*,
506 F.2d 914 (5th Cir. 1975) ....................................................................................12

*Plains Growers, Inc. v. Ickes-Braun Glasshouses, Inc.*,
474 F.2d 250 (5th Cir. 1973) ....................................................................................12

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)..................................................................................................14

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) (en banc) ........................................................25, 28, 30, 34

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018)............................................................................................15, 23

*Seila Law v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020)..........................................................................................30, 33, 34

*Sierra Club v. Franklin Cnty. Power of Ill.*,
2006 WL 8455938 (S.D. Ill. 2006) ...........................................................................25

*Soap Corp. of Am. v. Reynolds*,
178 F.2d 503 (5th Cir. 1949) ....................................................................................31

*Sommers v. Bank of Am., N.A.*,
835 F.3d 509 (5th Cir. 2016) ....................................................................................12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................27, 30

iv

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)..........................................................................................................27, 33

*Stringer v. Town of Jonesboro,*
    986 F.3d 502 (5th Cir. 2021) ...............................................................................................18

*Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto,*
    600 F. Supp. 1474 (D.N.J. 1985) ........................................................................................25

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.,*
    973 F.2d 1320 (7th Cir. 1992) .............................................................................................19

*U.S. ex rel. Taylor v. Healthcare Assocs. of Tex.*
    (5th Cir. Mar. 23, 2026) ......................................................................................................30

*TransUnion v. Ramirez,*
    594 U.S. 413 (2021)..............................................................................................................25

*Trump v. Slaughter,*
    2026 WL 1855612 (U.S. June 29, 2026) .............................................................................33

*U.S. Dep't of Energy v. Ohio,*
    503 U.S. 607 (1992)..............................................................................................................26

*United States ex rel. Conyers,*
    108 F.4th 351, 357 (5th Cir. 2024) ......................................................................................23

*United States v. Am. Elec. Power Serv. Corp.,*
    137 F. Supp. 2d 1060 ...........................................................................................................25

*United States v. Nixon,*
    418 U.S. 683 (1974)..............................................................................................................21

*Vt. Agency of Natural Res. v. U.S. ex rel Stevens,*
    529 U.S. 765 (2000)..............................................................................................................30

*Water Keeper All. v. Smithfield Foods,*
    2001 WL 1715730 (E.D.N.C. Sept. 20, 2001)......................................................................25

*Weinstein v. 440 Corp.,*
    146 F.4th 1046 (11th Cir. 2025) ..........................................................................................12

*Wis. Cent. Ltd v. United States,*
    585 U.S. 274 (2018)........................................................................................................15, 23

**Statutes**

12 U.S.C. § 5511(a) ....................................................................................................................33

v

18 U.S.C. § 1514A(b)(1)............................................................................................21

28 U.S.C. § 517........................................................................................................35

31 U.S.C. § 3730......................................................................................................14

33 U.S.C. § 1365......................................................................................................32

33 U.S.C. § 1365(g)..................................................................................................27

42 U.S.C. § 7401(b)(1)...............................................................................................2

42 U.S.C § 7401(c)....................................................................................................2

42 U.S.C § 7409).......................................................................................................3

42 U.S.C § 7410........................................................................................................3

42 U.S.C § 7412(i)..............................................................................................5, 22

42 U.S.C § 7412(a)(1)...............................................................................................5

42 U.S.C § 7412(d)....................................................................................................3

42 U.S.C. § 7413.......................................................................................................5

42 U.S.C. § 7413(b).................................................................................................13

42 U.S.C. § 7418(b).................................................................................................22

42 U.S.C. §§ 7470–7492............................................................................................4

42 U.S.C. § 7475(a)...................................................................................................5

42 U.S.C. § 7479(1)...................................................................................................5

42 U.S.C. § 7602(e).................................................................................................26

42 U.S.C. § 7604............................................................................................ *passim*

**Federal Rules and Regulations**

40 C.F.R. § 51.166(b)(1)(i) .......................................................................................5

40 C.F.R. § 52.21(b)(50)(i)........................................................................................5

40 C.F.R. § 52.1270(c)...............................................................................................3

40 C.F.R. §§ 63.6080–63.6175..................................................................................9

76 Fed. Reg. 54294 (Aug. 31, 2011)........................................................................................3, 4

80 Fed. Reg. 65292 (Oct. 26, 2015)............................................................................................4

83 Fed. Reg. 17226 (Apr. 18, 2018) .......................................................................................3, 4

89 Fed. Reg. 16202 (Mar. 6, 2024)............................................................................................4

90 Fed. Reg. 316 (Jan. 3, 2025) .................................................................................................4

91 Fed. Reg. 1910 (Jan. 15, 2026) .............................................................................................9

Fed. R. of Civ. P. 3....................................................................................................................11

Fed. R. of Civ. P. 21..................................................................................................................12

Fed. R. of Civ. P. 24..................................................................................................................12

Fed. R. of Civ. P. 41................................................................................................11, 12, 13, 14

Fed. R. of Civ. P. 42..................................................................................................................13

**State Rules and Regulations**

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013)........................................................................5

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013) ...............................................................................5

11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) ...................................................................................5

**Other Authorities**

U.S. Const. Article II, § 1, cl. 1 .............................................................................................24

U.S. Const. Article II,  § 3 ......................................................................................................24

1 Comm. on Pub. Works, 93d Cong., A Legislative History of the Clean Air
   Amendments of 1970 (1974) ..............................................................................................6, 7

Amendment No. 1373 § 609(a)(3) (Mar. 26, 1990), reprinted in 4 Comm. on Env't
   and Pub. Works, 103d Cong., Legislative History of the Clean Air Act
   Amendments of 1990 (1998) ...............................................................................................17

*Announcing xAI for Government, xAI* (July 14, 2025),
   https://x.ai/news/government .............................................................................................23

Carmen Arroyo & Rachel Metz, *SpaceX Inks Multibillion-Dollar Computing Deal with Reflection AI*, Yahoo! Finance (June 22, 2026), https://finance.yahoo.com/technology/ai/articles/spacex-inks-multibillion-dollar-computing-150509579.html ..........................................................................24

*New Compute Partnership with Anthropic*, xAI (May 6, 2026), https://x.ai/news/anthropic-compute-partnership........................................................24

Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131 (2026) .............................................26, 27, 30, 32, 34, 35

Restatement (Second) of Torts § 821C..........................................................................29

Restatement (Second) of Torts § 821D..........................................................................28

SpaceX, Registration Statement Amendment No. 2 Free Writing Prospectus (Form S-1) (June 3, 2026), https://perma.cc/TVT6-GS7G;.......................................24

SpaceX, Registration Statement (Form S-1) (May 20, 2026), https://perma.cc/GMF2-5W7U ..........................................................................24

3 William Blackstone, *Commentaries* ..............................................................28, 29, 31

**INTRODUCTION**

The United States does not dispute that xAI broke federal law when it installed—and began operating—the Colossus Gas Plant, which is comprised of dozens of unpermitted gas turbines in Southaven, Mississippi that power its Colossus 2 data center. Rightly so: At the heart of this lawsuit is xAI's decision to flout the Clean Air Act by constructing an industrial power plant without the permits and pollution controls that have been required for plants like it for the past 50 years. Nor does the United States dispute that these turbines emit hundreds of tons per year of dangerous pollutants that directly harm the frontline communities that live, work, play, and breathe in the shadow of the Plant, including Plaintiffs' members. Rightly so, again: The plant has the capacity to emit enough pollution that it is likely far and away the largest industrial source of smog-forming nitrogen oxides in the greater Memphis area.

Rather than help Plaintiffs secure relief from this harmful pollution, the United States instead moves to intervene to assert an absolute right to *prevent* these communities from suing to address their harms, which would leave the local choir singers, gardeners, and grandparents that tried to protect themselves and their loved ones from breathing polluted air to face that pollution without any opportunity to protect their rights in court. The United States maintains that it can do so because it has the right to dismiss *any* Clean Air Act citizen suit for any reason if it determines that curbing unlawful pollution is not the government's priority. This assertion of authority is unprecedented, and its claimed veto power finds no support in the Clean Air Act. Congress intended that federal and state governments, as well as citizens, would take action to ensure the protections of the Act exist in practice, not just on paper. And Congress created the citizen suit provision of the Clean Air Act precisely for situations like these: to allow citizens to abate

pollution that is causing them particularized harm when the government—and states—have failed to require compliance with the law.

None of the United States's arguments for claiming this right to dismiss hold up. First, Federal Rule of Civil Procedure 41 does not grant such a right, because it allows a plaintiff only to dismiss its own claims—*not* the claims of another plaintiff.

Second, the United States fares no better under the Clean Air Act. The government does not even attempt to locate any dismissal right in the text of the Act. Nor could it: Unlike other statutes, nothing in the Act's text grants the United States the right to override a private suit to abate pollution. Instead, the Act authorizes citizens harmed by unlawful pollution to sue to abate pollution when the government refuses to act, and it allows the government to participate only in more limited ways that stop far short of allowing it to dismiss the citizen plaintiff's action. No court has held otherwise, and this Court should reject the United States's effort here.

Finally, the United States asks this Court to adopt its atextual reading of the Clean Air Act "to avoid serious constitutional questions" under Article II. That is not how constitutional avoidance works, and, in any event, citizen suits raise no Article II concern. Citizen suits are private rights of action, created by Congress, that allow private plaintiffs to sue on their own behalf, not on behalf of the government. Unsurprisingly, then, every court to address these constitutional arguments has rejected them. This Court should not be the first to hold otherwise.

## BACKGROUND

The Clean Air Act exists "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). A "primary goal" of the Act "is to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention." *Id.*

2

§ 7401(c). The Act achieves these goals by giving the federal and state governments—and also the people the Act exists to protect—specific roles to ensure that its protections are realized. This case shows exactly why Congress structured the Act in this way and highlights the risks of rewriting that structure to cut out the people the Act is intended to protect.

**A.      The Clean Air Act regulates air pollution emissions to prevent serious harm to our health and environment.**

The Clean Air Act programs relevant here start by requiring the creation of standards that provide a basic level of protection for people who will breathe in the regulated pollutants. Under the National Ambient Air Quality Standards (NAAQS) program, the EPA Administrator must set standards (i.e., the NAAQS) for criteria pollutants at a level protective of public health and welfare. *See* 42 U.S.C. § 7409(a)–(b). These standards then get implemented at the state level in state implementation plans (SIPs), which must include standards and processes for issuing permits that will ensure that pollution sources meet applicable emissions limits. *Id.* § 7410(a), (k); *see also* 40 C.F.R. § 52.1270(c) (EPA-approved SIP for Mississippi). Under the hazardous air pollutants program, the Administrator must set National Emission Standards for Hazardous Air Pollutants (NESHAPs) on a category-of-source basis for sources that emit these pollutants. *See id.* § 7412(d).

These standards exist because the air pollutants they regulate pose real threats to our health. *See* Dkt. No. 1 (Complaint) ¶¶ 79, 82, 85, 87. For example, even short-term exposure to carbon monoxide (a criteria pollutant) is linked to serious heart problems. *See* Review of National Ambient Air Quality Standards for Carbon Monoxide, 76 Fed. Reg. 54294, 54298–299 (Aug. 31, 2011). Nitrogen dioxide and ozone (two other criteria pollutants) both harm, among other things, lung health. *See* Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17226, 17233, 17240 (Apr. 18, 2018) (concluding that short- and long-term exposure cause respiratory harm, such as worsening asthma); National Ambient Air Quality

Standards for Ozone, 80 Fed. Reg. 65292, 65302, 65305–308 (Oct. 26, 2015) (noting that short-term ozone exposure causes decreased lung function and worsened asthma symptoms, and long-term exposure causes irreversible lung damage). Fine particulate matter (a fourth criteria pollutant) can cause premature death. *See* Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16202, 16223, 16227 (Mar. 6, 2024). Formaldehyde is considered a "hazardous air pollutant," and is a human carcinogen that also causes respiratory harm. *See* Formaldehyde; Risk Evaluation Under the Toxic Substances Control Act (TSC); Notice of Availability, 90 Fed. Reg. 316, 317 (Jan. 3, 2025).

The people most harmed by exposure to these pollutants are already our most vulnerable. For example, young children and those with preexisting health conditions are most affected by carbon monoxide exposure. *See* 76 Fed. Reg. at 54298–299. And people with asthma, children, older adults, and those who spend large amounts of time in areas with elevated nitrogen dioxide levels (such as near roadways) are at a higher risk. *See* 83 Fed. Reg. at 17245–246.

Under the Act, new sources receive particular attention, to ensure that they are built with the best pollution control technology in place. As part of the NAAQS program, new sources in areas classified as being in "attainment" with the relevant NAAQS must comply with the Prevention of Significant Deterioration (PSD) program's requirements, which include pre-construction permits. 42 U.S.C. §§ 7470–7492.[1] These requirements prohibit construction unless the source will not cause or contribute to an exceedance of the NAAQS and pollution controls are installed that reflect the maximum degree of reduction achievable through the use of stringent

---

[1] The area this case concerns is classified as in attainment. *See* Dkt. No. 1 ¶ 72. But that does not mean its air quality is safe. The number of high ozone days has increased annually for the past seven years, and more recently, the data from DeSoto County and Memphis show that concentrations of ground-level ozone exceed the NAAQS. *Id.* ¶¶ 172–174.

4

pollution controls on an ongoing basis. *See id.* § 7475(a)(3)–(4). As part of the hazardous air pollutants program, new sources cannot be constructed without a permit that guarantees it will be in compliance with the relevant NESHAP. *See id.* § 7412(i). And under Mississippi's SIP, new sources of criteria pollutants must obtain permits before construction begins, so that the state can impose emission limits on those new sources. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013).

These requirements apply to stationary sources. The PSD program applies to construction of a "major stationary source," which is one that emits, or has the potential to emit, 250 tons per year or more of a criteria pollutant. 42 U.S.C. §§ 7475(a)(1), 7479(1); 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(50)(i); *see also* 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024). The hazardous air pollutants program applies to a "major source," which is "any stationary source" or group of sources "that emits or has the potential to emit . . . 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C. § 7412(a)(1). The Mississippi SIP applies to new stationary sources of criteria pollutants, regardless of whether they meet the PSD program's emission thresholds. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013); *see also id.* 2.1 C (28) (2013) (defining "stationary source" as "any building, structure, facility, or installation which emits or may emit a regulated air pollutant").

**B.      The federal government, states, and individuals each play a role in ensuring compliance with Clean Air Act standards.**

The Act assigns a role in securing compliance to the federal government, the relevant state government, and the people whom polluters harm by evading pollution limits. States and the federal government have several options available to them: They may, for example, address violations that occurred in the past but have ceased, may use administrative processes as an alternative (or precursor) to judicial proceedings, and may sue polluters. *See* 42 U.S.C. § 7413.

But Congress recognized that there might be circumstances where these governmental actors "cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). Because it would be "impossible for government enforcement to control all significant acts of pollution," Congress extended a "private right" to "persons directly affected or concerned" so that their "rights cannot be violated with impunity." 1 Comm. on Pub. Works, 93d Cong., A Legislative History of the Clean Air Amendments of 1970, at 355 (1974) (hereinafter *"Legislative History"*) (Sen. Hart quoting testimony of former Attorney General Ramsey Clark). Citizens would bring such suits, reasoned the Act's supporters, because of their "incentive[] to protect the health and welfare of those suing." *Id.* (Sen. Hart). In this way, citizen suits would not be a one-to-one "substitute" for "the enforcement efforts of the responsible administration agencies," but a way to "complement and encourage the abatement activities of government agencies." *Id.* at 263 (Sen. Spong); *see also id.* at 355 (Sen. Hart); *id.* at 436–437 (Sen. Rpt.).

Accordingly, the Act gives those harmed by unlawful emissions the option to sue to abate those violations. "[A]ny person" may bring "a civil action on his own behalf" against a polluter "alleged . . . to be in violation of" "an emission standard or limitation under" the Act or an "order" respecting "a standard or limitation." 42 U.S.C. § 7604(a)(1). Under this provision, people sue to address "harm" that "lies in the present or the future, not in the past"—that is, ongoing harm. *See Gwaltney*, 484 U.S. at 59 (interpreting parallel Clean Water Act provisions). Put simply, Congress authorized "a plaintiff who is injured or faces the threat of future injury due to illegal conduct"— that is, violations of the Clean Air Act—to sue. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

6

The Act imposes procedural requirements to incentivize state and federal governments to address violations in the first instance. A person must give the violator, the relevant state, and the EPA Administrator 60 days' notice before suing. *See* 42 U.S.C. § 7604(b)(1)(A). This gives the polluter the "opportunity to bring itself into complete compliance" and "render [the suit] unnecessary" and also allows the governments a chance to consider the violations and decide whether to act themselves. *Gwaltney*, 484 U.S. at 59–60. If a government does act and "has commenced and is diligently prosecuting a civil action . . . to require compliance," a person may not bring a separate suit. 42 U.S.C. § 7604(b)(1)(B). In this way, citizen suits both allow those harmed by pollution to vindicate their rights and serve as a "useful instrument for detecting violations and bringing them to the attention of the enforcement agencies." *Legislative History*, at 280 (Sen. Muskie).

A person who clears these hurdles may proceed with the suit, though as he does, the Clean Air Act contains multiple provisions that ensure the federal government can participate in the case. The federal government must be served with the complaint, and the EPA Administrator may intervene in the case as a matter of right, and at any time. *See* 42 U.S.C. § 7604(c)(2). The Attorney General and EPA Administrator must also receive notice and have a chance to weigh in on the proposal before any consent judgment enters. *See id.* § 7604(c)(3).

As to remedies, the Act authorizes the person to obtain relief in two ways. A court may order injunctive relief. *See id.* § 7604(a). The court may also "apply any appropriate civil penalties," to be paid into a U.S. Treasury fund. *Id.* This type of civil penalty can "encourage defendants to discontinue current violations and deter them from committing future ones," thereby "afford[ing] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." *Laidlaw*, 528 U.S. at 169, 186.

**C.     xAI constructed its Colossus Gas Plant without obtaining Clean Air Act permits.**

This case stems from xAI's decision to flout the Act by installing and operating gas turbines—without a Clean Air Act permit—to create the Colossus Gas Plant in Southaven, Mississippi, which is in DeSoto County and part of the greater Memphis area.  Dkt. No. 1 ¶ 41.[2] xAI installed twenty-seven of these unpermitted turbines on-site between August and December 2025.  *Id.* ¶ 4.  These turbines sit on newly laid concrete pads, and together with transformers, electrical lines, gas supply lines, water injection lines, and other infrastructure, make up the plant. *Id.* ¶ 153.

 

*Figures* 4 (left) and 5 (right) of NAACP's Complaint, Dkt. No. 1, at 26 & 29, respectively.

This is not the first time xAI has pulled this move.  Last year, 10 miles away from the Colossus Gas Plant, xAI installed unpermitted turbines in Memphis's Boxtown neighborhood.  *Id.* ¶ 10.  And xAI appears to be planning to repeat this tactic a third time.  *Id.*

The Colossus Gas Plant is materially indistinguishable from other power plants that must undergo review to comply with Clean Air Act requirements before construction.  The plant could generate 495 megawatts of energy—comparable to a medium-sized power plant that could power

---

[2]   Allegations in the complaint must be taken as true for the purposes of deciding this motion to dismiss, and this opposition brief focuses on the complaint for that reason.

up to 400,000 homes. Dkt. No 51-43 (Laufenberg Decl.) ¶ 7; Dkt. No. 1 ¶ 143. The plant has the potential to emit over 1,700 tons of smog-forming nitrogen oxides, likely making it the largest industrial source of nitrogen oxides in the greater Memphis area. Dkt. No. 1 ¶ 8.[3] That was at the time of the complaint. Now, the plant has more than double the number of turbines and emits triple the amount of pollution—making it among the largest sources of nitrogen oxide pollution in the country. *See* Dkt. No. 51-43 ¶ 53.

The EPA has explained that turbines like these are stationary sources under the Clean Air Act programs at issue here. Under the hazardous air pollutant program, EPA issued national emission standards for stationary combustion turbines to limit formaldehyde, toluene, benzene, acetaldehyde, and other pollutants. *See* 40 C.F.R. §§ 63.6080–63.6175. The relevant regulations define stationary to mean "that the combustion turbine is not self propelled or intended to be propelled while performing its function." *Id.* § 63.6175. Earlier this year, EPA stated that "[h]istorically" it has regulated even portable "combustion turbines . . . as stationary sources." New Source Performance Standards Review for Stationary Combustion Turbines and Stationary Gas Turbines, 91 Fed. Reg. 1910, 1926–27 (Jan. 15, 2026).

Even so, xAI did not seek and obtain the required Clean Air Act permits before constructing the Colossus Gas Plant. Instead, on July 25, 2025, it emailed the Mississippi Department of Environmental Quality of its plans to construct the plant without seeking a permit. Dkt. No. 1 ¶ 132. Four days later, the agency wrote back, stating that based on information at a prior meeting and the email, the turbines would be "mobile" because they would "remain affixed to a portable unit (i.e., a flatbed trailer)" and also "temporary" because they were "intended . . . to remain on-

---

[3] Indeed, at the time of the Complaint, the plant had the potential to emit more than twice the nitrogen oxide air pollution of the next largest source in the tri-state area—the Memphis International Airport. Dkt. No. 51-43 ¶ 53.

site . . . for less than twelve (12) months." Dkt. No. 1-2 (MDEQ Letter) at Ex. B-2. For that reason, the agency stated that the turbines were exempt from permitting requirements.

**D.      xAI's Clean Air Act violations harm the community around the plant.**

This failure to obtain a permit—and therefore to comply with the Clean Air Act processes and provisions that exist to protect human health and the environment—is causing real harm. The harmful pollutants the plant emits, including nitrogen oxides and formaldehyde, are tied to increases in asthma, respiratory diseases, heart problems, and certain cancers in persons exposed to them. Dkt. No 1 ¶ 7. Tens of thousands of people live, worship, study, and work in the homes, churches, and schools that immediately surround the Colossus Gas Plant. *Id.* ¶ 5. A Clean Air Act permit for a pollution source as large as the Colossus Gas Plant would require application of best available control technology to reduce emissions; not applying for a permit means xAI avoided those controls for its turbines. *Id.* ¶ 9.

Plaintiffs' members have experienced the effects of the plant first-hand. *Id.* ¶¶ 31–43. That includes a member who is exposed to pollution at her home, every day, when she waters her plants or relaxes on her patio. *Id.* ¶¶ 33–34. It also includes another nearby family, which has been forced by the plant to rethink the amount of time they spend outside working in their gazebo, tending their garden, and even walking their dog, particularly in light of one family member's serious pre-existing respiratory issues. *Id.* ¶¶ 36–39. And it includes a man who must limit his time working outside on his property because the plant's pollution threatens to aggravate his health conditions. *Id.* ¶¶ 41–42.

**E.      To protect its members' health, NAACP sued under Section 7604.**

NAACP complied with the Act's procedural requirements and then sued to abate the harm many of its members are suffering from xAI's unlawful actions. NAACP first brought these Clean Air Act violations to the attention of xAI, the federal government, and Mississippi per the notice

10

provisions. Dkt. No. 1 ¶ 15. xAI did not correct the violations. Neither Mississippi nor the U.S. Environmental Protection Agency acted to abate these harmful violations. *Id.* ¶ 191. NAACP thus sued in April 2026. The United States has now moved to dismiss.[4]

**ARGUMENT**

The United States's motion sometimes identifies Rule 41 (at 8–9) and sometimes identifies the Clean Air Act's "authorization for federal intervention" (at 17) as the source of its claimed authority to dismiss a Section 7604 action unilaterally and without any judicial review. For completeness, this opposition brief addresses each argument in turn. Neither route has merit.

**I.      Rule 41 does not grant the United States a unilateral right to dismiss Plaintiffs' action.**

The United States says (at 8) that it seeks to (and can) dismiss the NAACP's claims under Federal Rule of Civil Procedure 41(a)(1). There is no support for its request. Not in the text of the federal rules, not in precedent, and not in common sense.

The United States's extraordinary position—that one plaintiff to an action can unilaterally dismiss the claims of another under Rule 41(a)(1)—has no grounding in the federal rules. The rules allow "the plaintiff" to "dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1). The rules elsewhere explain that an "action is commenced by filing a complaint." Fed. R. Civ. P. 3. Rule 41(a)(1) thus ties "the plaintiff" to the "action" that that plaintiff can dismiss without a court order. That is, after the plaintiff commences its action via its complaint, it can dismiss that action (its claims) under the terms of Rule 41(a)(1).

---

[4]     The United States's arguments are relevant only if it is granted intervention. If Plaintiffs' motion to strike the United States's motion to intervene is granted (and the United States is not a party), this Court would not need to address the United States's motion to dismiss.

11

Rule 24 confirms that an intervening plaintiff cannot dismiss the original plaintiff's claims under Rule 41. It refers to the original plaintiff's action as "the main action," that is, as distinct from an action commenced by an intervening plaintiff. Fed. R. Civ. P. 24(b)(1)(B). This textual distinction between the initiating action and the intervenor's claims reinforces that, although an original plaintiff can dismiss the main action after another plaintiff intervenes, and although an intervening plaintiff can dismiss its additional action after intervening, neither can dismiss the claims of the other under Rule 41(a)(1).

This straightforward reading of the Federal Rules accords with case law, which explains that Rule 41 "[b]y itself . . . obviously does not authorize an intervenor-plaintiff to effect involuntary dismissal of the original plaintiff's claims." *United States ex rel. CIMZNHCA v. UCB, Inc.*, 970 F.3d 835, 850 (7th Cir. 2020). That is because, as just explained, "under Rule 41(a), an 'action' refers to all claims that an individual plaintiff has brought against an individual defendant, even if multiple actions involving multiple parties have been combined into a single lawsuit." *Weinstein v. 440 Corp.*, 146 F.4th 1046, 1051 (11th Cir. 2025); *Plains Growers, Inc. v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250, 254 (5th Cir. 1973) (collecting cases and determining the "better view" is that Rule 41(a) "can be effected against less than all of the defendants"); *cf. Elmore v. Henderson*, 227 F.3d 1009, 1011–12 (7th Cir. 2000) ("When there are several plaintiffs in a single suit and one is dismissed out, whether under Rule 21 or any other rule or doctrine, it is as if he had brought a separate suit that was dismissed."); *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 n.5 (5th Cir. 2016) (intervention as of right can be appropriate even after initial plaintiff's suit has been "dismissed voluntarily"). So, Rule 41(a)(1) just "grants a plaintiff an unconditional right to dismiss *his* complaint." *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 915 (5th Cir. 1975) (emphasis added).

12

This reading also avoids absurd results. Agreeing with the United States's reading would mean that Rule 41(a)(1) gives plaintiffs (original or intervening) quite an extraordinary benefit: The right to control the litigation of *another* plaintiff by dismissing *all* of their claims.[5] But Rule 41(a)(1) was just "designed to limit a plaintiff's ability to dismiss an action" in order to address the burden on defendants of being repeatedly summoned into court by the same plaintiff. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990). It "was not designed to give a plaintiff any benefit other than the right to take one such dismissal without prejudice." *Id.* If the drafters of the rule meant to "transform" the plaintiff's dismissal right in Rule 41(a)(1) in the way the United States envisions, "we would have heard about it." *Hall v. Hall*, 584 U.S. 59, 74 (2018) (explaining, when interpreting Rule 42's authorization of consolidating actions, that no sensible draftsperson would "silently and abruptly reimagine" a well-understood term).[6]

Against all of this, the United States has (at 8) two citations to offer. One is irrelevant. The other undermines the United States's argument.

The first case states the basic proposition that "[t]he plaintiff has an absolute right to a Rule 41(a)(1) dismissal," which operates without prejudice, "put[ting] the plaintiff in a legal position as if he had never" sued. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d

---

[5] Compounding the illogic: Applying the United States's reading of Rule 41(a)(1) in a suit the Administrator initiates under 42 U.S.C. § 7413(b), and in which a person "intervene[s] as a matter of right" as a plaintiff under 42 U.S.C. § 7604(b)(1)(B), means that the person could dismiss the United States's claims along with their own.

[6] Agreeing with the United States would create a real risk of gamesmanship. Imagine, for example, a corporation that agrees with 99% of a government action. If a plaintiff sues to challenge that action, that corporation would have an incentive to seek to intervene as a plaintiff, relying on the 1% of the action it disagrees with and then move under Rule 41(a)(1) to dismiss both the plaintiff's claims and its own. Because courts do not probe the reasons for a Rule 41(a)(1) dismissal, the original plaintiff would be powerless to protect their claims. That would leave the government action insulated from challenge. That cannot be how Rule 41(a)(1) works.

320, 324 (5th Cir. 2005) (asking whether a Rule 41(a)(1) dismissal is a "final judgment" for the purposes of the Anti-Injunction Act's relitigation exception and answering no). That means the United States can dismiss its own claims. It does not say an intervening plaintiff can dismiss an original plaintiff's claims (indeed, there was no intervening plaintiff in *Harvey Specialty*).

The second addressed the standard for resolving Rule 41(a)(2) dismissal motions in qui tam suits, which are brought by relators (as plaintiffs) "on behalf of and in the name of the Government." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 437 (2023). When the United States decides to proceed with an action brought by a relator, the False Claims Act expressly gives it "primary responsibility for prosecuting the action," which includes the ability to "dismiss the action notwithstanding the objections of the [relator]" if the relator received notice and "an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(1), (2)(A). Even there, where (unlike here) "[t]he suit alleges injury to the Government alone," and (also unlike here) the statute expressly grants a right to dismiss over the relator's objection, one "[p]art of the district court's task" in resolving a Rule 41(a)(2) motion "is to consider [the relator's] interests." *Polansky*, 599 U.S. at 437. The fact that the False Claims Act contains a specific, structured process for the United States to dismiss relators' claims over their objection strongly counsels against reading Rule 41(a)(1) to provide any and all intervening plaintiffs, in any kind of suit, with the right to unilaterally, and without review, dismiss another plaintiff's claims.

In sum, Rule 41(a)(1) does not grant the United States the authority it is looking for.

## II. The Clean Air Act does not grant the United States a unilateral right to dismiss the entire action.

That leaves the United States with the Clean Air Act provision that grants the Administrator a right to intervene in a suit under Section 7604(a). *See* Dkt. No. 59 (U.S. Br.) at 10 (citing 42 U.S.C. § 7604(c)(2)). But nothing in that language (or the rest of Section 7604) grants it a

14

unilateral right to dismiss a suit brought under Section 7604(a). Just the opposite: Over and over, the Clean Air Act expressly preserves the ability of people who are being harmed by unlawful air pollution to abate that harm through a suit when no one else does so and also expressly identifies when and how federal government actors can intervene in and influence these people's suits.

### A. The text does not support the United States's view.

To start with the obvious, the United States does not identify any Clean Air Act text that expressly grants it "the right to dismiss . . . [a] citizen suit" (at 10), presumably because it recognizes that there is none. The provision that it cites states that the EPA Administrator "may intervene as a matter of right at any time" in "any action" under Section 7604. 42 U.S.C. § 7604(c)(2). It does not state that, once he intervenes, the EPA Administrator may dismiss the action as a matter of right. And, as discussed (at 14), the False Claims Act shows that Congress knows how to grant the United States the ability to seek dismissal of a case, and the textual choice not to do so here must be respected. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018).

Instead of identifying express text that supports it, the United States argues (at 10) that the provisions in Section 7604 that address the government's role "must be interpreted to include [that] right to dismiss." That is not how statutory interpretation works. Policy arguments or an official's preferences about what power they should have "cannot create an ambiguity when the words on the page are clear." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018) (rejecting the Director of the Patent Office's view that a statute granted him "a wholly unmentioned 'partial institution' power" to "select only some challenged claims for decision"). A court's "duty is to give effect to the text that 535 actual legislators (plus one President) enacted into law." *Id.*

That aside, the United States's view that Section 7604 secretly grants it this expansive power cannot be squared with the statutory text. At bottom, its view is (at 13) that the section "expressly envision[s] that the United States could preclude citizen-enforcement actions" because

15

its provisions provide the government with a clear, specified role in Section 7604 proceedings. That overreading of the statute gets things backwards: Yes, the political branches consciously and carefully addressed the government's role in this provision. No, that does not mean courts should read this provision to grant the government *more* authority than the provision's text does.

Section 7604 specifies the conditions under which government action could preclude a person from initiating a lawsuit. Before suing under Section 7604(a)(1), plaintiffs must give sixty-days' notice of the violation to the polluter and the EPA Administrator (and the relevant state). *See* 42 U.S.C. § 7604(b)(1)(A). This gives the government time to act and remove the need for the person to sue. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989).[7] Government action during that period precludes a person from being able to sue after the notice period only where there is action by EPA or a state to "commence[]" and "diligently prosecut[e] a civil action . . . to require compliance with the" pollution standard being violated. 42 U.S.C. § 7604(b)(1)(B).[8] The upshot is that the Act is structured to preclude a person from suing only if the government is already bringing the polluter into compliance with the relevant requirements—that is, the text's focus is on ensuring air pollution standards are met and people are protected.

If EPA or the State does not enforce the same standards before the notice period expires, Section 7604 expressly authorizes citizens to file an enforcement action. It also specifies how the

---

[7] It also gives the polluter an opportunity to bring itself into compliance and avoid the suit.

[8] The text of the Act is plainly focused on two things: (1) giving these governments an ability to sue *first* and thereby preclude a person from suing separately under Section 7604 and (2) specifying the relationship between the federal government and the person suing under Section 7604 after he sues. That does not mean that other actions to bring the polluter into compliance cannot, as a practical matter, affect a person's ability to sue under Section 7604(a) through doctrines such as standing or mootness. *See, e.g., Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008). But those practical effects flow from established legal doctrines, not from *implying* powers that do not exist in the text of the Clean Air Act.

16

federal government may join if it wishes to influence the outcome of that person's suit. The person suing must serve his complaint on the EPA Administrator and the Attorney General. *See* 42 U.S.C. § 7604(c)(3). As discussed, the EPA Administrator may intervene as a matter of right at any time. *See id.* § 7604(c)(2). And the person may not resolve the suit through a consent judgment without providing the EPA Administrator and the Attorney General at least 45 days of notice, to allow either comments on the proposed judgment or for intervention at that time. *See id.* § 7604(c)(3).

Notably absent from the text is any mechanism for the government to dismiss a suit brought under Section 7604(a). The statutory context confirms as much. Congress considered amending the Clean Air Act to provide the United States with similar authority to what it seeks here. In 1990, an amendment was proposed that would have allowed "the Administrator" to "substitute himself as the plaintiff with regard to any claim for civil penalties. Upon such substitution, the citizen plaintiffs' claims for civil penalties shall abate." Nickles (and Others) Amendment No. 1373 § 609(a)(3) (Mar. 26, 1990), reprinted in 4 Comm. on Env't and Pub. Works, 103d Cong., Legislative History of the Clean Air Act Amendments of 1990, at 6406, 6427 (1998). This amendment was *narrower* than what the United States argues for here, in that the United States's authority to dismiss a suit would have been limited to a claim for civil penalties and not for a claim seeking injunctive relief. Even so, the amendment failed. *See Cook v. Gralike*, 531 U.S. 510, 521 (2001) (noting that "[t]he fact that the proposal [of an amendment] was made suggests that its proponents thought it necessary"—that is, was not in the text already "and the fact that it was rejected . . . suggests that we should give weight to the" rejection).

All of this leads to one inevitable conclusion: Section 7604 exists to allow a person being harmed from unlawful air pollution to sue when the government does not act to stop that pollution. That is what it means for the government to have "primary enforcement authority" under the Act,

17

*Env't Conservation Org.*, 529 F.3d at 528. The statute places the government in the role of the first (primary) mover, letting it decide whether it wants to address a violation before a person can sue and, in doing so, preclude that suit. But if the government "cannot or will not" move at all, the provision's clear function is to allow people to do *something* about their injuries from air pollution. *Gwaltney*, 484 U.S. at 62; *see also Stringer v. Town of Jonesboro*, 986 F.3d 502, 506 (5th Cir. 2021) ("Enforcement is primarily the work of government regulators. But Congress also empowered private citizens to bring suit . . . ." (cleaned up)).

There is no way to read these provisions to suggest that Congress, having gone out of its way to preserve people's ability to sue to *stop* unlawful pollution when the government has not, also implicitly authorized the government to dismiss those very suits at its whim because it would prefer that the unlawful pollution *continue*.

**B.    Precedent does not support the United States's view.**

No court has agreed with the United States's position; instead, courts have rejected its logic. In *City of Green Forest*, the Eighth Circuit addressed a polluter's argument that "the EPA's decision *not to* commence an action against it is binding upon the" people who sued under the Clean Water Act's (CWA) equivalent of Section 7604(a). *EPA v. City of Green Forest*, 921 F.2d 1394, 1405 (8th Cir. 1990). That "novel proposition" didn't "detain [the court] long," because it "flies in the face of the clear language of the citizens' action provision of the CWA, as well as the legislative history, which make clear that agency inaction is precisely the circumstance in which private action is appropriate." *Id.*

The United States cherry picks quotes from *Gwaltney* to claim (at 14) that courts "have recognized" its view. There, the Supreme Court addressed whether the Clean Water Act provision largely paralleling Section 7604 authorizes people to sue not only to address ongoing unlawful pollution, but to address past violations. *See* 484 U.S. at 59. The text of the statute answered that

18

question: These suits address harm occurring "in the present or the future, not in the past." *Id.* The Court also noted that this reading avoided a situation where the Administrator acted to resolve violations during a certain time period by declining to seek civil penalties in exchange for the polluter installing stringent control technology, only to allow a person to upset that compromise years later by seeking civil penalties for violations in that same time period. *See id.* at 60–61. But *Gwaltney* did not endorse the United States's view that it has unfettered discretion to dismiss a person's suit. The opposite is true. It endorsed the idea that these suits are proper if "agencies fail to exercise their enforcement responsibility." *Id.* at 60 (cleaned up).

The other cases the United States cites (at 14–15) are similarly off-point. Each arose in a context where a government acted to require abatement of unlawful pollution, not one where the government acted to shield the polluter from liability. *See Env't Conservation Org.*, 529 F.3d at 523–24 (compliance order, settlement negotiation, enforcement action filing, consent decree); *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 466 (6th Cir. 2004) (enforcement action filing, consent decree); *EPA v. City of Green Forest*, 921 F.2d 1394, 1397 (8th Cir. 1990) (enforcement action filing, consent decree); *Karr v. Hefner*, 475 F.3d 1192, 1194–95 (10th Cir. 2007) (enforcement action filing, consent decree); *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1322 (7th Cir. 1992) (enforcement action filing, order for corrective action and fines).

## C. The United States's remaining arguments lack merit.

The United States has various additional atmospheric arguments, none of which can justify overriding the statutory text.

*First*, it points out (at 12) that it exercises discretion when deciding whether and how to pursue those who violate the Clean Air Act. True enough. But a citizen suit when the government does not pursue a violator does not interfere with that discretion. *Heckler*, on which the United States relies, shows as much. There, the Supreme Court held the Administrative Procedure Act

19

exception to reviewability for action committed to agency discretion "include[s] agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). In doing so, it explained that these refusals can turn on different factors, such as "whether a violation has occurred," whether the agency has the resources to devote to the proceeding, whether doing so "best fits the agency's overall policies," and whether the agency "is likely to succeed." *Id.* at 831. These factors shape the government's choice about how to allocate its own limited resources. But when a person sues under Section 7604(a), they are using their own resources, not the federal government's. Their suit does not affect the government's discretion about whether to initiate enforcement proceedings.[9]

This takes care of the United States's citation (at 11) to *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987), which contradicts the United States's arguments here. There, the court held, referencing *Heckler*, that a person cannot sue the EPA Administrator under the Clean Water Act provision that parallels Section 7604(a)(2) to challenge a failure to initiate an enforcement proceeding. *See id.* at 945–46, 948–49; *see also* 42 U.S.C. § 7604(a)(2) (allowing suit "against the Administrator" for "failure . . . to perform any act or duty under this chapter which is not discretionary"). Such a suit would allow the plaintiff "access to enforcement power of the federal government," where the proper step was instead "to supplement that power by bringing actions directly against violators." *Dubois*, 820 F.2d at 949. As *Dubois* recognized, there is no conflict between enforcement discretion and a suit under Section 7604(a)(1) or (3) like this one.

---

[9] The United States cites (at 18, 22) to portions of In re *Aiken Cnty.*, 725 F.3d 255, 261–66 (D.C. Cir. 2013), that failed to secure a majority. *See id.* at 261 n.2 (noting that then-"Judge Kavanaugh alone joins Part III"). Even that dicta does not support the United States's view, as it discusses the view that "Congress may not mandate that the President prosecute a certain kind of offense or offender." *Id.* at 263. Nothing in Section 7604(a) mandates that the President do so.

20

*Second*, and relatedly, the United States says (at 12) that it is entitled to dismissal of NAACP's claims because it wants to set "the desired level of deterrence" under the Clean Air Act. But, in authorizing state enforcement and citizen suits, Congress rejected the view that the federal government alone should set the level of deterrence. Rather, Congress's authorization of standalone citizen suits—brought only in circumstances where the government has declined to act—reflects its judgment for the need for an additional "quantum of deterrence" beyond what the government alone might provide. *See Laidlaw*, 528 U.S. at 186–87; *supra* at 6, 16, 19.

Moreover, the government's argument for *less* deterrence (that is, *more* violations of) federal law is troubling on its own terms. There is no legitimate public interest in facilitating violations of law. *Cf. United States v. Nixon*, 418 U.S. 683, 696 (1974) ("So long as [a] regulation remains in force, the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and enforce it."); *Curry v. Regents of the Univ. of Minn.,* 167 F.3d 420, 422 (8th Cir. 1999) (denying intervention to groups with no "constitutional or legal right" to continue unlawful activity). But that is what accepting the United States's view would cause, and not just in the environmental context: The U.S. Code is filled with provisions that parallel Section 7604—that is, provisions that give a federal agency the first shot at addressing a violation of a federal law but allow a person to sue on his own if the government does not act (or does not act within time limits). *See, e.g.*, 18 U.S.C. §1514A(b)(1) (Sarbanes Oxley Act whistleblower retaliation protections). And under the government's theory, it has an implicit right to intervene in any of these and dismiss the suit simply because it would prefer less deterrence.

*Third*, the United States says (at 15) that it has "determined" that relief here is not "consistent with federal policy and the public interest." But the Clean Air Act tells the EPA Administrator how to make his views known in this Court. He may intervene (presumably as a

21

plaintiff, as the United States takes pains not to say xAI is *complying* with the Clean Air Act) and, in relevant briefing, oppose those forms of relief he does support (for example, the United States appears to leave open injunctive relief to install the pollution controls the Act requires). This Court can then give those views appropriate weight when exercising its role under Section 7604's remedy provisions, such as when shaping injunctive relief. *See* 42 U.S.C. § 7604(a) (authorizing the district court "to enforce [the] emission standard or limitation, or . . . order" being violated or "apply any appropriate civil penalties"); *see also id.* § 7604(c)(3) (laying out exactly this process to ensure the federal government can offer its views on any consent judgment). What Congress did not do is give the United States the power to dismiss an injured party's claims.

As to the specific policy the United States mentions, it appears to be of two minds. It discusses national security but then claims (at 9) that its reasons are irrelevant to whether the Court should dismiss the case. Regardless, the statutory text precludes the United States's argument. Congress gave the Executive Branch authority to grant exemptions (including for national security reasons) in other parts of the Act, but chose not to do so in Section 7604. The provision applying the Act to federal facilities, for example, authorizes the President to "exempt" any federal emission from some (but not all) requirements "if he determines it to be in the paramount interest of the United States to do so." 42 U.S.C. § 7418(b) (not authorizing an exemption from the new source performance standards in Section 7411 and authorizing exemptions from the hazardous air pollutants program only under the Section 7412(i)(4) procedures). The hazardous air pollutants program authorizes the President to "exempt any stationary source from compliance" after determining "that the technology to implement such standard is not available and that it is in the national security interests of the United States." *Id.* § 7412(i)(4).

Congress knows "exactly how to" authorize an Executive Branch actor to exempt a source from the Act's requirements. *Iancu*, 584 U.S. at 364–65. Its choice not to authorize the EPA Administrator to dismiss a Section 7604(a) suit "requires respect, not disregard." *Wis. Cent.*, 585 U.S. at 279. The United States cannot by litigation create exemptions that render Congress's legislative choices superfluous. *United States ex rel. Conyers*, 108 F.4th 351, 357 (5th Cir. 2024); *see also Enbridge Energy, LP v. Nessel*, 146 S. Ct. 1074, 1082–83 (2026) (declining to read in additional equitable exceptions into a statute containing "[a]n explicit listing of exceptions" that "already reflect equitable considerations" (cleaned up)).

To the extent this Court views the substance of the United States's references to national security relevant, it should seek extra briefing on the issue and allow the development of a record beyond the United States's improperly submitted declaration. From what we do know, the United States's assertion (at 9) that the turbines at issue here are "the power that supports Grok" makes little sense. xAI has stated that it will begin removing turbines from the site as soon as August. *See* Dkt. No. 61 (Defs.'PI Br.) at 1. If those turbines were critical to the United States, one would think xAI would not be taking those actions.

Moreover, there's reason to question the declarant's statement that "preserving xAI's current data center capacity" powered by the plant "is a matter of paramount national security." Dkt. No. 58-01 (Stanley Decl.) ¶ 8. Grok's operations in support of the Department of War ("Grok for Government") began *before* the Southaven Colossus Gas Plant was constructed, *see Announcing xAI for Government, xAI* (July 14, 2025), https://x.ai/news/government, and, since entering into the Grok for Government partnership, xAI has made billions selling off its excess data center capacity. As an example, on the very same day NAACP moved for a preliminary injunction, xAI announced its plans to rent out "compute" power, including from Colossus 1, to

23

Anthropic for $1.25 billion a month, power that could have been used to support its "Grok for Government" efforts.[10]  Nothing in the declaration explains why xAI cannot satisfy its obligations using this excess compute power, which would not be impacted by the relief Plaintiffs seek here.

**III.     The constitutional avoidance canon does not support interpreting the Clean Air Act to grant the United States a unilateral right to dismiss.**

The United States attempts to support its atextual reading of the Clean Air Act with an argument that its reading "avoid[s] serious constitutional questions." U.S. Br. at 17–23.  But that's "not how the canon of constitutional avoidance works." *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018).  It at most permits a court to "choos[e] between competing *plausible* interpretations of a statutory text" but does not "give a court authority to rewrite a statute as it pleases." *Id.*  Without any textual hook for the United States's claimed dismissal right, *see supra* § II, constitutional avoidance can play no role.  Regardless, citizen suits pose no constitutional problem, *infra* § III.A, and the United States's arguments to the contrary lack merit, *infra* § III.B.

**A.     Section 7604 does not raise constitutional concerns.**

The United States is wrong that allowing people to sue under the Clean Air Act to abate pollution that is harming them violates the Vesting and Take Care Clauses of Article II, which provide that "[t]he executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1 & § 3.  Every court that has addressed

---

[10]   *New Compute Partnership with Anthropic*, xAI (May 6, 2026), https://x.ai/news/anthropic-compute-partnership; SpaceX, Registration Statement (Form S-1) (May 20, 2026), https://perma.cc/GMF2-5W7U, at 13.  xAI is also renting its excess compute power to Google ($920 million a month) and Reflection AI ($150 million a month).  *See* SpaceX, Registration Statement Amendment No. 2 Free Writing Prospectus (Form S-1) (June 3, 2026), https://perma.cc/TVT6-GS7G; Carmen Arroyo & Rachel Metz, *SpaceX Inks Multibillion-Dollar Computing Deal with Reflection AI*, Yahoo! Finance (June 22, 2026), https://finance.yahoo.com/technology/ai/articles/spacex-inks-multibillion-dollar-computing-150509579.html.

Article II challenges to similar private rights of action has rejected them, both in the environmental context[11] and elsewhere.[12]  This Court should not be the first to hold otherwise.

The United States does not engage with any of that caselaw, but it nonetheless maintains that NAACP's interpretation of the Clean Air Act is inconsistent with Article II because it authorizes private parties to exercise Executive power.  U.S. Br. at 23.  The United States does not contend that enforcing federal law *always* must be an exercise of Executive authority.  Rather, it concedes that, consistent with Article II, "Congress has the power to authorize private parties who have suffered Article III injury to sue to enforce certain federal statutes."  U.S. Br. at 22.  With good reason:  While a "regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law" might raise Article II concerns, *TransUnion v. Ramirez*, 594 U.S. 413, 429 (2021), Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law."  *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc); *see Davis v. Passman*, 442 U.S. 228, 241 (1979) ("[I]t is entirely appropriate for Congress, in creating [federal] rights and obligations, to determine in addition, who may enforce them and in what manner.").  Congress can also allow "private parties to enforce the law through civil litigation."  *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357,

---

[11]  *See, e.g.*, *Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985) (Clean Water Act); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623–25 (D. Md. 1987) (Clean Water Act); *Natural Res. Def. Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 815–17 (N.D. Ill. 1988) (Clean Water Act); *Water Keeper All. v. Smithfield Foods*, 2001 WL 1715730, at *5 (E.D.N.C. Sept. 20, 2001) (Clean Water Act); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (Clean Air Act); *Sierra Club v. Franklin Cnty. Power of Ill.*, 2006 WL 8455938, at *9–10 (S.D. Ill. 2006) (Clean Air Act); *Atl. States Legal Found. v. Buffalo Envelope*, 823 F. Supp. 1065, 1074–76 (W.D.N.Y. 1993) (Emergency Planning and Community Right-to-Know Act).

[12]  *Capitol Records v. Alaujan*, 626 F. Supp. 2d 152, 154 (D.D.C. 2009) (Copyright Act); *Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 256 (D.D.C. 2021) (Federal Election Campaign Act).

367 (2025). Congress has exercised this authority to create private rights of action to supplement government enforcement actions in "almost every area of public law," from civil rights to antitrust. *See* Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131, 140–44 (2026) (hereinafter "*Private Enforcement*"); *accord* U.S. Br. at 22–23.

The Clean Air Act citizen suit provision thus does not infringe on Article II because it authorizes private parties to seek redress on their own behalf, not on behalf of the federal government. While the "central purpose" of such provisions may be to permit "citizens to abate pollution when the government cannot or will not command compliance," *Gwaltney*, 484 U.S. at 62, a citizen plaintiff "commence[s] a civil action on his own behalf," 42 U.S.C. § 7604(a), not on behalf of the government. *See also Conservation Law Found. of New England, Inc. v. Browner*, 840 F. Supp. 171, 175 (D. Mass. 1993). Even where the federal government has brought suit, a private plaintiff may "intervene as a matter of right," 42 U.S.C. § 7604(b)(1), which further reflects that citizen actions assert an interest distinct from that of the government. Likewise, the provision authorizes citizen suits *against* the federal government, both when the government pollutes, *id*. § 7604(a)(1), or fails to perform a nondiscretionary duty, *id*. § 7604(a)(2), underscoring that Congress did not conceive of such suits as being *on behalf* of the federal government. Accepting the government's understanding of the provision would require viewing these suits too as on the government's behalf, which not only would be incoherent, but also would prevent the government from being held accountable for its own violations. Finally, it makes little sense to view suits under this provision as being on the federal government's behalf where the set of "person[s]" who "may commence a civil action" under the provision includes other governmental actors, like "States[s]" and "municipalit[ies]." 42 U.S.C. §§ 7602(e), 7604(a); *see U.S. Dep't of Energy v.*

26

*Ohio*, 503 U.S. 607, 616 (1992).  Adopting the government's argument thus would threaten States' ability to pursue violations of the Act they detect.  *Contra* U.S. Br. at 21.

Citizen suits, unlike actions brought by the federal government, do not vindicate some general public interest in environmental enforcement, but instead serve to address a concrete harm to the plaintiff.  Citizen suit "provisions apply only to persons who can claim some sort of injury." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16–17 (1981); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 129 (1998) (Stevens, J., concurring) (reasoning that "EPCRA's citizen-suit provision" does not "impinge[] on the power of the Executive" where the plaintiff does not "merely possess[] the 'undifferentiated public interest' in seeing EPCRA enforced" but instead alleges "a particularized injury"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 347 (2016) (Thomas, J., concurring) ("The separation-of-powers concerns underlying our public-rights decisions are not implicated when private individuals sue to redress violations of their own private rights.").  To that end, Congress provided, in the analogous Clean Water Act citizen suit provision, that inherent in the word "citizen" is a "person or persons having an interest which is or may be adversely affected."  *See also* 33 U.S.C. § 1365(g); U.S. Br. at 4 n.1 (conceding CWA authority is "'persuasive' here").  And when it comes to remedies, a citizen plaintiff is limited to relief— whether injunctions or civil penalties—that "redress" the plaintiff's "injuries by abating current violations and preventing future ones."  *Laidlaw*, 528 U.S. at 187.  The Clean Air Act's private right of action thus furthers the public interest only in the indirect way that other kinds of private suits do:  The "adjudication of private rights" both "redress[es] injuries *and* deter[s] harmful behavior."  *Private Enforcement*, *supra*, at 150 (describing deterrent effect of tort law).[13]

---

[13]  The United States emphasizes the Sixth Circuit's observation that citizen suit plaintiffs "seek relief not on their own behalf but on behalf of society as a whole."  *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004).  But that decision did not engage with the Act's recognition

27

There is yet another reason that citizen suits should be understood to be private actions to secure particularized relief, and not merely relief on behalf of the general public: "[M]odern environmental statutes" are based on the common-law nuisance actions, which permitted private plaintiffs to bring suit only when they were harmed directly. *Cox v. City of Dallas*, 256 F.3d 281, 289, 291 (5th Cir. 2001); *Riley*, 252 F.3d at 753 (a "historical perspective provides us with a helpful bridge into the workings of the statute itself"). Nuisances could be private nuisances or public nuisances, where the former occurred upon a "nontrespassory invasion of another's interest in the private use and enjoyment of land," and the latter involved an "unreasonable interference with a right common to the general public." *Cox*, 256 F.3d at 289. Pollution could give rise to both kinds of nuisance, and in either case, a private plaintiff could maintain suit on his own behalf.

Pollution long has given rise to claims of private nuisance. Blackstone recognized pollution as an exemplar cause of "nuisance to one's lands," describing, for example, the operation of a "smelting house for lead" resulting in "vapor and smoke" that harmed property and livestock. 3 William Blackstone, *Commentaries* \*217. The Second Restatement of Torts likewise drew upon cases where pollution, smoke, dust, and odors gave rise to claims of private nuisance. Restatement (Second) of Torts § 821D cmts. b, c, and Reporter's Note. It recognized that pollution should give rise to private nuisance liability when it actively interfered with the use of land (for example, by destroying crops), plaintiff's health, or merely interfered with the "pleasure, comfort and enjoyment that a person normally derives from the occupancy of land." *Id.*

Importantly, even where pollution also caused a public nuisance—that is, where it caused an "unreasonable interference with a right common to the general public"—private plaintiffs could

---

that citizen suits are on the private plaintiff's "own behalf" and instead relies on a case that predated *Laidlaw*'s rejection of the theory that citizen suits do not require "'personalized' remedies." *See id.* (citing *Orange Env't v. Cnty. of Orange*, 923 F. Supp. 529, 539 (S.D.N.Y. 1996)).

28

still bring suit, under either of two theories.  First, the pollution giving rise to the public could independently give rise to a private nuisance claim when, "in addition to interfering with the public right," the nuisance also fit the definition of a private nuisance—that is, it "interferes with the use and enjoyment of the plaintiff's land."  *See Cox*, 256 F.3d at 289.  In those circumstances, the pollution "is a private nuisance as well as a public one."  Restatement (Second) of Torts § 821C cmt. e.  Second, the common law relaxed the general principle that no private "action lies for a public or common nuisance, but an *indictment* only," if the private plaintiff could establish that he "suffers some extraordinary damage."  3 William Blackstone, *Commentaries* \*219–20; *see also* Restatement (Second) of Torts § 821C(1) & cmt. b. (recognizing private action "for a public nuisance" where the plaintiff "suffered harm of a kind different from that suffered by other members of the public").  Where a private plaintiff established that pollution interfered with the use and enjoyment of his land, he thus "can maintain an action not only on the basis of the private nuisance itself, but also . . . on the basis of the particular harm from the public nuisance."  Restatement (Second) of Torts § 821C cmt. e.  And, regardless of any harm to a plaintiff's property, he could maintain suit under this theory when the "public nuisance causes personal injury to the plaintiff."  *Id.* § 821C cmt. d.[14]

Accordingly, the common law of nuisance reflected the same structured approach to litigating public harms that Congress would later adopt in the Clean Air Act:  A "single act" might give rise to both "a private wrong and a public wrong," and a "private suit brought by the individual vindicate[s] the private wrong, and the public prosecution brought by the sovereign vindicate[s] the public wrong."  *Ellingburg v. United States*, 607 U.S. 163, 179–80 (2026) (Thomas, J.,

---

[14]  Plaintiffs' complaint alleges that the challenged pollution harms them in precisely the same ways that would have given rise to such common law nuisance claims: by physically harming them and interfering with their use and enjoyment of their land.  Dkt. No. 1 ¶¶ 37–39, 42.

concurring) (describing common law); *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring) (describing nuisance). Just as under common law nuisance, when a private plaintiff sues under the Clean Air Act, he brings a claim on his own behalf, not on behalf of the public.

These features of citizen suits—that they are on behalf of people, not the government, to secure relief to redress particular harms to those plaintiffs—place them on even firmer constitutional ground than qui tam suits, which the en banc Fifth Circuit has already upheld from Article II challenge, *Riley*, 252 F.3d at 751, 753–57; *see United States ex rel. Montcrief v. Peripheral Vascular Assocs.*, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring) (recognizing that *Riley* resolves whether there are "constitutional flaws in the FCA's *qui tam* device"); *United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*, 157 F.4th 758, 766–67 (5th Cir. 2025) (Ho., J., concurring) (similar). Qui tam suits, unlike citizen suits, are brought "in the name of the Government" and seek to vindicate "an injury in fact suffered by the United States." *Vt. Agency of Natural Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 769–71 (2000). Such qui tam provisions "raise the most direct constitutional questions," *Private Enforcement*, *supra*, at 181, but even they do not "violate the constitutional separation of powers doctrine under the Take Care and Appointments Clauses of Article II." *Riley*, 252 F.3d at 751; *see generally* U.S. Br., No. 25-10842, *U.S. ex rel. Taylor v. Healthcare Assocs. of Tex.* (5th Cir. Mar. 23, 2026), Dkt. No. 91 (maintaining that qui tam provisions are consistent with Article II). Because citizen suits are not brought in the government's name, they do not even raise constitutional questions in the first place.

**B.    The United States's contrary arguments lack merit.**

The United States's primary argument is that the provisions authorizing citizen suits permit plaintiffs "to seek civil penalties to the United States," which is a "quintessentially executive power." U.S. Br. at 19–20 & n.5, 23 (quoting *Seila Law v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020)). It contrasts that form of relief with "compensatory monetary relief." *Id.* at 23;

30

*see also id* at 20 n.5 (emphasizing that qui tam suits allow plaintiffs to "share in any monetary recovery"). The United States's argument fails on two levels.

First, the United States's argument is admittedly incomplete, where it recognizes that the citizen suit provision authorizes, and Plaintiffs have sought, "not just civil penalties but also injunctive relief." U.S. Br. at 21. There is no ground to argue that seeking this kind of injunctive relief intrudes on any Executive Branch prerogative. *Compare id.* at 21. At common law, plaintiffs were entitled to a "judgment . . . to have the nuisance abated." *See* 3 William Blackstone, *Commentaries* \*221. And plaintiffs continued to secure that relief, including in cases where personalized "injury [was] occasioned by a public nuisance," leading up to the enactment of the Clean Air Act. *See Soap Corp. of Am. v. Reynolds*, 178 F.2d 503, 504–07 (5th Cir. 1949) (in case relating to "foul and obnoxious vapors . . . causing plaintiffs irreparable damage in their persons and property," plaintiffs "may, in the one action, restrain the source of the damage" rather than bring "successive suits for recurring damages"). Accordingly, even if the United States were correct that a suit seeking civil penalties must be subject to Executive control, that would supply no basis for the need for government control over suits seeking injunctive relief.

The United States maintains it is irrelevant that Plaintiffs also seek injunctive relief because the statute should be interpreted to authorize it to dismiss even private suits seeking "injunctive relief." U.S. Br. at 21. But even if the United States's argument that it must have some say over a Section 7604(a) claim seeking civil penalties is accepted, that would not give it any interest in— or basis to dismiss—claims seeking injunctive relief. Interpreting the act to allow the United States to dismiss only those claims over which it has an interest would eliminate the "constitutional doubts" the United States raises. U.S. Br. at 17. The United States's argument otherwise departs from historical practice, where it was accepted that the government could move to terminate only

31

the portion of the action in which the government had an interest. *Private Enforcement*, *supra*, at 155–56, 168, 173–74 (detailing practice in England and early American practice).

Second, and more fundamentally, the United States is wrong that when private parties seek civil penalties they are exercising Executive power. To start, the United States's position here is an about-face from what it said just last year where it correctly recognized that citizen suits are, for Article II purposes, directly analogous to private suits under provisions allowing for compensatory relief. United States Br. 13–16, No. 24-13581, *United States ex rel. Clarissa Zafirov v. Fla. Med. Assocs.* (11th Cir. Jan. 6, 2025), Dkt. 39 (arguing that individuals bringing "private suits under . . . the Clean Water Act" "are not exercising Executive power"); *see also* United States Br. 12, No. 17-20545, *Environment Texas Citizen Lobby, Inc. v. Exxon Mobil Corp.* (5th Cir. Jan. 17, 2023), Dkt. No. 299 ("That limited—but important—role for citizen suits in protecting private interests [by seeking forward-looking relief] fully aligns with traditional understandings of the separation of powers."). Indeed, the United States defended citizen suits in even greater detail twenty-five years ago: "A citizen suit is a private action brought to redress harm to the plaintiff," which is "no different from any other lawsuit, such as an action brought in tort or in contract." Br. of United States as Intervenor Defending the Constitutionality of 33 U.S.C. § 1365, at 7–8, *N. Carolina Shellfish Growers Ass'n & N. Carolina Coastal Fed'n v. Holly Ridge*, No. 7:01-cv-36 (E.D.N.C. Aug. 15, 2001), Dkt. No. 33. That was also true of suits seeking "penalties" payable to the "federal treasury," because a citizen may obtain relief only if the "relief sought would deter further harmful violations of the law, thereby redressing harm to them." *Id.* at 11–12. And it is no matter that such relief also "serve[s] public goals in the course of advancing a private interest," because that dynamic is "pervasive throughout the law." *Id.* at 11. The upshot was clear: "There is nothing constitutionally suspect about these arrangements." *Id.* at 13.

32

The United States had it right before.  The premise of the United States's new argument—that civil penalties, unlike compensatory relief, do not redress "any specific injury to the citizen-plaintiff," U.S. Br. at 23—is unsupportable.  As the United States acknowledges (at 19 n.4), the Supreme Court rejected that claim in *Laidlaw*:  Penalties, like injunctive relief, provide "a form of redress" for "future injury" because they can "effectively abate[]" harmful conduct "and prevent[] its recurrence."  528 U.S. at 185–87.  Penalties for past violations that do not abate ongoing harm or prevent future harm serve only "vindication of the rule of law" and an "undifferentiated public interest," *Steel Co.*, 523 U.S. at 106 (cleaned up)—that is, the stuff of Executive enforcement.  But when plaintiffs pursue civil penalties to remedy particularized concrete harm, as they do here, they are not standing in the shoes of the government.  *Laidlaw*, 528 U.S. at 185–187.

The United States has hardly any support for the contrary conclusion, citing only non-binding concurrences and dissents from the Supreme Court and Fifth Circuit, *see* U.S. Br. at 19-20, and the Supreme Court's decision in *Seila Law*, U.S. Br. at 19, 23.  The former are of no help because they conflict with the binding decision in *Laidlaw*, *see* U.S. Br. at 19 n.4.  And the latter's observation that the power "to seek daunting monetary penalties against private parties on behalf of the United States" is a "quintessentially executive power," *Seila Law*, 591 U.S. at 219, cannot be read to say that every suit seeking penalties is an exercise of Executive power.  In *Seila*, the entity that could seek penalties was an "independent administrative agency" designed to pursue the public interest broadly, by "'implement[ing] and enforc[ing]' a large body of financial consumer protection laws." *Id.* at 203, 206 (quoting 12 U.S.C. § 5511(a)); *see also Trump v. Slaughter*, 2026 WL 1855612, at *17 (U.S. June 29, 2026) (discussing "in-house adjudications" and "fil[ing] civil suits on behalf of the United States").  Those monetary penalties would not address any particularized harm to the agency bringing suit, but the public interest more generally,

33

and so of course would be exercising only a "quintessentially executive power." *Seila Law*, 591 U.S. at 219. But that does not in any way undermine the Supreme Court's recognition that private parties can use such penalties to seek personalized relief: abating "the threat of future injury" to them. *Laidlaw*, 528 U.S. at 185–87.

That leaves the United States's claim that there is no historical evidence showing that the Founders would have accepted that private parties could seek civil penalties. U.S. Br. at 20 & n.5.[15] But there is such evidence, in the form of early American legislatures going beyond common law nuisance by allowing parties to seek penalties for nuisances on behalf of the public. *See Private Enforcement*, *supra*, at 164–65. Moreover, there is evidence that private parties could seek equitable relief to abate nuisances, and there is no meaningful distinction about achieving that end through the deterrent effect of civil penalties, as opposed to a direct action for abatement, *see supra* at 27, 31, 33. That evidence, on top of all the historical evidence demonstrating the Founder's comfort with private parties seeking penalties in the qui tam context, shows that private parties can seek civil penalties without running afoul of Article II. *See Riley*, 252 F.3d at 752–53.

In the end, even if private suits for civil penalties are necessarily on behalf of the Executive, the United States maintains sufficient control to avoid any constitutional difficulty without granting it the dismissal right it seeks. *Contra* U.S. Br. at 20 & n.5. The Supreme Court previously emphasized that the United States "retains the power to foreclose a citizen suit by undertaking its own action," and that, if it "opposes a particular citizen suit, the statute allows" it to "'intervene as a matter of right' and bring [its] views to the attention of the court." *Laidlaw*, 528 U.S. at 188 n.4; *see* 42 U.S.C. § 7604(c)(2). Beyond that, the United States also could intervene as a defendant

---

[15] Given all the historical support discussed above, the United States wisely does not make the broader claim that there is no history or tradition of private individuals bringing suit to remedy particularized environmental harm. *See supra* at 28–30.

34

under Rule 24(b)(2) or file a statement of interest under 28 U.S.C. § 517.  These mechanisms all would allow the government to assert its interests in the litigation and do so without it providing xAI blanket immunity for the ongoing harm its violations of the Act are imposing on communities.

The United States cannot square its claim that Article II requires more—that it be given the authority to take over *and dismiss* the action, U.S. Br. at 20 & n.5—with history showing that granting the "President a free-floating authority to annul private suits . . . that had been duly authorized by statute" would have been a "striking departure from English tradition."  *Private Enforcement*, *supra*, at 158; *see also id.* at 155 ("[B]oth the *nolle prosequi* and the pardon were inapplicable against the Founding Era suits most directly relevant to modern private enforcement . . . ."); *see also supra* at 19–21 & n.9 (explaining why Section 7604(a) does not interfere with presidential control over prosecutorial decisionmaking, *contra* U.S. Br. at 18).

This Court should reject the Article II concerns the United States raises.

## CONCLUSION

For these reasons, this Court should deny the United States's motion to dismiss the complaint.

Dated: July 10, 2026

Respectfully submitted,

/s/ Carroll Rhodes

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
  OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

35

/s/ Elias L. Quinn

Elias L. Quinn (CO Bar No. 42159)
(Pro Hac Vice) – Lead Counsel
Mary Rock (IL Bar No. 6332240)
(Pro Hac Vice)
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
(Pro Hac Vice)
Rebecca Ramirez (TX Bar No. 24126749)
(Pro Hac Vice)
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

/s/ Benjamin Grillot

Benjamin Grillot (DC Bar. No. 982114)
(Pro Hac Vice) – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

36