**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

|  |  |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE** <br><br> **Plaintiffs,** <br> **v.** <br><br> **X.AI CORP. and MZX TECH LLC** <br><br> **Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' REBUTTAL MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................ 1

I.    The Colossus Gas Plant's unpermitted pollution harms frontline communities
as a matter of law and a matter of fact. ......................................................... 2

    A.    Recognizing more pollution—at any level—means more harm,
Congress required Clean Air Act permits "notwithstanding" regional
air quality. ........................................................................................ 2

    B.    The science is settled: Colossus Gas Plant's pollution is harmful. .................. 3

II.    Plaintiffs have established a likelihood of success on the merits of their claims. ........ 4

    A.    Defendants have failed their burden to establish a permitting exemption. ........ 4

    B.    MDEQ's two paragraph letter did not overwrite the Clean Air Act's
substantive protections or excuse Defendants' violations. ............................. 6

III.    An injunction barring xAI's operation of unpermitted turbines is appropriate. ........... 8

    A.    xAI gained a competitive edge by breaking the law. Its profits from
that conduct are no reason it should avoid compliance with the
Clean Air Act. ................................................................................... 8

    B.    xAI's bond demand aims to escape any requirement for
timely compliance. ............................................................................. 9

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ala. Dep't Envt'l Conserv.,* 540 U.S. 461 (2004)..................................................................................7

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.,*
    299 F.3d 1007 (9th Cir. 2002) ........................................................................................7

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
    297 F.R.D. 633 (N.D. Ala. 2014)....................................................................................9

*Friends of the Earth v. Laidlaw Env't Servs.,*
    528 U.S. 167 (2000)........................................................................................................3

*Hawaiian Elec. Co. v. EPA,*
    723 F.2d 1440 (9th Cir 1984) .........................................................................................2

*HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue,*
    296 So. 3d 668 (Miss. 2020)...........................................................................................7

*Pound v. Airosol Co.,*
    498 F.3d 1089 (10th Cir. 2007) ......................................................................................6

*Retractable Techs., Inc. v. Occupational & Med. Innovations, LTD.,*
    No. 6:08-cv-120, 2010 WL 3199624 (E.D. Tex. Aug. 11, 2010)....................................9

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,*
    73 F.3d 546 (5th Cir. 1996) .......................................................................................3, 7

*Sierra Club v. Franklin Cnty. Power of Illinois, LLC,*
    546 F.3d 918 (7th Cir. 2008) ..........................................................................................5

*Sierra Club v. Otter Tail Power Co.,*
    615 F.3d 1008 (8th Cir. 2010) ........................................................................................2

*Students for Fair Admissions v. Harvard,*
    600 U.S. 181 (2023)........................................................................................................3

*United States v. Ameren Missouri,*
    421 F. Supp. 3d 729 (E.D. Mo. 2019).............................................................................3

*United States v. Xcel Energy, Inc.,*
    759 F. Supp. 2d 1106 (D. Minn. 2010)...........................................................................8

*Weiler v. Chatham Forest Products, Inc.,*
    392 F.3d 532 (2d Cir. 2004)............................................................................................7

ii

*Windsurfing Int'l Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986)....................................................................................8

**Statutes**

42 U.S.C. § 7470(1) ...................................................................................................2

42 U.S.C. § 7470(4) ...................................................................................................5

42 U.S.C. § 7475........................................................................................................5

42 U.S.C. § 7604(d) ...................................................................................................9

**Federal Rules and Regulations**

40 C.F.R. § 52.21(b)(11)............................................................................................5

62 Fed. Reg. 38652 (July 18, 1997)..........................................................................3

71 Fed. Reg. 61144 (Oct. 17, 2006)..........................................................................3

78 Fed. Reg. 3086 (Jan. 15, 2013) ............................................................................3

91 Fed. Reg. 1910 (2026) ..........................................................................................5

**State Rules and Regulations**

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D(5) (2013) ..........................................................5

**Other Authorities**

Amended Space Exploration Technologies Corp., SEC Form S-1, June 3, 2026 ..........................8

H.R. Rep. 95-294, National Academy of Sciences, Summary of Proceedings:
    Conference on Health Effects of Air Pollution (Nov. 1973) ......................................2

The Colossus Gas Plant spans city blocks, sports smokestacks three stories tall, and can generate enough power to serve a million homes. Without submitting a permit application that described its plans or assessed its pollution, xAI installed the Plant's first turbines in August 2025. The company's construction did not slow with NAACP's Notice of Intent detailing xAI's Clean Air Act violations, nor with the filing of the complaint in this case, nor even the submission of NAACP's motion for a preliminary injunction. Instead, the facility metastasized, growing from 18 to 27 to 33 to, now, 60 unpermitted gas turbines. xAI built at such a clip that its disclosures to the State couldn't keep up; its updates were out of date before they were submitted. Dkt. No. 49 at 1–2. And as the Plant rose in their midst, Memphis area communities were left to piece together the pollution threat for themselves, to requisition satellite images and seek expert counsel.

The Clean Air Act's substantive requirements ensure new pollution sources implement state-of-the-art pollution controls. More than that, though, the permitting process grants communities the dignity of transparency, of assessing and disclosing a pollution threat before it is built in their backyard. xAI's conduct failed on both counts. Now, day in and day out, the Colossus Gas Plant's pollution increases NAACP members' risks of heart disease, lung disease, and even premature death. The company provides no convincing reason why NAACP's request for preliminary relief to protect nearby members' health and welfare should be denied.

## ARGUMENT

In its brief opposing NAACP's Motion for a Preliminary Injunction (Dkt. No. 94), xAI does not meaningfully challenge the scope of its Colossus Gas Plant's pollution or that its pollution comes without a permit. Rather, xAI claims (1) its pollution is not harmful, (2) its Plant should be exempted or excused from permitting requirements, and (3) that, even if it is violating the law, the company is too profitable to be stopped. None of these arguments warrant denying the preliminary injunction NAACP seeks.

1

I.     **The Colossus Gas Plant's unpermitted pollution harms frontline communities as a matter of law and a matter of fact.**

In its Opposition Brief, xAI presses an antiquated theory that the Colossus Gas Plant's pollution cannot harm nearby communities because, they say, the region's air quality is relatively good.  Following modern public health science, Congress rejected that notion generations ago.

A.     **Recognizing more pollution—at any level—means more harm, Congress required Clean Air Act permits "notwithstanding" regional air quality.**

Under the Clean Air Act, the National Ambient Air Quality Standards (NAAQS) serve as an air quality benchmark for various programs.  But they do not serve as a limit below which air quality protections are no longer necessary or effective.

xAI suggests in its Opposition Brief (at 8–13) the Colossus Gas Plant cannot harm Plaintiffs' members because it claims the region's air quality is in attainment with the NAAQS. But the statute is explicit: operators must permit their facilities and implement pollution protections "***notwithstanding*** attainment and maintenance of all national ambient air quality standards."  42 U.S.C. § 7470(1) (emphasis added).  This provision, passed 50 years ago as a part of the 1977 Clean Air Act Amendments, was crafted as a specific rejection of the argument xAI presses here. As Congress recognized then,

> The idea that the national primary standards are adequate to protect the health of the public has been belied. . . . '[I]t is impossible at this time to establish an ambient air concentration for any pollutant—other than zero—below which it is certain that no human beings will be adversely affected.'

H.R. Rep. 95-294 at 112 (quoting National Academy of Sciences, Summary of Proceedings: Conference on Health Effects of Air Pollution (Nov. 1973)).[1]

---

[1]     *Cf. Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010) (merely setting ambient air quality goals "failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS"); *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447(9th Cir 1984) (recognizing that "NAAQS alone were insufficient to protect public health").

### B. The science is settled: Colossus Gas Plant's unpermitted pollution is harmful.

The scientific consensus that drove Congress to adopt the PSD permitting program 50 years ago has not wavered. As Dr. Suh explained in her declaration (and EPA has concluded over,[2] and over,[3] and over[4] again), "any incremental increase in ambient $PM_{2.5}$ concentrations, including those associated with the Colossus Gas Plant, carries quantifiable public health consequences, regardless of whether the area remains in compliance with the NAAQS." Dkt. 51-46 (Public Health Review) ¶ 32 at 9-10; *see also United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 774 (E.D. Mo. 2019) ("any incremental increase in $PM_{2.5}$ exposure produces an incremental increased risk of mortality and other health effects in the population exposed to" that pollution). Similarly, the scientific consensus indicates that "any increase in ambient $NO_2$ concentrations is harmful to health." Dkt. No. 51-46 ¶ 44 at 12.

Defendants (at 12) deride the standing witness' "worries" over their health as "speculative." But as Dr. Suh explains, these neighbors of the facility are right to be worried: the Colossus Gas Plant is dangerous. Unpermitted air pollution foisted on frontline community members by the Colossus Gas Plant increases their risks of heart disease, lung disease, and even premature death. *See* Dkt. No. 51-46 ¶¶ 22–25. And there is no question that such harms—and the related fears of community members—establish cognizable, traceable, and redressable harms.[5]

---

[2] *See* 78 Fed. Reg. 3086, 3148 (Jan. 15, 2013) (EPA recognizes that "there is no discernible population level threshold below which effects would not occur").

[3] *See* 71 Fed. Reg. 61144, 61158 (Oct. 17, 2006) (noting most new studies "have been unable to detect threshold levels" below which exposure to $PM_{2.5}$ pollution did not cause harm).

[4] *See* 62 Fed. Reg. 38652, 38670 (July 18, 1997) ("[T]he level or even existence of population thresholds below which no effects occur cannot be reliably determined by an examination of the results from the available studies.").

[5] The Supreme Court has recognized "reasonable concerns" as basis for an injury. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996) ("the fairly traceable element does not

Finally, xAI says (at 13) that NAACP "delay[ed]" filing this lawsuit challenging its illegal conduct. Since xAI never filed a permit application or submitted a plan for its unpermitted Gas Plant, citizens have been forced to build the case through painstaking investigation. xAI says (at 14) that NAACP "dragged its feet" in bringing this case. But the first time the company said anything about the amount of pollution its Gas Plant could emit was after this litigation was filed. *See* Dkt. No. 51-36 (May 15, 2026 Disclosure) at 4–7. xAI's claim of "undue delay" seeks to blame NAACP for the company's own lack of transparency.

**II.     Plaintiffs have established a likelihood of success on the merits of their claims.**

**A.     Defendants have failed their burden to establish a permitting exemption.**

Defendants' arguments for an exemption to the PSD program's plain permitting requirements lack a foothold in the Clean Air Act's text.

**"Mobile Source"**: Defendants assert that their 3-story, hundred-ton, required-a-crane-to-install turbines are "mobile" sources, and so the entire Colossus Gas Plant is exempt from the Act's permitting requirements for stationary sources. True, Mississippi's State Implementation Plan for the Clean Air Act's PSD permitting program does not independently provide a definition for 'mobile source.' But, as xAI admits (at 4), the State's SIP incorporates federal PSD regulations. Those federal regulations *do* define "mobile source" for PSD purposes. Dkt. No. 52 (NAACP's PI Brief) at 18. Rather than address those applicable definitions, xAI relies on a dictionary

---

require that the plaintiffs 'show to a scientific certainty that [the] defendant's effluent, and [the] defendant's effluent alone, caused the precise harm suffered by the plaintiffs.'"). Other than contesting whether its pollution causes harm, xAI does not contest that "the standing requirements of Article III can be satisfied" by an association acting "solely as the representative of its members," *Students for Fair Admissions v. Harvard*, 600 U.S. 181, 199 (2023), nor that NAACP satisfies the three-part test for such associational standing here. *Cf.* Dkt. No. 52 at 9–10. xAI does argue Clean Air Act does not provide a cause of action for associations to sue, but that argument lacks merit. *See* Dkt. No. 90 (NAACP MTD Opp Br.) at 14–18.

definition (at 17) to say "mobile" means anything that "can move or be moved," but the law—and EPA—recognize the difference: "The source is 'stationary' because the combustion turbine is not self-propelled or intended to be propelled while performing its function. Combustion turbines may, however, be mounted on a vehicle (or trailer) for portability and still be considered stationary." 91 Fed. Reg. 1910, 1914 (2026).

**"Temporary Use"**: Mississippi's Clean Air Act regulations use the word "temporary" twice; neither use has anything to do with gas turbines, emissions sources, or permitting exemptions. Where the State's implementation plan *does* discuss facilities "located only temporarily at a site," it is to ensure that such sources *nonetheless* obtain permits so that their construction and operations are regulated *wherever* the source is located. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D(5) (2013). There is no basis for exempting "temporary" facilities from stationary source permitting in state or federal regulations, and Defendants do not claim there is.

**"Begin Actual Construction"**: The PSD permitting program is a "preconstruction" requirement that aims to "prevent" deterioration of air quality. 42 U.S.C. §§ 7470(4), 7475. To better implement the "preconstruction" aspect of the program, applicable regulations flesh out what it means to "begin actual construction" on a major source without the requisite permits and controls. 40 C.F.R. § 52.21(b)(11); *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 930 (7th Cir. 2008). Naturally, the phrase contemplates steps taken before the end of construction like laying "foundations," "pipework," and "storage structures" and other installations "of a permanent nature"; it could not be a "preconstruction" requirement if the obligations arose only after the facility was up and running. *Id.* So, under the regulations, certain pre-operational construction efforts trigger permitting obligations, which in turn establish emissions limitations.

xAI flips this sensible structure on its head. According to the company, it has not yet—indeed *cannot ever*—"begin actual construction" on their now-operating and polluting power plant. According to xAI, the company's unenforceable statement that the turbines are not "permanent" is enough to evade stationary source obligations. And even if their plan holds true, such an exemption would be no small matter when it comes to public health. The emissions limitations established in the PSD permits could force emissions reductions by as much as 90%. *See* Dkt. No. 52 at 17. So, on Defendants' theory, operators could install an uncontrolled turbine and emit 10-years-worth of pollution in one year without consequence, as long as they proclaim their (unenforceable) intention to wrap it up thereafter. But the Clean Air Act imposes objective standards and "strict liability upon owners and operators who violate the Act." *Pound v. Airosol Co.*, 498 F.3d 1089, 1097 (10th Cir. 2007). This Court should not allow xAI to escape compliance with only a say-so, nor squeeze a decades' worth of pollution into "temporary" operation.

xAI does not meaningfully contest the scale of the Colossus Gas Plant's potential emissions—but neither does the company give any reason why, under its theory, it could not double or triple the Plant's size. According to xAI's reading, a rotating fleet of "impermanent" turbines would be perpetually exempt from CAA requirements, and there is no limiting principle for its purported exemption that would give any meaning to the permitting requirements to confine their pollution to the emissions limitations established by the Clean Air Act.

### B. MDEQ's two paragraph letter did not overwrite the Clean Air Act's substantive protections or excuse Defendants' violations.

Unable to provide a basis for an exemption in the text of the law or the precedent implementing it, xAI pivots to procedural arguments. First, the company claims (at 16–20) that, because MDEQ said it, it must be valid. Next, xAI argues (at 22–26) that because MDEQ said it,

6

they should not be blamed for believing it.  Finally, xAI insists (at 26–29) the citizen suit provision of the Clean Air Act violates the Constitution.  None of these arguments hold water.

MDEQ's letter agreeing with xAI that the company's turbines are exempted from permitting is not dispositive, nor even persuasive.  As described further in NAACP's Memorandum in Opposition to xAI's Motion to Dismiss, MDEQ's letter—like xAI's briefs— never wrestles with the applicable definition of "mobile source," never provides a citation for its "temporary" exemption, and ignores the fact that EPA confirmed in 2025 (and again in 2026) that portable gas turbines like these are still stationary sources.  *See* Dkt. No. 90 (NAACP MTD Opp Br.) at 18–24.  Rather than defend the letter's scant reasoning, xAI insists on the sanctity of the result because it was printed on MDEQ letterhead.  But a regulator's failure to follow the law is no safe harbor.  A court's review of a state agency's permitting decision is not limited to "the insubstantial question whether the state permitting authority . . . uttered the key words." *Ala. Dep't Envt'l Conserv.,* 540 U.S. 461, 489 (2004).[6]  And courts regularly consider citizen suits where plaintiffs allege state authorities failed to implement the law's objective requirements.  *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 566 (5th Cir. 1996).[7]

With its last effort, xAI argues (at 26–29) that the Clean Air Act's citizen suit provision is itself unconstitutional.  Every court to confront that argument has rejected it, and with good reason: Article II allows Congress to authorize private parties to sue on their own behalf for violations of federal law, and the Clean Air Act's text and common-law antecedents show that's exactly what a citizen suit is. *See* Dkt. No. 90 (NAACP MTD Opp. Br.) 26–35.

---

[6]  *Accord HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue*, 296 So. 3d 668, 677 (Miss. 2020) (agency interpretations of statutes should not "receive deferential treatment," and the interpretations and opinions of administrative agencies are not controlling on courts").

[7]  *See also Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 538 (2d Cir. 2004); *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.*, 299 F.3d 1007, 1011–12 (9th Cir. 2002)

**III.     An injunction barring xAI's operation of unpermitted turbines is appropriate.**

xAI's facility is polluting illegally.  That pollution harms the Black and other frontline communities surrounding the facility.  The Colossus Gas Plant's operation should be enjoined.

**A.     xAI gained a competitive edge by breaking the law.  Its profits from that conduct are no reason it should avoid compliance with the Clean Air Act.**

xAI argues (at 30) that an injunction would cause the company to "suffer permanent competitive damage."  But the market advantage xAI enjoys now was gained by skirting the permitting requirements of the Clean Air Act.

In recent filings with the SEC, SpaceX—corporate parent to both Defendants—touted its ability to bring the Colossus 2 data center online in 91 days when "an industry benchmark for a 100 megawatt" center is "approximately two years."[8]  The company's "significant improvement in cost efficiency" over competitors was made possible by sidestepping permitting review times and avoiding pollution control costs.  SpaceX then leased the Colossus 1 and 2 data centers to another artificial intelligence company for more than a *billion dollars* a month.[9]  Since the Colossus 2 data center is powered exclusively by the Colossus Gas Plant, the deal would not have been possible without xAI's operation of this unpermitted and illegal source of power.

xAI's market advantage was achieved at the expense of other tech companies who follow the law and paid for by withdrawals from the health and welfare of frontline communities.  Thus, the "competitive damage" Defendants fear is in fact the indelible cost of doing business in accordance with the law, and should not weigh on the equities of an injunction.  *Accord Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to

---

[8]     Amended Space Exploration Technologies Corp., SEC Form S-1 at 8 ("SpaceX S-1"), June 3, 2026 https://perma.cc/NLN6-NYUC; *accord United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1113 (D. Minn. 2010) ("the [Clean Air Act] permitting process takes up to two years").

[9]     SpaceX S-1 at 13.

build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Retractable Techs., Inc. v. Occupational & Med. Innovs*, 2010 WL 3199624, at *5 (E.D. Tex. Aug. 11, 2010) (a company's "financial position as a result of its infringement is irrelevant to the Court's injunction analysis").

### B. xAI's bond demand aims to escape any requirement for timely compliance.

xAI's bond demand essentially insists the company's profits are too big for it to be stopped—no matter how brazen its violations. The company (at 2) claims that its artificial intelligence installations around Memphis make up "perhaps the largest private investment in Mississippi's history." Any bond big enough to cover a number like that would be prohibitive, essentially immunizing the company from preliminary relief in citizen suits. *Cf. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633, 635 (N.D. Ala. 2014) (noting "[a] bond in the amount of $780,000,000 would, of course, be prohibitive in any case"). But, in keeping with its public interest purpose, the Clean Air Act's citizen suit provision states a court "may" require a bond to secure a preliminary injunction, not that it "shall" or "must." 42 U.S.C. § 7604(d); *see also* Dkt. No. 52 (PI Brief) at 26 (discussing bonds in public interest litigation).

Without an injunction, Defendants will learn all the wrong lessons at its Colossus Gas Plant. SpaceX has already announced plans to "rapidly bring gigawatt-scale data centers online"— and it highlighted the Colossus 1 and 2 data centers as examples of its success. SpaceX S-1 (*supra* n.8) at 168-69. Even more concerning: SpaceX disclosed an $805-million purchase agreement to acquire more "turbines for AI infrastructure." *Id.* at F-61. If profits excuse pollution, this will not be the last time NAACP members and others in the Memphis area are forced to breathe the pollution from unpermitted turbines in their homes, at their jobs, or in their churches.

9

Dated: July 15, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
  OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

10