**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** — **PLAINTIFFS**

**V.** — **NO. 3:26-CV-74-DMB-JMV**

**X.AI CORP.; and MZX TECH LLC** — **DEFENDANTS**

## OPINION AND ORDER

The National Association for the Advancement of Colored People and the Mississippi State Conference of the NAACP claim that X.AI Corp. and MZX Tech LLC violated the Clean Air Act and Mississippi's State Implementation Plan by constructing and operating, without a permit, a power plant in DeSoto County, Mississippi, comprised of gas-fired combustion turbines. The defendants move to dismiss all claims for failure to state a claim, arguing that the plaintiffs lack statutory standing, the power plant is exempted from permitting requirements under the mobile source exception in Mississippi's SIP, and the Clean Air Act's citizen suit provision is unconstitutional. Because the plaintiffs have statutory standing under the Clean Air Act, because the combustion turbines are not "mobile sources" under Mississippi's SIP, and because the citizen suit provision does not violate Article II of the Constitution or the private nondelegation doctrine, the plaintiffs' claims will proceed.

### I
### Procedural History

On April 14, 2026, the National Association for the Advancement of Colored People ("NAACP") and the Mississippi State Conference of the NAACP filed a complaint against X.AI Corp. and MZX Tech LLC in the United States District Court for the Northern District of

Mississippi, alleging that the defendants violated, and continue to violate, the Clean Air Act and Mississippi's State Implementation Plan ("SIP") by constructing and operating the Colossus Gas Plant in Southaven, DeSoto County, Mississippi.[1] Doc. #1. Specifically, the plaintiffs claim that the defendants violated (1) Mississippi's SIP by constructing and operating a stationary source without a permit; (2) both the Clean Air Act and Mississippi's SIP by constructing and operating a major stationary source without a Prevention of Significant Deterioration ("PSD") permit and without installing and operating best available control technology ("BACT"); and (3) the Clean Air Act by constructing and operating a major source of hazardous air pollutants without complying with NESHAP Subpart YYYY. *Id*. at 38–42. The plaintiffs seek a declaration that the defendants have violated the Clean Air Act; injunctive relief permanently enjoining the defendants from operating the Colossus Gas Plant except in accordance with the Clean Air Act and ordering the defendants to install and operate BACT and to remedy, mitigate, and offset the harm to public health and the environment; a civil penalty up to $124,426.00 per day per violation; and costs and attorneys' fees pursuant to 42 U.S.C. § 7604(d). *Id*. at 42.

On June 15, 2026, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #54. The plaintiffs responded in opposition on July 10, Doc. #89; and the defendants replied on July 24, Doc. #100.

## II
## <u>Rule 12(b)(6)</u>

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) asserts a "failure to state a

[1] "The NAAQS [(National Ambient Air Quality Standards)] program requires the EPA to identify air pollutants that 'may reasonably be anticipated to endanger public health or welfare.'" *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 561 (5th Cir. 2024) (quoting 42 U.S.C. § 7408(a)(1)(A)). "States have primary responsibility for implementing the NAAQS by developing 'State implementation plans.'" *Id*. at 563 (quoting *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 308 (2014)). Mississippi's SIP was approved by the EPA and therefore "ha[s] the force and effect of federal law." 40 C.F.R. § 52.1270(c) (2024); *Sierra Club*, 100 F.4th at 564.

claim upon which relief can be granted." To survive dismissal under the Rule 12(b)(6) standard, "a complaint must present enough facts to state a plausible claim to relief. … A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail." *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (quoting *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010)). However, the Court "do[es] not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Great Lakes*, 624 F.3d at 210). In reviewing a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Serrano v. Customs & Border Patrol*, 975 F.3d 488, 496 (5th Cir. 2020) (per curiam) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

## III
## Factual Allegations

In July 2025, MZX Tech LLC acquired property at 2875 Stanton Road South in Southaven, DeSoto County, Mississippi, to construct its Colossus Gas Plant ("Plant"). Doc. #1 at 20. MZX was the owner and an operator of the Plant. *Id.* X.AI Corp. was an operator of the Plant based on its involvement in managing, directing, or conducting operations and decision-making related to pollution for the Plant.[2] *Id.* X.AI and/or its subsidiaries own and operate the Colossus 2 data center in Whitehaven, Memphis, Tennessee. *Id.* at 36–37. The Plant supplies power to the Colossus 2 data center. *Id.* at 37.

[2] MZX Tech is a wholly owned subsidiary of X.AI. Doc. #1 at 9.

Also in July 2025, Brent Mayo, X.AI's Vice President of Operations,[3] informed the Mississippi Department of Environmental Quality ("MDEQ") by e-mail of X.AI's plan to build energy resources at the Stanton Road location using combustion turbines. *Id.* at 20. MDEQ responded on July 29:

> MDEQ understands that the referenced turbines will be "mobile" as each will remain affixed to a portable unit (i.e., a flatbed trailer) and "temporary" as it is intended for each to remain on-site … for less than twelve (12) months. Therefore, contingent upon the two (2) denoted criteria remaining valid, MDEQ acknowledges that the referenced turbines are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D.

*Id.*; Doc. #1-2 at PageID 89.

X.AI and MZX Tech installed gas-fired combustion turbines at the Plant between August 1 and December 18, 2025. Doc. #1 at 21. As of April 7, 2026, there were at least twenty-seven gas-fired combustion turbines on site— fourteen SMT-130s, one M35, four Gen 6 TM 2500s, five Gen 7 TM 2500s, and three Gen 8 TM 2500s. *Id.* at 24, 26. The turbines have a combined generating capacity of at least 495 megawatts ("MW").[4] *Id.* at 27. Each turbine has a heat input greater than 10 MMBtu/h. *Id.* The TM 2500 turbines and M35 turbines have water injection systems, including piping along the exterior of the turbine and parallel to fuel lines, flow meters, pumps, valves, water treatment equipment, and storage tanks. *Id.* at 28. Additional construction implemented at the Plant includes laying concrete pads as support for the turbines; installing selective catalytic reduction, at least ten transformers between turbine rows, electrical lines, gas supply lines, and water injection lines; and erecting two switch houses. *Id.*

Collectively, the twenty-seven turbines have the potential to emit per year approximately

---

[3] *Id.* at 21. Mayo has also been identified as an authorized signatory and responsible corporate officer of MZX Tech. *Id.*

[4] Each of the SMT-130s has a generating capacity of 13 MW, the M35 has a generating capacity of 25 MW, each of the Gen 6 TM 2500s has a generating capacity of 22 MW, each of the Gen 7 TM 2500s has a generating capacity of 25 MW, and each of the Gen 8 TM 2500s has a generating capacity of 25 MW. *Id.* at 27.

1,700 tons of nitrogen oxide (“$No_x$”), 19 tons of formaldehyde, 580 tons of carbon monoxide (“CO”), and 180 tons of fine particulate matter. *Id.* at 29. $NO_x$ reacts with other chemicals, including volatile organic compounds, in the air to form both particulate matter and ozone, and is a primary cause of smog. *Id.*

Prior to installing and/or beginning to operate the turbines, neither of the defendants applied for a PSD permit pursuant to the Clean Air Act, a Permit to Construct pursuant to Mississippi’s SIP, or a Clean Air Act Title V or State Permit to Operate. *Id.* at 32. After the defendants began constructing the Plant, MDEQ issued MZX Tech a permit for a different gas plant to be built at the same location. *Id.* at 37. None of the turbines at the Plant are subject to the permit. *Id.*

Since learning about the turbines, the plaintiffs’ members who live, work, worship, matriculate, and/or recreate near the Plant have changed their behavior to avoid exposure, including by spending less time outdoors than they otherwise would and inviting friends and family with health vulnerabilities over less than they would like. *Id.* at 4, 6.

## IV
## Analysis

The defendants submit that all the claims against them should be dismissed with prejudice for failure to state a claim under Rule 12(b)(6) because the plaintiffs “lack[] any statutory cause of action under the [Clean Air] Act” since “the NAACP pleads no injury to itself as an organization and brings this action solely on behalf of its members;” “Counts 1 and 2[] fail because [they] rightly relied on [MDEQ’s] determination that the portable temporary turbines at issue are ‘mobile sources’ excluded from the construction and operation permitting requirements for stationary sources;” and “[t]he Clean Air Act’s citizen suit provision violates Article II of the Constitution and the private non-delegation doctrine.” Doc. #54 at 1, 2.

The plaintiffs respond that the defendants' argument that the "NAACP, as an association, does not have statutory standing to bring suit under the Clean Air Act on behalf of its members … ignores the text, context, and plain purpose of the Clean Air Act, as well as decades of precedent;" "[t]he Clean Air Act and Mississippi's implementing regulations required [the defendants] to obtain a preconstruction permit for and implement state-of-the-art pollution controls" at the Plant; and "Article II allows Congress to authorize private parties to sue on their own behalf for violations of federal law." Doc. #89 at 1–2.

The defendants reply that "the core defect with Plaintiffs' suit" is that "Plaintiffs wish to sue on behalf of others, whether for their members or by stepping into the shoes of the government itself[, but n]either the statute nor Article II allow them to do so." Doc. #100 at 1.

**A. Statutory Standing**

The defendants argue that the plaintiffs lack statutory standing because "[t]he phrase 'on his own behalf' in the Clean Air Act is … best read to mean that an organization may sue 'to vindicate only its own interests as an organization, and not the interests of its individual members;'" and "[t]he NAACP does not allege that it is suffering injury to its own organizational interests sufficient to satisfy Article III" but rather "the only harms that the NAACP seeks to remedy are alleged 'harms to Plaintiffs' members'—third parties not before the Court." Doc. #55 at 8, 9 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.6 (1998)).

The plaintiffs counter that "[t]he Act … plainly authorizes associations, such as NAACP, to sue under Section 7604(a)" because "[w]hen an association sues to protect the interests of its members, it is protecting its own interests and therefore commencing an action on its 'own behalf;'" and "the function the 'on his own behalf' language serves [is to] establish[] that a citizen plaintiff[] 'does not, merely by virtue of filing suit under the statute in question, represent the

public at large in the same sense that government does when it brings an enforcement action.'" Doc. #90 at 14, 15 (quoting *Conservation Law Found. of New England, Inc. v. Browner*, 840 F. Supp. 171, 175 (D. Mass. 1993)).

The defendants reply that though "the Clean Air Act defines 'person' to include 'associations,'" "no 'person' can bring suit on behalf of someone else;" the plaintiffs' argument that an association acts on its own behalf when it sues to protect its members' interests "conflates two distinct concepts from associational standing under Article III: germaneness and injury" but "germaneness has never meant that the members' injuries become the association's own;" and "Plaintiffs do not explain why the associational claims they bring are any different" from "public suits generally or class actions." Doc. #100 at 1–3.

The Clean Air Act provides that "any person may commence a civil action *on his own behalf* … against any person … who is alleged to have violated … or to be in violation of … an emission standard or limitation under this chapter[; or] against any person who proposes to construct or constructs any new or modified major emitting facility without a [PSD] permit." 42 U.S.C. § 7604(a)(1), (a)(3) (emphasis added). The term "person" includes an association. *Id.* at § 7602(e).

Though the United States Supreme Court, the Fifth Circuit Court of Appeals, and district courts in the Fifth Circuit have found that associations may have Article III standing under the Clean Air Act and similar statutes,[5] it does not appear that any have addressed the precise question here: whether an association suing to protect the interests of its members has statutory standing in

[5] *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–88 (2000) (Clean Water Act); *Texans United for a Safe Economy Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792–94 (5th Cir. 2000); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 668–78 (E.D. La. 2010); *Env't Tex. Citizen Lobby, Inc. v. ExxonMobile Corp.*, 524 F. Supp. 3d 547, 554–65 (S.D. Tex. 2021); *Sierra Club v. Energy Future Holdings Corp.*, 921 F. Supp. 2d 674, 679–81 (W.D. Tex. 2013).

light of the "on his own behalf" language in § 7604(a).

In *Middlesex County Sewerage Authority v. National Sea Clammers Association*, the United States Supreme Court held that the provision of the Clean Water Act[6] defining "citizen" as "a person or persons having an interest which is or may be adversely affected" "was intended by Congress to allow suits by all persons possessing [Article III] standing." 453 U.S. 1, 16 (1981) (quoting 33 U.S.C. § 1365(g)). Though the definition of "citizen" reviewed in *Middlesex* is absent from the Clean Air Act, the Clean Water Act contains similar "on his own behalf" language. *Id.* at 6 n.9. The Supreme Court did not address such language in holding that statutory standing under the Clean Water Act extends to all persons with Article III standing.

Without addressing the "on his own behalf" language, several district courts in the Fifth Circuit have cited *Middlesex* in finding that an association's statutory standing under the Clean Air Act extends to the limits of Article III standing. *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 668 (E.D. La. 2010); *Tex. Campaign for the Env't v. Lower Colo. River Auth.*, No. H-11-791, 2012 WL 1067211, at *3 (S.D. Tex. Mar. 28, 2012); *see St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Refin., L.L.C.*, 354 F. Supp. 2d 697, 700 (E.D. La. 2005) ("[B]ecause Congress authorized 'any person' to commence a civil suit and defined 'person' to include 'an individual, corporation, partnership, or association,' statutory standing to sue under the Clean Air Act extends to the outer boundaries set by the 'case or controversy' requirement of Article III of the Constitution.") (citing *Ecological Rts. Found. v. Pac.*

[6] "[C]ourts often consult cases interpreting [Clean Water Act] provisions when analyzing issues arising under the [Clean Air Act]." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobile Corp.*, 123 F.4th 309, 315 n.37 (5th Cir. 2024) (Davis, J., concurring) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987)). This is so because "[t]he citizen suit provision of the Clean Water Act was explicitly modeled on the similarly worded [citizen suit provision] of the Clean Air Act." *St. Bernard Citizens for Env't Quality, Inc. v. Chalmette Refin., L.L.C.*, 500 F. Supp. 2d 592, 602 n.2 (E.D. La. 2007) (quoting *Friends of the Earth v. Consol. Rail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985)). In fact, "[t]he words 'on his own behalf,' in addition to the entire citizen suit provision, originate in the Clean Air Act." *Conservation Law Found.*, 840 F. Supp. at 174.

*Lumber Co*., 230 F.3d 1141, 1147 (9th Cir. 2000)).

The defendants' argument relies in part on a footnote from *Steel Co*. Doc. #55 at 8 (quoting 523 U.S. at 104 n.6). In *Steel Co*., the Supreme Court, in dicta, briefly addressed similar language in the Emergency Planning and Community Right-to-Know Act ("EPCRA"):

> EPCRA states that "any person may commence a civil action *on his own behalf* …." 42 U.S.C. § 11046(a)(1) (emphasis added). "[P]erson" includes an association, see § 11049(7), so it is arguable that the statute permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members. Since it makes no difference to our disposition of the case, we assume without deciding that the interests of individual members may be the basis of suit.

523 U.S. at 104 n.6.

District courts in other circuits, both before and after *Steel Co*., have rejected the argument the defendants advance here. *See Coho Salmon v. Pac. Lumber Co*., 30 F. Supp. 2d 1231, 1240 (N.D. Cal. 1998) ("[T]he phrase 'on his behalf' in [the citizen suit provision of the Endangered Species Act] does not limit the ability of an environmental organization to represent the interests of its members."); *Sierra Club v. Aluminum Co. of Am*., 585 F. Supp. 842, 847 (N.D.N.Y. 1984) ("There is simply no support for the defendant's position that the inclusion in [the Clean Water Act's citizen suit provision] of the words 'on his own behalf' precludes citizen suits by representative organizations."). The parties do not cite any case where a court has held that "on his own behalf" prevents associations from bringing citizen suits, and the Court is not aware of any such case.

The defendants also cite two Black's Law Dictionary definitions of "behalf" to support their argument that "on his own behalf" means an association cannot sue for the benefit of another. *See* Doc. #55 at 8 (quoting *Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968); and *Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024)). The 1968 edition defines "behalf" as "[b]enefit, support, defence, or advantage;" while the 2024 edition defines "behalf" as "[s]ide, part, advantage, or

interest" and "on behalf of" as "in the name of, on the part of, as the agent or representative of." *Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968); *Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024). According to the defendants, because the plaintiffs are acting for the benefit and in the interest of their members, they are not acting on their own behalf. Doc. #55 at 8–9.

However, just because the plaintiffs' actions in this case benefit their members does not mean that the plaintiffs are not simultaneously acting for their own benefit and interest. The plaintiffs allege in their complaint that "[their] principal objectives are to ensure the political, educational, social, and economic equality of all citizens; to eliminate racial prejudice; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued adverse effects of racial discrimination;" "environmental and climate issues are civil rights issues; and "[their] work involves fighting the disproportionate risks faced by Black and frontline communities to risks from pollution exposure." Doc. #1 at 5–6. Accordingly, this suit is in the interest of and benefit for the NAACP (and its Mississippi chapter) as an organization.[7]

The defendants also argue that any interpretation of "on his own behalf" other than their own would "render that phrase surplusage." Doc. #55 at 9. The plaintiffs respond that the purpose of "on his own behalf" is to exclude class actions and to clarify that citizen plaintiffs do not represent the public at large. Doc. #90 at 15.

The legislative history of the Clean Air Act supports the plaintiffs' view. *See* 116 CONG. REC. 33102 (1970) (statement of Sen. Edmund Muskie), *reprinted in* 1 LEGISLATIVE HISTORY OF

[7] The defendants argue that this conclusion conflates the Article III associational standing concepts of germaneness and injury. Doc. #100 at 2. However, Article III standing is not at issue here. While the question of whether the suit is on the plaintiffs' behalf may be similar to the germaneness inquiry in an Article III standing analysis, Article III standing and statutory standing are two separate issues. The above analysis relates to statutory standing, not any Article III standing concept.

THE CLEAN AIR AMENDMENTS OF 1970, at 351 (1974) ("S. 4358 is not [a class action bill]. S. 4358 is limited to citizens acting *on their own behalf*.") (emphasis added). The legislative history of the same provision in the Clean Water Act confirms this view. *See* S. REP. NO. 92-414 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3746 ("The [citizen suit] section is drawn to avoid problems raised by class action provisions of the Federal rules of civil procedure, specifically by Rule 23. Section 505 does not authorize a 'class action.' Instead, it would authorize a private action by any citizen or citizens acting *on their own behalf*.") (emphasis added).

Other district courts, considering this legislative history, have interpreted "on his own behalf" in other environmental statutes to mean that citizen plaintiffs may not bring class actions or suits on behalf of the public at large. *See Brown v. Ruckelshaus*, 364 F. Supp. 258, 265 (C.D. Cal. 1973) ("What quickly becomes apparent is the passage [in the Clean Water Act] stating that one may sue only 'on his own behalf.' The legislative history bluntly states that this section was inserted to prevent [class actions].") (citing S. REP. NO. 92-414); *Conservation Law Found.*, 840 F. Supp. at 175 ("'On his own behalf' establishes that a citizen plaintiff, while a 'private attorney general,' … does not … represent the public at large in the same sense that a state attorney general or the Department of Justice does when it brings an enforcement action. Indeed, the legislative history of the citizen suit provision of the Clean Air Act and Clean Water Act reveals clearly that such provision is not to be taken as an authorization for a class action.") (internal citation omitted) (quoting *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 723–30 (D.C. Cir. 1974); and citing S. REP. NO. 92-414); *Sierra Club v. Aluminum Co.*, 585 F. Supp. at 847–48 ("[T]here is a presumption against construing a statute as containing superfluous or meaningless words, … [but] the phrase 'on his own behalf' [in the Clean Water Act] is not mere surplusage but rather was intended only to exclude class action suits.").

As for the defendants' citation of the Tenth Circuit's opinion in *United Food & Commercial Workers Union, Local 1564 of New Mexico v Albertson's, Inc.*,[8] the analysis from that case does not apply here. In *Albertson's*, the Tenth Circuit held that that "organizations, as opposed to groups of individual consenting employees, cannot be plaintiffs to damages actions under § 216(b)" of the Fair Labor Standards Act based on that statute's provision that an action may be brought "by any one or more *employees* for and in behalf of himself or themselves or other employees similarly situated." 207 F.3d at 1200 (quoting 29 U.S.C. § 216(b)) (emphasis added). As the plaintiffs point out,[9] the Tenth Circuit's *Albertson's* decision was based on the use of the word "employees," not the "in behalf of himself" language. *See* 207 F.3d at 1200 ("The wording of this provision suggests that standing to pursue an action for liability is statutorily limited to *employees only*.") (emphasis added). Such analysis is not relevant here since the Clean Air Act explicitly allows citizen suits to be brought by associations.

Ultimately, because the plaintiffs are persons bringing an action on their own behalf, they have statutory standing under the Clean Air Act.

**B. Permitting Requirements**

The defendants argue that they were not required to obtain permits to construct and operate the Plant because "Mississippi's SIP … categorically excludes 'mobile sources' from the obligation to obtain [permits];" "the term ['mobile source'], as ordinarily understood, covers the temporary portable turbines, and MDEQ … confirmed as much in its July 2025 letter to [them];" and "[a]t the very least, [they] were 'not on notice' that the SIP's mobile source exception did not apply." Doc. #55 at 9, 12 (quoting *United States v. Cinergy Corp.*, 623 F.3d 455, 459 (7th Cir.

[8] Doc. #55 at 8 (citing 207 F.3d 1193, 1200 (10th Cir. 2000)).

[9] Doc. #90 at 17.

2010)).

The plaintiffs respond that "[f]ederal regulations define 'mobile source' as it is used by the Clean Air Act and Mississippi's SIP [as] 'a motor vehicle, nonroad engine or nonroad vehicle,'" and the defendants' turbines "cannot qualify as 'mobile sources'" under this definition; "Mississippi's SIP incorporates federal PSD regulations, it does not conflict with them;" and "MDEQ's letter is unpersuasive and should be given no deference" as it is "[u]ntethered to the language of the statute or the regulations." Doc. #90 at 18–20, 22 (quoting 40 C.F.R. § 51.50). As to the defendants' notice argument, the plaintiffs counter that "[the defendants were] warned in EPA rulemakings and by citizen notices that methane gas turbines like those of [their] Colossus Power Plant require Clean Air Act permits;" and "even if [the defendants] could muster an argument that the regulations were ambiguous with regard to [their] conduct, the appropriate measure would be to tailor any relief granted accordingly, not to dismiss a well-pled complaint for failure to state a claim." *Id.* at 24, 25.

The defendants reply that "mobile source" is undefined because though "Rule 5.2 of the Mississippi SIP expressly incorporates a different set of regulations," "[t]his does not somehow incorporate any other federal regulations into the SIP;" "[t]he fair notice doctrine is grounded in constitutional due process and relevant not only to the choice of remedies, but also to the imposition of liability;" and "private warnings and threats" are "irrelevant to the fair notice inquiry." Doc. #100 at 5–6, 8, 9.

The plaintiffs' first and second claims allege that the defendants constructed and are operating a new stationary source without a permit in violation of 11 Pt. 2 Ch. 2 MISS. CODE R. 2.1 D (1)-(2) and (5)-(6);[10] and that the defendants constructed and are operating a major source

[10] Mississippi's SIP requires construction permits for "any new stationary source or modification of a stationary source," subject to exceptions enumerated in Rule 2.13 and 2.15. 11 Pt. 2 Ch. 2 MISS. CODE R. 2.1 D (2).

of criteria pollutants without a PSD permit and without installing and operating BACT in violation of 42 U.S.C. § 7475(a)(1) and (a)(4),[11] and 11 Pt. 2 Ch. 5 MISS. CODE R. 5.2. Mississippi's SIP provides that "[m]obile sources" are "excluded from the requirement for a permit to construct and a permit to operate." 11 Pt. 2 Ch. 2 MISS. CODE R. 2.13.

**1. "Mobile source" definition**

The defendants are correct that "mobile source" is not defined anywhere in Mississippi's SIP. However, the plaintiffs point to a definition in 40 C.F.R. § 51.50, which defines terms under the subpart governing air emissions reporting requirements. The plaintiffs arrive at § 51.50 because "Mississippi adopted and incorporated 40 C.F.R. § 52.21 into its SIP;" "Section 52.21 in turn uses but does not define 'mobile source;'" and "40 C.F.R. § 52.01 leads off by noting all terms 'used in this part … but not defined herein shall have the meaning given them in parts 51 and 60' of the chapter." Doc. #90 at 20 n.12. The defendants argue that although "Rule 5.2 of the Mississippi SIP expressly incorporates … the provisions of 40 CFR 52.21," "Rule 5.2 does not incorporate § 52.01;" "§ 52.01 does not even define 'mobile source;'" and "[e]ven if Rule 5.2's incorporation of § 52.21 could justify reading § 52.21 according to a federal definition located via a chain of cross-references from § 52.01 to § 51.50, there is no reason to export that definition more broadly, to Rule 2.13 that has no express incorporation by reference." Doc. #100 at 5–7.

Mississippi's SIP incorporates[12] and adopts by reference the federal PSD regulations at 40 C.F.R. § 52.21. 11 Pt. 2 Ch. 5 MISS. CODE R. 5.2. Section 52.21(b)(18) provides that "[s]econdary emissions do not include any emissions which come directly from a *mobile source*, such as emissions from the tailpipe of a motor vehicle, from a train, or from a vessel." 40 C.F.R. §

[11] The PSD program prohibits the construction of a "major emitting facility" unless "a permit has been issued for such proposed facility." 42 U.S.C. § 7475(a)(1).

[12] There are certain exceptions to what Mississippi's SIP incorporates but none are applicable here.

52.21(b)(18) (emphasis added). Section 52.01 provides the definitions for terms used in part 52 and specifies that "[a]ll terms used in [part 52] but not defined herein shall have the meaning given them in … part[] 51." In part 51, "mobile source" is defined as "a motor vehicle, nonroad engine or nonroad vehicle." 40 C.F.R. § 51.50.

Based on the overall statutory and regulatory scheme, the best reading of Rule 5.2 of Mississippi's SIP is that it incorporates the federal PSD regulations along with the definitions of the terms used in those regulations, including "mobile source." While there is no definition of "mobile source" in the precise section incorporated, that section is covered by a definitions section. It is logical to conclude that the meanings of the terms used in the federal PSD regulations remain the same when those regulations are incorporated into Mississippi's SIP.[13] And though the defendants take issue with the fact that the definition is "located via a chain of cross-references," since each link in the chain has been established, there is nothing inherently wrong with the use of cross-references as opposed to restating the same definition in multiple sections. "[C]ourts must carefully consider the text and context of each statute before adopting a one-size-fits-all approach to cross-references." *Brown v. United States*, 602 U.S. 101, 118 (2024). Considering the text and context of Rule 5.2, particularly its incorporation by reference of the federal PSD regulations as a whole, it makes the most sense that the terms used in the federal PSD regulations have the same meanings as incorporated in Rule 5.2. So, the definition of "mobile source" from 40 C.F.R. § 51.50 is incorporated by reference into 11 Pt. 2 Ch. 5 MISS. CODE R. 5.2.

And, though the defendants argue that "there is no reason to export" the definition of

[13] The defendants cite *Doe v. X Corp*. in arguing that "a specific reference to a 'limited aspect' of a statutory provision does not constitute a reference to the provision 'as a whole,' including its 'definitions.'" Doc. #100 at 6 (quoting 821 F. Supp. 3d 632, 638–39 (N.D. Tex. 2026)). In that case, however, the statute at issue referred only to a limited aspect of the referenced statute, and the definition the plaintiff sought to incorporate was "not essential to determining" whether that specific part of the statute applied. *Doe v. X Corp*., 821 F. Supp. 3d at 638. Here, Rule 5.2 incorporates all of 40 C.F.R. § 52.21 (subject to several exceptions not relevant here), so the definition of each term used in § 52.21 is essential to determining how to apply the PSD regulations.

"mobile source" from Rule 5.2 to Rule 2.13 because Rule 2.13 has "no express incorporation by reference," Doc. #100 at 7; Rule 2.1 provides that the definitions set forth in Chapter 5 are "incorporated by reference and shall have the same definition" in Chapter 2. Consequently, the definition of "mobile source" is also incorporated by reference from Rule 5.2 to Rule 2.13.

The defendants cite *United States v. Minor*, 121 F.4th 1085, 1090 (5th Cir. 2024), for the proposition that a reference to a specific regulation "cuts and pastes" that regulation as it existed when the referring regulation was enacted. Doc. #100 at 6. In *Minor*, the Fifth Circuit addressed the reference canon, which counsels that "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, *without any subsequent amendments*." 121 F.4th at 1090 (quoting *Jam v. Int'l Fin. Corp*., 586 U.S. 199, 209–10 (2019)) (emphasis added). But here, the issue is not what version of the federal regulations was incorporated. That Mississippi's SIP "cut and pasted" 40 C.F.R. § 52.21 as it existed when the SIP was enacted does not mean it did so without including the definitions of terms used in that section.

Applying the definition from 40 C.F.R. § 51.50, to qualify as mobile sources, the turbines each must be "a motor vehicle, nonroad engine or nonroad vehicle." Since the turbines clearly are not vehicles, they are only mobile sources if they are considered nonroad engines. A nonroad engine is "an internal combustion engine (including fuel system) that is … not affected by sections 111 or 202 of the [Clean Air Act]." 40 C.F.R. § 51.50. Section 111 of the Clean Air Act governs standards of performance for new stationary sources. 42 U.S.C. § 7411. "The term 'new source' means any stationary source, the construction or modification of which is commenced after the publication of regulations … prescribing a standard of performance under this section which will be applicable to such source." *Id*. at § 7411(a)(2). Subpart KKKK of 40 C.F.R. Pt. 60 establishes

such standards of performance for stationary combustion turbines.[14] Subpart KKKK applies to "stationary combustion turbine[s] with a heat input at peak load equal to or greater than 10.7 gigajoules (10 MMBtu) per hour." 40 C.F.R. § 60.4305. The definition of "[s]tationary combustion turbine" specifies that "[s]tationary means that the combustion turbine is not self-propelled or intended to be propelled while performing its function. It may, however, be mounted on a vehicle for portability." 40 C.F.R. § 60.4420.

Taking the plaintiffs' allegations as true, each turbine at the Plant has a heat input greater than 10 MMBtu/h. Doc. #1 at 27. Because the turbines at the Plant are "stationary combustion turbines" since they are not self-propelled or intended to be propelled while performing their function, and they have a heat input greater than 10 MMBtu/h, they are subject to standards of performance under 40 C.F.R. Pt. 60, Subpart KKKK. So, they are affected by § 111 of the Clean Air Act and are therefore not "nonroad engines" and not "mobile sources."

**2. MDEQ letter**

The defendants argue that MDEQ "issu[ed] a formal determination letter to [them] explaining that it 'understands that the referenced turbines will be "mobile" as each will remain affixed to a portable unit (i.e., a flatbed trailer) and "temporary" as it is intended for each to remain on-site for less than twelve (12) months;'" "[t]his conclusion follows … from MDEQ's unique expertise in administering the SIP's entire regulatory regime, as well as MDEQ's familiarity with the specific facts;" and "MDEQ's interpretation and application of the SIP in drawing the line between mobile and stationary sources is hence entitled to careful consideration and particular weight." Doc. #55 at 11.

[14] Section 111 clarifies that "nonroad engines" and "stationary combustion turbines" are mutually exclusive. 42 U.S.C. § 7411(a)(3) ("Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.").

The plaintiffs respond that "[t]he fact [the defendants] sought and received a letter from MDEQ does not change things" because the letter "does not erase the law's substantive requirements." Doc. #90 at 21–22. To support their argument that MDEQ's determination is not controlling, the plaintiffs cite *Association to Protect Hammersley, Eld, and Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1011–12 (9th Cir. 2002), and *Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 538–39 (2d Cir. 2004).

While the defendants argue that "courts have long held that the SIP controls even over conflicting general federal regulations and that private parties thus cannot be held liable under the Clean Air Act for conduct that adheres to the plain text of the applicable, federally approved SIP," Doc. #55 at 11–12 (citing *Cinergy*, 623 F.3d at 458–59), it does not follow that a state agency's *interpretation* of the SIP controls.

In *Hammersley*, the Ninth Circuit addressed the "contention that a private party cannot bring a Clean Water Act citizen's suit for unpermitted discharges when the state agency charged with administering the NPDES permit program has determined that such a permit is not required." 299 F.3d at 1011. Holding such a contention "runs squarely against the plain words of the statute and would frustrate the purposes of the Clean Water Act's empowerment of citizen suit," the court explained that while the state agency's determination "that an NPDES permit is not needed warrants consideration," "neither the text of the Act nor its legislative history expressly grants to … a state agency the exclusive authority to decide whether the release of a substance into the waters of the United States violates the Clean Water Act." *Id.* at 1011–12. In *Weiler*, the Second Circuit rejected the argument "that Congress must have intended to foreclose [Clean Air Act] citizen suits … that would challenge the determinations of state agencies" because "Congress has required both state agencies and private entities to meet the demands of the Act," and when "[t]he

plaintiffs allege that both the agency and the private entity have not met their responsibilities … the private entity should [not] be immune from … suit." 392 F.3d at 538–39. Though the defendants point out in a footnote in their reply that *Hammersley* and *Weiler* did not address "liability for conduct authorized by [an] EPA-approved SIP," Doc. #100 at 7 n.4, nothing in the Clean Air Act gives state agencies alone the ability to interpret the state's SIP and determine what it authorizes.[15]

Moreover, the Fifth Circuit applies state law to review a state agency's permitting decision. *Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 562 (5th Cir. 2024). Under Mississippi law, courts do not give deference to agency interpretations of statutes. *HWCC-Tunica, Inc. v. Miss. Dep't of Revenue*, 296 So. 3d 668, 673 (Miss. 2020).

"Although an agency's interpretation of a statute cannot bind a court, it may be especially informative to the extent it rests on factual premises within the agency's expertise." *Texas v. U.S. EPA*, 170 F.4th 328, 340 (5th Cir. 2026) (internal quotation marks omitted) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024)).[16]

Here, MDEQ's interpretation of the meaning of "mobile source" under Mississippi's SIP does not depend on facts within MDEQ's expertise.

---

[15] The defendants also argue that "*Weiler* is not good law in this Circuit." Doc. #100 at 8 n.4 (citing *CleanCOALition v. TXU Power*, 536 F.3d 469, 478–79 (5th Cir. 2008)). In *CleanCOALition*, the Fifth Circuit held that "§ 7604(a)(3) does not authorize preconstruction citizen suits against facilities that have either obtained a permit or are in the process of doing so" but only "when an entity proposes to construct or constructs a facility without a permit whatsoever." 536 F.3d at 478–79. In *Weiler*, the Second Circuit held that pre-construction relief was available when the defendant obtained a synthetic minor source permit but did not obtain a major source permit. 392 F.3d at 535, 539. The defendant in *CleanCOALition* did apply for and was in the process of obtaining a major source permit, 536 F.3d at 470, so *CleanCOALition* does not directly conflict with *Weiler*. Even if it did, it does not mean *Weiler*'s analysis cannot be persuasive to this Court in this case when the defendants did not apply for or obtain *any* permit for the turbines at issue.

[16] The defendants cite *Alaska Department of Environmental Conservation v. E.P.A.*, 540 U.S. 461, 490–91 (2004). Doc. #55 at 11. In that case, the Supreme Court held that "[o]nly when a state agency's BACT determination is 'not based on a reasoned analysis' … may EPA step in to ensure that the statutory requirements are honored." 540 U.S. at 490. But MDEQ's finding that the defendants' turbines are mobile sources, based on its interpretation of relevant statutes and regulations, is not like a state agency's BACT determination, which involves some amount of discretion and relies on the agency's expertise.

Since MDEQ's letter to the defendants is not consistent with Mississippi's SIP, the letter does not alter the Court's determination that the defendants' turbines are not mobile sources.[17]

### 3. Notice

In response to the defendants' argument that they were not on notice that the SIP's mobile source exception did not apply, the plaintiffs argue that "[the defendants] had explicit—and recent—notice that turbines like those used at the Colossus Gas Plant were not exempted from the Clean Air Act's stationary source permitting requirements" because "EPA published a proposed rule that discussed the use of 'portable' turbines in December of 2024" seeking "public commentary on whether an exemption should be developed;" "in January[] 2026, EPA confirmed in its final rule [that] temporary turbines aren't 'mobile sources;'" and "[o]n June 17, 2025, NAACP sent [X.AI] a Notice of Intent to Sue the company for its unpermitted construction and operation of portable turbines" at a different site. Doc. #90 at 24. The plaintiffs further argue that "[w]here a defendant lacks fair notice, a Court may adjust the remedy appropriate for that defendant; it should not take the reins of the regulatory program and adjust the liability calculus for all possible defendants, nor overturn what compliance requires under the law generally." *Id.* at 25.

The defendants reply that "[they] reasonably relied on MDEQ's determination that the temporary portable turbines were exempt;" "the [notice] inquiry focuses on what the *government* has communicated" as opposed to "private warnings and threats;" "Plaintiffs identify no contrary statement or guidance from MDEQ that would have unsettled [their] reliance" on its letter; and

[17] In addition to the mobile source exception, MDEQ's statement in its letter that "the referenced turbines are exempt from permitting requirements" was contingent on its "understanding" that the turbines were "intended … to remain on-site … for less than twelve (12) months." Doc. #1-2 at PageID 89. It is unclear why the length of time the turbines remain on-site is relevant to permitting requirements. More, whether that "understanding" and what the defendants "intended" were reasonable under the circumstances, and precisely what the defendants "intended," are matters at this early stage that are not pertinent or fully developed in the record.

"EPA's December 2024 notice of *proposed* rulemaking … at most addressed whether portable turbines are stationary sources under federal regulations—which … is not relevant to interpreting Mississippi's SIP exemption" and "did not state the agency's final view," and "EPA's January 2026 final rule … could not retroactively furnish the fair *advance* notice due process requires." Doc. #100 at 8, 9 & n.6. The defendants also maintain that "fair notice doctrine is grounded in constitutional due process and relevant not only to the choice of remedies, but also to the imposition of liability." *Id.* at 8.

"The fair notice doctrine is a 'basic principle of administrative law.'" *CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444 (5th Cir. 2024) (quoting *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017)). "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Id.* (quoting *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017)). "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *General Elec. Co. v. U.S. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (quoting *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)). "It is unclear what, if any, daylight exists between that conception of 'fair notice' and [the] change-in-position doctrine." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569 (2025). "Under that doctrine, agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *Id.* at 568 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016))

(internal quotation marks omitted).

The fair notice doctrine might apply if MDEQ, after informing the defendants that their turbines are exempt from permitting requirements, later attempted to enforce permitting requirements against them.[18] However, that is not the situation here. There is no indication that MDEQ changed its position, and MDEQ is not attempting to impose civil liability against the defendants. MDEQ fairly notified the defendants of its interpretation of Mississippi's SIP. However, that does not mean that the plaintiffs are barred from bringing this action asserting a contrary interpretation, and it does not mean that the Court is bound by MDEQ's interpretation.

#### 4. Summary

Because the Plant is not a "mobile source" according to the federal regulations incorporated into Mississippi's SIP, the Plant was not (and is not) exempted from permitting requirements under the Clean Air Act and Mississippi's SIP. So, the plaintiffs' first and second claims will not be dismissed.

### C. Constitutionality of Citizen Suits

The defendants argue that the Clean Air Act's citizen suit provision violates Article II of the Constitution and the private nondelegation doctrine because "[t]he 'executive Power,' as understood in 1789 and today, includes the core law enforcement authority to prosecute all federal public offenses, whether civil or criminal;" "Congress cannot … vest federal law enforcement power—including the authority to obtain federal penalties payable to the U.S. Treasury—outside the executive branch, at least unless such suits remain subject to presidential control and direction;"

---

[18] This is true even in light of the NAACP's notice of intent to sue regarding the defendants' nearby facility and EPA's notice of proposed rulemaking and final rule. As the defendants note, the question is what MDEQ has communicated. If MDEQ were to now assert that the defendants needed a permit after previously determining they did not, that would create a fair notice issue regardless of whether the defendants had notice that Mississippi's SIP *could* be interpreted to require them to obtain permits.

and "[t]he Clean Air Act vests law-enforcement power in private persons without regard to these constitutional first principles." Doc. #55 at 13–15.

Pointing out that "these kinds of arguments have been rejected whenever they have been raised," the plaintiffs counter that because "citizen suits … are on behalf of the private plaintiff, not the government," Congress did not "assign core law enforcement power to private parties" but rather "has granted citizen plaintiffs only the right to pursue their private right to redress particularized harms they face." Doc. #90 at 26, 28, 29 (quoting Doc. #55 at 18).

The defendants reply that although "the Clean Air Act says that citizen suits are brought by a plaintiff 'on his own behalf,'" "[w]hat matters is the nature of the power that private parties may use," and that power "is 'quintessentially executive;'" and "that citizen plaintiffs must be injured in order to sue … does not convert the business conducted inside a courthouse into private-rights litigation." Doc. #100 at 11, 13 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020)).

"Article II provides that 'the executive Power shall be vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 213 (quoting U.S. CONST. art. II, § 1, cl. 1; id., § 3). "The entire 'executive Power' belongs to the President alone." *Id.* "[T]he private nondelegation doctrine … teaches that a private entity may wield government power only if it functions subordinately to an agency with authority and surveillance over it." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 178 F.4th 224, 233 (5th Cir. 2026) (internal quotation marks omitted) (quoting *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 & n.21 (5th Cir. 2022)). "[A] law … violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025)). The question of whether the citizen suit provision here violates Article II and whether it violates the private nondelegation doctrine requires the same inquiry—whether citizen suits

impermissibly allow private parties to exercise the President's executive power. *See Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 87–88 (2015) (Thomas, J., concurring) ("[O]ur so-called 'private nondelegation doctrine' flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government.").

Though "[t]he Constitution charges the Executive Branch with enforcing federal law," "sometimes Congress also allows private parties to enforce the law through civil litigation." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025); *see Davis v. Passman*, 442 U.S. 228, 241 (1979) ("Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner."); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc) ("Although [Article II's Take Care] Clause states that the Executive must 'take Care that the Laws be faithfully executed,' it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law.") (quoting U.S. Const. art. II, § 3). That the Clean Air Act's citizen suit provision allows private parties to enforce the Clean Air Act through civil litigation, therefore, does not make citizen suits an impermissible exercise of executive power.

The defendants cite *Trump v. United States*, 603 U.S. 593, 607, 620 (2024), for the proposition that under the Take Care Clause, the President's authority over enforcement actions is "conclusive and preclusive" and Congress is therefore disabled from acting upon the subject. Doc. #55 at 15. However, *Trump* addressed the "[i]nvestigation and prosecution of crimes," which is a "quintessentially executive function." 603 U.S. at 620. A civil suit by a private citizen who has

been harmed by a violation of the Clean Air Act is not equivalent to a criminal prosecution.

The defendants similarly argue that "[t]he powers to sanction and sue are quintessentially executive functions." Doc. #55 at 15 (quoting *Horsemen's*, 178 F.4th at 241). However, because as discussed above, Congress may "allow[] private parties to enforce the law through civil litigation," *Medina*, 606 U.S. at 367, these powers are not always quintessentially executive functions which cannot be delegated to a private party.

The defendants also raise the issue of prosecutorial discretion. Doc. #55 at 14–15. Though "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), citizen suits do not interfere with the *agency's* decision not to enforce the Clean Air Act. The citizen suit provision allows private citizens to sue when the EPA and state agencies choose to forego enforcement, but it does not allow private citizens to challenge or interfere with the EPA's discretion not to enforce. *See* 42 U.S.C. § 7604(a)(2) (allowing citizen suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is *not discretionary* with the Administrator") (emphasis added).

The defendants focus on the remedies for citizen suits, including injunctive relief and monetary penalties payable to the United States Treasury, as evidence that citizen suits constitute the exercise of executive power. Doc. #55 at 15–16. The plaintiffs respond that "both the injunctive relief and civil penalties sought here are designed to vindicate [their] private rights" because "[t]he ability to seek injunctive relief is not an exclusive executive prerogative," and the injunctive relief requested here is not "generalized relief to benefit the public at-large" but rather "addresses the particularized harms [they] allege;" and "penalties still provide particularized relief to [citizen] plaintiffs" although they do not receive any portion of the penalty award "because they

are 'a sanction that effectively abates' the harmful conduct 'and prevents its recurrence.'" Doc. #90 at 30, 31 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 185–87 (2000)). The defendants reply that "seeking civil penalties payable to the United States is 'quintessentially executive,'" and "the same enforcement authority cannot be quintessentially executive when the FTC seeks it and quintessentially private when an association does;" and "Plaintiffs' claims for injunctive relief fare no better" because "Plaintiffs sue 'not to enforce specific legal obligations whose violation works a direct harm' to the NAACP's members, 'but to force companies to comply with' a federal permitting regime." Doc. #100 at 13 (quoting *Trump v. Slaughter*, 609 U.S. 422, 456 (2026), and *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 13 (2023) (Thomas, J., concurring in the judgment)).

Contrary to the defendants' assertion, the injunctive relief requested here is intended to enforce obligations which the plaintiffs allege would abate harm to them and their members. For example, the plaintiffs allege that "at least thirteen of the turbines at the Colossus Gas Plant" lack "technology that would satisfy BACT for the control of $NO_x$ emissions in compliance with PSD regulations," and "[i]f applied to [those] turbines … BACT-level controls could reduce $NO_x$ emissions … by approximately 90 percent or more." Doc. #1 at 32, 40.

As to the civil penalties, though the Supreme Court, in finding that the FTC exercises executive power, held that the FTC's power to seek penalties in "civil suits *on behalf of the United States*" is "quintessentially executive," *Trump v. Slaughter*, 609 U.S. at 455 (emphasis added), it does not follow that *all* civil penalties require the exercise of nondelegable executive power. As the Supreme Court recognized in *Laidlaw* in addressing the Clean Water Act:

> It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they

> encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

528 U.S. at 185–86. Citizen suit plaintiffs bring actions on their own behalf, seeking remedies, including civil penalties, to address their own injuries. Doing so is not equivalent to an administrative agency seeking penalties on behalf of the United States.

As to the defendants' argument that the requirement that citizen suit plaintiffs must be personally injured to sue is relevant to Article III standing, not Article II and the private nondelegation doctrine, Doc. #100 at 13, while Article III standing and the exercise of executive power are separate questions, the fact that citizen suit plaintiffs must establish an injury to themselves in order to have standing indicates that they are suing on their own behalf to remedy their own injuries, as opposed to suing on behalf of the government. In contrast, for example, "the *United States*' injury in fact suffices to confer standing on" qui tam relators, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (emphasis added); and "qui tam actions exist 'on behalf of and in the name of the government,'" *Vanderlan v. United States*, 135 F.4th 257, 267 (5th Cir. 2025).

Because citizen suit plaintiffs sue on their own behalf, in their own name, and seek penalties that redress harm to themselves, they are not exercising the federal government's executive power. Other district courts to consider the issue have reached the same conclusion. *See, e.g., Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 256 (D.D.C. 2021) (citizen suit provision does not violate Article III because "plaintiff is not vindicating a public right in the courts" but rather "vindicating its own unique and particularized … injury"); *Atl. States Legal Found., Inc. v. Buffalo Envelope, Div. of Am. Envelope Co.*, 823 F. Supp. 1065, 1075 (W.D.N.Y. 1993) ("Under EPCRA, Congress … has granted a concurrent right to enforce the statute to the Administrator and to private individuals who are aggrieved by violations of the statute. The fact

that the monetary penalties sought are payable to the Treasury rather than to the private individual is of no moment. Such penalties redress the injuries of private parties whose interests are met through compliance with EPCRA's reporting requirements. The civil fine provisions are designed to effect compliance through general and specific deterrence."); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 556 (E.D.N.C. 2001) ("Defendant's claim … that the power to bring a civil enforcement action is strictly executive, to be enjoyed by the executive branch to the exclusion of private citizens, is unsupported in the law. As noted by the Supreme Court, 'statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner.'") (quoting *Davis v. Passman,* 442 U.S. 228, 241 (1979)).[19]

In short, the Clean Air Act's citizen suit provision does not violate Article II or the private nondelegation doctrine, and the plaintiffs' claims will not be dismissed for this reason either.

## V
## Conclusion

For the reasons above, the defendants' motion to dismiss [54] is **DENIED**.

**SO ORDERED**, this 30th day of October, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**

[19] Other district courts have also upheld citizen suit provisions primarily on the grounds that they do not involve the legislative branch impermissibly intruding upon the executive branch's authority. *See United States v. Am. Elec. Power Serv. Corp*., 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001) (Clean Air Act does not unconstitutionally delegate executive power because "[t]he private right of action does not result in one branch of government impermissibly intruding upon the acts of another branch of government"); *Nat. Res. Def. Council, Inc. v. Outboard Marine Corp*., 692 F. Supp. 801, 816 (N.D. Ill. 1988) (no separation-of-powers issue with Clean Water Act citizen suits, noting that "there is no possibility here of private litigants being subject to congressional control;" "when the Supreme Court has been confronted with Section 1365 it has not even hinted at a lurking separation-of-powers problem;" and "[u]nder the Act's structure the Executive Branch and state regulatory authorities retain primary enforcement responsibility"); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp*., 652 F. Supp. 620, 626 (D. Md. 1987) (upholding Clean Water Act citizen suit provision because it "does not aggrandize the Legislative Branch at the expense of the Executive, and because Congress may determine who will enforce the statutory rights and obligations that it creates"). However, as the defendants indicate, Doc. #55 at 17–18, this does not end the analysis because the private nondelegation doctrine prevents private parties, not just other branches of government, from exercising the federal government's executive power.